

LIONEL Z. GLANCY (#134180)
PETER A BINKOW (#173848)
**GLANCY BINKOW & GOLDBERG, LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: mmgoldberg@glancylaw.com

Laurence M. Rosen, Esq.
Phillip Kim, Esq.
**THE ROSEN LAW FIRM, P.A.**
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Attorneys for Plaintiff Allan Query

**E-FILING**

**ADR**

*Filed*

FEB 0 6 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

**C08    00832**
**PVT**

ALLAN QUERY, Individually and on Behalf of All Others Similarly Situated,

    Plaintiff,

vs.

MAXIM INTEGRATED PRODUCTS, INC., JOHN F. GIFFORD and CARL W. JASPAR,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff Allan Query, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1

**ORIGINAL**

conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Maxim Integrated Products, Inc. ("Maxim," or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants and their executive officers and directors who purchased the common stock and stock options of Maxim during the period from April 29, 2003 through January 17, 2008, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Maxim's principal place of business is in the Northern District of California and Defendant Gifford resides in the Northern District of California. Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.    Plaintiff Allan Query, as set forth in the accompanying certification, incorporated by reference herein, purchased Maxim securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.    Defendant Maxim is California Corporation with its principal executive offices located at 120 San Gabriel Drive, Sunnyvale, CA 94086. According to the Company's website, Maxim designs, develops, and manufactures analog, mixed-signal, high-frequency, and digital circuits. During the Class Period the Company's common stock traded on the NASDAQ under ticker "MXIM." The Company's stock now trades over-the-counter on the "Pink Sheets" under ticker "MXIM.PK."

8.    Defendant John F. Gifford ("Gifford") served as the Company's CEO, President, and Chairman of the Board from April of 1983 through December of 2006.

9.    Defendant Carl W. Jaspar ("Jaspar" or "Maxim's CFO") served as the Chief Financial Officer of Maxim from 1999 through January 31, 2007.

10.    Gifford and Jaspar are referred to herein as the Individual Defendants.

11.    During the Class Period, defendant Gifford, as CEO, President, and Chairman of the Board of Maxim, and Jaspar as CFO was privy to non-public information concerning the Company's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to him in connection therewith. Because of their possession of such information, the defendants Gifford and Jaspar knew or recklessly disregarded the fact

1   that adverse facts specified herein had not been disclosed to, and were being concealed
2   from, the investing public.

3       12.    Defendants Gifford and Jaspar because of their positions of control and
4   authority as CEO, President, and Chairman of the Board of the Company, were able to
5   and did control the content of the various SEC filings, press releases and other public
6   statements pertaining to the Company during the Class Period. Defendants Gifford and
7   Jaspar were provided with copies of the documents alleged herein to be misleading prior
8   to or shortly after their issuance and/or had the ability and/or opportunity to prevent their
9   issuance or cause them to be corrected. Accordingly, defendants Gifford and Jaspar are
10  responsible for the accuracy of the public reports and press releases detailed herein and
11  are therefore primarily liable for the representations contained therein.

12                    **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

13      13.    Plaintiff brings this action as a class action pursuant to Federal Rules of
14  Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who
15  purchased shares of Maxim common stock and options to purchase common stock
16  during the Class Period and who were damaged thereby. Excluded from the Class are
17  defendants, the officers and directors of the Company, at all relevant times, members of
18  their immediate families and their legal representatives, heirs, successors or assigns and
19  any entity in which defendants have or had a controlling interest.

20      14.    The members of the Class are so numerous that joinder of all members is
21  impracticable. Throughout the Class Period, Maxim's securities were actively traded on
22  the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this
23  time and can only be ascertained through appropriate discovery, Plaintiff believes that
24  there are at least hundreds of members in the proposed Class. Members of the Class may
25  be identified from records maintained by Maxim or its transfer agent and may be notified
26  of the pendency of this action by mail, using a form of notice customarily used in
27  securities class actions.

28  CLASS ACTION COMPLAINT FOR VIOLATIONS
    OF THE FEDERAL SECURITIES LAWS                                              4

15. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

16. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

17. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, financial performance, and management of Maxim; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

18. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Stock Option Plan

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                     5

19.    On April 29, 2003, the first day of the Class Period,    Maxim issued a

press release announcing the Company's fiscal year third quarter 2003 financial results.

The press release stated, in relevant part, as follows:

### MAXIM REPORTS REVENUES AND EARNINGS FOR THE THIRD QUARTER OF FISCAL 2003 AND DOUBLES QUARTERLY DIVIDEND

SUNNYVALE, CA–April 29, 2003–Maxim Integrated Products, Inc., (MXIM) reported net revenues of $286.2 million for its fiscal third quarter ending March 29, 2003, a 10.7% increase over the $258.5 million reported for the third quarter of fiscal 2002 and unchanged from reported revenues for the second quarter of fiscal 2003. Net income for the quarter was $77.6 million, a 16.3% increase over the $66.7 million reported last year and a 0.7% increase over the $77.1 million reported for the previous quarter. Diluted earnings per share (which measure the cost of employee stock options and include the Company's average outstanding common stock for the quarter, or 322.9 million shares, increased by 19.0 million shares using the Treasury Stock Method) were $0.23 for the third quarter, a 21.1% increase over the $0.19 reported for the same period a year ago and unchanged from reported second quarter fiscal 2003 results.

* * *

Mr. Gifford continued: "Based on the Company's profitability, strong cash position, and business outlook, the Company's Board of Directors has increased this quarter's dividend from $0.02 per share to $0.04 per share. Payment will be made on May 30, 2003 to stockholders of record on May 12, 2003."

Mr. Gifford concluded: "Maxim is opposed to expensing employee stock options, as we believe that this concept is bad accounting. We believe that the Treasury Stock Method both rigorously and accurately defines the cost and resulting dilutive effect of stock options on reported earnings. We fear that requiring U.S. corporations to expense stock options could seriously damage our
country's leadership position in technology innovation and our ability to effectively compete with other countries. Our nation's technology leadership over
the past 15 years has caused some to forget the economic effect during the 1970s of our country's losing our technology leadership to Japan. Entrepreneurial individuals and companies, given incentive by stock options, reversed this situation. This impact on the U.S. economy and its people in the 1970s has been too easily forgotten. The potential damaging long-term effect on our nation's economy and lifestyle resulting from the forced expensing of stock options should

be taken very seriously."

20.    The April 29, 2003 press release and defendants' public statements during the Class Period, as described herein, were materially false and misleading because defendants knew or recklessly disregarded that their statements during the Class Period were materially false and misleading or failed to disclose material adverse information regarding Maxim's stock option granting practices.

21.    During the Class Period, Maxim regularly used employee stock options as a form of compensation to attract, retain, and incentivize key employees. Maxim also used stock options to compensate members of its Board of Directors. Each option gave the grantee the right to buy Maxim common stock from the Company at a set price, called the "exercise" or "strike" price, on a future date after the option vested. An option was "in-the-money" when granted if on the date of the grant the trading price of Maxim common stock exceeded the option's exercise price. An option was "at-the-money" when granted if on the date of the grant the trading price of Maxim's common stock was the same as the exercise price

22.    Stock options were the most important part of Maxim's compensation package. Maxim generally paid its officers and technical employees lower salaries than its peers; it competed against other companies for employees by offering the potential gains provided by stock options. Maxim's ability to recruit and retain the engineers who designed and manufactured its new products was closely tied to its stock option program. In addition, Maxim attributed its earnings growth and positive stockholder returns in part to its option practices. The Company repeatedly emphasized these facts in communication with its shareholders.

23.    Maxim granted options to almost all new employees when they were hired. Maxim also granted employees additional options every year as part of their annual performance review. Because it granted so many options, Maxim had to ask shareholders

1  to approve increases in the number of shares available for issuance under its primary
2  stock option plan every year from 1999 through 2005.

3      24.    Maxim's primary stock option plan authorized it to grant both "incentive"
4  stock options and "non-qualified" stock options. Maxim's plan defined an incentive stock
5  option as an option intended to qualify as an incentive stock option within the meaning of
6  certain provisions of the Internal Revenue Code. Maxim's plan defined a "non-qualified"
7  option as any option not intended to qualify as an incentive stock option.

8  **Company Policy Prohibited Issuance of "In-the-Money" Options**

9      25.    From at least 2000 and continuing through June 30, 2004, Maxim's
10  primary stock option plan prohibited it from granting incentive stock options with an
11  exercise price less than the stock's fair market value on the date of grant. In other words,
12  the plan did not allow incentive stock options to be granted "in-the-money."

13      26.    During the same period, Maxim's primary stock option plan allowed some
14  flexibility in granting non-qualified stock options with an exercise price less than the
15  stock's fair market value on the date of grant, but only subject to certain conditions not
16  applicable here.

17      27.    Under Accounting Principles Board Opinion No. 25, "Accounting for
18  Stock Issued to Employees" ("APB 25") and the accounting rules in effect from 1997
19  through 2005, issuers were required to record an expense on their financial statements for
20  the "in-the-money" portion of any option grant. According to APB 25, that difference
21  must be recorded as a compensation expense to be recognized over the vesting period of
22  the option. Consequently, granting "in-the-money" options to employees could have a
23  significant impact on the expenses and income (or loss) reported to the shareholders of a
24  public company. APB 25 allowed companies, where the keys terms of an option grant
25  were known, to grant employee stock options without recording any compensation
26  expense so long as the option exercise price was not below the stock's market price on
27  the date of the grant.

28  CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                8

1    28.    Maxim publicly reported in its annual reports on Form 10-K for fiscal
2    years 2000 through 2005 that the Company accounted for its employee stock options in
3    accordance with APB 25. Additionally, during the Class Period, Maxim represented that
4    the Company generally granted options "at-the-money," not "in-the-money." Hence, in
5    its annual reports for fiscal years 2000 through 2005, Maxim did not report any
6    compensation expenses for stock options.

7    **The Company's Illicit Backdating of Option Grants**

8    29.    Maxim's primary stock option plan provided that it was to be administered
9    by the Board of Directors or a committee designated by the Board. The Board had the
10   ability to select employees, directors, and consultants to whom options would be granted,
11   to determine the number of shares to be covered by each option, and to determine the
12   terms and conditions of any option granted under the plan.

13   30.    Maxim's Board delegated to Gifford the authority to grant stock options to
14   non-officer employees as well as to outside directors. From at least 1999 and continuing
15   through at least Maxim's 2004 fiscal year, Gifford approved all option grants made to
16   non-officer employees and outside directors.

17   31.    Maxim repeatedly backdated option grants made to current employees, to
18   newly hired employees, and to outside directors. These backdated grants reflected
19   historically low prices of Maxim stock for the weeks prior to the date on which the price
20   actually was selected. For ten consecutive quarters, from the second quarter of fiscal year
21   2002 to the fourth quarter of fiscal year 2004, Maxim granted options to current
22   employees with an exercise price equal to the lowest price of the quarter. By backdating
23   the options grants to make it falsely appear that "in-the-money" option grants had been
24   "at-the-money" when granted, Maxim avoided reporting in its financial statements
25   compensation for the options.

26

27

28   CLASS ACTION COMPLAINT FOR VIOLATIONS
     OF THE FEDERAL SECURITIES LAWS                                                    9

## The Company's Option Grants to Employees

32.    During the Class Period, Maxim granted options to current employees on a quarterly basis. Each quarter, Maxim's managers proposed to Gifford the number of options to be granted to employees whose annual performance reviews fell within that quarter. Gifford either approved, or first revised than approved, the number of proposed options for each employee. Maxim's stock administration department accumulated the employee options approved by Gifford until it learned the grant date for those options.

33.    Gifford approved the grant date and price for some options awarded to current employees. The grant date then was communicated to Maxim's stock administration department so that the grants could be recorded for the undisclosed "in-the-money" option grants to current employees.

34.    A number of grant dates used for options awarded to Maxim's current employees were selected with hindsight. This allowed Maxim to select the lowest possible price for the options. No compensation expenses were recorded for the undisclosed "in-the-money" option grants to current employees.

35.    During the Class Period, Maxim also granted options to new hires on a quarterly basis. Similar to the current employee grants, Gifford approved the number of options to be granted to new hires. Maxim's stock administration department accumulated the options approved by Gifford until it learned the applicable grant date.

36.    As with stock options awarded to current employees, grant dates used for options awarded to new hires were selected with hindsight. After the date on which the employee was hired, Maxim determined the grant dates by determining a date with a low stock price for the quarter. No compensation expenses were recorded for the undisclosed "in-the-money" grants to new hires.

37.    In connection with certain grants to current employees and new hires, Gifford signed backdated memoranda (drafted by Maxim's Chief Financial Officer and, at times, other Maxim employees) indicating that he had selected the grant date on the

dates indicated in the memoranda. One of the purposes of the grant approval memoranda was to serve as an audit trail and make it appear as though the options had been granted at the market price on the earlier date. Gifford signed these memoranda and similar documents without making any effort to confirm that they accurately reflected the actual date on which the selection of the grant data had in fact been made. These memoranda did not accurately reflect the dates on which decisions were made to grant options.

38.    With respect to at least four backdated option grants, Gifford – in writing – instructed Maxim's CFO to record compensation expenses. But no compensation expenses were recorded.

**Egregious Instances of Company Backdating of Employee Options**

39.    Maxim purportedly granted approximately 2.7 million options to employees on June 30, 2003, with an exercise price equal to that day's closing stock price of $34.10. This was Maxim's lowest stock price of the quarter. In reality, the grant was not made until on or around August 26, 2003, when the stock was trading at $43.26. According to a civil complaint filed by the SEC against Maxim for violations of the Federal securities laws, on or around August 22, 2003, Gifford asked Maxim's CFO: "What is the lowest price we can use for Q1 options?" The CFO responded: "The best price is the first day of the quarter – June 30, 2003. The price was $34.10 on that date." Gifford approved the grant using the June 30th price, but also instructed the CFO to record a compensation expense if it was material. Although the options were "in-the-money" when granted, Maxim failed to record compensation expenses for the options.

40.    In another example, Maxim purportedly granted 2.4 million options to certain employees on October 2, 2001, with an exercise price equal to that day's closing stock price of $33.40. This was Maxim's lowest stock price of the quarter. In reality, the grant was not made until on or around December 28, 2001, when the stock was trading at $54.61. On or around December 28, Maxim's CFO proposed to Gifford that Maxim use October 2 as the grant date for options awarded to certain current employees, and

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                    11

1  November 28 and December 24 for options awarded to certain new hires (depending on
2  their hire date). Maxim used the dates suggested by its CFO to grant options. Although
3  the options were "in-the-money" when granted, Maxim failed to record compensation
4  expenses for the options.

5      41.    Additionally, Maxim purportedly granted 3.2 million options to existing
6  employees on September 30, 2003, with an exercise price equal to that day's closing
7  stock price of $39.39. This was Maxim's lowest stock price of the quarter. Maxim's stock
8  administration department did not learn about the grant date until on or about November
9  25, 2003, when Maxim's stock was trading at $51.74. As alleged in the aforementioned
10 complaint filed by the SEC against Gifford and Maxim, Gifford later signed a
11 memorandum (drafted by another Maxim employee) dated September 2003, that stated:
12 "I have granted options today for all existing employees for this quarter, and for new
13 hires up through this date – the stock closed at $39.39." Although the options were "in-
14 the-money" when granted, Maxim failed to record compensation expenses for the
15 options.

16     42.    Maxim purportedly granted options on March 25, 2002, to new employees
17 hired after February 28, 2002, with an exercise price equal to the March 25th closing stock
18 price of $51.81. In reality, these grants were not made until sometime in late April 2002,
19 after the quarter had ended. The SEC's complaint against Gifford and Maxim recounts
20 that on or about April 22, Maxim's CFO asked Gifford to sign a grant approval
21 memorandum dated March 25, 2002, to "keep [Maxim's] documentation and records
22 straight." Gifford signed the memorandum, which stated: "I want you to make sure that
23 any new hire who started at Maxim between March 1, 2002 and today has their [sic]
24 stock granted at today's closing price of $51.81." Maxim's stock administration
25 department did not learn of the supposed March 25th grant date until on or about April 24,
26 2002.

27 **The Company's Option Grants to Outside Directors**

28 CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                  12

43.    Maxim also backdated certain stock option grants to its outside directors. For example, Maxim purportedly granted the directors 36,000 options on October 1, 2001, at an exercise price equal to that day's closing stock price of $34.06. This grant was not actually made until on or around December 11, 2001, when Maxim's stock was trading at $57.90. In or around December 2001, Maxim's CFO proposed to Gifford a range of historical dates for the outside director grants. On or around December 11, Gifford approved using a grant date of October 1, 2001, but also in writing instructed the CFO to record an expense if it was material. Gifford later signed meeting minutes stating that he held a meeting on October 1, 2001, and granted options at the fair market value on that date. Although the options were "in-the-money" when granted, Maxim failed to record compensation expenses for the options.

**Defendants' Knowledge of the Consequences of Options Backdating**

44.    Gifford understood that there were accounting implications for awarding "in-the-money" options. Indeed, as noted in the SEC complaint filed against Gifford and Maxim, Gifford told Maxim employees that Maxim's stock option program helped Maxim's bottom line because "an option granted at fair market value does not result in expense for profit & loss purposes, so profit is increased."

45.    Maxim's CFO also understood that the accounting implication of awarding "in-the-money" options. For example, he warned Gifford in writing that Maxim should record a compensation expense where it contemplated giving one employee a retroactively-priced option but nonetheless noted, as alleged in the SEC complaint, that "for one person, we will just get it done."

46.    Gifford instructed Maxim's CFO on several occasions to record a compensation expense for option grants, demonstrating familiarity with stock option accounting principles. As noted in the SEC complaint, in one handwritten note to the CFO, Gifford stated: "I would like to use [a price from eight weeks ago] for our employees but we will have to expense the difference if it is material."

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1

2

3

**Concealment of the Options Backdating Leads the Company**
**to Report Materially False and Misleading Financial Information**

4      47.     Maxim is a public company. Accordingly, it filed with the SEC annual

5 reports on Form 10-K for the fiscal years ended June 24, 2000 (filed September 22,

6 2000), June 30, 2001 (filed September 24, 2001), June 29, 2002 (filed September 25,

7 2002), June 28, 2003 (filed September 22, 2003), June 26, 2003 (filed September 9,

8 2004), and June 25, 2005 (filed September 8, 2005), which included audited financial

9 statements that were certified by the Company's outside auditors.

10     48.     Both Gifford and Maxim's CFO reviewed Maxim's annual reports filed on

11 Forms 10-K before they were filed with the SEC for its 2000 through 2005 fiscal years.

12 In connection with Maxim's 2003, 2004, and 2005 annual reports, Gifford and Maxim's

13 CFO signed certifications stating that they had reviewed the annual reports and that the

14 annual reports did not contain any untrue statements of a material fact or omit to state a

15 material fact necessary to make the statements made, in light of the circumstances under

16 which such statements were made, not misleading.

17     49.     In the notes to its audited financial statements, which were included in its

18 annual reports for fiscal years 2000 through 2005, Maxim affirmatively stated that the

19 Company accounted for its employee stock option plans in accordance with APB 25.

20 Additionally, in its annual reports for fiscal years 2000 through 2003, Maxim stated that

21 under the Company's stock option plans, options generally were granted at prices not less

22 than the fair market value of the Company's common stock on the grant date. In its

23 annual report for fiscal year 2004, Maxim stated affirmatively that it was not required to

24 record compensation expenses in connection with stock option grants to employees.

25 Maxim knew or recklessly disregarded that these statements were false and misleading,

26 because Maxim was aware it granted "in-the-money" options but concealed them through

27 the use of backdating.

28

50.     In its financial statements accompanying its annual reports, Maxim failed to record compensation expenses in connection with the backdated, "in-the-money" option grants. It was aware it granted "in-the-money" options and was aware it was required to record compensation expenses for these options, yet it failed to do so. Maxim materially understated its expenses and overstated its net income in the financial statements included in its annual reports by more than 10% for its fiscal years 2003 through 2005.

51.     Maxim also filed with the SEC quarterly reports on Form 10-Q for the quarters ended September 28, 2002 (filed November 8, 2002), December 28, 2002 (filed February 11, 2003), March 29, 2003 (filed May 12, 2003), September 27, 2003 (filed November 6, 2003), December 27, 2003 (filed February 5, 2004), March 27, 2004 (filed May 6, 2004), September 25, 2004 (filed November 4, 2004), December 25, 2004 (filed February 3, 2004), and March 26, 2005 (filed May 5, 2005), which contained Maxim's quarterly financial statements. These financial statements were materially false or misleading because Maxim failed to record in its quarterly financial statements compensation expenses associated with "in-the-money" options.

52.     Both Gifford and Maxim's CFO reviewed the above Forms 10-Q before they were filed with the SEC. Additionally, for the quarters ended September 28, 2002, December 28, 2002, and March 29, 2003, they certified that the quarterly reports fairly presented Maxim's financial condition and results of operation. For the quarter ended September 27, 2003 through the quarter ended March 26, 2005, they certified that they had reviewed the quarterly reports and that they were not aware of any material misstatements of fact or omission in those reports.

53.     In addition, Maxim filed with the SEC current reports on Form 8-K on April 29, 2003, August 12, 2003, October 28, 2003, February 5, 2004, April 27, 2004, November 1, 2004, February 1, 2005, and May 3, 2005, each of which announced the Company's financial results for the prior quarter. These current reports contained

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                     15

1   materially false and misleading financial information because Maxim failed to record
2   compensation expenses associated with undisclosed grants of "on-the-money" stock
3   options.

4        54.    Maxim's proxy statements (which were sent to its shareholders) also made
5   materially false representations about Maxim's stock option grants. Gifford reviewed and
6   edited Maxim's proxy statements before they were filed with the SEC. In Maxim's proxy
7   statement filed August 19, 2004, Gifford signed an introductory letter discussing
8   Maxim's request that its shareholders approve an additional 13 million shares for its stock
9   option plan. As noted in the SEC complaint, in urging shareholders to approve the
10  additional shares, the letter stated that Maxim's stock option plan was "managed for the
11  best interests of the stockholders," in part because "all of Maxim's options are granted at
12  fair market value." These statements were repeated elsewhere in the proxy statement.

13       55.    In Maxim's proxy statement filed October 7, 2005, Gifford signed an
14  introductory letter discussing Maxim's request that its shareholders authorize an
15  additional 10.8 million shares for its option plan. In urging shareholders to approve the
16  additional shares, the letter similarly stated that Maxim's stock option plan was "managed
17  for the best interests of the stockholders" in part because "Maxim's stock options have
18  always been granted with an exercise price equal to the fair market value of Maxim's
19  stock." These statements were repeated elsewhere in the proxy statement.

20       56.    Maxim also sold securities pursuant to offering documents, including
21  registration statements on Forms S-8, which incorporated Maxim's false and misleading
22  financial statements. Those Forms S-8 were filed with the SEC on April 12, 2001
23  (incorporating Maxim's annual report on Form 10-K for the year ended June 24, 2000,
24  Maxim's quarterly reports on Forms 10-Q for the quarters ended September 23, 2000 and
25  December 30, 2000, and Maxim's current reports on Forms 8-K filed on January 30,
26  2001 and April 11, 2001); February 13, 2003 (incorporating Maxim's annual report on
27  Form 10-K for the year ended June 29, 2002, and Maxim's quarterly reports on Forms

28  CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS          16

10-Q for the quarters ended September 28, 2002, and December 28, 2002); and April 24, 2005 (incorporating Maxim's annual report on Form 10-K for the year ended June 26, 2004, Maxim's quarterly reports on Forms 10-Q for the quarterly periods ended September 25, 2004 and December 25, 2004, Maxim's current report on Form 8-K filed December 20, 2004, and Maxim's proxy statements filed August 19, 2004 and October 18, 2004). Both Gifford and Maxim's CFO signed these S-8s.

57.     Gifford was aware that Maxim used hindsight to select grant dates for some options. He also was aware there were accounting implications for granting "in-the-money" options. In connection with at least four backdated option grants, he instructed Maxim executives to record compensation expenses for "in-the-money" options. Based on these actions, Gifford should have known that Maxim did not properly account for its resulting stock option compensation expenses in its financial statements, which were included in its Forms 10-K, Forms 10-Q, Forms 8-K, and Forms S-8 during the Class Period. Gifford also should have known that Maxim did not accurately describe its stock option grants in its proxy statements and annual reports on Forms 10-K.

58.     Maxim was aware that it used hindsight to select grant dates for options. Maxim also was aware of the accounting implications of granting in-the-money options. Maxim knew, or was reckless in not knowing, that its annual reports on Forms 10-K, quarterly reports on Form 10-Q, Forms 8-K, Forms S-8, and proxy statements during the Class Period contained false and misleading statements and omissions regarding Maxim's stock option grants.

59.     Maxim provided documentation, which failed to disclose the true grant dates for options to employees and outside directors, to the Company's external auditors in connection with audits of Maxim's financial statements.

60.     During the Class Period, Gifford received annual bonuses tied in part to the Company's achievements and reported profitability.

61.     On January 17, 2008, the last day of the Class Period, Maxim announced that it had failed to properly account for almost $650 million of stock option compensation expenses and would likely restate earnings approximately $360 million to $425 million lower as a result of the discovery of the stock options back-dating.

62.     This announcement caused Maxim's stock price to drop during the next three trading days by more than $5.00 per share, or approximately 23%, from $23.63 per share on January 16, 2008 -- the day before the announcement -- to close on January 22, 2008, at $18.07 per share on unusually heavy trading volume.

## DEFENDANTS CAUSED PLAINTIFF'S LOSSES

63.     During the Class Period, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Maxim's share price and operated as a fraud or deceit on purchasers of Maxim shares by misrepresenting the Company's financial condition and business prospects. Once defendants' misrepresentations and fraudulent conduct were disclosed to the market, Maxim's share price reacted negatively as the artificial inflation was removed from its share price. As a result of their purchases of Maxim's shares during the Class Period, Plaintiff and other members of the Class suffered economic loss.

64.     During the Class Period, defendants' false and misleading statements had the intended effect and caused Maxim shares to trade at artificially inflated levels throughout the Class Period.

65.     As investors and the market became aware of Maxim's prior misstatements and omissions and that Maxim's actual financial condition and business prospects were, in fact, not as represented, Maxim's share price reacted negatively, damaging investors.

66.     Had Plaintiffs known the truth behind the Company's disclosures, they would not have purchased the Company's shares or would have purchased the shares at a much lower market price.

1
2
3
4

**Applicability of Presumption of Reliance:**
**Fraud-on-the-Market Doctrine**

5      67.      At all relevant times, the market for Maxim's  common stock was an

6    efficient market for the following reasons, among others.

7          (a)    Maxim's stock met the requirements for listing, and was listed

8                 and actively traded on the NASDAQ, a highly efficient and

9                 automated market;

10         (b)    During the Class Period, on average, millions of shares of Maxim stock

11                were traded on a weekly basis, demonstrating a very active and broad

12                market for Maxim stock and permitting a *very strong* presumption of an

13                efficient market;

14         (c)    As a regulated issuer, Maxim filed periodic public reports with the

15                SEC and the NASDAQ;

16         (d)    Maxim regularly communicated with public investors via

17                established market communication mechanisms, including

18                through regular disseminations of press releases on the national

19                circuits of major newswire services and through other wide-

20                ranging public disclosures, such as communications with the

21                financial press and other similar reporting services; and

22         (e)    Maxim was followed by several securities analysts employed

23                by major brokerage firms who wrote reports that were

24                distributed to the sales force and certain customers of their

25                respective brokerage firms during the Class Period. Each of

26                these reports was publicly available and entered the public

27                marketplace.

28

1          (f)    Numerous NASD member firms were active market-makers in

2                Maxim stock at all times during the Class Period;

3          (g)    Material news about Maxim was rapidly reflected and incorporated

4                into the Company's stock price during the Class Period.

5      68.    As a result of the foregoing, the market for Maxim's shares promptly

6 digested current information regarding Maxim from all publicly available sources and

7 reflected such information in Maxim's stock price. Under these circumstances, all

8 purchasers of Maxim's shares during the Class Period suffered similar injury through

9 their purchase of Maxim's shares at artificially inflated prices and a presumption of

10 reliance applies.

11 **NO SAFE HARBOR**

12      69.    The statutory safe harbor provided for forward-looking statements under

13 certain circumstances does not apply to any of the allegedly false statements pleaded in

14 this complaint. Many of the specific statements pleaded herein were not identified as

15 "forward-looking statements" when made. To the extent there were any forward-looking

16 statements, there were no meaningful cautionary statements identifying important factors

17 that could cause actual results to differ materially from those in the purportedly forward-

18 looking statements. Alternatively, to the extent that the statutory safe harbor does apply

19 to any forward-looking statements pleaded herein, defendants are liable for those false

20 forward-looking statements because at the time each of those forward-looking statements

21 was made, the particular speaker knew that the particular forward-looking statement was

22 false, and/or the forward-looking statement was authorized and/or approved by an

23 executive officer of Maxim who knew that those statements were false when made.

24 **FIRST CLAIM**

25

26 **Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

27

28

70.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

71.    During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Maxim securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

72.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Maxim's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

73.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Maxim as specified herein.

74.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Maxim's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Maxim and its business operations and future prospects, in the light of the circumstances

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1  under which they were made, not misleading, as set forth more particularly herein, and

2  engaged in transactions, practices and a course of business which operated as a fraud and

3  deceit upon the purchasers of Maxim's shares during the Class Period.

4       75.    The Defendants had actual knowledge of the misrepresentations and

5  omissions of material facts set forth herein, or acted with reckless disregard for the truth

6  in that they failed to ascertain and to disclose such facts, even though such facts were

7  available to them.  Such Defendants' material misrepresentations and/or omissions were

8  done knowingly or recklessly and for the purpose and effect of concealing Maxim's

9  operating condition and future business prospects from the investing public and

10  supporting the artificially inflated price of its shares.  As demonstrated by defendants'

11  overstatements and misstatements of the Company's financial condition throughout the

12  Class Period, Defendants, if they did not have actual knowledge of the misrepresentations

13  and omissions alleged, were reckless in failing to obtain such knowledge by deliberately

14  refraining from taking those steps necessary to discover whether those statements were

15  false or misleading.

16       76.    As a result of the dissemination of the materially false and misleading

17  information and failure to disclose material facts, as set forth above, the market price of

18  Maxim's shares was artificially inflated during the Class Period.  In ignorance of the fact

19  that market prices of Maxim's shares were artificially inflated, and relying directly or

20  indirectly on the false and misleading statements made by defendants, or upon the

21  integrity of the market in which the shares trade, and/or on the absence of material

22  adverse information that was known to or recklessly disregarded by defendants but not

23  disclosed in public statements by defendants during the Class Period, plaintiff and the

24  other members of the Class acquired Maxim shares during the Class Period at artificially

25  high prices and were damaged thereby.

26       77.    At the time of said misrepresentations and omissions, Plaintiff and other

27  members of the Class were ignorant of their falsity, and believed them to be true.  Had

28  CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1   Plaintiff and the other members of the Class and the marketplace known the truth

2   regarding Maxim's financial results, which were not disclosed by Defendants, Plaintiff

3   and other members of the Class would not have purchased or otherwise acquired their

4   Maxim shares, or, if they had acquired such shares during the Class Period, they would

5   not have done so at the artificially inflated prices that they paid.

6       78.     By virtue of the foregoing, Defendants have violated Section 10(b) of the

7   Exchange Act, and Rule 10b-5 promulgated thereunder.

8       79.     As a direct and proximate result of Defendants' wrongful conduct,

9   Plaintiff and the other members of the Class suffered damages in connection with their

10  respective purchases and sales of the Company's shares during the Class Period.

11      80.     This action was filed within two years of discovery of the fraud and within

12  five years of plaintiff's purchases of securities giving rise to the cause of action.

13                          **SECOND CLAIM**

14                  **Violation of Section 20(a) of**
15          **The Exchange Act Against the Individual Defendants**

16      81.     Plaintiff repeats and re-alleges each and every allegation contained above

17  as if fully set forth herein.

18      82.     Defendants Gifford and Jaspar acted as controlling persons of Maxim

19  within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of

20  their high-level positions, and ownership and contractual rights, participation in and/or

21  awareness of the Company's operations and/or intimate knowledge of the false financial

22  statements filed by the Company with the SEC and disseminated to the investing public,

23  the Defendants Gifford and Jaspar had the power to influence and control and did

24  influence and control, directly or indirectly, the decision-making of the Company,

25  including the content and dissemination of the various statements which plaintiff

26  contends are false and misleading. Defendants Gifford and Jaspar were provided with or

27  had unlimited access to copies of the Company's reports, press releases, public filings

28

1  and other statements alleged by plaintiff to be misleading prior to and/or shortly after

2  these statements were issued and had the ability to prevent the issuance of the statements

3  or to cause the statements to be corrected.

4      83.    In particular, each of these defendants had direct and supervisory

5  involvement in the day-to-day operations of the Company and, therefore, is presumed to

6  have had the power to control or influence the particular transactions giving rise to the

7  securities violations as alleged herein, and exercised the same.

8      84.    As set forth above, Maxim and Defendants Gifford and Jaspar each

9  violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

10  Complaint.

11     85.    By virtue of their positions as controlling persons, Defendant Gifford and

12  Jaspar are liable pursuant to Section 20(a) of the Exchange Act. As a direct and

13  proximate result of defendants' wrongful conduct, plaintiff and other members of the

14  Class suffered damages in connection with their purchases of the Company's shares

15  during the Class Period.

16     86.    This action was filed within two years of discovery of the fraud and within

17  five years of each plaintiff's purchases of securities giving rise to the cause of action.

18     **WHEREFORE**, plaintiff prays for relief and judgment, as follows:

19         (a)    Determining that this action is a proper class action, designating

20  plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23

21  of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

22         (b)    Awarding compensatory damages in favor of plaintiff and the other

23  Class members against all defendants, jointly and severally, for all damages sustained as

24  a result of defendants' wrongdoing, in an amount to be proven at trial, including interest

25  thereon;

26         (c)    Awarding plaintiff and the Class their reasonable costs and expenses

27  incurred in this action, including counsel fees and expert fees; and

28  CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS                                                    24

1

## JURY TRIAL DEMANDED

2

Plaintiff hereby demands a trial by jury.

3

4

5  Dated: February 5, 2008

Respectfully submitted,

6

**GLANCY BINKOW & GOLDBERG LLP**

7

8

By:

9

Lionel Z. Glancy
Peter A. Binkow

10

1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067

11

Telephone:   (310) 201-9150

12

Telephone:   (310) 201-9160

13

**THE ROSEN LAW FIRM, P.A.**

14

Laurence Rosen, Esq.
Phillip Kim, Esq.

15

350 Fifth Avenue, Suite 5508
New York, NY  10118

16

Telephone: (212) 686-1060

17

Telephone: (212) 202-3827

18

Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

25

CERTIFICATION
Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Maxim Integrated Products, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Maxim Integrated Products, Inc. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

First name: Allan
Last name: Query

The Plaintiff Certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

SHARES PURCHASED:

Purchase Date(s): 09/07/2005
Number of shares: 200
Price per Share: 42.73

Purchase Date(s): 04/27/2006
Number of shares: 200
Price per Share: 34.45

Purchase Date(s): 08/02/2006
Number of shares: 200
Price per Share: 29.22

Purchase Date(s): 11/09/2007
Number of shares: 300
Price per Share: 23.98

SHARES SOLD:

Sale Date(s): 12/04/2006
Number of shares: 200
Price per Share: 32.50

Sale Date(s): 02/23/2007
Number of shares: 200
Price per Share: 33.65

7. During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except if detailed below:

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:

By clicking on the button below, I intend to sign and execute this agreement: yes

Clicked to Submit Certification in the Maxim Integrated Products, Inc. Action

Signed pursuant to California Civil Code Section 1633.1, et seq. - Uniform Electronic Transactions Act
------------