BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
BLAIR A. NICHOLAS   (Bar No. 178428)
TIMOTHY A. DeLANGE   (Bar No. 190768)
NIKI L. MENDOZA   (Bar No. 214646)
MATTHEW P. JUBENVILLE (Bar No. 228464)
TAKEO A. KELLAR   (Bar No. 234470)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323
blairn@blbglaw.com
nikim@blbglaw.com
matthewj@blbglaw.com
takeok@blbglaw.com

CHITWOOD HARLEY HARNES LLP
MARTIN D. CHITWOOD
(Admitted *Pro Hac Vice*)
JAMES M. WILSON, JR.
(Admitted *Pro Hac Vice*)
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel:   (404) 873-3900
Fax:   (404) 876-4476
mchitwood@chitwoodlaw.com
jwilson@chitwoodlaw.com
        -and-
GREGORY E. KELLER
(Admitted *Pro Hac Vice*)
11 Grace Avenue, Suite 306
Great Neck, NY 11021
Tel:   (516) 773-6090
Fax:   (404) 876-4476
gkeller@chitwoodlaw.com

*Attorneys for Lead Plaintiffs the Cobb County Government Employees' Pension Plan, the DeKalb County Pension Plan and the Mississippi Public Employees Retirement System*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| In re MAXIM INTEGRATED PRODUCTS, INC. SECURITIES LITIGATION | CASE NO. C-08-00832-JW <br><br> <u>CLASS ACTION</u> <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

Page

I.     NATURE AND SUMMARY OF THE ACTION ........................................................ 1

II.    JURISDICTION AND VENUE .............................................................................. 4

III.   THE PARTIES ........................................................................................................ 5

       A.    Lead Plaintiffs ........................................................................................... 5

       B.    Defendants ................................................................................................. 6

IV.    THE FRAUDULENT SCHEME ............................................................................ 9

       A.    Stock Option Granting, Dating, Pricing And Accounting
             For Stock-Based Compensation ................................................................ 9

       B.    Importance Of Stock Options To Maxim ................................................ 10

             1.    Options Were Integral To Attracting And Retaining Talent .......... 10

             2.    Maxim's Stock Option Plans ........................................................ 12

       C.    Defendants Knew And Understood The Implications Of Backdating......... 14

       D.    Defendants Unlawfully Backdated Stock Option Grants ........................... 19

             1.    Defendants Knowingly Backdated Option Grants To Employees ......... 20

             2.    Defendants Knowingly Backdated Grants To New Hires .............. 25

             3.    Defendants Knowingly Backdated Option Grants To Directors ...... 29

       E.    Maxim's Restatement Details Defendants' Intentional Conduct................. 33

             1.    The Special Committee's Findings................................................ 33

             2.    Massive Financial Impact ............................................................ 34

             3.    The Restatement's Backdating Summary ...................................... 36

             4.    Maxim's Deficient Controls And Procedures ............................... 39

V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ......................... 43

       A.    False And Misleading Financial Statements............................................ 44

             1.    Fiscal Year 2003 (3Q And 4Q)..................................................... 44

             2.    Fiscal Year 2004 ......................................................................... 48

             3.    Fiscal Year 2005 ......................................................................... 55

             4.    Fiscal Year 2006 ......................................................................... 63

            5.      Fiscal Year 2007 .................................................... 71

            6.      Fiscal Year 2008 .................................................... 79

      B.    False And Misleading Proxy Statements ................................. 80

VI.   ADDITIONAL SCIENTER ALLEGATIONS .......................................... 83

      A.    GAAP Violations .................................................................. 83

      B.    Insider Sales ........................................................................... 87

      C.    Violation Of SEC Rules ....................................................... 88

      D.    Violation Of The Internal Revenue Code ............................ 89

VII.  THE TRUTH EMERGES ........................................................................ 92

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
      DOCTRINE ............................................................................................ 102

IX.   NO SAFE HARBOR .............................................................................. 103

X.    CLASS ACTION ALLEGATIONS ........................................................ 104

XI.   CLAIMS FOR RELIEF .......................................................................... 106

      COUNT I  Violations Of Section 10(b) Of The Exchange Act
                And Rule 10b-5 Promulgated Thereunder Against
                Maxim, Gifford and Jasper .................................................. 106

      COUNT II  Violations Of Section 20(a) Of The Exchange Act
                Against Maxim, Gifford, Jasper and Ruehle ......................... 109

      PRAYER FOR RELIEF ........................................................................... 110

      JURY TRIAL DEMANDED ..................................................................... 110

1    Court-appointed Lead Plaintiffs, the Cobb County Government Employees' Pension Plan, the

2    DeKalb County Pension Plan and the Mississippi Public Employees Retirement System ("Lead

3    Plaintiffs"), bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of

4    1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), on

5    behalf of themselves and all other persons or entities who purchased or acquired the common stock of

6    Maxim Integrated Products, Inc. ("Maxim" or the "Company") between April 29, 2003 and January

7    17, 2008 (the "Class Period"), and were damaged thereby.   The named defendants are Maxim, its

8    former Chief Executive Officer ("CEO") John F. Gifford ("Gifford"), its former Chief Financial

9    Officer ("CFO") Carl W. Jasper ("Jasper") and its former Treasurer, Timothy Ruehle ("Ruehle")

10   (collectively "Defendants").

11   **I.       NATURE AND SUMMARY OF THE ACTION**

12        1.      Maxim is a worldwide leader in the design, development and manufacture of mixed-

13   signal, high-frequency, and digital circuits that enable interface between digital processors and the

14   physical world.  Its products are used in a wide variety of microprocessor-based electronics equipment

15   including consumer electronics, personal computers, handheld electronics and video displays.

16        2.      Beginning in 1994 and through the end of the Class Period, Defendants knowingly

17   engaged in one of the most egregious instances of unlawful stock option backdating in United States

18   history.  Maxim failed to properly account for nearly all – *over 91%* – of the stock options granted by

19   the Company, resulting in false and misleading financial statements and inflation of Maxim's stock

20   price throughout the Class Period.  Maxim has now admitted this egregious stock option backdating

21   fraud.   In total, the admitted backdating at Maxim involved options to purchase over 150 million

22   Maxim shares and resulted in the Company restating more than nine years of financial statements and

23   recording $773.5 million in additional stock-based compensation expense.

24        3.      Maxim's issuance of backdated stock options was central to its perceived success.

25   Stock options were Maxim's principal tool to recruit, retain, and motivate employees, including highly

26   sought-after technical personnel and engineers needed to implement its business plan.   Maxim

27   competed against other rival high-technology companies for engineers, but paid salaries far below the

28

---

CONSOLIDATED CLASS ACTION COMPLAINT                                                            -1-
CASE NO. C-08-00832-JW

1  rest of the market.   Therefore, the Company depended upon issuance of stock options to entice
2  prospective employees, and offer current employees competitive compensation.

3      4.      In order to make these incentive stock options as valuable as possible to employees,
4  Defendants intentionally and fraudulently selected the lowest available historic stock price (which was
5  oftentimes far below the current fair market value price), thus ensuring that such options were "in-the-
6  money" at the time of the grant.   This backdating was in clear violation of Maxim's shareholder-
7  approved stock option plans which represented that options were granted at the fair market value on
8  the date of the grant.

9      5.      Further, under Generally Accepted Accounting Principles ("GAAP"), Maxim was
10  required to record compensation expense for any options it granted with an exercise price below the
11  current market price ("in-the-money").   To disguise the cost of backdating options from shareholders
12  and the broader market, Maxim repeatedly failed to properly record a compensation expense for its
13  issuance of these "in-the-money" options.   This failure to record compensation expenses caused the
14  Company to artificially inflate its financial results and materially overstate its reported net income and
15  earnings per share ("EPS") throughout the Class Period.

16      6.      Publicly, Defendants repeatedly emphasized Maxim's recruitment capabilities and
17  reduced compensation expenses in communications to the market.   Until the last day of the Class
18  Period, however, Defendants failed to disclose that they were backdating options and failing to record
19  hundreds of millions of dollars in compensation expenses.   If properly recorded and disclosed, the
20  massive backdating scheme would have greatly reduced Maxim's reported income and earnings – and
21  its stock price.   Privately, Defendants were well aware that Maxim would be unable to both meet Wall
22  Street's and investors' expectations and retain key personnel without fraudulently backdating options
23  and concealing it from the public.

24      7.      On September 30, 2008, Maxim filed its restated financial statements, financial data
25  and related disclosures for the fiscal year 2006 Form 10-K (the "Restatement").   The Restatement
26  specifically admitted that Defendants Gifford, Jasper and Ruehle were at the center of the fraud,
27  stating that these individuals "had ***knowledge of, and participated in, the selection of***" grant dates
28  with the benefit of ***"hindsight or prior to completion of the grant-approval process."***   Further, the

Restatement admitted that Defendants Gifford and Jasper *"were the employees most involved in the selection of grant dates*."  The Restatement further admitted that these individuals "*understood the accounting consequences of granting options at a price other than the fair market value on the date of grant*."[1]

8.     As a result of this massive fraud, the Securities and Exchange Commission ("SEC") commenced civil actions against Maxim, Gifford and Jasper on December 4, 2007 (the "SEC Complaints").  Maxim and Defendant Gifford settled the SEC action against them, agreeing to a permanent injunction against violations of the antifraud and certain other provisions of the federal securities laws.  Defendant Gifford's Final Judgment included a civil penalty amounting to $150,000 and disgorgement and interest in the amount of $652,681.  The SEC continues to prosecute the civil action against Defendant Jasper.

9.     In addition to the SEC civil action, Maxim received a subpoena from the United States Attorney for the Northern District of California related to the options backdating scheme.  Maxim was also investigated and subsequently delisted by NASDAQ due to its inability to timely file financial statements as a result of the massive stock option backdating.

10.     As Maxim admitted in the Restatement, but for the fraudulent conduct, the Company's true earnings were far below the market's expectation during the Class Period.  As the chart below illustrates, instead of consistently meeting or exceeding analysts' expectations throughout the Class Period, the Company would have missed its earnings targets each and every year since 1997:

---

[1] Unless otherwise noted, all emphasis is added.



**Maxim Earnings per Share, 1997-2006\***

* Full fiscal years except 2006, which is 9 months

11.     In fact, Defendants' materially false and misleading statements throughout the Class Period caused Maxim's stock price to trade as high as $55.99.  By the time the magnitude of the fraud was completely disclosed, however, the stock price had plunged to $19.33, representing a ***market capitalization loss of over $11 billion.***

12.     Defendants Gifford and Jasper reaped an extraordinary financial benefit from their fraudulent scheme, not only from their receipt of backdated options, but from their sales of Maxim's stock at artificially inflated prices.  During the Class Period, Defendants Gifford and Jasper received $23,715,240 and $716,415 in insider trading profits, respectively.

13.     On January 31, 2007, the Company announced that in connection with the findings of the Special Committee of the Board of Directors' investigation, Defendant Gifford retired and Defendant Jasper resigned from the Company.  Likewise, Defendant Ruehle is no longer with the Company.

**II.     JURISDICTION AND VENUE**

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Maxim's principal place of business is in the Northern District of California, and Defendants Gifford, Jasper and Ruehle reside in the Northern District of California. Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this district.

17.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III.    THE PARTIES

### A.    Lead Plaintiffs

18.     Lead Plaintiff the Cobb County Government Employees' Pension Plan purchased Maxim common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.

19.     Lead Plaintiff the DeKalb County Pension Plan purchased Maxim common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.

20.     Lead Plaintiff the Mississippi Public Employees Retirement System purchased Maxim common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.

21.     By Order dated May 15, 2008, the Court appointed the Cobb County Government Employees' Pension Plan, the DeKalb County Pension Plan, and the Mississippi Public Employees Retirement System as Lead Plaintiffs in this action.

22.     The allegations contained herein are based upon information and belief with information obtained through the investigation made by and through Lead Counsel. Lead Counsel's investigation has included, among other things: (i) interviews of former employees of Maxim with first hand knowledge of the events alleged herein; (ii)  a review and analyses of Maxim's filings with the SEC, Company press releases and other public statements; (iii) a review and analyses of the court

filings in the actions styled *SEC v. Maxim Integrated Products, Inc. et al.*, N.D. Cal. (San Jose), Case No. 07-cv-06121; *SEC v. Jasper*, N.D. Cal. (San Jose), Case No. 07-cv-06122; *In re Maxim Integrated Products, Inc. Derivative Litigation*, N.D. Cal. (San Jose), Case No. 06-3344; and *Ryan v. Gifford, et al.*, Del. Ch. Ct., Civil Action No. 2213-CC; and (iv) a review of news, media and analyst research reports.

### B.    **Defendants**

23.    Defendant Maxim is a Delaware Corporation with its principal executive offices located at 120 San Gabriel Drive, Sunnyvale, California 94086.  Maxim designs, develops, manufactures, and markets a broad range of linear and mixed-signal integrated circuits, commonly referred to as analog circuits.  The Company also provides a range of high-frequency design processes and capabilities that can be used in custom designs.  Until its common stock was delisted as a result of the conduct alleged herein, Maxim traded on the NASDAQ under ticker "MXIM," and was included in a number of prominent indices including the S&P 500, the NASDAQ-100, the Russell 1000 and the Philadelphia Semiconductor Index ("SOX Index").  Following its suspension and delisting on October 2, 2007 the Company's stock traded over-the-counter on the "Pink Sheets" under ticker "MXIM.PK." Following the filing of the Restatement, Maxim was relisted on NASDAQ on October 8, 2008.

24.    (a)    Defendant John F. Gifford served as the Company's CEO, President and Chairman of the Board from April of 1983 through December 19, 2006, when Maxim announced that Defendant Gifford, "on the advice of his doctor, elected to retire as CEO" but would continue to "remain with the company on a part time basis as a strategic advisor."  On January 31, 2007, the Company announced that in connection with the findings of the Special Committee of the Board of Directors (the "Special Committee"), which was established to investigate Maxim's improper backdating practices, Defendant Gifford retired as a strategic advisor to the Company;

(b)    Pursuant to Sections 13 and 15(d) of the Exchange Act, Defendant Gifford signed and certified Maxim's false and misleading annual reports on Forms 10-K during the Class Period for the fiscal years 2003 through 2005.  Defendant Gifford also signed and certified Maxim's false and misleading quarterly reports on Forms 10-Q filed from fiscal third quarter 2003 ("3Q'03") through and including fiscal third quarter 2006 ("3Q'06");

(c) Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), Defendant Gifford executed certifications in conjunction with Maxim's annual reports on Forms 10-K for the fiscal years 2003 through 2005. Defendant Gifford also signed § 302 certifications for Maxim's Form 10-Qs filed for 3Q'03 through and including 3Q'06;

(d) Defendant Gifford signed Maxim's Schedule 14A proxy statements to shareholders dated October 7, 2003, August 18, 2004, October 18, 2004, and October 11, 2005;

(e) Defendant Gifford directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition. Because of this position of control and authority, his ability to exercise power and influence with respect to Maxim's course of conduct and his access to material inside information about Maxim during the Class Period, Defendant Gifford, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act;

(f) Maxim admitted in the Restatement that starting in 1995, Maxim's Compensation Committee "delegated an increasing amount of option granting authority to [Defendant Gifford], as the one-person Option Committee." This culminated in "authority to make grants to anyone other than himself and other officers . . . by November 1997." Defendant Gifford remained the singular member of the "Option Committee" throughout the Class Period and approved stock option grants on a regular basis; and

(g) For the years in which Maxim was required to report Defendant Gifford's salary and bonuses, he received $3,222,300 in salary and $19,868,993 in bonuses. Defendant Gifford recieved a total of 10,502,233 stock options during his tenure with Maxim and recorded $248,894,543 in insider sales, including $23,715,210 during the Class Period.

25. (a) Defendant Carl W. Jasper served as the Vice President and CFO of Maxim from April of 1999 through January 31, 2007. Defendant Jasper obtained his California Certified Public Accountant license in 1984. Before working at Maxim, Defendant Jasper was an auditor at on of the Big Four accounting firms, Ernst & Young LLP, from 1983 to 1995;

(b)     Pursuant to Sections 13 and 15(d) of the Exchange Act, Defendant Jasper signed and certified Maxim's false and misleading annual reports on Forms 10-K during the Class Period for the fiscal years 2003 through 2005.  Defendant Jasper also signed and certified Maxim's false and misleading quarterly reports on Forms 10-Q filed from 3Q'03 through and including 3Q'06;

(c)     Pursuant to Section 302 of SOX, Defendant Jasper executed certifications in conjunction with Maxim's annual reports on Forms 10-K for the fiscal years 2003 through 2005. Defendant Jasper also signed § 302 certifications for Maxim's Form 10-Qs filed for 3Q'03 through and including 3Q'06;

(d)     Defendant Jasper directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition.  Because of this position of control and authority, his ability to exercise power and influence with respect to Maxim's course of conduct and his access to material inside information about Maxim during the Class Period, Defendant Jasper, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act;

(e)     Defendant Jasper was granted a total of 375,000 stock options during his tenure with Maxim and recorded $820,283 in insider sales; and

(f)     Defendant Jasper resigned from Maxim in connection with the conclusion of the Special Committee's investigation on January 31, 2007.

26.     (a)     Defendant Timothy Ruehle served as a Managing Director and Treasurer at Maxim.  Defendant Ruehle obtained his California Certified Public Accountant license on November 17, 1995.  As first revealed in the Restatement, Defendant Ruehle, identified as Treasurer, along with Defendants Gifford, Jasper and the former manager of stock administration, "had knowledge of, and participated in, the selection of certain [option] grant dates based on hindsight" and "understood the accounting consequences of granting options at a price other than the fair market value on the date of grant."  According to a former cost accounting manager ("CW1"), Defendant Ruehle was the architect of Maxim's stock option program and one of Defendant Gifford's closest advisors.  As detailed below,

1  in addition to his duties at Maxim, Defendant Ruehle actively participated in lobbying efforts by

2  Defendants Maxim and Gifford throughout the Class Period related to stock option accounting

3  standards; and

4         (b)    Defendant Ruehle directly participated in the management of the Company, was

5  directly involved in the day-to-day operations of the Company at the highest levels and had actual

6  knowledge of confidential proprietary information concerning the Company and its business,

7  operations, growth, financial statements and financial condition.  Because of this position of control

8  and authority, his ability to exercise power and influence with respect to Maxim's course of conduct

9  and his access to material inside information about Maxim during the Class Period, Defendant Ruehle,

10  at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a)

11  of the Exchange Act.

12      27.    Collectively, Defendants Gifford, Jasper and Ruehle are referred to herein as the

13  "Individual Defendants."

14  **IV.**    **THE FRAUDULENT SCHEME**

15      **A.**    **Stock Option Granting, Dating, Pricing And**
16               **Accounting For Stock-Based Compensation**

17      28.    Publicly traded companies, such as Maxim, may, under certain specific circumstances

18  and as set forth in the company's stock option plans, award their employees stock option grants.   A

19  stock option granted to an employee allows the employee to purchase, at some future date, a specified

20  number of shares of corporate stock at a specified price, called the "exercise price" or "strike price."

21  If the exercise price is the same as the market price of the stock on the date the option is granted, the

22  option is said to be "at-the-money."  If the exercise price of the option is less than the market price of

23  the stock on the date the option is granted, the option is said to be "in-the-money."

24      29.    Under GAAP, Accounting Principals Board Opinion No. 25 ("APB 25"), a company

25  that grants an option "in-the-money" is required to record a compensation expense for the "in-the-

26  money" portion of the option grant equal to the difference between the exercise price and the market

27  price of the stock on the date the option is granted.  By way of example, if a company grants an option

28  to an employee at $1.00 per share and the company's stock is trading at $2.00 per share, the company

is required to record a compensation expense of $1.00. If the company does not record and report a compensation expense for the "in-the-money" portion of the grant, as required by GAAP, any subsequently issued financial statements are false and misleading. This is because the difference between the price of the stock on the grant date (higher) and the record date (lower) is a form of compensation which has an impact on the company's earnings per share, net income, operating income, compensation expenses, related tax expenses and other items. If a company awards option grants to its employees, but does not account appropriately for such grants under GAAP, investors do not have an accurate picture of the company's finances.

30. "Stock option backdating" describes a practice where the record date of the option grant deviates from the actual grant date. A stock option is said to have been "backdated" when the recorded grant date is not the date that the grant was *actually* approved with finality. GAAP and Internal Revenue Service ("IRS") accounting rules and regulations require that options be accounted for from the date the grant was approved with finality. Options are generally backdated to match a prior date when the stock traded at the option exercise, or "strike" price. If the market price of the stock on the recording date was lower than the market price on the actual grant date, the option would be "in-the-money." By design, backdating often results in or causes improper accounting, as the practice makes it appear that an option grant was actually approved with finality on an earlier date.

**B.**      **Importance Of Stock Options To Maxim**

**1.**      **Options Were Integral To Attracting And Retaining Talent**

31. Stock-based compensation was integral to the compensation of Maxim's employees and Maxim's overall business strategy. The semiconductor business is highly competitive. While Maxim competed against its rivals for quality and experienced engineering and other employees, the Company paid far lower base salaries than its competitors. In order to provide and lure employees with competitive compensation packages, Maxim relied heavily on awarding stock option compensation to make up for lower cash compensation. Maxim's ability to recruit, retain and incentivize engineers and other employees was highly dependent on its ability to grant lucrative stock options. In fact, according to the June 25, 2004 Schedule 14A Proxy Statement, Maxim informed investors that options were "quite necessary to make up for the lower salaries Maxim pays."

32.     Failing to retain key personnel and attract talented recruits could be devastating to Maxim's success.  Defendants repeatedly emphasized the importance and benefit of stock options in public statements and communications with shareholders throughout the Class Period.  For example, in an April 27, 2004 conference call, Defendant Gifford expressed his thoughts on Maxim's use of stock options:

> Broad-based stock option, options have been the heart of our business strategy for over the last 20 years.  That options has [sic] been beneficial to both shareholders and employees alike is evidenced by the fact that we've grown 13000% since we went public and we've increased our shareholder value significantly, obviously.

33.     Also, in the June 25, 2004, August 19, 2004 and October 7, 2005 Schedule 14A Proxy Statements, the Company noted: "Maxim's compensation program is heavily tilted toward performance rather than guaranteed cash payments," and "Maxim's salaries are generally lower than in comparable companies." But, the Company stated: ***"Maxim believes options are the most important part of its compensation mix."***

34.     Maxim's strategy of focusing on stock option compensation, while paying low base salaries, is corroborated by the fact that the offer of employment letter at Maxim often informed recruits the following about their salary and number of stock options:

> Maxim stock options provide a powerful opportunity for key employees to share in the financial success of the company.  As the stock price increases above the option price, a substantial gain can be realized by the employee due to Maxim's industry-leading revenue growth.

35.     Several former employees at Maxim corroborate Maxim's compensation structure. A former production manager, IT manager and industrial engineer ("CW2"), who worked at Maxim from 2000 to 2007, stated that salaries at Maxim were "20 to 25% below the industry average."  A former senior financial analyst employed by Maxim from late 2001 through July 2005 ("CW3") noted: "when I was being recruited by Maxim, I wanted more salary, but they kept offering me more options." A former senior member of technical staff and director of business management ("CW4"), who worked at Maxim from early 1999 through early 2008, and whose job responsibilities included the recruiting of new employees, stated that the Company line for recruiting new employees was that "you won't get as much base salary as you would at another company, but because the stock options have been so lucrative in the past, you can have reasonable assurance that you will make up in stock options what

you would have had with a higher salary."  In addition, a strategic accounts manager for Maxim from 2000 through 2005 ("CW5"), noted that Maxim "painted a picture that options were going to make up for what the employees lacked in salary" compared to the average in Silicon Valley.

36.     Defendants Maxim, Gifford, Jasper and Ruehle knew that in order for Maxim to pay low base salaries compared to its competitors, Maxim had to recruit, retain and incentivize engineers and other key employees with not only lucrative stock options, but stock options issued at the lowest possible exercise price.  This is not per se fraud – *not* disclosing it and overstating financials *is.* Throughout the Class Period Defendants used hindsight to select option grant dates with historical price lows.  Defendants did not disclose these backdating practices and deliberately circumvented the financial reporting and tax consequences of these "in-the-money" grants.  As a result, Maxim reported lower compensation expenses (and higher net income and EPS) while falsely representing to investors and the market that the Company was complying with GAAP and the Company's stock option plans.

### 2.     Maxim's Stock Option Plans

37.     According to Maxim's SEC filings, as of June 24, 2006, the Company had five stock option plans and one employee stock participation plan: (a) the 1987 Stock Option Plan; (b) the 1987 Supplemental Stock Option Plan; (c) the 1987 Employee Stock Participation Plan; (d) the Supplemental Non-employee Stock Option Plan; (e) the 1993 Officer and Director Stock Option Plan; and (f) the 1996 Stock Incentive Plan, as amended ("1996 Plan").

38.     The 1996 Plan was originally adopted by Maxim on August 16, 1996.  The purpose of the 1996 Plan was to "attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees, Directors and Consultants of the Company and its Subsidiaries and to promote the success of the Company's business."

39.     Under the 1996 Plan, only the Board, or a committee designated by the Board could serve in the capacity of "Plan Administrator."  Once designated, the Plan Administrator had the authority, *inter alia*, to:

a)     select the employees, directors and consultants to whom options were be granted;

b)     determine whether and to what extent options were granted;

c)    determine the number of shares or the amount of other consideration to be covered by each option granted;

d)    determine the fair market value of the common stock used to price the options; and

e)    determine the terms and conditions of any option granted.

40.    The Compensation Committee, which is, and at all times during the Class Period was, made up of directors James R. Bergman ("Bergman"), B. Kipling Hagopian ("Hagopian"), and A. R. Frank Wazzan ("Wazzan"), is the Plan Administrator for the 1996 Plan.

41.    According to the Restatement, throughout the Class Period, the Compensation Committee had the power to approve grants of options to "executive management, including those employees with a title of Vice President."

42.    The authority to grant options to non-employee directors and non-officer employees (including new hires), however, was delegated to the "Option Committee."  Maxim admitted in the Restatement that starting in 1995 "the Compensation Committee delegated an increasing amount of option granting authority to [Defendant Gifford], as the one-person Option Committee, culminating in authority to make grants to anyone other than himself and other officers . . . by November 1997." Defendant Gifford remained the singular member of the "Option Committee" throughout the Class Period and approved grants pursuant to the 1996 Plan on a regular basis.

43.    The 1996 Plan contained important limitations regarding pricing of stock options.  For example, the 1996 Plan provided that "the per Share exercise price shall be not less than ***one hundred percent (100%) of the Fair Market Value per Share on the date of the grant.***"

44.    The 1996 Plan, as amended, notes that when there is a public market for Maxim common stock, Fair Market Value shall be:

> ***the closing sale price of the Common Stock for the last market trading day prior to the date of the determination or on the date of the determination,*** as determined by the Administrator at the time of the determination (or, if no sales were reported on either such date, on the last trading date on which sales were reported) on the stock exchange determined by the Administrator to be the primary market for the Common Stock or the Nasdaq National Market, whichever is applicable . . . .

45.     Maxim's other stock option plans also prohibited the Company from granting options with an exercise price that was less than the market price on the date of the grant.  Maxim repeatedly represented to the market that, with limited exceptions, options were granted at 100% of fair market value per share on the date of the grant in compliance with its option plans.  Maxim has now admitted that these representations were false.

### C.     Defendants Knew And Understood The Implications Of Backdating

46.     As admitted in the Restatement, Defendants Gifford and Jasper "***had knowledge of, and participated in, the selection of grant dates for director, non-employee and employee option grants from 1999 through 2005, either with the benefit of hindsight or prior to completion of the grant-approval process, and were the employees most involved in the selection of grant dates***." Moreover, the Company found that Defendants Gifford, Jasper and Ruehle and the former manager of stock administration "***understood the accounting consequences of granting options at a price other than the fair market value on the date of grant***."

47.     For example, a memorandum from Mike Byrd to, *inter alia*, Defendants Jasper and Ruehle, dated May 6, 1998 (obtained from the publicly available electronic docket of the Delaware Court of Chancery), confirms that Defendants Jasper and Ruehle knew the implications of backdating, and knew that backdating and repricing options was prohibited:

> It is Maxim's intention to set the option price as low as possible, but unfortunately we can not grant the option with hindsight. Under our plan, the option price must equal the closing price the date prior to the day of grant. Once the option has been granted, the option price can not be changed.

48.     Additionally, an October 10, 2000 email (obtained from the publicly available electronic docket of the Delaware Court of Chancery), from Defendant Jasper to Defendant Gifford (via his executive assistant), and also forwarded to Defendant Ruehle, explicitly set forth the accounting implications of options backdating and options repricing as shown below:

> I have thought through the issue of the VP bonus grants. The problem is, the Compensation Committee took action back on September 19, 2000 to approve the grants to the six individuals when the price was $75 on September 18th. If we cancel these grants and had the Comp Committee approve a new grant at today's closing price of $67.5625, this will trigger variable accounting for these options. I have re-read the new option rules which states that if options are cancelled within 6 months before or after another grant, which has a lower strike price, this is

considered an effective repricing and variable accounting will need to be made on the new grants.

49.     The known prohibition on backdating stock options and the accounting consequences of engaging in such an action is further memorialized in an email dated October 21, 2004, from Maxim director Hagopian to Defendant Jasper, which stated in relevant part that:

> Bergie talked to Carl [Jasper] yesterday and I [Hagopian] talked to him today regarding procedures for granting stock options to the rank and file. Carl [Jasper] assured both Bergie and me on no uncertain terms that they do not back date option grants. ***He volunteered that he is well aware that if we did that in order to get a lower price we would have to expense the discount against our earning.***"

This email was followed by a memorandum also dated October 21, 2004, to the Board of Directors memorializing Bergman's conversation with Defendant Jasper: "Carl [Jasper] reported that no options would be granted retroactively at a price lower than the grant date ***because this would require expensing the difference between the price at grant and price of the option as a current expense.***" These documents were obtained from the publicly available electronic docket of the Delaware Court of Chancery.

50.     Internal documents and Defendants' public statements further corroborate the Restatement and show that Defendants Gifford, Jasper and Ruehle had a superior understanding of the accounting provisions governing stock options.  Further, Defendants repeatedly lobbied the Financial Accounting and Standards Board ("FASB") during the Class Period in hopes of preventing the adoption of Statement of Financial Accounting Standards No. 123(R) ("SFAS 123(R)"), which would require them to recognize compensation expenses for "at-the-money" options.  Thus, Defendants not only knew the proper methodology for granting, pricing and expensing stock options throughout the Class Period, but they knew that granting options below the current market price required recognition of additional compensation expense.

51.     For example, on or about January 30, 2003, Defendant Gifford wrote a comment letter to the FASB relating to the potential adoption of SFAS 123(R).  At the time, and as summarized above, APB 25 required a stock option-related compensation expense to be taken only if the market price on the date of grant exceeded the exercise price.  SFAS 123(R) proposed to change this accounting and would require companies to record deferred compensation expense equal to the entire

value of all option grants on the grant date, amortized as expense over the options' vesting periods. Defendant Gifford's letter to FASB advocated against the adoption of SFAS 123(R), a standard he said created "distortions" and used a "dubious model to invent a hypothetical expense to charge against earnings."  Defendant Gifford's letter exhibits a detailed understanding of the implications of both APB 25 and SFAS 123 and SFAS 123(R), and utilized many specific examples as to why APB 25 was superior accounting and was "entirely adequate for the task" of accounting for stock option grants.

52.     Defendants Gifford, Jasper, Ruehle and Maxim continued to advocate against the adoption of SFAS 123 during the Class Period.  For example, the Company's April 29, 2003 press release announcing Maxim's third quarter of fiscal year 2003 financial results stated:

> *Maxim is opposed to expensing employee stock options, as we believe that this concept is bad accounting.* We believe that the Treasury Stock Method both rigorously and accurately defines the cost and resulting dilutive effect of stock options on reported earnings. *We fear that requiring U.S. corporations to expense stock options could seriously damage our country's leadership position in technology innovation and our ability to effectively compete with other countries.* Our nation's technology leadership over the past 15 years has caused some to forget the economic effect during the 1970s of our country's losing our technology leadership to Japan. Entrepreneurial individuals and companies, given incentive by stock options, reversed this situation. This impact on the U.S. economy and its people in the 1970s has been too easily forgotten. The potential damaging long-term effect on our nation's economy and lifestyle resulting from the forced expensing of stock options should be taken very seriously.

53.     Defendant Gifford reiterated Maxim's strong opposition to expensing employee stock options in an April 29, 2003 conference call, stating "[w]e are opposed to the expensing of stock options and stock option expense regulations currently under review, and we are opposed on two fronts.  First, it is bad accounting, pure and simple.  Secondly, we strongly believe that if these regulations are put in place *they could severely damage the U.S. leadership position over other countries regarding technology innovation.*"

54.     In a February 5, 2004 conference call, Defendant Gifford further expounded on Maxim's position relating to expensing stock options:

> If politicians and government officials are concerned about keeping jobs in the U.S., they should seriously consider the negative impact of that [sic] expensing stock options is going to have on increasing salaries and keeping the jobs off shore.

55.     On March 31, 2004, Maxim continued its advocacy when director Hagopian submitted a position paper to FASB arguing against the adoption of FASB's Statement No. 123(R).  The paper was entitled "Stock Option Expensing: Getting the Accounting Right," and advocated that companies who issue stock options "in-the-money" or "at-the-money" should not be required to recognize any compensation expense at the time of issuance.  The paper spanned 33 pages and detailed the accounting implications of using the "intrinsic value" method (*i.e.,* APB 25) versus the "fair value" method (*i.e.,* SFAS 123 and SFAS 123(R)).  While the paper was significantly longer and more detailed than the letter Defendant Gifford sent to FASB on January 30, 2003, it specifically referenced the letter and noted that "[t]he underpinning of the paper was a letter of comment on FASB's proposals on stock-based compensation submitted by Maxim Integrated Products, Inc."

56.     Further, in the "Acknowledgements" section of the paper, Hagopian included the following statement about Defendant Gifford's letter to FASB:

> The lead writer of that comment letter was Tony Gilbert, formerly a senior partner of Cooley Godward LLP and, at that time, Maxim's chief legal counsel. Mr. Gilbert did an outstanding job of summarizing and presenting the case against expensing ESOs. ***The CEO of Maxim, Jack Gifford, together with  Maxim CFO, Carl Jasper and Managing Director, Tim Ruehle were major contributors to the letter*** (both Mr. Jasper and Mr. Ruehle are CPAs), as was the author of this paper.  Parts of that letter have been used in this paper.

This is further evidence that Defendants Gifford, Jasper and Ruehle were intimately familiar with the concepts related to accounting for stock-based compensation.

57.     Hagopian made it clear that Defendants Jasper and Ruehle had major influence and control not only on Defendant Gifford's initial letter to the FASB and Maxim's position, but the position paper as well:

> During the drafting process, several people provided invaluable insights and commentary on the paper.  Chief among them was Tim Ruehle, who supplied volumes of accounting literature and FASB pronouncements and provided ongoing assistance in the interpretation of the many accounting concepts and rules pertaining to this issue.   Carl Jasper also made very important contributions in this respect.

58.     The substance of the position paper described in detail how adoption of SFAS 123(R) would constitute a "radical departure" from the intrinsic value method.  The paper also contained many specific examples and illustrations which leave little question that Defendants Gifford, Jasper

and Ruehle understood how to properly account for stock options, whether under APB 25 or FAS 123(R):

> Under the intrinsic value method, the intrinsic value of the ESO on the date of grant is expensed over the period in which the ESO vests. For example, assuming an ESO has a four-year vesting period, is granted with an exercise price of $10, and its fair market value at date of grant is $12, the $2 intrinsic value will be expensed ratably over four years. ***The vast majority of ESOs are granted at fair market value (intrinsic value, therefore, is zero); in these cases, no expense is charged***.

59.    In an April 27, 2004 conference call, Defendant Gifford continued Maxim's advocacy against expensing stock options, as follows:

> Also as you know last month FASB issued proposed guidelines for expensing employee stock options. Maxim has [sic] and continues to believe strongly that stock option expensing can be very damaging to the growth of high tech companies and furthermore it is not correct accounting.
>
> Maxim vigorously opposes attempts at mandating such incorrect accounting practice and we urge all of you and our shareholders, legislators and others to support this effort.
>
> Broad-based stock option, options has [sic] been the heart of our business strategy for over the last 20 years. That options have been beneficial to both shareholders and employees alike is evidenced by the fact that we've grown 13000% since we went public and we've increased our shareholder value significantly, obviously.

60.    In an February 1, 2005 conference call, Defendant Gifford made the following statements expressing his opposition to expensing stock options:

> As the FASB, the SEC and the entire financial community know, we believe expensing stock options is bad accounting, but even if it were not so, free cash flow will still be a better measure of performance because of the broader variations in – in option valuation that are almost certain to exist once this expensing is required.

61.    On May 9, 2005, Maxim went so far as to issue a press release entitled "Maxim's Views Regarding Stock Options Expensing – And a Link to a Relevant Web Site."  This press release stated, in relevant part:

> Maxim views the proposed option expensing rules are distortive to earnings in part because the higher the company's option grant price the higher the expense. This can lead to nonsensical results where options that are valuable to the employee carry a small charge while other options which are of little or no value to the employee carry a disproportionately large charge. Here is a concrete example of how distorting the option expense rules can be. As of the date of this posting, Maxim trades around $38. We have employees holding options that are unvested with exercise prices that range from $12 to $87. The $12 option triggers an earnings charge of

approximately $8 over the life of the option while the $87 option triggers a charge of $55 over the option life, almost seven times the charge! This would seem to indicate that the out-of-the-money $87 option is seven times more valuable than the in-the-money $12 option. However, the true economic value to the employee is probably the opposite.

*     *     *

Maxim therefore believes that options expensing is bad accounting, a bad rule.

62.     Defendants Maxim, Gifford, Jasper and Ruehle never disclosed during its advocacy against this change that they were intentionally backdating options and not properly recognizing compensation expense under applicable accounting and tax rules and regulations.

**D.     Defendants Unlawfully Backdated Stock Option Grants**

63.     Maxim, through the Individual Defendants Gifford, Jasper and Ruehle, repeatedly backdated options made to current employees, newly hired employees, and non-employee directors. Defendants also failed to record compensation expenses for these grants in violation of GAAP, as now admitted in the Restatement, and as evidenced by internal Company documents obtained from the publicly available electronic docket of the Delaware Court of Chancery, the SEC Complaints, and confidential witnesses.

64.     Through the Restatement, the Company admitted that Defendants Gifford and Jasper "***were the employees most involved in the selection of grant dates***," and that they, along with Defendant Ruehle and the former manager of stock administration ***"had knowledge of, and participated in"*** the backdating of options.  The Company has further admitted that these individuals "***understood the accounting consequences of granting options at a price other than the fair market value on the date of grant***."

65.     In the Restatement, Maxim admitted that it "concluded that some grant dates were selected with hindsight or the original grant date preceded the completion of the grant approval process. In total there were 37,060 grants in this category with 106,172,454 underlying shares during the Restated Annual Periods for which measurement date adjustments were required. The compensation expense, net of forfeitures, resulting from these adjustments totals $382.7 million, of which $39.3 million arose from grants made to persons who were directors or officers on their recorded grant date." According to the Restatement, Maxim was forced to restate more than $343

million in stock-based compensation due to the improper backdating of employee grants. In addition, over $35 million in stock-based compensation had to be recorded for grants to officers.

### 1.   Defendants Knowingly Backdated Option Grants To Employees

66.     Maxim granted options to current employees on a quarterly basis. Each quarter, Maxim's managers proposed to Defendant Gifford the number of options to be granted to employees whose annual performance reviews fell within that quarter. Defendant Gifford, as the one-person Option Committee, exercised unchecked power to backdate the stock option grants. Numerous former employees attest to Defendant Gifford's controlling oversight of stock option grants, as well as all other aspects of Maxim's operations. According to CW4, Gifford had to approve all hiring decisions, including the number of stock options and the grant price. Similarly, a former technical recruiter ("CW6"), who worked for Maxim from 1999 to 2004, confirmed that Gifford approved all stock option grants. According to CW2, "Jack Gifford was a bottleneck for most everything at Maxim," as Gifford wanted everything printed on paper and then placed on his desk. CW2 stated that Gifford "pretty much approved everything at Maxim – hiring decisions, purchase decisions, you name it. Up until 2004 or 2005, you had to get Gifford's approval to get a new desktop computer." A former test/product engineer ("CW7"), who worked at Maxim from 1999 to 2006, corroborated Gifford's control, stating that he had to approve all decisions at Maxim, from stock option grants to individual computer purchases. In addition, CW3 corroborated that Defendant Gifford approved every new hire and had to approve any type of capital expenditure over a few thousand dollars.

67.     According to the SEC Complaints and internal Company documents obtained from the publicly available electronic docket of the Delaware Court of Chancery, Defendant Gifford informed Defendant Jasper through handwritten notes or memoranda of the grant date and price, which were often dates Defendant Jasper suggested that corresponded to quarterly lows of Maxim's closing stock price. Defendant Jasper then would communicate this information to the Company's stock administration department. The stock administration department's role in the option granting process "was limited and varied from grant to grant." According to the Restatement:

> There was no prescribed stage at which Stock Administration was to be informed that a particular option grant was or was to be made. For grants approved by the Option Committee, the key grant terms were often supplied separately and, in particular, information regarding the number of shares and the exercise price was frequently provided at different times.

68.     Numerous confidential witnesses corroborated that Maxim repeatedly used quarterly lows as stock option grant dates.   According to CW6, as of 2003 and 2004, it was Maxim's practice to give existing employees the lowest strike price of the quarter when they received new options as part of the annual review process.   Furthermore, a former process engineering manager ("CW8") who worked for Maxim between 1997 and 1999, stated that the Company always set stock options prices to the lowest point of the relevant quarter.   According to CW7, the practice of backdating stock options was known throughout the Company and discussed openly at Company meetings.   At annual meetings, Defendant Gifford also spoke about Maxim's historical stock performance and the manner in which employee stock options were priced, including the backdating process.   In addition, according to a former senior executive account manager ("CW9") who worked for Maxim from 1999 to 2006, Defendant Gifford would regularly tell employees during weekly conference calls that in order to keep everyone working at Maxim, the Company would give employees more options at a lower strike price than the market price, which benefited them.

69.     According to CW2, employees would be informed at their annual reviews as to the number of options they would receive, but were not informed of the strike price until they received a letter signed by Defendant Jasper titled "Notice of Grant of Stock Options and Option Agreement" weeks or months later.   Employees, such as CW2, then would sign the letter, which had the strike price based on the earlier date.   In one instance, CW2 received options in April 2005 and the grant date was in November 2004.

70.     The following is a chart denoting the option date, option price and signature date for the options CW2 received while employed at Maxim:

| Option Date | Option Price | Signature Date | |
|---|---|---|---|
| 05/22/00 | $58.875 | 11/27/00 | |
| 11/30/00 | $51.00 | 03/22/01 | |
| 03/30/01 | $41.59 | Not on form | *Quarterly Low* |
| 04/09/01 | $35.16 | 05/25/01 | |
| 04/09/01 | $35.16 | 09/04/01 | |
| 06/25/02 | $35.92 | 08/22/02 | *Quarterly Low* |
| 10/09/02 | $21.35 | 11/08/02 | *Quarterly Low* |
| 06/25/03 | $33.85 | Not on form | *Quarterly Low* |
| 03/23/04 | $44.38 | 06/30/04 | *Quarterly Low* |
| 11/30/04 | $40.96 | 05/23/05 | |

71.     Similarly, on one occasion, CW5 also received options on November 21, 2003, which were granted at the June 25, 2003 quarterly-low price of $33.85.

72.     One specific example where Defendants Jasper and Gifford backdated the grant date and exercise price with the benefit of hindsight occurred for the October 2, 2001 employee grant. Maxim granted 2.4 million options to certain employees, with an exercise price equal to the October 2, 2001 closing stock price of $33.40. This was the lowest closing price of the quarter, which ran from September 31, 2001 through December 28, 2001.  According to internal Company documents which were obtained directly from the publicly available electronic docket of the Delaware Court of Chancery, the grant was not made until on or around December 28, 2001, when the stock was trading at $54.61.  On or around December 28, 2001, according to computer metadata associated with the document, in a memorandum entitled "Q202 Option Prices," Defendant Jasper wrote to Defendant Gifford:

> Given the run up in our stock price this quarter, I would like to propose the following to set the option price for Q202 activity.  Attached is a print out of all the close prices of our stock for the second quarter.
>
> 1. Existing employee reviews – *use October 2, 2001 close price of $33.40*

Although the options were "in-the-money" by $21.21 when granted, Maxim failed to record compensation expenses for the options as required by GAAP, according to the SEC Complaints.

73.     Similarly, in an undated memorandum entitled "Q302 Grant Prices," obtained directly from the publicly available electronic docket of the Delaware Court of Chancery, Defendant Jasper wrote the following to Defendant Gifford regarding the pricing of stock options for "Q302" (which ran from January 1, 2002 through March 30, 2002):

> In order to keep our documentation and records straight, please sign the attached three memos that set the option prices for Q302.  Two memos have a date of February 28th which is what we are using for the Q3 reviews and new hires that started between December 30th and February 28th.  The other memo is dated March 25th which will be used to set the price of new hires starting between March 1st and March 25[th].

74.     The computer metadata associated with the "Q302 Option Prices" memorandum from Defendant Jasper indicates that it was created on or about April 22, 2002.  The date suggested by

Defendant Jasper for pricing stock options, February 28, 2002, coincided with the lowest stock price of the fiscal quarter at $45.76.

75.     In another example, Maxim granted approximately 2.7 million options to employees with a grant date of June 30, 2003 and exercise price equal to that day's closing stock price of $34.10. This was Maxim's lowest stock price of the quarter.  The grant, however, was not made until on or around August 26, 2003, when the stock was trading at $43.26, according to the SEC Complaints and internal Company documents obtained from the publicly available electronic docket of the Delaware Court of Chancery.  In an August 22, 2003 memorandum from Defendant Gifford to Defendant Jasper entitled "Q104 Options," Defendant Gifford wrote, "[w]hat is the lowest price we can use for Q1 options?" to which Jasper responded:

> Response to your question – what is the lowest price we can use for Q1 options?
>
> The best price is the first date of the quarter – June 30, 2003. The price was $34.10 on that date. . . . I have attached a listing of Maxim's closing stock prices for the quarter for your reference.

According to the SEC Complaints, Defendant Gifford approved the grant using the June 30th price, but also instructed Defendant Jasper to record a compensation expense if it was material.  Although the options were "in-the-money" by over $9 when granted, according to the SEC Complaints, Maxim did not record compensation expenses for the options in violation of GAAP.

76.     In yet another egregious example, Maxim granted 3.2 million options to existing employees with a grant date of September 30, 2003, and an exercise price equal to that day's closing stock price of $39.39.  This was Maxim's lowest stock price of the quarter.  In reality according to the SEC Complaint against Maxim and Gifford, the grant was not made until significantly later in the quarter.  Maxim's stock administration department did not learn about the grant date until on or about November 25, 2003, when Maxim's stock was trading at $51.47 – more than $10 higher – resulting in more than $32 million in compensation to employees that it did not properly expense.  According to the SEC Complaint, Defendant Gifford later signed a memorandum (drafted by another Maxim employee) backdated to September 30, 2003, that stated:  "I have granted options today for all existing employees for this quarter, and for new hires up through this date – the stock closed at $39.39."

Although the options were "in-the-money" by $12.08 per share when granted, Maxim failed to record compensation expenses for the options in direct violation of GAAP.

77.     Similarly, numerous other internal Company correspondence, obtained from the publicly available electronic docket of the Delaware Court of Chancery, evidence that Defendants Gifford and Jasper continuously granted stock options with the benefit of hindsight and the practice was well known inside the Company:

(a)     "Jack [Gifford] intended the options to be priced at the lowest the stock traded in the quarter. *If $63.09375 is the lowest closing price, that would be it."*  (Email dated October 28, 1999);

(b)      "Normally, the price is not usually set until the quarter is almost over *so they can get the lowest price possible."*  (Email dated February 8, 2002);

(c)     In an email dated October 14, 2002, Maxim's Stock Administrator stated: "Jack had approved for the strike price for all Q103 reviews, bonus options, and new hires @ $21.35 (10/9/02) closing price."   The October 9, 2002 closing price of $21.35 was the lowest price of the quarter;

(d)     In a January 30, 2003 email: "We should lock in the lowest current price and then watch for the next 30 days";

(e)     "I talked to Tim and we feel safe enough to go ahead and use February 7th for Q3 reviews, and new hires up through this date. Accordingly, we can go ahead and start inputting options for these cohorts. Will get back to you regarding the rest of the new hires later."  (Email dated March 18, 2003);

(f)     "According to Personnel, Jeff's hire date was 7/9/03 and that puts any option grant within the Q104 quarter for determining his option price. T*he option price is determined by the lowest price in the respective quarter after Jeff's hire date."*  (Email dated September 5, 2003);

(g)     "I think we can decide today what price we're going to use for Q304 merit & bonus options: The lowest price in the quarter (12/29/03 – 3/26/04) will be the closing on 3/23/04 - $44.38. I don't think tomorrow will drop below this point tomorrow, you agree?"  (Email dated March 25, 2004); and

(h)     "Please go ahead and start enters [sic] Q404 merit and bonus shares. Date will be 5/4/04 - $45.25. For all new hires from 3/29/04 – 5/4/04, use 5/4/04 option strike price. Other new hires, please hold on to them. Please ensure all of these grants are in INACTIVE status. And let's hope that between now and end of the quarter, our stock price won't hit below $45.25." (Email dated June 2, 2004.)  Indeed, the May 4, 2004 closing price of $45.25 was the lowest closing price of the quarter.

78.     Further corroborating the Maxim fraud, according to a former senior product designer and principal member of the technical staff ("CW10"), who was employed by Maxim from 1997 to 2006, Maxim's Board of Directors held "emergency meetings" to approve stock option grants while the Company's stock price was low.  According to CW10, both the engineers and the senior management at Maxim were acutely aware of the Company's stock price and the exercise price of options.

79.     Further details of the backdating of employee grants were set forth in the Company's non-public letter to the NASDAQ Listing and Hearing Review Council, dated May 4, 2007, in which Maxim reported that "[t]he Special Committee's review of the thirty-eight quarterly grants to existing rank-and-file employees made between the first fiscal quarter of 1996 through the third fiscal quarter of 2006 revealed that grant dates fell at market prices that were uniquely low. The evidence also revealed the existence of general process issues, including (1) grant lists that were not entirely finalized until after the selection of the grant date; and (2) post-grant-date changes by Mr. Gifford to the number of shares recommended to particular employees."

### 2.     Defendants Knowingly Backdated Grants To New Hires

80.     Maxim attracted new employees with its lucrative stock options.  However, as admitted in the Restatement, "certain grants to newly hired employees were improperly accounted for and required accounting adjustments. There were 4,762 new hire grants for a total of 36,884,194 underlying shares during the Restated Annual Periods, approximately *96% of new hire grants*, for which adjustments were required. The compensation expense resulting from the adjustment of measurement dates for these grants is *$122.1 million*, net of forfeitures, in the Restated Annual Periods."

81.     As admitted in the Restatement, Maxim improperly granted options to new hires "with hindsight:"

*Grant dates were selected with hindsight or prior to completion of the granting process*

Shares for new hires were finalized and communicated in offer letters; however the exercise price was not typically stated in the letters but instead included a statement that the timing of the grant would be at the full-time start date or other date decided at the discretion of the Board. . . .

The preparation date of the memoranda as evidenced by its metadata and the date of the emails were considered to be the most reliable indication of the actual date on which the Option Committee made its pricing decision. ***The memoranda and emails were often prepared on a date after the originally recorded grant dates and documented the use of hindsight in the selection of the grant dates.*** We consequently adjusted the measurement dates for these grants to the later of the hire date or the date reflected by the pricing documentation.

82.     The Restatement also admitted additional improper accounting practices for grants to newly hired employees prior to commencement of their full-time employment:

*The Part-Time Program*

In 1999, we created a program that we believed would permit the granting of options to employees prior to commencement of their full-time employment (the "Part-Time Program"). The terms of the Part-Time Program specified that an employee was eligible for part-time status prior to commencement of full-time employment with the Company if certain criteria were met.

***The majority of participants in this program were found not to have the characteristics of an "employee" based on the definitions and criteria provided in Section 422 of the Internal Revenue Code of 1986, as amended, and in certain cases did not meet the criteria set by us for participation in the Part-Time Program.*** We concluded that the grants to the Part-Time Program participants should not have been considered employee grants until the commencement of their full-time employment. Nevertheless, for purposes of proper measurement date determination, we treated all grants made to part-time employees as employee grants as they were made in contemplation of full-time employment and the grant would not vest until full-time employment commenced. No grant made under the Part-Time Program was given a measurement date earlier than the full-time hire date.

83.     Several former employees corroborate Maxim's new hire granting practices.   For example, CW4 interviewed with Ron Young ("Young"), a Maxim director, who said that ***it was Maxim's standard policy to grant options at a strike price based on the lowest price for the stock in the previous three months.***   When CW4 received an offer letter one month later, it did not contain the lowest price of the previous three months.   CW4 contacted Young about the discrepancy, and Young verbally agreed that the option award would be backdated to the three-month low price.   Three months after beginning work at Maxim (and five months after his conversation with Young), CW4 received a

1   standard letter detailing his option price which confirmed that ***his options had been awarded at the***

2   ***three-month low price.***

3       84.   According to CW4, Maxim's hiring practices with respect to college students was to

4   grant stock options with a strike price the day that they signed the offer letters, which was six months

5   before they started employment at Maxim.   This practice incentivized the students – to Maxim's

6   benefit – to honor their agreement with Maxim and not accept a competing offer from another

7   company.

8       85.   Similarly, CW6, a former technical recruiter for Maxim from 1999 to 2004, noted that

9   Maxim would enter into written agreements with some candidates it interviewed, which resulted in the

10  candidates receiving a nominal sum – *e.g.*, "$10 an hour for two hours per week" or "a check from

11  Maxim for $40" – during the period between their interview and their start date.   These written

12  arrangements, which CW6 referred to as "bogus employment agreements," gave Maxim the ability to

13  set the strike price for the candidate's options as far back as when a candidate interviewed (rather than

14  the day in which they started working), even though the candidate had not yet started working for the

15  Company.   CW6 noted that when candidates would inquire as to why they were receiving checks for

16  small amounts despite not yet working at Maxim, CW6 told them it was a mechanism to get them a

17  lower strike price for their options.

18      86.   According to CW7, who worked at Maxim from 1999 to 2006, in one instance, an

19  individual's stock option price was based on when that person began as an intern rather than when the

20  individual started full-time employment with the Company.

21      87.   Also, according to CW10, the Company made its employment offers more attractive by

22  dating the options based on when the candidate first began interviewing with Maxim, rather than

23  according to their actual start date, in order to give the new hire a lower strike price.   CW3, who was

24  employed by Maxim from late 2001 through July 2005 corroborates this statement.   CW3 was

25  interviewed for a position at Maxim by Doug Ahrens ("Ahrens"), Managing Director of Finance at

26  Maxim in Sunnyvale, California.   Ahrens informed CW3 that the stock options received upon

27  employment would be backdated to a low price three or four weeks prior to the date of the signed

28

1   employment agreement.  The signed employment agreement, in turn, could be several weeks before

2   employment actually began at Maxim.

3        88.   In one specific instance, Maxim granted options to new employees hired after February

4   29, 2002, with the grant date of March 25, 2002, and the exercise price equal to the March 25 closing

5   stock price of $51.81.  These grants, however, were not made until sometime in late April 2002, after

6   the quarter had ended, as set forth in the SEC Complaints and corroborated by internal Company

7   documents obtained from the publicly available electronic docket of the Delaware Court of Chancery.

8   On or about April 22, 2002, according to computer metadata associated with the memorandum,

9   Defendant Jasper asked Defendant Gifford to sign a grant approval memorandum dated March 25,

10  2002, to "keep [Maxim's] documentation and records straight."   Defendant Gifford signed the

11  memorandum, which stated:  "I want you to make sure that any new hire who started at Maxim

12  between March 1, 2002 and today has their stock granted at today's closing price of $51.81."

13  Maxim's stock administration department did not learn of the supposed March 25 grant date until on

14  or about April 24, 2002, according to the SEC Complaints.

15       89.   According to a former human resources consultant who worked for Maxim in 2003

16  ("CW11"), it was Maxim's practice to group new hires by quarter and to give all of the people hired

17  during a given quarter the lowest strike price of the quarter.  CW11 stated that the purpose of this

18  practice "was to ensure that a group of people hired during the quarter received the benefit of the

19  lowest stock price."  A former payroll manager who worked for the Company in Dallas, Texas from

20  1998 to 2003 ("CW12") corroborated that Maxim grouped new hires according to the quarter in which

21  they were hired and were given the same strike price for their options corresponding to the lowest

22  price of the quarter.

23       90.   Other internal Company documents, obtained from the publicly available electronic

24  docket of the Delaware Court of Chancery, evidence that new hires were granted options at quarterly

25  lows with the benefit of hindsight.  For example, in a June 30, 2003 email titled "New Hire Strike

26  Price in Q403", Maxim's Stock Plan Administrator wrote "[f]or all new hires on or before 6/25/03, use

27  6/25/03 as strike price." The June 25, 2003 closing price was the lowest price of the "Q403," closing at

28  $33.85.

CONSOLIDATED CLASS ACTION COMPLAINT                                                  -28-
CASE NO. C-08-00832-JW

91.     An email forwarded to Defendants Jasper and Ruehle, dated August 19, 1998, titled "Q4 new employees", stated:

> I wanted to let you know that any new employee who started in Q4 will get an option price of $28.125.  Also if there was an offer outstanding on June 17, 1998 Jack [Gifford] approved their option at $28.125.  Please be sure this is communicated to the new employees so that are not concerned with their decision to join Maxim.
> This decision, which Jack made, only impacts new employees who started in Q498 or had an offer outstanding at June 17, 1998.  We expect to get the option paperwork out in the next few weeks.

Indeed, the June 17, 1998 closing price was the lowest price of the quarter.

92.     As set forth in the Restatement, the compensation expense resulting from the adjustment of the improperly backdated new hire grants was **_over $122 million_**.

### 3.     Defendants Knowingly Backdated Option Grants To Directors

93.     At the Annual Meeting of the Board of Directors on November 13, 1997, Defendant Gifford was delegated sole authority to grant stock options to non-employee directors on the Board.

94.     The Option Agreements between Maxim and certain directors granted under the 1996 Stock Incentive Plan expressly stated that "[t]he exercise price of this option is set forth in the Notice of Grant, being one hundred percent (100%) of the fair market value of the Common Stock on the date of grant of this option."   Notwithstanding this fact, Defendants engaged in a widespread pattern of granting stock options to directors at a price less than 100% of the fair market value of Maxim's common stock on the date of the grant.

95.     For example, on October 21, 1999, Maxim purported to grant options to directors Bergman, Hagopian and Wazzan. Internal Company documents, however, obtained from the publicly available electronic docket of the Delaware Court of Chancery, evidence that the October 21, 1999 grant date and exercise price was actually chosen with the benefit of hindsight and backdated over two months later in January.  On January 4, 2000, Defendant Jasper wrote a memorandum to Defendant Gifford stating the following:

> I read your note back on this topic and talked with Tony on this. To confirm, since the Directors were given 10,000 options last year, do you want them to be granted 8,000 (pre-split shares) in Q200?
>
> Also the dates that fit the price range that you want are as follows:

Date    Price
10/18 = $65.2500
10/19 = $65.6875
10/20 = $67.4375
10/21 = $69.2500
10/22 = $70.4375
10/25 = $71.3750
10/26 = $70.4375
10/27 = $69.6250

I would use 10/21 to achieve this objective.

To establish a clean audit trail, can you approve the attached memo stating that you granted 8,000 options to each director on 10/21/99? We will use this for our files.

In a memorandum created the next day, on January 5, 2000, Defendant Gifford authorized granting 8,000 options to each outside director.  Although the memorandum was created on January 5, 2000, it was dated as of October 21, 1999, which coincides with the exercise price of $69.25 carried on these options.  After adjusting for Maxim's 2:1 stock split on December 22, 1999, the exercise price for these options was $34.625.  However, on January 5, 2000, the date on which Defendant Gifford actually authorized the options for the outside directors, Maxim stock closed at the split-adjusted price of $47.375.

96.    In another instance, according to the SEC Complaints and corroborated by internal Company documents obtained from the publicly available electronic docket of the Delaware Court of Chancery, Maxim granted 36,000 options dated October 1, 2001, to directors Bergman, Hagopian, Karros, M.D. Sampels ("Sampels"), and Wazzan, at an exercise price equal to that day's closing stock price of $34.06.   This grant was not actually made until on or around December 11, 2001, when Maxim's stock was trading at $57.90.  On or around December 10, 2001, according to computer metadata associated with the memorandum, Defendant Jasper wrote a memorandum to Defendant Gifford, stating the following:

I have attached the option position of each outside director so that you can review and make them their grant for FY01 before the price gets away from us. I would suggest granting them on one of the following dates:

October 1      $34.06
October 2      $33.40
October 3      $38.07
October 4      $39.87

October 9      $39.37 (last $30 price)
October 18     $41.71
October 30     $43.16
November 1     $48.65 (last $40 price)

Please sign the attached as your authorization (this will keep our audit trail straight).

97.    Defendant Gifford responded to Defendant Jasper's memorandum with a handwritten note, including the handwritten date "12/7/01", in which he wrote:

We're late … these grants! The price is higher than Oct! Use $34.06 price & we'll expense it. Is it material?
Jack

98.    As a result of Defendants Gifford and Jasper backdating the director options to October 1, 2001, with an exercise price of $34.06 per share – the second lowest closing price of the fiscal quarter – the directors received a built-in value (and cost to Maxim) of approximately $14 per share as the stock was trading at $57.90 on the actual date of the grant in December.  Also during December 2001, minutes were created and signed by Defendant Gifford to make it appear as if the options had been granted on October 1, 2001.

99.    Then, on November 21, 2002, Defendant Jasper wrote a memorandum to Defendant Gifford, stating the following:

I have attached paperwork for your consideration and approval for the Board's 2002 grant. Option summaries are also attached for your reference purposes.

Issue: I just learned that the new governance laws not only require that exercises of options and sales of stock be disclosed to the SEC in 2 days but also grants.

Recommendation: grant them on October 10th and let them show up as late. 4 of the last 5 years we have listed late filings in our proxy.

100.    Defendant Gifford followed Defendant Jasper's recommendation and chose to grant options as of October 10, 2002, with an exercise price of $21.35 (the closing price on October 9, 2002), the lowest closing price of the fiscal quarter.  This grant created an instant, "in-the-money" profit of $21.29 per share for the director recipients, and corresponding compensation cost to Maxim, based upon the November 21, 2002 closing price of $42.64.  Defendant Gifford, however, made it appear as if the grant had been actually made on October 10, 2002.

101.    By letters from Defendant Jasper dated December 3, 2002, directors Wazzan, Hagopian, Bergman and Sampels were notified that they had purportedly been granted their options on October 10, 2002.  In the letters to each of these directors, which were obtained from the publicly available electronic docket of the Delaware Court of Chancery, Defendant Jasper stated:

> [A]nnual option grant[s were] made on October 10, 2002 for the current quarter. Option paperwork will be forthcoming to you in the mail. Unfortunately, I was unaware that under the Sarbanes-Oxley Act grants to Outside Directors and Company Officers must be disclosed within 2 days of their grant date. . . . We filed notice with the SEC today concerning your grant[s] and this late filing will be disclosed in next year's proxy.

102.    Another stock option manipulation occurred during November 2002 when director Karros, who did not stand for re-election at the Annual Meeting on November 14, 2002, was nevertheless granted 5,000 options carrying the October 9, 2002 grant date.  Maxim granted these options pursuant to a part-time employment contract "effective" on October 9, 2002, which was signed by Defendant Jasper and Karros on a form last revised on "10/25/02."  Thus, this agreement could not have been effective as of October 9, 2002.  Also, Karros signed his Notice of Option grant on December 16, 2002, further substantiating the backdating of these options.

103.    In another instance, on June 20, 2003, Defendant Gifford sent Defendant Jasper a facsimile, authorizing the issuance of an option grant to director Wazzan for his service.  Defendant Gifford wrote: "I want to give Frank a stock option for 8,000 shares vested for this work. Do this at 34/35/share."   On June 20, 2003, Maxim stock closed at $35.82 per share. The option grant purportedly was made on June 25, 2003, when Maxim's stock closed at $33.85, the lowest price of the month and the fiscal quarter.  Director Wazzan did not file his Form 4 disclosing this option grant until September 25, 2003.  However, Defendant Jasper had notified him in a letter dated December 3, 2002, that pursuant to the Sarbanes-Oxley Act of 2002, option grants to outside directors must be disclosed within two days of the grant date.  Maxim stock closed at $39.72 on September 25, 2003, almost $6 higher than the close on the purported June 25, 2003 grant date.

104.    As admitted in the Restatement, Maxim had to record an additional $3.986 million in compensation expenses for backdated director grants.

### E.    Maxim's Restatement Details Defendants' Intentional Conduct

105.    On September 30, 2008, Maxim filed the Restatement which details the existence of pervasive, massive and systematic accounting violations at Maxim throughout the Class Period.  In the aggregate, the Company recorded additional stock-based compensation expense totaling $773.5 million from the beginning of fiscal year 1997 through its fiscal third quarter ended March 25, 2006.[2]

106.    Accounting restatements are only permitted, and are required, under GAAP, for material accounting errors that existed at the time the financial statements were prepared.  *See* SFAS 16 and APB Opinion No. 20.  In this case, material accounting adjustments to Maxim's previously filed financial statements were required for: (a) instances where periodic grants were made to employees and independent directors where the selection of grant dates was made with the benefit of hindsight or prior to the completion of the granting process; (b) instances where grants were made to new employees prior to commencement of employment or were dated prior to the completion of the granting process; (c) instances where the accounting treatment of other granting activities was not in compliance with GAAP; (d) instances where modifications to grants were not properly accounted for; and (e) the provision for income taxes, payroll taxes, penalties and interest in connection with the above stock-based adjustments and the use of incorrect cash exercise dates.

#### 1.    The Special Committee's Findings

107.    In Item 7 of the Restatement regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Maxim included a section entitled "Restatements of Consolidated Financial Statements and Special Committee and Company Findings."  Therein, Maxim detailed the findings of the Special Committee.  Among the "principal findings" of the Special Committee were that:

(a)    authority to grant options to directors and non-officer employees and newly-hired employees (who were not officers) was delegated to Defendant Gifford as the one-person Option Committee;

---

[2] In addition to stock-based compensation adjustments, certain stock option-related and other adjustments were also recorded.  As a result, total pre-tax adjustments to income from operations were $838.3 million.

(b)     ***there were procedural deficiencies and misdated grants, including documentation that was not finalized until after the selection of grant dates,*** and changes made by the Option Committee to the number of shares underlying certain grants after the approval date of such option grants;

(c)     the ***limited controls and the lack of definitive processes for stock option approval and recordation allowed for the use of hindsight*** in selecting dates for grants made to certain newly-hired employees and, in some cases, part-time employees;

(d)     ***the Company's former chief executive officer and former chief financial officer had knowledge of, and participated in, the selection of grant dates for director, non-employee and employee option grants from 1999 through 2005, either with the benefit of hindsight or prior to completion of the grant-approval process, and were the employees most involved in the selection of grant dates;***

(e)     ***the Company's former treasurer and former manager of stock administration had knowledge of, and participated in, the selection of certain grant dates based on hindsight*** or prior to the completion of the grant-approval process;

(f)     on many occasions, exercise dates for options exercised by grant recipients, including Defendant Gifford, appear to have been incorrectly reported.  Generally, in these instances, the price of Maxim's common stock was lower on the reported exercise date than on the date the option actually was exercised.  This reporting had the effect of reducing the exercising employees' taxable income, and resulted in underreported liabilities for withholding taxes and exposed Maxim to withholding tax liabilities plus penalties and interest for failure to pay such withholding taxes; and

(g)     the former chief executive officer, former chief financial officer, former treasurer, and former manager of stock administration ***understood the accounting consequences of granting options at a price other than the fair market value on the date of grant.***

## 2.     <u>Massive Financial Impact</u>

108.     The Restatement dramatically lowered Maxim's net income and earnings per share for the fiscal years ended 1997 through the 9 months ended March 25, 2006, as demonstrated below:





109.    Also, as set forth below, because Defendants knowingly failed to properly account for compensation expenses attributable to the Company's improper backdating practices:

(a)    Maxim's reported net income was materially overstated during the Class Period by **$73 million (31%), $114 million (37%), $79 million (17%) and $47 million (16%)** in fiscal years 2003, 2004, 2005 and for the 9 months ended March 25, 2006, respectively.

(b)    Maxim's earnings per share were materially overstated during the Class Period by ***$0.22 (24%), $0.33 (27%), $0.23 (15%) and $0.15 (15%)*** in fiscal years 2003, 2004, 2005, and for the 9 months ended March 25, 2006, respectively:

| *In millions | Fiscal year-ended | | | 9 mos. ended |
|---|---|---|---|---|
| | June 28, 2003 | June 26, 2004 | June 25, 2005 | March 25, 2006 |
| | | | | |
| Net income, as reported | $ 310 | $ 420 | $ 541 | $ 38,235 |
| Net income, as restated | $ 237 | $ 306 | $ 462 | $292 |
| | | | | |
| **Overstated net income ($)** | **$ 73** | **$ 114** | **$ 79** | **$ 47** |
| **Overstated net income (%)** | **31%** | **37%** | **17%** | **16%** |
| | | | | |
| Earnings per share, as reported | $ 0.91 | $ 1.20 | $ 1.58 | $ 1.00 |
| Earnings per share, as restated | $ 0.69 | $ 0.87 | $ 1.35 | $ 0.85 |
| | | | | |
| **Overstated EPS ($)** | **$ 0.22** | **$ 0.33** | **$ 0.23** | **$ 0.15** |
| **Overstated EPS (%)** | **24%** | **27%** | **15%** | **15%** |

### 3.    The Restatement's Backdating Summary

110.    Note 2 to the Restatement summarized the option grants which required new grant dates:

As a result of the findings of the Company's stock option review, the Company has recorded additional pre-tax stock-based compensation expense, net of forfeitures, of $515.4 million for the fiscal years 1997 through 2005 ("Restated Annual Periods") under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and its related interpretations arising from revised measurement dates. In addition to the adjustment resulting from the measurement date revisions, the Company separately recorded additional pre-tax stock-based compensation expense for such years of $204.6 million to properly account for modifications to options terms and for the granting of options to non employees. Included in the additional pre-tax stock-based compensation expense amounts noted above is $8.0 million which has been capitalized into inventory as of June 25, 2005. Such capitalized cost was subsequently reflected in cost of goods sold as the related inventory was sold. After related payroll tax, penalties, interest and withholding tax adjustments of $29.2 million, the restatement resulted in total pre-tax adjustments of $741.2 million related to stock-based compensation for the fiscal years 1997 through 2005.

In addition to the above, the Company has made certain non-stock option related pre-tax adjustments (described below) totaling $23.0 million for the Restated Annual Periods. Certain of these adjustments were previously considered immaterial and related to accruals, reserves and allowances and the amortization of manufacturing variances.

111.   Maxim admitted that in total there were 37,060 grants comprising 106,172,454 shares to directors, officers and other employees which had inaccurate (*i.e.,* backdated) grant dates.   This required *$382.6 million* of additional stock-based compensation, as detailed below:

|  | Number of Shares Requiring Adjustment | % of Total Adjusted Grants | Stock-based Compensation Expense ($ in thousands) | % of Expense |
|---|---|---|---|---|
| Directors | 671,000 | 0.6% | 3,986 | 1.0% |
| Officers | 15,612,301 | 14.7% | 35,357 | 9.2% |
| Other Employees | 89,889,153 | 84.7% | 343,316 | 89.8% |
| **Total** | **106,172,454** | **100.0%** | **$     382,659** | **100.00%** |

112.   In addition, Maxim admitted that in total there were 4,762 grants comprising 36,884,194 shares to newly-hired employees which had inaccurate (*i.e.*, backdated) grant dates. This required a total of *$122.1 million* of additional stock-based compensation.

113.   Further, the Company admitted "that certain grants to foreign employees and to non-employee consultants were improperly accounted for and required accounting adjustments [and] we have recorded an adjustment for certain option related arrangements such as guaranteed gains and repurchase agreements that had been accounted for improperly."   These violations resulted in additional adjustments of *over $223 million*.

114.   With respect to improperly accounting for grants to non-employee consultants, the Company had to restate compensation expenses of $34 million. As set forth in the Restatement:

> Stock option grants were made to employees of outside firms that performed design work for us under contractual arrangements as a means of recruiting these individuals for eventual employment by the Company. At the time of the grants, these individuals did not meet the characterization of an employee as defined by the Internal Revenue Service Revenue Ruling 87-41. Additionally, there were other grants made to non-employee individuals who rendered consulting services to the Company. These grants have been restated to account for them as non-employee grants under the relevant accounting literature at the time.

> *         *         *

> A total of 71 non-employees received a total of 86 grants for a total of 3,015,728 underlying shares for which adjustments were required. The *aggregate restated compensation expense resulting from the adjustment of measurement dates for these grants is $34.0 million*, net of forfeitures, in the Restated Annual Periods.

115.   With respect to grants to foreign employees, the Company admitted:

> In 2000, we became aware of tax regulations in Switzerland that resulted in employees being taxed upon grant at the fair market value of the award. In 2001, we made modifications to

grants that had been made to Swiss employees in 2000 by changing grant dates in an effort to minimize the employees' tax liabilities.

Also in 2000, we became aware of certain Italian tax regulations that affected the tax obligations of the Company and Italian employees related to stock option grants in Italy. To avoid negative tax consequences, grants made to Italian employees needed to be priced at the higher of the grant date's spot price, which was defined as the prior day's closing price, or the average of the prior 30 days' closing prices. Between November 2000 and October 2001, we modified historical grant dates and/or prices made to Italian employees to comply with the Italian tax pricing requirements.

There were 109 foreign employees who received 508 grants for a total of 2,154,282 underlying shares during the Restated Annual Periods with modified grant dates and/or prices. The *aggregate restated compensation expense resulting from the adjustment of measurement dates for these grants is $10.1 million*, net of forfeitures, in the Restated Annual Periods.

116.    The Company also failed to properly account for grants with "guaranteed gain provisions" or "repurchase arrangements:"

In connection with certain grants, we pledged to the grant recipient that a specified level of gain would be realized upon exercise of the grants. As a result of our lack of process for tracking and calculating guaranteed gains offered to employees, we failed to identify, properly calculate and record accrued expenses for certain minimum guaranteed gain amounts, resulting in the need for correction of this error. Prior to the restatement, we had recorded a total of $3.7 million in compensation expense related to these provisions.

Additionally, we identified certain transactions which were previously accounted for as guaranteed gains, but in substance were repurchase arrangements. Pursuant to the terms of these arrangements, we agreed to repurchase a stipulated amount of a new hire's options at a fixed price (above the exercise price) within a period of time after a selected date. In substance, this feature represents a "put" giving the employee the right to require us to repurchase the shares after the selected date. The proper accounting for this type of put feature is variable accounting from the grant date to the earlier of (a) the expiration of the put feature or (b) exercise of the put feature.

We have recorded as part of the restatement *an additional $5.8 million in compensation expense*, net of forfeitures, for the above provisions through June 25, 2005. The aggregate restated compensation expense, net of forfeitures resulting from guaranteed gains and repurchase arrangements is *$9.5 million* in the Restated Annual Periods.

117.    Maxim also admitted that "many modifications had been made to grants and had not been accounted for in accordance with GAAP:"

We identified instances where modifications to grants effectively renewed or extended the life of the grants or that accelerated the vesting of options in connection with an individual's termination of employment. This population includes grants that were not properly canceled upon an employee's termination, a small number of which were made available to the individual upon rehire. A total of 546 employees and 2,047 grants for a total of 8,450,000 underlying shares were modified in this way, resulting in the recognition of an *aggregate compensation expense of $150.7 million* in the Restated Annual Periods.

We also identified certain grants that were modified to alter the grant date exercise price through a direct repricing of the grant or a cancellation of the grant and issuance of a

replacement grant at a lower exercise price. These modifications require variable accounting treatment. We have recorded in the Restated Annual Periods ***an additional \$12.9 million in compensation expense***, net of forfeitures, for these direct and indirect repricings.

### 4.    Maxim's Deficient Controls And Procedures

118.    To create the false appearance that options had actually been granted at-the-money on a date prior to the actual grant date, Defendants systematically falsified or caused to be falsified Company books, records and accounts.

119.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP]."  15 U.S.C. § 78m(b)(2).  These provisions require the issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized and to properly record transactions on the issuer's books.

120.    Maxim violated Section 13(b)(2)(A) of the Exchange Act by, *inter alia,* failing to maintain accurate records concerning its stock options and stock option practices and by filing false financial statements and inaccurate tax returns during the Class Period.  Despite signing certifications to the contrary, Defendants failed to design and enforce appropriate procedures for record-keeping, segregation of duties, and to prevent improper management override of controls with respect to stock-based compensation, stock option administration, SEC financial reporting and disclosure requirements, and tax compliance.  Maxim's inaccurate and false stock option recordkeeping, financial statement inflation, and tax non-compliance were not isolated or unique instances because they were improperly maintained for most or all of 1997 through at least the third quarter of fiscal 2006.

121.    In addition, Maxim violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  Maxim failed to ensure that proper review and checks were in place to ensure that it was properly recording, accounting for and reporting its employee compensation.  The Company also failed to ensure that transactions were reported during the Class Period in accordance with SEC Regulations and GAAP.

122.    In Item 9A of the Restatement, the Company discussed its Controls and Procedures as follows:

In performing the assessment, our management concluded that two material weaknesses existed in our internal control over financial reporting as of June 24, 2006, due to the effect of not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions.

123.    Maxim also admitted the material weakness of the control environment during the Class Period:

Based on the results of this assessment, management has concluded that the control environment was not effective and therefore a material weakness existed in internal control for the following reasons.

- As of June 24, 2006, the Company did not maintain at the executive management level a tone and control consciousness that consistently emphasized in the area of option grants strict adherence to and compliance with accounting rules. The stock option granting process during the Review Period was overly dependent on certain former executive officers of the Company, including the former CEO and CFO. *Our former CEO was the sole member of the Option Committee which, starting in 1996, had authority to make all grants other than officer grants under the Company's option plan.* The timing and approval of granting actions was under the direct control of the CEO and the CFO, without significant involvement of other members of senior management with respect to the selection of grant dates and exercise prices. The lack of adherence to consistent procedures was additionally contributed to and perpetuated by our then Treasurer and Manager of Stock Administration. Within the office of the CEO, the office of the CFO, the office of the Treasurer, and the Stock Administration department, and generally within the Company as a whole, there were insufficient consistently applied, rigorous procedures for selecting, approving, documenting, and monitoring stock option grants and related transactions, including modifications and cash exercises, and for assuring their conformance to Company policies and appropriate accounting treatment.

- The Company's policies and procedures with respect to the review, supervision and monitoring of our Stock Administration department *were not designed properly and were not operating effectively.*

- The Company *failed to design, institute and maintain sufficient controls, including monitoring controls, to reasonably ensure the prevention or detection of non-compliance with Company policies concerning the granting of options,* including adherence to certain provisions of our option plan and the recording of stock-based compensation expense and other proper accounting for options.

- Proper lines of communication regarding the identification and processing of stock option transactions among senior management and our human resources, Stock

Administration, accounting and legal functions were not maintained. This produced, among other things, a lack of adequate supporting documentation for many stock option grants.

The foregoing deficiencies in the control environment permitted and **led to the use of hindsight in determining the grant date and exercise price of certain options,** the failure to complete all required granting actions before the selection of recorded grant dates in many instances and many option grant transactions during the Review Period and certain cash exercises not being properly accounted for and disclosed in the Company's consolidated financial statements.

124.   In the "Stock Option Practices and Related Accounting for Stock Option Transactions" section of Item 9A in the Restatement, Maxim admitted that "additional stock-based compensation is being recorded due to errors in accounting for stock option transactions." More specifically:

- The Company failed to design and maintain sufficient procedures and controls to ensure that option grants were made and accounted for in accordance with Company policies, including with respect to the identification, proper assessment, and application of the proper accounting treatment of stock option transactions, especially the determination of correct measurement dates for stock option grants and the accounting for modifications of key terms of options.

- There was a lack of sufficient staffing, accounting knowledge and training among the personnel dealing with stock options and insufficient supervision of Stock Administration to ensure the proper application of accounting and financial reporting for stock option transactions.

- There was a lack of complete and consistent documentation for stock option transactions.

Based on its findings with respect to the existence of material weaknesses in our internal control over financial reporting described above, management concluded that our internal control over financial reporting was not effective as of June 24, 2006.

125.   Also, on September 30, 2008, Maxim filed its Form 10-K for the fiscal year ended June 30, 2007 ("FY'07 Form 10-K"). In Item 9A of the FY'07 Form 10-K, Maxim discussed its Controls and Procedures as follows:

As set forth in our Annual Report on Form 10-K for the fiscal year ended June 24, 2006, our management determined that material weaknesses existed in our control environment and controls over stock option practices and the related accounting for stock option transactions as of June 24, 2006. As discussed in more detail below, our management, including the CEO and the CFO, has concluded that the Company's disclosure controls and procedures were not effective as of June 30, 2007 due to the continuing presence of the material weaknesses or ongoing implementation of remedial actions as of June 30, 2007.

\*       \*       \*

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. C-08-00832-JW

-41-

In performing the assessment, our management concluded that two material weaknesses existed in our internal control over financial reporting as of June 30, 2007, due to the effect of not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions.

126.   In the "Stock Option Practices and Related Accounting for Stock Option Transaction" section of Item 9A of the FY'07 Form 10-K, Maxim explained:

[O]ur management determined that the recording of additional stock-based compensation for fiscal years 1997 through 2005 due to errors in accounting for stock option transactions constituted a material weakness, due to the Company's failure to maintain sufficient procedures and controls over granting and accounting of stock options, lack of sufficient staffing, accounting knowledge and training among the personnel dealing with stock options, and lack of complete and consistent documentation for stock option transactions. Due to the continuing presence of the material weaknesses or ongoing implementation of remedial actions as of June 30, 2007, management has concluded that the Company's internal control over financial reporting was not effective as of June 30, 2007.

127.   Finally, Maxim detailed the remedial measures due to the improper backdating and accounting practices it has taken, including, *inter alia*:

- The Option Committee, of which the former CEO of the Company was the single member, was effectively abolished on December 19, 2006.

- The Board of Directors separated the role and responsibility of Chairman of the Board and Chief Executive Officer in January 2007, which were previously combined (however, the Board retains the authority to combine such positions at anytime).

* * *

- On April 6, 2007 the Board of Directors adopted a revised Compensation Committee Charter which authorizes the Compensation Committee to (i) grant stock options and other equity-based awards to individuals eligible for such grants (including the CEO, officers, and employees but excluding the non-employee members of the Board of Directors), (ii) interpret the terms of the plans and award agreements issued hereunder, and (iii) modify or waive any condition of outstanding awards issued under the plans. The Compensation Committee may form and delegate authority to one or more subcommittees where appropriate, including but not limited to a subcommittee comprised of at least two members of the Compensation Committee to approve equity awards under the Company's Equity Award Grant Policy (discussed below).

* * *

- Only the Compensation Committee or the Board of Directors may approve the grant of equity awards under the 1996 Plan (or any future successor plan). In addition, pursuant to the Compensation Committee Charter, the Compensation Committee

may delegate the authority to approve the grant of equity awards to a subcommittee comprised of at least two members of the Compensation Committee ("Equity Grant Subcommittee").

- The grant date for an equity award is the date on which the Compensation Committee or Equity Grant Subcommittee of the Board of Directors meets and approves the number of shares of an individual's equity award.

- The exercise price for all stock options will not be less than the closing sales price as reported by NASDAQ (or other national market, including over-the-counter markets) of the Company's common stock on the grant date.

* * *

- The Compensation Committee approves annual, new hire and special recognition (e.g., promotions) grants on the first Tuesday of each month.

* * *

- In October 2007, the Company completed the restaffing of the Company's Stock Administration department with a management team experienced in designing, implementing and maintaining effective control environments.

* * *

- In April 2008, the Company created and filled a new position within finance, Director of Technical Accounting, who has the responsibility to provide independent monitoring of Stock Administration and stock option accounting.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

128.   During the Class Period, Defendants knowingly made false and misleading public statements regarding the granting of, and accounting for, Maxim's stock options.  As detailed below, Defendants' statements, including Maxim's financials statements, press releases and conference calls were false and misleading for one or more of the following reasons:

(a)   Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant.  This practice was in direct contravention of Maxim's public statements and guidelines in the Company's employee stock option plans regarding the grant price for stock options;

(b)   Defendants failed to properly record (in accordance with GAAP) compensation expense to account for the difference between the stock option grant price and the fair market value of

the stock options. This resulted in the overstatement of numerous financial metrics, including, but not limited to, net income and diluted earnings per share; and

(c)     As admitted by Defendants in the Restatement, the Company's financial statements, including its operating income, net income, and earnings per share were overstated during the Class Period by the following amounts:

| ($ in millions) | Overstated Operating Income | | Overstated Net Income | | Overstated EPS | |
|---|---|---|---|---|---|---|
| **PERIOD** | **$** | **%** | **$** | **%** | **$** | **%** |
| **FY 2003** | **$113.3M** | **34%** | **$ 72.9M** | **31%** | **$0.211** | **30%** |
| | | | | | | |
| **FY 2004** | **$181.2M** | **43%** | **$114.1M** | **37%** | **$0.320** | **36%** |
| **1Q05** | $27.0M | 15% | $19.2M | 15% | $0.056 | 15% |
| **2Q05** | $25.0M | 13% | $17.4M | 14% | $0.051 | 14% |
| **3Q05** | $30.1M | 20% | $20.1M | 19% | $0.059 | 19% |
| **4Q05** | $30.5M | 20% | $21.9M | 21% | $0.062 | 21% |
| **FY 2005** | **$112.6M** | **17%** | **$ 78.6M** | **17%** | **$0.228** | **17%** |
| **1Q06** | $30.7M | 27% | $18.6M | 21% | $0.054 | 21% |
| **2Q06** | $23.1M | 17% | $14.9M | 15% | $0.045 | 15% |
| **3Q06** | $21.3M | 14% | $13.2M | 12% | $0.039 | 12% |
| **2006 (9 mos.)** | **$75.0M** | **19%** | **$46.7M** | **16%** | **$0.142** | **17%** |
| **CLASS PERIOD TOTALS** | **$482.1M** | **26%** | **$312.3M** | **24%** | **$0.910** | **24%** |

A.     **False And Misleading Financial Statements**

1.     **Fiscal Year 2003 (3Q And 4Q)**

129.     On April 29, 2003, the first day of the Class Period, Maxim issued a press release announcing financial results for the Company's fiscal third quarter 2003 which ended March 29, 2003. The release was filed with the SEC on Form 8-K that same day. The press release stated, in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported net revenues of $286.2 million for its fiscal third quarter ending March 29, 2003, a 10.7% increase over the $258.5 million reported for the third quarter of fiscal 2002 and unchanged from reported revenues for the second quarter of

fiscal 2003. ***Net income for the quarter was $77.6 million, a 16.3% increase over the $66.7 million reported last year and a 0.7% increase over the $77.1 million reported for the previous quarter. Diluted earnings per share (which measure the cost of employee stock options and include the Company's average outstanding common stock for the quarter, or 322.9 million shares, increased by 19.0 million shares using the Treasury Stock Method) were $0.23 for the third quarter, a 21.1% increase over the $0.19 reported for the same period a year ago and unchanged from reported second quarter fiscal 2003 results.***

130.    On May 12, 2003, Maxim filed with the SEC its Report on Form 10-Q with the SEC for the period ended on March 29, 2003 ("3Q'03 Form 10-Q").  Defendants Gifford and Jasper signed certifications included with the 3Q'03 Form 10-Q stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

131.    Note 3 to the 3Q'03 Form 10-Q consolidated financial statements described Maxim's accounting for stock-based compensation as follows:

> The Company has elected to follow APB Opinion No. 25, Accounting for Stock Issued to Employees, and related interpretations in accounting for the stock options granted to employees and directors. ***Accordingly, employee and director compensation expense is recognized only for those options whose price is less than fair market value at the measurement date.***

132.    In accordance with § 302 of SOX, Defendants Gifford and Jasper signed certifications which were included in the 3Q'03 Form 10-Q.  These certifications represented, *inter alia*, that: (a) the 3Q'03 Form 10-Q fairly represented Maxim's financial condition; (b) the 3Q'03 Form 10-Q did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" (c) the financial statements and other financial information included with the 3Q'03 Form 10-Q, fairly presented in all material respects Maxim's financial condition, results of operations and cash flows; (d) Defendants were "responsible for establishing and maintaining disclosure controls and procedures;" and (e) Defendants had inspected the Company's disclosure controls and procedures within 90 days prior to the filing of the 3Q'03 Form 10-Q  and found them to be effective.

133.    The foregoing statements concerning Maxim's 3Q'03 results and compensation practices were materially false and misleading because:

(a)     Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)     As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options. This resulted in the overstatement of numerous financial metrics in the 3Q'03 Form 10-Q, including, but not limited to, net income and diluted earnings per share; and

(c)     The SOX certifications signed by Defendants Gifford and Jasper stated that Maxim's financial condition and results of operations were fairly presented despite the Company's failure to adequately recognize the compensation expense associated with the backdated options. Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact that the Company admitted in the Restatement that it had "material weaknesses" in internal controls related to "not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions."

134.    On August 12, 2003, the Company issued a press release announcing its financial results for the fourth quarter and for the fiscal year ended June 28, 2003.  The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported net revenues of $295.0 million for its fiscal fourth quarter ending June 28, 2003, an $8.8 million increase over the $286.2 million reported for the third quarter of fiscal 2003. ***Diluted earnings per share were $0.24 for the fourth quarter on net income of $81.7 million compared to diluted earnings per share of $0.23 on net income of $77.6 million reported for the third quarter of fiscal 2003. . . .***

> For the 2003 fiscal year, Maxim reported net revenues of $1.153 billion compared to $1.025 billion for last year, a 12.5% increase. ***Net income for the 2003 fiscal year was $309.6 million compared to $259.2 million reported for fiscal 2002.*** Dallas Semiconductor contributed 16.8% of the Company's fiscal 2003 net income. ***Diluted earnings per share for the Company grew 24.7% from the $0.73 per share reported for fiscal 2002 to $0.91 per share in fiscal 2003.***

135.    On September 22, 2003, Maxim filed with the SEC its Report on Form 10-K for the period ended on June 28, 2003 ("FY'03 Form 10-K").  Defendants Gifford and Jasper signed certifications included with the FY'03 Form 10-K stating that, "to the best of my knowledge . . . the

information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

136.    In Note 2 to the FY'03 Form 10-K, the Company reiterated verbatim its statement from Note 3 of the 3Q'03 Form 10-Q (*see* ¶131 *supra*) regarding accounting for stock-based compensation, again noting that ***"employee and director compensation expense is recognized only for those options whose price is less than fair market value at the measurement date."***  In addition, the Company stated that it issued pro forma information related to its stock plans in accordance with SFAS 123, as amended by SFAS 148.

137.    In Note 3 to the FY'03 Form 10-K, Maxim stated the following regarding its accounting for stock-based compensation:

> Under SFAS 148, the Company may elect to continue to account for the grant of stock options under APB Opinion 25, ***in which options granted with an exercise price equal to the fair market value on the date of grant do not require recognition of expense in the Company's financial statements.*** Under SFAS 148, the Company is, however, required to provide pro forma disclosure regarding net income and earnings per share as if the Company had accounted for its employee stock options . . . granted subsequent to June 30, 1995, under the methodology prescribed by that statement.

138.    In Note 11 to the FY'03 Form 10-K financial statements, the Company described its purported practice under the various Stock Option plans of issuing all stock options at their fair-market value on the date of the grant:

> At June 28, 2003, the Company has reserved a total of 100,974,576 of its common shares for issuance to employees and certain others under its 1996 Stock Incentive Plan, 1993 Officer and Director Stock Option Plan, 1987 Stock Option Plan, 1987 Supplemental Stock Option Plan, 1983 Incentive Stock Option Plan, 1987 Employee Stock Participation Plan (ESP Plan), and Supplemental Nonemployee Stock Option Plan. ***Under the plans, options are generally granted at a price not less than fair market value as determined by the Board of Directors or Plan administrator at the date of grant.*** Subject to certain limitations, the Board of Directors or Plan administrator has authority to make grants at prices less than fair market value.

139.    Defendants Gifford and Jasper again certified the accuracy of the financial statements in the FY'03 Form 10-K and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

140.    With respect to the issue of controls, Maxim stated in Item 9A that they had "carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer (CEO) and Chief Financial Officer (CFO), of the effectiveness of the design and operation of our

1   disclosure controls and procedures. . . . Based on this evaluation, *our Chief Executive Officer and*

2   *Chief Financial Officer concluded that our disclosure controls and procedures are effective in*

3   *timely alerting them to material information required to be included in this report at the reasonable*

4   *assurance level."*

5   141.   The foregoing statements in Maxim's FY'03 Form 10-K concerning Maxim's FY'03

6   financial results and compensation practices were materially false and misleading because:

7   (a)   Defendants failed to disclose they were regularly and consistently backdating

8   stock options, an act which resulted in those options being granted at prices below the fair market

9   value of Maxim's common stock at the time of the grant;

10   (b)   As Maxim has now admitted, Defendants did not record (in accordance with

11   GAAP) adequate compensation expense to account for the difference between the stock option grant

12   price and the fair market value of the stock options.  This resulted in the overstatement of numerous

13   financial metrics in the 4Q'03 Form 10-Q and the FY'03 Form 10-K, including, but not limited to, net

14   income and diluted earnings per share.  For example, as detailed in the Restatement, stock-based

15   compensation expense in the FY'03 Form 10-K was understated by $127.4 million.  Therefore, net

16   income should have been $236.7 million, rather than $309.6 million (a 31% overstatement). Had this

17   extra expense been properly reported, it would have caused the diluted EPS to be reduced from $0.91

18   to $0.70 per share; and

19   (c)   The SOX certifications signed by Defendants Gifford and Jasper stated that

20   Maxim's financial condition and results of operations were fairly presented despite the Company's

21   failure to adequately recognize the compensation expense associated with the backdated options.

22   Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact

23   that the Company admitted in the Restatement that it had "material weaknesses" in internal controls

24   related to "not maintaining an effective control environment and, separately, not maintaining effective

25   controls over our stock option practices and the related accounting for stock option transactions."

26   **2.   Fiscal Year 2004**

27   142.   On October 28, 2003, Maxim issued a press release announcing financial results for the

28   Company's first quarter 2004 which ended September 27, 2003.  The release was filed with the SEC

on Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported net revenues of $310.2 million for its fiscal first quarter ending September 27, 2003, a 5.1% increase over the $295.0 million reported for the Company's last reported quarter, the fourth quarter of fiscal 2003. ***Net income for the quarter was $87.4 million, a 19.4% increase over the $73.2 million reported last year and a 6.9% increase over the $81.7 million reported for the fourth quarter. Diluted earnings per share were $0.25 for the first quarter, a 13.6% increase over the $0.22 reported for the same period a year ago and a 4.2% increase over the $0.24 reported for the fourth quarter of fiscal 2003.***

143.     On November 6, 2003, Maxim filed its Report on Form 10-Q with the SEC for the period ended September 27, 2003 ("1Q'04 Form 10-Q").  Defendants Gifford and Jasper signed certifications included with the 1Q'04 Form 10-Q stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

144.     In Note 2 to the 1Q'04 Form 10-Q consolidated financial statements, the Company reiterated verbatim its statement from Note 3 of the FY'03 Form 10-K (*see* ¶131 *supra*) regarding accounting for stock-based compensation.  In relevant part, Maxim stated, "Under Statement of Financial Accounting Standards 148, the Company may elect to continue to account for the grant of stock options under Accounting Principal Board Opinion 25, in which ***options granted with an exercise price equal to the fair market value on the date of grant do not require recognition of expense in the Company's financial statements.***"

145.     Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's 1Q'04 Form 10-Q and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

146.     The foregoing statements in Maxim's 1Q'04 Form 10-Q concerning Maxim's 1Q'04 results and compensation practices were materially false and misleading because:

(a)     Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)     As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant

1   price and the fair market value of the stock options.  This resulted in the overstatement of numerous

2   financial metrics in the 1Q'04 Form 10-Q, including, but not limited to, net income and diluted

3   earnings per share; and

4        (c)   The SOX certifications signed by Defendants Gifford and Jasper stated that

5   Maxim's financial condition and results of operations were fairly presented despite the Company's

6   failure to adequately recognize the compensation expense associated with the backdated options.

7   Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact

8   that the Company admitted in the Restatement that it had "material weaknesses" in internal controls

9   related to "not maintaining an effective control environment and, separately, not maintaining effective

10  controls over our stock option practices and the related accounting for stock option transactions."

11       147.   On February 5, 2004, Maxim issued a press release announcing financial results for the

12  Company's second quarter 2004 which ended December 27, 2003.  The release was filed with the SEC

13  on Form 8-K that same day and stated in relevant part:

14       Maxim Integrated Products, Inc., (MXIM) reported net revenues of $338.1 million for its fiscal
        second quarter ending December 27, 2003, an 18.2% increase over the $286.1 million reported

15      for the second quarter of fiscal 2003 and a 9.0% increase over the $310.2 million reported for
        the first quarter of fiscal 2004. ***Net income for the quarter was $98.5 million, a 27.8%***

16      ***increase over the $77.1 million reported last year and a 12.8% increase over the $87.4***
        ***million reported for the first quarter. Diluted earnings per share were $0.28 for the second***

17      ***quarter, a 21.7% increase over the $0.23 reported for the same period a year ago and a***
        ***12.0% increase over the $0.25 reported for the first quarter of fiscal 2004.***

18

19       148.   Also on February 5, 2004, Maxim filed its Report on Form 10-Q with the SEC for the

20  period ended December 27, 2003 ("2Q'04 Form 10-Q").  Defendants Gifford and Jasper signed

21  certifications included with the 2Q'04 Form 10-Q stating that, "to the best of my knowledge . . . the

22  information contained in the Report fairly presents, in all material respects, the financial condition and

23  results of operations of the Company at the dates and for the periods indicated."

24       149.   In Note 2 to the 2Q'04 Form 10-Q consolidated financial statements, the Company

25  reiterated verbatim its statement from Note 2 of the 1Q'04 Form 10-Q (*see* ¶144 *supra*) regarding

26  accounting for stock-based compensation.  In relevant part, Maxim stated, "***options granted with an***

27  ***exercise price equal to the fair market value on the date of grant do not require recognition of***

28  ***expense in the Company's financial statements***."

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. C-08-00832-JW

-50-

150. Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's 2Q'04 Form 10-Q and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

151. The foregoing statements concerning Maxim's 2Q'04 results and compensation practices were materially false and misleading because:

(a) Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b) As Maxim has now admitted, Defendants failed to properly record compensation expenses associated with the difference between the stock option grant price and the fair market value of the stock options in accordance with GAAP. This resulted in the overstatement of numerous financial metrics in the 2Q'04 Form 10-Q, including, but not limited to, net income and diluted earnings per share; and

(c) The SOX certifications signed by Defendants Gifford and Jasper stated that Maxim's financial condition and results of operations were fairly presented despite the Company's failure to adequately recognize the compensation expense associated with the backdated options. Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact that the Company admitted in the Restatement that it had "material weaknesses" in internal controls related to "not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions."

152. On April 27, 2004, Maxim issued a press release announcing financial results for the Company's third quarter 2004 which ended March 27, 2004. The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

Maxim Integrated Products, Inc., (MXIM) reported net revenues of $370.0 million for its fiscal third quarter ending March 27, 2004, a 29.3% increase over the $286.2 million reported for the third quarter of fiscal 2003 and a 9.4% increase over the $338.1 million reported for the second quarter of fiscal 2004. ***Net income for the quarter was $109.2 million, a 40.7% increase over the $77.6 million reported last year and a 10.8% increase over the $98.5 million reported for the second quarter. Diluted earnings per share were $0.31 for the third quarter, a 34.8% increase over the $0.23 reported for the same period a year ago and a 10.7% increase over the $0.28 reported for the second quarter of fiscal 2004.***

153.   On May 6, 2004, Maxim filed its Report on Form 10-Q with the SEC for the period ended March 27, 2004 ("3Q'04 Form 10-Q").  Defendants Gifford and Jasper signed certifications included with the 3Q'04 Form 10-Q stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

154.   In Note 2 to the 3Q'04 Form 10-Q consolidated financial statements, the Company reiterated verbatim its statement from Note 2 of the 1Q'04 Form 10-Q (*see* ¶144 *supra*) regarding accounting for stock-based compensation.  In relevant part, Maxim stated, "***options granted with an exercise price equal to the fair market value on the date of grant do not require recognition of expense in the Company's financial statements***."

155.   Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's 3Q'04 Form 10-Q and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

156.   The foregoing statements concerning Maxim's 3Q'04 results and compensation practices were materially false and misleading because:

(a)   Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)   As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options.  This resulted in the overstatement of numerous financial metrics in the 3Q'04 Form 10-Q, including, but not limited to, net income and diluted earnings per share; and

(c)   The SOX certifications signed by Defendants Gifford and Jasper stated that Maxim's financial condition and results of operations were fairly presented despite the Company's failure to adequately recognize the compensation expense associated with the backdated options. Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact that the Company admitted in the Restatement that it had "material weaknesses" in internal controls

1    related to "not maintaining an effective control environment and, separately, not maintaining effective

2    controls over our stock option practices and the related accounting for stock option transactions."

3        157.    On August 6, 2004, Maxim issued a press release announcing financial results for the

4    Company's 2004 fourth quarter and year ended June 26, 2004.  The release was filed with the SEC on

5    Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported net revenues of $421.0 million for its fiscal
> fourth quarter ending June 26, 2004, a 42.7% increase over the $295.0 million reported for the
> fourth quarter of fiscal 2003 and a 13.8% increase over the $370.0 million reported for the
> third quarter of fiscal 2004. ***Net income for the quarter was $124.7 million, a 52.5% increase
> over the $81.7 million reported last year and a 14.2% increase over the $109.2 million
> reported for the third quarter. Diluted earnings per share were $0.36 for the fourth quarter,
> a 50.0% increase over the $0.24 reported for the same period a year ago and a 16.1%
> increase over the $0.31 reported for the third quarter of fiscal 2004.***

> For the 2004 fiscal year, Maxim reported net revenues of $1.439 billion compared to $1.153
> billion for last year, a 24.8% increase. ***Net income for the 2004 fiscal year was $419.8 million
> compared to $309.6 million reported for fiscal 2003. Diluted earnings per share grew 31.9%
> from $0.91 per share reported for fiscal 2003 to $1.20 per share in fiscal 2004.***

14        158.    On or about September 9, 2004, Maxim filed with the SEC a Report on Form 10-K for

15    the fiscal year ended June 26, 2004 ("FY'04 Form 10-K").  Defendants Gifford and Jasper signed

16    certifications included with the FY'04 Form 10-K stating that, "to the best of my knowledge . . . the

17    information contained in the Report fairly presents, in all material respects, the financial condition and

18    results of operations of the Company at the dates and for the periods indicated."

19        159.    In Note 2 to the FY'04 Form 10-K, the Company reiterated it accounting for stock-

20    based compensation was described as follows:

> The Company accounts for its stock option and employee stock purchase plans using the
> intrinsic value method prescribed in Accounting Principles Board's Opinion No. 25 (APB 25),
> "Accounting for Stock Issued to Employees." ***Accordingly, employee and director
> compensation expense is recognized only for those options whose price is less than fair
> market value at the measurement date.***

25        160.    Additionally, the Company reiterated verbatim its statement from Note 2 of the 1Q'04

26    Form 10-Q (*see* ¶144 *supra*) regarding accounting for stock-based compensation.  In relevant part,

27    Maxim stated, ***"options granted with an exercise price equal to the fair market value on the date of***

28    ***grant do not require recognition of expense in the Company's financial statements.***"

---

CONSOLIDATED CLASS ACTION COMPLAINT                                                                    -53-
CASE NO. C-08-00832-JW

161.   In Note 10 to the FY'04 Form 10-K financial statements, the Company described its purported practice of issuing all stock options at their fair market value on the date of the grant. Note 10 states in relevant part:

**Stock option and purchase plans**

At June 26, 2004, the Company has reserved a total of 98,511,342 of its common shares for issuance to employees and certain others under its 1996 Stock Incentive Plan, 1993 Officer and Director Stock Option Plan, 1987 Stock Option Plan, 1987 Supplemental Stock Option Plan, 1987 Employee Stock Participation Plan (ESP Plan), and Supplemental Nonemployee Stock Option Plan. ***Under the plans, options are granted at a price not less than fair market value as determined by the Board of Directors or Plan administrator at the date of grant.***

162.   Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's FY'04 Form 10-K and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

163.   With respect to the issue of internal controls, Maxim stated in Item 9A that they had:

carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer, Chief Financial Officer, and Vice Presidents, of the effectiveness of our disclosure controls and procedures. . . . Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that information that the Company is required to disclose in reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

164.   The foregoing statements concerning Maxim's FY'04 financial results and compensation practices were materially false and misleading because:

(a)   Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)   As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options. This resulted in the overstatement of numerous financial metrics in the FY'04 Form 10-K, including, but not limited to, net income and diluted earnings per share. For example, stock-based compensation expense in the FY'04 Form 10-K was understated by $153.5 million. Therefore, as now admitted in the Restatement, net income should

1   have been $305.6 million, rather than $419.7 million (a 37% overstatement).  Had this extra expense

2   been properly reported, it would have caused the diluted EPS to be reduced from $1.20 to $0.88 per

3   share; and

4                  (c)      The SOX certifications signed by Defendants Gifford and Jasper stated that

5   Maxim's financial condition and results of operations were fairly presented despite the Company's

6   failure to adequately recognize the compensation expense associated with the backdated options.

7   Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact

8   that the Company admitted in the Restatement that it had "material weaknesses" in internal controls

9   related to "not maintaining an effective control environment and, separately, not maintaining effective

10  controls over our stock option practices and the related accounting for stock option transactions."

11              **3.      Fiscal Year 2005**

12       165.    On November 1, 2004, Maxim issued a press release announcing financial results for

13  the Company's first quarter 2005 which ended September 25, 2004.  The release was filed with the

14  SEC on Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported net revenues of $435.1 million for its fiscal first quarter ending September 25, 2004, a 40.3% increase over the $310.2 million reported for the first quarter of fiscal 2004. ***Diluted earnings per share were $0.42 for the first quarter, a 68.0% increase over the $0.25 reported for the same period a year ago.*** Net revenues were 3.4% above the $421.0 million reported for the fourth quarter of fiscal 2004, and diluted earnings per share were 16.7% above the $0.36 reported for the fourth quarter of fiscal 2004. ***Net income for the first quarter was $144.5 million or 33.2% of net revenues, a 65.4% increase over the $87.4 million reported for the first quarter of last year and a 15.9% increase over the $124.7 million reported for the fourth quarter.*** Operating income for the Company was $210.7 million or 48.4% of net revenues for the first quarter, compared to the $125.7 million or 40.5% of net revenues reported for the same period a year ago and the $181.2 million or 43.1% of net revenues reported for the fourth quarter of fiscal 2004.

23       166.    On November 1, 2004, the Company conducted a conference call where Defendant

24  Gifford stated:

> In closing, I would like to take a minute here to thank the institutions and individual shareholders who recognize that Maxim is an exceptional company and ***uses its stock options responsibly and effectively*** to incentivize employees with very little resulting dilution.

27       167.    On November 4, 2004, Maxim filed its Report on Form 10-Q with the SEC for the

28  period ended September 25, 2004 ("1Q'05 Form 10-Q").  Defendants Gifford and Jasper signed

1  certifications included with the 1Q'05 Form 10-Q stating that, "to the best of my knowledge . . . the

2  information contained in the Report fairly presents, in all material respects, the financial condition and

3  results of operations of the Company at the dates and for the periods indicated."

4       168.    Additionally, in Note 2 to the 1Q'05 Form 10-Q the Company reiterated verbatim its

5  statement from Note 2 of the FY'04 Form 10-K (*see* ¶160 *supra*) regarding accounting for stock-based

6  compensation.  In relevant part, Maxim stated, "***options granted with an exercise price equal to the***

7  ***fair market value on the date of grant do not require recognition of expense in the Company's***

8  ***financial statements.***"

9       169.    Defendants Gifford and Jasper again certified the accuracy of the financial statements

10  in Maxim's 1Q'05 Form 10-Q and the existence and effectiveness of the internal controls in

11  accordance with § 302 of SOX.

12       170.    The foregoing statements concerning Maxim's 1Q'05 results and compensation

13  practices were materially false and misleading because:

14           (a)    Defendants failed to disclose they were regularly and consistently backdating

15  stock options, an act which resulted in those options being granted at prices below the fair market

16  value of Maxim's common stock at the time of the grant;

17           (b)    As Maxim has now admitted, Defendants did not record (in accordance with

18  GAAP) adequate compensation expense to account for the difference between the stock option grant

19  price and the fair market value of the stock options.  This resulted in the overstatement of numerous

20  financial metrics in the 1Q'05 Form 10-Q, including, but not limited to, net income and diluted

21  earnings per share.  As detailed in the Restatement, stock-based compensation expense in the 1Q'05

22  Form 10-Q was understated by $25.9 million.  Therefore, net income should have been $125.3 million,

23  rather than $144.5 million (a 15% overstatement).  Had this extra expense been properly reported, it

24  would have caused the diluted EPS to be reduced from $0.42 to $0.37 per share; and

25           (c)    The SOX certifications signed by Defendants Gifford and Jasper stated that

26  Maxim's financial condition and results of operations were fairly presented despite the Company's

27  failure to adequately recognize the compensation expense associated with the backdated options.

28  Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact

that the Company admitted in the Restatement that it had "material weaknesses" in internal controls related to "not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions."

171.    On February 1, 2005, Maxim issued a press release announcing financial results for the Company's second quarter 2005 which ended December 25, 2004.  The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported net revenues of $436.1 million for its fiscal second quarter ending December 25, 2004, a 29.0% increase over the $338.1 million reported for the second quarter of fiscal year 2004. ***Diluted earnings per share were $0.42 for the second quarter, a 50.0% increase over the $0.28 reported for the same period a year ago. Net income for the second quarter was $144.6 million, a 46.8% increase over the $98.5 million reported for the second quarter of last year.*** Net revenues, net income, and diluted earnings per share for the second quarter were similar to those reported for the first quarter of fiscal year 2005. The Company's free cash flow was $122 million, or $0.36 per diluted share, for the second quarter, compared to $102 million, or $0.29 per diluted share, for the second quarter of fiscal year 2004.

172.    On February 3, 2005, Maxim filed its Report on Form 10-Q with the SEC for the period ended December 25, 2004 ("2Q'05 Form 10-Q").  Defendants Gifford and Jasper signed certifications included with the 2Q'05 Form 10-Q stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

173.    Additionally, in Note 2 to the 2Q'05 Form 10-Q, the Company reiterated verbatim its statement from Note 2 of the FY'04 Form 10-K (*see* ¶160 *supra*) regarding accounting for stock-based compensation.  In relevant part, Maxim stated, "***options granted with an exercise price equal to the fair market value on the date of grant do not require recognition of expense in the Company's financial statements.***"

174.    Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's 2Q'05 Form 10-Q and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

175.    The foregoing statements concerning Maxim's 2Q'05 results and compensation practices were materially false and misleading because:

(a)     Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)     As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options.  This resulted in the overstatement of numerous financial metrics in the 2Q'05 Form 10-Q, including, but not limited to, net income and diluted earnings per share.  As detailed in the Restatement, stock-based compensation expense in the 2Q'05 Form 10-Q was understated by $16.7 million.  Therefore, net income should have been $127.1 million, rather than $144.6 million (a 14% overstatement). Had this extra expense been properly reported, it would have caused the diluted EPS to be reduced from $0.42 to $0.37 per share; and

(c)     The SOX certifications signed by Defendants Gifford and Jasper stated that Maxim's financial condition and results of operations were fairly presented despite the Company's failure to adequately recognize the compensation expense associated with the backdated options.  Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact that the Company admitted in the Restatement that it had "material weaknesses" in internal controls related to "not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions."

176.    On May 3, 2005, Maxim issued a press release announcing financial results for the Company's third quarter 2005 which ended March 26, 2005.  The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported net revenues of $400.2 million for its fiscal third quarter ending March 26, 2005, an 8.2% increase over the $370.0 million reported for the third quarter of fiscal year 2004 and an 8.2% decrease over the $436.1 million reported for the second quarter of fiscal 2005. ***Net income for the quarter was $125.5 million, a 15.0% increase over the $109.2 million reported last year and a 13.2% decrease from the $144.6 million reported for the second quarter. Diluted earnings per share were $0.37 for the third quarter, a 19.4% increase over the $0.31 reported for the same period a year ago and an 11.9% decrease from the $0.42 reported for the second quarter of fiscal 2005.*** The Company's free cash flow was $156 million, or $0.45 per diluted share for the third quarter, compared to $120 million, or $0.34 per diluted share, for the third quarter of fiscal year 2004. This is a 32.4% increase in free cash flow per diluted share from the prior year's comparable

quarter. For the nine months ended March 26, 2005 free cash flow per diluted share increased 20.8% relative to the comparable period last year.

177.    On May 3, 2005, the Company conducted a conference call, where Defendant Gifford responded to an analyst's question with the following statement:

Well, first of all, there's been no gain in the option grants whatsoever in the last four years. Okay. Our stock when we acquired Dallas was 41. Stock went down to 20 and come back up to 40. **So there've been really virtually no gains to any employee as stock option in the last four years.**

178.    On May 5, 2005, Maxim filed its Report on Form 10-Q with the SEC for the period ended March 26, 2005 ("3Q'05 Form 10-Q"). Defendants Gifford and Jasper signed certifications included with the 3Q'05 Form 10-Q stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

179.    Additionally, in Note 2 to the 3Q'05 Form 10-Q, the Company reiterated verbatim its statement from Note 2 of the FY'04 Form 10-K (*see* ¶160 *supra*) regarding accounting for stock-based compensation. In relevant part, Maxim stated, "**options granted with an exercise price equal to the fair market value on the date of grant do not require recognition of expense in the Company's financial statements.**"

180.    Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's 3Q'05 Form 10-Q and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

181.    The foregoing statements concerning Maxim's 3Q'05 results and compensation practices were materially false and misleading because:

(a)    Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)    As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options. This resulted in the overstatement of numerous

financial metrics in the 3Q'05 Form 10-Q, including, but not limited to, net income and diluted earnings per share.  For example, as detailed in the Restatement, stock-based compensation expense in the 3Q'05 Form 10-Q was understated by $22.1 million.  Therefore, net income should have been $105.4 million, rather than $125.5 million (a 19% overstatement). Had this extra expense been properly reported, it would have caused the diluted EPS to be reduced from $0.37 to $0.31 per share; and

(c)     The SOX certifications signed by Defendants Gifford and Jasper stated that Maxim's financial condition and results of operations were fairly presented despite the Company's failure to adequately recognize the compensation expense associated with the backdated options. Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact that the Company admitted in the Restatement that it had "material weaknesses" in internal controls related to "not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions."

182.    On May 18, 2005, Defendant Gifford spoke at the JPMorgan 33rd Annual Technology Conference.  He included the following statement in his presentation:

> ***The cost of options to our shareholders is approximately without taking into account the repurchasing of options by the Company is about 4% a year.***  That is equivalent to -- that is paid for if we grow a 25.8% instead of 25%. We do repurchase shares in the past. ***That has reduced the dilutive effect to less than 2%.***

183.    On August 1, 2005, Maxim issued a press release announcing financial results for the Company's fourth quarter and year ended June 25, 2005.  The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported net revenues of $400.4 million for its fiscal fourth quarter ended June 25, 2005. ***Net income for the fourth quarter was $126.1 million, a slight increase over the $124.7 million reported for the fourth quarter of last year. Diluted earnings per share were $0.37 for the fourth quarter, a 2.8% increase over the $0.36 reported for the same period a year ago.*** Net revenues, net income, and diluted earnings per share for the fourth quarter were similar to those reported for the third quarter of fiscal year 2005.
>
> For the 2005 fiscal year, Maxim reported net revenues of $1.672 billion compared to $1.439 billion for last year, a 16.2% increase. ***Net income for the 2005 fiscal year was $540.8 million compared to $419.8 million reported for fiscal 2004, a 28.8% increase. Diluted earnings per***

*share grew 31.7% from $1.20 per share reported in fiscal 2004 to $1.58 per share in fiscal 2005.*

184.    On or about September 8, 2005, Maxim filed with the SEC a Report on Form 10-K for the fiscal year ended June 25, 2005 ("FY'05 Form 10-K").  Defendants Gifford and Jasper signed certifications included with the FY'05 Form 10-K stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

185.    Additionally, in Note 2 to the FY'05 Form 10-K, the Company reiterated verbatim its statement from Note 2 of the FY'04 Form 10-K (*see* ¶160 *supra*) regarding accounting for stock-based compensation.  In relevant part, Maxim stated, "*options granted with an exercise price equal to the fair market value on the date of grant do not require recognition of expense in the Company's financial statements*."

186.    In Note 10 to the FY'05 Form 10-K financial statements, the Company described its purported practice under the various stock option plans to issue all stock options at their fair market value on the date of the grant.  Note 10 states in relevant part:

**Stock option and purchase plans**

At June 25, 2005, the Company has reserved a total of 107,022,787 of its common shares for issuance to employees and certain others under its 1996 Stock Incentive Plan, 1993 Officer and Director Stock Option Plan, 1987 Stock Option Plan, 1987 Supplemental Stock Option Plan, 1987 Employee Stock Participation Plan (ESP Plan), and Supplemental Nonemployee Stock Option Plan. ***Under the above-mentioned stock option plans, options are granted at a price not less than fair market value as determined by the Board of Directors or Plan administrator at the date of grant.***

187.    Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's FY'05 Form 10-K and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

188.    With respect to internal controls, Maxim issued the following statement in Item 9A of its FY'05 Form 10-K in relevant part:

As of the end of the period covered by this Annual Report on Form 10-K, the Company carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer (CEO), Chief Financial Officer (CFO), Presidents, and Vice Presidents (VPs), of the

effectiveness of our disclosure controls and procedures. . . . Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective as of June 25, 2005 to ensure that information that the Company is required to disclose in reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and is accumulated and communicated to the Company's management, including the CEO and CFO of the Company, as appropriate to allow timely decisions regarding required disclosure.

189.    The foregoing statements concerning Maxim's FY'05 financial results and compensation practices were materially false and misleading because:

(a)    Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)    As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options.  This resulted in the overstatement of numerous financial metrics in the 4Q'05 Form 10-Q and the FY'05 Form 10-K, including, but not limited to, net income and diluted earnings per share.  As detailed in the Restatement, stock-based compensation expense in the 4Q'05 Form 10-Q was understated by $21.7 million.  Therefore, net income should have been $104.3 million, rather than $126.1 million (a 21% overstatement). Had this extra expense been properly reported, it would have caused the diluted EPS to be reduced from $0.37 to $0.31 per share.  Further, stock-based compensation expense in the FY'05 Form 10-K was understated by $86.6 million.  Therefore, net income should have been $462.2 million, rather than $540.8 million (a 17% overstatement).  Had this extra expense been properly reported, it would have caused the diluted EPS to be reduced from $1.58 to $1.35 per share; and

(c)    The SOX certifications signed by Defendants Gifford and Jasper stated that Maxim's financial condition and results of operations were fairly presented despite the Company's failure to adequately recognize the compensation expense associated with the backdated options.  Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact that the Company admitted in the Restatement that it had "material weaknesses" in internal controls

related to "not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions."

### 4. Fiscal Year 2006

190. On October 27, 2005, Maxim issued a press release announcing financial results for the Company's first quarter 2006 which ended September 24, 2005. The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> Net revenues were $424.4 million for the first quarter, a 6.0% increase over the $400.4 million reported for the fourth quarter of fiscal 2005. ***Pro forma net income excluding stock based compensation expense for the quarter was $133.2 million or $0.39 diluted earnings per share and GAAP net income was $105.4 million including stock based compensation or $0.31 diluted earnings per share. This compares to $126.1 million or $0.37 diluted earnings per share reported for the fourth quarter of fiscal 2005.***

> During the first quarter of fiscal 2006, the Company adopted FAS 123R. As a result $41.5 million of non-cash stock based compensation expense was recorded in the first quarter. Also because of the provisions of FAS 123R, the Treasury Stock Method for computing fully diluted shares was modified to incorporate stock based compensation, which resulted in an increase of approximately 2.2 million shares in our fully diluted shares, as a result of adding additional Black-Scholes non-cash option expense in the Treasury Stock Method calculation. No additional options, shares or share value contributed to this 2.2 million additional shares.

> Pro forma gross margin (excluding stock based compensation expense) for the first quarter was 71.2% and GAAP gross margin was 68.7% including stock based compensation of $10.5 million. This is a decrease from the 72.0% reported for the fourth quarter of fiscal 2005.
>
> \*     \*     \*

> Mr. Gifford added: "Company GAAP to pro forma result comparisons clearly points out the confusion and distortions caused by introducing non-cash option expenses to profit and share calculations."

191. On Maxim's October 27, 2005 conference call, Defendant Gifford stated the following related to the change in accounting for stock option compensation:

> We're totally committed, and believe that ***options are the most cost-effective way from our shareholders' point of view, to retain and attract people,*** our people feel very much the same way. They have a long-term belief in our Company, ***even though they haven't gotten a gain in the last three or four years in their stock. So, that number does not require any additional cash compensation.***

192. On November 3, 2005, Maxim filed its Report on Form 10-Q with the SEC for the period ended September 24, 2005 ("1Q'06 Form 10-Q"). Defendants Gifford and Jasper signed

1   certifications included with the 1Q'06 Form 10-Q stating that, "to the best of my knowledge . . . the

2   information contained in the Report fairly presents, in all material respects, the financial condition and

3   results of operations of the Company at the dates and for the periods indicated."

4       193.    In Note 2 to the 1Q'06 Form 10-Q consolidated financial statements, Maxim reported

5   the following related to stock-based compensation:

6       Effective June 26, 2005, the Company adopted the provisions of Statement of Financial
        Accounting Standards ("SFAS") No. 123(R), "Share-Based Payment" ("SFAS 123(R)"). SFAS
7       123(R) establishes accounting for stock-based awards exchanged for employee services.
        *Accordingly, stock-based compensation cost is measured at grant date, based on the fair*
8       *value of the award, and is recognized as an expense over the employee's requisite service*
        *period.* The Company previously applied Accounting Principles Board (APB) Opinion No. 25,
9       "Accounting for Stock Issued to Employees," and related Interpretations and provided the
        required pro forma disclosures of SFAS No. 123, "Accounting for Stock-Based Compensation"
10      ("SFAS 123"). The Company elected to adopt the modified prospective application method as
        provided by SFAS 123(R), and, accordingly, the Company recorded compensation costs as the
11      requisite service rendered for the unvested portion of previously issued awards that remain
        outstanding at the initial date of adoption and any awards issued, modified, repurchased, or
12      cancelled after the effective date of SFAS 123(R).

13
        At September 24, 2005 the Company had five stock option plans and one employee stock
14      participation plan, including the Company's 1996 Stock Incentive Plan (1996 Plan), 1993
        Officer and Director Stock Option Plan, 1987 Stock Option Plan, 1987 Supplemental Stock
15      Option Plan, 1987 Employee Stock Participation Plan (ESP Plan), and Supplemental
        Nonemployee Stock Option Plan. *The Company's aggregate $41.5 million compensation cost*
16      *for the three months ended September 24, 2005, was mainly generated by the Company's*
        *1996 Plan and the Company's ESP Plan*, which represented $37.7 million and $3.8 million in
17      compensation cost, respectively.

18
        **1996 Stock Incentive Plan**
19
        The Company's 1996 Plan, which was previously approved by the Company's stockholders,
20      permits the grant of up to 117.6 million shares. *Under the 1996 Plan, options are granted with*
        *an exercise price not less than fair market value on the date of grant as determined by the*
21      *Board of Directors or Plan administrator.*
22

23      194.    Further, in Management's Discussion and Analysis of Financial Condition and Results

24  of Operations, under "Critical Accounting Policies and Estimates," Maxim stated the following about

25  stock-based compensation:

26      Effective June 26, 2005, the Company adopted the provisions of Statement of Financial
        Accounting Standards ("SFAS") No. 123(R), "Share-Based Payment" ("SFAS 123(R)"). SFAS
27      123(R) establishes standards for the accounting for transactions in which an entity exchanges
        its equity instruments for goods or services.  It also addresses transactions in which an entity
28      incurs liabilities in exchange for goods or services that are based on the fair value of the

entity's equity instruments or that may be settled by the issuance of those equity instruments. ***Accordingly, stock-based compensation cost is measured at grant date, based on the fair value of the award, and is recognized as expense over the employee's requisite service period.*** The measurement of stock based compensation cost is based on several criteria including, but not limited to, the valuation model used and associated input factors such as expected term of the award, stock price volatility, dividend rate, risk free interest rate, and award cancellation rate.

195.    As a result of the change in accounting under SFAS 123R, Maxim reported $41.5 million of non-cash stock-based compensation expenses for 1Q'06.

196.    Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's 1Q'06 Form 10-Q and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

197.    Notwithstanding that the 1Q'06 Form 10-Q financial statements were prepared using SFAS 123R (which required that some compensation expense be recorded for stock options) the foregoing statements were materially false and misleading because:

(a)    Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)    As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options.  This resulted in the overstatement of numerous financial metrics in the 1Q'06 Form 10-Q, including, but not limited to, net income and diluted earnings per share.  For example, as detailed in the Restatement, stock-based compensation expense in the 1Q'06 Form 10-Q was understated by $23.5 million.  Therefore, net income should have been $86.8 million, rather than $105.3 million (a 21% overstatement). Had this extra expense been properly reported, it would have caused the diluted EPS to be reduced from $0.31 to $0.25 per share; and

(c)    The SOX certifications signed by Defendants Gifford and Jasper stated that Maxim's financial condition and results of operations were fairly presented despite the Company's failure to adequately recognize the compensation expense associated with the backdated options. Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact

that the Company admitted in the Restatement that it had "material weaknesses" in internal controls related to "not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions."

198.    On January 25, 2006, Maxim issued a press release announcing financial results for the Company's second quarter 2006 which ended December 24, 2005.  The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported a record for net revenues of $445.9 million for its second quarter ending December 24, 2005, a 5.1% increase over the $424.4 million reported for the first quarter of fiscal 2006. ***Pro forma net income excluding stock based compensation expense for the quarter was $140.0 million or $0.42 diluted earnings per share and GAAP net income was $112.6 million including stock based compensation or $0.33 diluted earnings per share. This compares to $133.2 million of pro forma net income or $0.39 diluted earnings per share reported for the first quarter of fiscal 2006 and GAAP net income of $105.4 million including stock based compensation or $0.31 per diluted share.***

199.    On February 2, 2006, Maxim filed its Report on Form 10-Q with the SEC for the period ended December 24, 2005 ("2Q'06 Form 10-Q").  Defendants Gifford and Jasper signed certifications included with the 2Q'05 Form 10-Q stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

200.    On April 26, 2006, Maxim filed its Report on Form 10-Q/A with the SEC for the period ended December 24, 2005 ("2Q'06 Form 10-Q/A").   Defendants Gifford and Jasper signed certifications included with the 2Q'05 Form 10-Q stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."  The 2Q'06 Form 10-Q/A which reported net revenues of $445.9 million, pro forma net income of $144.6 million or $0.42 diluted earnings per share and GAAP net income of $106.9 million or $0.32 diluted earnings per share.

201.    In both Note 2 and Management's Discussion and Analysis of Financial Condition and Results of Operations of the 2Q'06 Form 10-Q/A, Maxim reiterated its statement from Management's Discussion and Analysis of Financial Condition and Results of Operations of the 1Q'06 Form 10-Q (*see* ¶194 *supra*) regarding accounting for stock-based compensation.  In relevant part, Maxim stated,

1    *"stock-based compensation cost is measured at grant date, based on the fair value of the award, and*
2    *is recognized as an expense over the employee's requisite service period."*

3    202.    Defendants Gifford and Jasper again certified the accuracy of the financial statements
4    in Maxim's 2Q'06 Form 10-Q/A and the existence and effectiveness of the internal controls in
5    accordance with § 302 of SOX.

6    203.    Notwithstanding that the 2Q'06 Form 10-Q/A financial statements were prepared using
7    SFAS 123R (which required that some compensation expense be recorded for stock options) the
8    foregoing statements were materially false and misleading because:

9    (a)    Defendants failed to disclose they were regularly and consistently backdating
10   stock options, an act which resulted in those options being granted at prices below the fair market
11   value of Maxim's common stock at the time of the grant;

12   (b)    As Maxim has now admitted, Defendants did not record (in accordance with
13   GAAP) adequate compensation expense to account for the difference between the stock option grant
14   price and the fair market value of the stock options.  This resulted in the overstatement of numerous
15   financial metrics in the 2Q'06 Form 10-Q/A, including, but not limited to, net income and diluted
16   earnings per share.  For example, as detailed in the Restatement, stock-based compensation expense in
17   the 2Q'06 Form 10-Q/A was understated by $19.8 million.  Therefore, net income should have been
18   $97.7 million, rather than $112.5 million (a 15% overstatement).  Had this extra expense been properly
19   reported, it would have caused the diluted EPS to be reduced from $0.33 to $0.29 per share; and

20   (c)    The SOX certifications signed by Defendants Gifford and Jasper stated that
21   Maxim's financial condition and results of operations were fairly presented despite the Company's
22   failure to adequately recognize the compensation expense associated with the backdated options.
23   Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact
24   that the Company admitted in the Restatement that it had "material weaknesses" in internal controls
25   related to "not maintaining an effective control environment and, separately, not maintaining effective
26   controls over our stock option practices and the related accounting for stock option transactions."

27   204.    Defendants' failure to properly record compensation expenses materially affected
28   Maxim's 2Q'06 reported financials.  For example, Maxim reported $0.33 of earnings per share and

when the Company finally corrected these results on September 30, 2008, it revealed that the earnings per share were truly only $0.29. This amounted to an overstatement of $0.04 (12%).

205. On April 26, 2006, Maxim issued a press release announcing financial results for the Company's third quarter 2006 which ended March 25, 2006. The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> Maxim Integrated Products, Inc., (MXIM) reported a record for net revenues of $478.1 million for its third quarter ending March 25, 2006, a 7.2% increase over the $445.9 million reported for the second quarter of fiscal 2006. **Net income was $120.3 million including total stock based compensation or $0.36 diluted earnings per share. This compares to $112.6 million or $0.33 diluted earnings per share for the second quarter of fiscal 2006. Non-GAAP net income, which excludes the impact of total stock based compensation expense, for the third quarter was $148.6 million or $0.45 per diluted share compared to non-GAAP net income of $140.0 million or $0.42 per diluted share for the second quarter of fiscal 2006. The total amount of stock based compensation recorded during the third quarter was $42.1 million on a pretax basis as compared to $40.8 million for the second quarter of fiscal 2006.**

206. On April 26, 2006, the Company conducted a conference call where Defendant Jasper made the following statement:

> Regarding profit measures, please note that in our press release, we have disclosed both GAAP and non-GAAP financial results. **Non-GAAP results differ from GAAP results by the amount of total stock based compensation expense calculated in accordance with Financial Accounting Standard 123(R).**

207. On or about May 3**,** 2006, Maxim filed its Report on Form 10-Q with the SEC for the period ended March 25, 2006 ("3Q'06 Form 10-Q"). Defendants Gifford and Jasper signed certifications included with the 3Q'05 Form 10-Q stating that, "to the best of my knowledge . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."

208. In both Note 2 and Management's Discussion and Analysis of Financial Condition and Results of Operations of the 3Q'06 Form 10-Q, Maxim reiterated its statement from Management's Discussion and Analysis of Financial Condition and Results of Operations in the 1Q'06 Form 10-Q (*see* ¶194 *supra*) regarding accounting for stock-based compensation. In relevant part, Maxim stated, **"stock-based compensation cost is measured at grant date, based on the fair value of the award, and is recognized as an expense over the employee's requisite service period."**

209. Defendants Gifford and Jasper again certified the accuracy of the financial statements in Maxim's 3Q'06 Form 10-Q and the existence and effectiveness of the internal controls in accordance with § 302 of SOX.

210. Notwithstanding that the 3Q'06 Form 10-Q financial statements were prepared using SFAS 123R (which required that some compensation expense be recorded for stock options) the foregoing statements were materially false and misleading because:

(a) Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b) As Maxim has now admitted, Defendants did not record (in accordance with GAAP) adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options. This resulted in the overstatement of numerous financial metrics in the 3Q'06 Form 10-Q, including, but not limited to, net income and diluted earnings per share. For example, as detailed in the Restatement, stock-based compensation expense in the 3Q'06 Form 10-Q was understated by $18.2 million. Therefore, net income should have been $107.1 million, rather than $120.3 million (a 12% overstatement). Had this extra expense been properly reported, it would have caused the diluted EPS to be reduced from $0.36 to $0.32 per share; and

(c) The SOX certifications signed by Defendants Gifford and Jasper stated that Maxim's financial condition and results of operations were fairly presented despite the Company's failure to adequately recognize the compensation expense associated with the backdated options. Further, the certifications stated that Maxim had effective disclosure controls in place, despite the fact that the Company admitted in the Restatement that it had "material weaknesses" in internal controls related to "not maintaining an effective control environment and, separately, not maintaining effective controls over our stock option practices and the related accounting for stock option transactions."

211. On May 24, 2006, EDN.com issued an article entitled "Shareholders Sue Maxim Over Options" regarding the derivative actions against Maxim listed above. In the article, Maxim said "[t]he company's management believes that it has complied with all applicable laws and its

shareholder approved stock option plan in granting options to officers and it has not backdated options."

212.    On August 4, 2006, Maxim issued a press release announcing financial results for the Company's fourth quarter and year ended June 24, 2006 ("4Q'06" and "FY'06," respectively).  The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> **Net income for the fourth quarter of fiscal 2006 was $124.3 million including total stock based compensation or $0.37 diluted earnings per share. This compares to $120.3 million or $0.36 diluted earnings per share for the third quarter of fiscal 2006, and consistent with the $0.37 reported for the same period a year ago.** Non-GAAP net income, which excludes the impact of total stock based compensation expense, for the fourth quarter was $158.9 million or $0.48 per diluted share a 6.7% increase in earnings per share over the previous quarter and a 29.7% over the fourth quarter of fiscal 2005. The total amount of stock based compensation recorded during the fourth quarter was $51.3 million on a pre-tax basis as compared to $42.1 million for the third quarter of fiscal 2006.

213.    Maxim's August 4, 2006 press release and Form 8-K were materially false and misleading because:

(a)    Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value of Maxim's common stock at the time of the grant;

(b)    As Maxim has now admitted, Defendants did not record adequate compensation expense to account for the difference between the stock option grant price and the fair market value of the stock options.  This resulted in the overstatement of numerous financial metrics in the 4Q'06 press release, including, but not limited to, net income and diluted earnings per share.  In the August 4, 2006 press release, Maxim claimed EPS of $0.37 in 4Q'06 and $1.37 for FY'06.  When it finally restated these results, Maxim revealed that EPS for 4Q '06 and FY'06 were only $0.29 and $1.14, respectively.  In other words, Maxim's August 4, 2006 financial statements overstated EPS for those periods by $0.08 (29%) and $0.23 (30%), respectively.

214.    Then, after the close of trading on September 7, 2006, the Company disclosed in its Form 12b-25 filing with the SEC for the first time that the ongoing review of its stock-options grants and practices would cause it to be unable to file its 10-K for the year ended June 24, 2006, saying:

> Maxim Integrated Products, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the fiscal year ended June 24, 2006 ("Form 10-K") by the prescribed due date of

1   September 7, 2006.  As previously announced, on June 14, 2006 the Company's Board of
2   Directors authorized a review of certain of the Company's past stock option grants and
3   practices, which is being conducted by a Special Committee of the Board with the assistance of
    outside independent legal counsel. At this time, the Special Committee has not completed its
4   review. ***Until this review is completed, the Company will not be able to file its Form 10-K.***
5   The Company intends to file the Form 10-K as soon as possible following the completion of
    the Special Committee's review.

6   215.   Later that month, on September 28, 2006, Maxim announced that on
7   September 25, 2006, it had received a letter from NASDAQ regarding a violation of NASDAQ
8   Marketplace Rule 4310(c)(14).  The letter was issued in accordance with NASDAQ procedures and
9   came "as a result of the delay in the filing of Maxim's Annual Report on Form 10-K for the fiscal year
10  ended June 24, 2006 with the Securities and Exchange Commission (SEC)."  Maxim again reassured
11  investors, stating that it would proactively request a NASDAQ hearing regarding the stock listing, but
12  failed to disclose the pervasive nature of the backdating scheme or the full magnitude of unrecorded
13  compensation expense.

14          5.   **Fiscal Year 2007**

15  216.   On November 1, 2006, Maxim issued a press release announcing financial results for
16  the Company's first quarter ended September 23, 2006 ("1Q'07").  The release was filed with the SEC
17  on Form 8-K that same day and stated in relevant part:

18      November 1, 2006-Maxim Integrated Products, Inc., (MXIM) reported net revenues of $502.7
        million for its fiscal first quarter ended September 23, 2006, a 1.5% decrease over the fourth
19      quarter of fiscal 2006 and a 18.5% increase over the first quarter of fiscal 2006.

20      ***Net income for the first quarter of fiscal 2007 was $107.5 million or $0.33 diluted earnings***
21      ***per share including stock based compensation. For comparison purposes, net income for the***
        ***fourth quarter of fiscal 2006 was $124.3 million or $0.37 diluted earnings per share and net***
22      ***income for the same period a year ago was $105.4 million or $0.31 per share including stock***
23      ***based compensation.***

24  217.   On November 1, 2006, the Company conducted a conference call, during which
25  Defendant Jasper stated in relevant part:

26      With the investment community having moved to GAAP accounting for stock-option
        expensing much sooner than anticipated, we feel that Maxim's stock price, and consequently
27      our most loyal shareholders, are being penalized due to the comparison of our GAAP earnings
        versus those companies that accelerated stock options prior to the adoption of FAS 123(R).

28

*Had we accelerated the vesting of out-of-the-money stock options upon the adoption of FAS 123(R), our earnings per share during Q1 would have been approximately $0.033 higher.*

218. On November 2, 2006, Maxim filed its Form 12b-25 with the SEC informing the market that is would be unable to file its 10-Q for the quarter ended September 23, 2006, saying:

> Maxim Integrated Products, Inc. (the "Company") is unable to file its Quarterly Report on Form 10-Q for the first quarter of fiscal 2007 ended September 23, 2006 ("Form 10-Q") by the prescribed due date of November 2, 2006. As previously announced, the Company's Board of Directors authorized a review of certain of the Company's past stock option grants and practices, which is being conducted by a Special Committee of the Board with the assistance of outside independent legal counsel. At this time, the Special Committee has not completed its review. Until this review is completed, the Company will not be able to file its Form 10-Q. The Company intends to file the Form 10-Q as soon as possible following the completion of the Special Committee's review but does not expect that such filing will be made by November 7, 2006, the extended deadline.

219. On November 13, 2006, in its Form 8-K filed with the SEC, Maxim disclosed that NASDAQ had stayed the decision to delist the company, pending a written decision on the Company's request for additional time:

> On November 7, 2006, Maxim Integrated Products, Inc. ("Maxim") received an additional NASDAQ Staff Determination notice indicating that Maxim is not in compliance with the filing requirements for continued listing as set forth in Marketplace Rule 4310(c)(14). As expected, the notice was issued in accordance with NASDAQ procedures due to the delayed filing of Maxim's Quarterly Report on Form 10-Q for the fiscal quarter ended September 23, 2006. This notice is routinely issued to all NASDAQ-listed companies when required periodic filings have not been made with the SEC on a timely basis.

> As previously announced, Maxim requested a hearing before the NASDAQ Listing Qualifications Panel (the "Panel") to review the NASDAQ Staff's original determination to delist the Company's common stock based on its failure to timely file a Form 10-K for its fiscal year ended June 24, 2006 (the "Form 10-K") with the SEC and to seek an extension of time from the Panel to file its Forms 10-K and 10-Q. This in-person hearing was held on November 9, 2006. NASDAQ has advised the Company that the delisting of its common stock has been stayed, pending a final, written decision by the Panel on the Company's request for an extension of time to file its outstanding SEC reports.

220. Maxim's public statements from November 1, 2006 through November 13, 2006, were materially false and misleading because:

(a) Defendants failed to disclose they had regularly failed to properly record compensation expenses associated with the difference between the stock option grant price and the fair market value of the stock options in accordance with GAAP; and

(b)     Defendants failed to disclose the pervasive nature of the backdating scheme or the full magnitude of the unrecorded compensation expense.

221.    On January 31, 2007, Maxim announced the findings of the Special Committee formed to investigate backdating of options.  The Special Committee found, *inter alia*, that:

> there were ***deficiencies related to the process for granting stock options*** to employees and directors and, specifically, that in certain instances from the beginning of fiscal year 2000 until the end of fiscal year 2006, ***the recorded exercise price of stock option grants to employees and directors differed from the fair market value of the underlying shares on the actual measurement date.***

Further, Maxim stated that the accounting adjustments relating to the recordation of additional stock-based compensation expense were "material" and that the Company ***"expects to restate its financial statements for the fiscal years 2000 through 2005 and the related interim periods through March 25, 2006."***  Maxim further reported:

> The Company ***has not yet determined the amount to be restated in any specific period,*** nor has the Company determined the tax consequences that may result from these matters or whether any tax consequences will give rise to additional tax liabilities.  Accordingly, the financial statements, and the related reports of its independent registered accountants, and all earnings press releases and similar communications issued by the Company relating to the periods discussed above (fiscal years 2000 through 2005 and the related interim periods through March 25, 2006) should not be relied upon.

Maxim, however, stated that there had been no evidence of wrongdoing by outside directors, and also that NASDAQ had granted the Company's request for an extension to file its periodic reports and thus Maxim would remain listed.  Further, Maxim Defendants failed to disclose the pervasive nature of the backdating scheme or the full magnitude of the unrecorded compensation expense.

222.    On February 7, 2007, Maxim issued a press release announcing financial results for the Company's second quarter ended December 23, 2006 ("2Q'07").  The release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> February 7, 2007-Maxim Integrated Products, Inc., (NASDAQ:MXIM) reported net revenues of $497.5 million for its fiscal second quarter ending December 23, 2006, a 1% decrease from the first quarter of fiscal 2007 and an 11.6% increase over the second quarter of fiscal 2006.
>
> During the quarter, cash, cash equivalents and short-term investments decreased $78.3 million to $1.3 billion after the Company paid out $50.1 million in dividends, $99.5 million for property and equipment, and $116.5 million for income tax payments. These cash outlays

totaling $266.1 million were partially offset by cash generated by the Company's operations. Because of the then ongoing inquiry into the Company's stock-option grant practices, there was no stock buy back during the quarter.

Maxim is not providing detailed GAAP and non-GAAP financials for the quarter ending December 23, 2006 due to the previously announced stock-option review by a Special Committee of the Board of Directors. That review was recently completed. Maxim expects to restate its historical financial statements for the fiscal years 2000 through 2005 and the related interim periods through March 25, 2006, and to record additional non-cash, stock-based compensation expense related to past stock-option grants. Therefore, limited financial data is presented in the table below.

223.    On February 8, 2007, Maxim informed the market in its Form 12b-25 filing with the SEC that is would be unable to file its Form 10-Q for the quarter ended December 23, 2006, saying in relevant part:

As announced on January 31, 2007, the independent review of certain of the Company's past stock option grants and practices, which was conducted by a Special Committee of the Board with the assistance of outside independent legal counsel, was recently completed, and the Special Committee found that *there were deficiencies related to the process for granting stock options to employees and directors during the period under review and, specifically, that in certain instances from the beginning of fiscal year 2000 until the end of fiscal year 2006, the recorded exercise price of certain stock option grants to employees and directors differed from the fair market value of the underlying shares on the actual measurement date.*

As result, on January 31, 2007, the Board of Directors of the Company concluded the financial statements, and the related reports of its independent registered accountants, and all earnings press releases and similar communications issued by the Company relating to the periods beginning in fiscal year 2000 through fiscal year 2005 and the related interim periods through March 31, 2006 should no longer be relied upon.  The Company intends to restate its financial statements as a result of the independent review as necessary to record additional non-cash stock-based compensation expense, but has not determined the amount of such charges, the amount to be restated in any specific period or the resulting tax and accounting impact. As a result, the Company was unable to prepare restated financials prior to the prescribed due date for the Quarterly Report on Form 10-Q for the quarter ended December 23, 2006, and consequently, the Company is unable to file its Quarterly Report on Form 10-Q for the quarter ended December 23, 2006 within the prescribed period.

224.    On February 13, 2007, Maxim issued a press release that was filed with the SEC on Form 8-K that same day and stated in relevant part:

On February 7, 2007, Maxim Integrated Products, Inc. ("Maxim") received an additional Nasdaq Staff Determination notice indicating that Maxim is not in compliance with the filing requirements for continued listing as set forth in Marketplace Rule 4310(c)(14). As expected, the notice was issued in accordance with Nasdaq procedures due to the delayed filing of Maxim's Quarterly Report on Form 10-Q for the fiscal quarter ended December 23, 2006. This

notice is routinely issued to all Nasdaq-listed companies when required periodic filings have not been made with the SEC on a timely basis.

As previously announced, the Nasdaq Listing Qualifications Panel has granted Maxim's request for an extension of time to file its delinquent periodic reports. Pursuant to the extension, Maxim's common stock will continue to be listed on Nasdaq subject to the timely provision to Nasdaq of certain information concerning the stock option review and filing of the delinquent periodic reports, and any required restatements by March 26, 2007. Maxim may seek an additional extension of time in the event Maxim is not able to meet the March 26, 2007 deadline.

225.   Maxim's public statements from February 7, 2007 through February 13, 2007, were materially false and misleading because:

(a)   Defendants failed to disclose they had regularly failed to properly record compensation expenses associated with the difference between the stock option grant price and the fair market value of the stock options in accordance with GAAP; and

(b)   Defendants failed to disclose the pervasive nature of the backdating scheme or the full magnitude of the unrecorded compensation expense.

226.   On March 9, 2007, Maxim filed its Form 8-K with the SEC disclosing that, pursuant to its request, the NASDAQ Listing and Hearing Review Council had decided to review the NASDAQ's Listing Qualifications Panel's January 19, 2007 decision, and had also stayed any future action by the Panel to suspend the Company's securities from trading on NASDAQ.  Maxim further disclosed that it may submit additional information for the Listing Council's consideration by May 4, 2007.

227.   On April 25, 2007, Maxim issued a press release announcing financial results for the Company's second quarter ended March 24, 2007 ("3Q'07").   The press release was filed with the SEC on Form 8-K that same day and stated in relevant part:

SUNNYVALE, CA- April 25, 2007-Maxim Integrated Products, Inc., (NASDAQ:MXIM) reported net revenues of $475.8 million for its fiscal third quarter ending March 24, 2007, a 4.4% decrease from the second quarter of fiscal 2007 and a 0.5% decrease from the third quarter of fiscal 2006.

Maxim is not providing detailed GAAP and non-GAAP financials for the quarter ending March 24, 2007 due to the previously announced need to restate its historical financial statements for the fiscal years 2000 through 2005 and the related interim periods through March 25, 2006, to record additional non-cash, stock-based compensation expense related to past stock-option grants. Consequently, limited financial data is being presented at the present time.

228.     On May 3, 2007, Maxim informed the market in its Form 12b-25 filing with the SEC that it would be unable to file its Form 10-Q for 3Q'07.  The wording of the release was identical in substance to the release announcing the Company's inability to file the 2Q'07 Form 10-Q.

229.     Thereafter, on May 10, 2007, Maxim announced that it had received an additional NASDAQ Staff Determination notice indicating that it was not in compliance with requirements for continued listing.  Maxim later disclosed similar letters of failed compliance which were the direct result of its inability to file periodic reports due to the ongoing stock option investigation.

230.     Maxim further announced on July 9, 2007, that the Company had submitted a request to the NASDAQ Board to exercise its discretion to stay any future action to suspend trading of Maxim's common stock on NASDAQ.  Specifically, Maxim requested that the NASDAQ Board grant Maxim additional time to complete and file its past due periodic reports with the SEC and to allow continued listing of its common stock on NASDAQ during this period.

231.     On July 17, 2007, Maxim announced that NASDAQ's Board had granted Maxim's request to stay the decision to suspend the Company's securities from trading, and consequently Maxim's common stock would remain listed on NASDAQ pending further consideration by the NASDAQ Board.

232.     Maxim's public statements between March and July, 2007 were false and misleading because:

(a)     Defendants failed to disclose they had regularly failed to properly record compensation expenses associated with the difference between the stock option grant price and the fair market value of the stock options in accordance with GAAP; and

(b)     Defendants failed to disclose the pervasive nature of the backdating scheme or the full magnitude of the unrecorded compensation expense.

233.     On August 2, 2007, Maxim issued a press release announcing financial results for the Company's fourth quarter and year ended June 30, 2007 ("4Q'07" and "FY'07," respectively).  The press release was filed with the SEC on Form 8-K that same day and stated in relevant part:

SUNNYVALE, CA- August 2, 2007-Maxim Integrated Products, Inc., (NASDAQ:MXIM) reported net revenues of $531.1 million for its fiscal fourth quarter ending June 30, 2007, an 11.6% increase from the third quarter of fiscal 2007 and a 4.0% increase from the fourth

quarter of fiscal 2006. The fourth quarter of fiscal 2007 was a 14 week quarter for Maxim while the third quarter of fiscal 2007 and the fourth quarter of fiscal 2006 were 13 week quarters.

For the fiscal year ending June 30, 2007, Maxim recorded net revenues of $2.007 billion, an 8.0% increase from the $1.859 billion of net revenues recorded in fiscal 2006. Fiscal 2007 was a 53 week year for the Company while fiscal 2006 was a 52 week year.

Maxim is not providing detailed GAAP and non-GAAP financials for the quarter ending June 30, 2007 due to the previously announced need to restate its historical financial statements, to record additional non-cash, stock-based compensation expense related to past stock-option grants. Consequently, limited financial data is being presented at the present time.

234.   On August 23, 2007, Maxim announced that although the NASDAQ Board had granted the Company until September 25, 2007, to file its past due periodic reports with the SEC (and thus regain compliance with NASDAQ's listing requirements) it would "not be able to file its past due periodic reports with the Commission by September 25, 2007."   The Company downplayed the likelihood of an actual delisting, however, as it stated:  "Maxim is exploring alternatives that may be available to it to prevent the suspension from trading of its common stock on Nasdaq on September 27, 2007 as well as the delisting of its common stock from Nasdaq, including seeking relief from Nasdaq's Board of Directors and the Commission." From August 23, 2007 to August 28, 2007, however, Maxim Defendants failed to disclose the pervasive nature of the backdating scheme or the full magnitude of the unrecorded compensation expense.

235.   On August 30, 2007, Maxim informed the market that is would be unable to file either its Form 10-K, nor Form 10-Q for the period ended June 30, 2007.  The Form 12b-25 filed with the SEC stated, in relevant part:

As announced on January 31, 2007, the independent review of certain of the Company's past stock option grants and practices, which was conducted by a Special Committee of the Board with the assistance of outside independent legal counsel, was completed, and the Special Committee found that ***there were deficiencies related to the process for granting stock options to employees and directors during the period under review and, specifically, that in certain instances from the beginning of fiscal year 2000 until the end of fiscal year 2006, the recorded exercise price of certain stock option grants to employees and directors differed from the fair market value of the underlying shares on the actual measurement date.***  As result, on January 31, 2007, the Board of Directors of the Company concluded the financial statements, and the related reports of its independent registered accountants, and all earnings press releases and similar communications issued by the Company relating to the periods beginning in fiscal year 2000 through fiscal year 2005 and the related interim periods through September 23, 2006 should no longer be relied upon. The Company intends to restate its financial statements for the fiscal years 2000 through 2005 and the related interim periods

through March 25, 2006 to record additional non-cash stock-based compensation expense. *In addition, fiscal years prior to 2000 may need to be restated due to possible process problems in the granting of stock options.* The Company has not determined the amount of such charges, the periods to be restated, the amount to be restated in any specific period, or the resulting tax and accounting impact. As a result, the Company was unable to prepare restated financials prior to the prescribed due date for the Annual Report on Form 10-K for the year ended June 30, 2007, and consequently, the Company is unable to file its Annual Report on Form 10-K for the year ended June 30, 2007 within the prescribed period without unreasonable effort or expense.

236.     On September 6, 2007, Maxim issued a press release which stated, in relevant part:

On August 31, 2007, Maxim Integrated Products, Inc. ("Maxim") received an additional Nasdaq Staff Determination notice indicating that Maxim is not in compliance with the filing requirements for continued listing as set forth in Marketplace Rule 4310(c)(14).  As expected, the notice was issued in accordance with Nasdaq procedures due to the delayed filing of Maxim's Annual Report on Form 10-K for the fiscal year ended June 30, 2007.

237.     On September 25, 2007, after the close of the market, Maxim announced that the SEC had granted another interim stay of the suspension and delisting of the Company's common stock in order to allow the SEC to more fully consider and evaluate the issues involved in the Company's appeal.

238.     On October 2, 2007, Maxim announced that the SEC had denied its appeal of a NASDAQ decision to suspend and delist the Company's common stock, and that delisting was now a certainty:

On September 28, 2007, the Securities and Exchange Commission (the "Commission") denied the Company's appeal to stay the Nasdaq Stock Market LLC's decision to suspend and delist the Company's common stock. This decision terminates the interim stay of Nasdaq's ruling that was put in place by the Commission on Tuesday, September 25, 2007 to allow the Commission more time to fully consider the Company's appeal. *The Company's common stock is suspended from trading on Nasdaq effective as of the opening of business on Tuesday, October 2, 2007, and will be subsequently delisted.*

As previously disclosed by the Company on August 23, 2007, the Board of Directors of Nasdaq originally gave the Company until September 25, 2007 to file its past due periodic reports with the Commission and regain compliance with Nasdaq's listing requirements contained in Nasdaq Marketplace Rule 4310(c)(14). While the Company continues to make progress in restating its prior periods, it was unable to file its past due periodic reports with the SEC by Nasdaq's deadline.

The Company anticipates that its common stock will be quoted on the Pink Sheet Electronic Quotation Service automatically and immediately after Nasdaq suspends trading. The Company expects that the trading symbol of its common stock will be changed to "MXIM.PK" and will also be listed as "Other-OTC" securities on the OTCBB website.

239.   Maxim's public statements between August and October, 2008 were false and misleading because:

(a)   Defendants failed to disclose they had regularly failed to properly record compensation expenses associated with the difference between the stock option grant price and the fair market value of the stock options in accordance with GAAP; and

(b)   Defendants failed to disclose the pervasive nature of the backdating scheme or the full magnitude of the unrecorded compensation expense.

### 6.   <u>Fiscal Year 2008</u>

240.   On November 1, 2007, Maxim issued a press release announcing financial results for the quarter ended September 29, 2007 ("1Q'08").  The press release was filed with the SEC on Form 8-K that same day and stated in relevant part:

> SUNNYVALE, CA — November 1, 2007 — Maxim Integrated Products, Inc., (PINK SHEETS:MXIM) reported net revenues of $522.7 million for its fiscal 2008 first quarter ending September 29, 2007, a 4.0% increase from the first quarter of fiscal 2007.
>
> During the prior quarter, a 14 week quarter for Maxim, the Company recorded revenues of $531.1 million. When normalized to a 13 week quarter, that is equivalent to revenues of $493.2 million. Consequently, Maxim's first quarter fiscal 2008 revenues of $522.7 million would be a 6.0% sequential increase over the normalized revenues of the previous quarter.
>
> Maxim is not providing detailed GAAP and non-GAAP financials for the quarter ending September 29, 2007 due to the previously announced need to restate its historical financial statements to record additional non-cash, stock-based compensation expense related to past stock-option grants. Consequently, limited financial data is being presented at the present time.

241.   On November 15, 2007, Maxim informed the market that it would be unable to file its Form 10-Q for the quarter ended September 29, 2007.  The Form 12b-25 filed with the SEC was identical in substance to the Form 12b-25 announcing the Company's inability to file the FY'07 Form 10-K.

242.   Maxim's public statements between September and November, 2007 were false and misleading because:

(a)   Defendants failed to disclose they had regularly failed to properly record compensation expenses associated with the difference between the stock option grant price and the fair market value of the stock options in accordance with GAAP; and

(b)     Defendants failed to disclose the pervasive nature of the backdating scheme or the full magnitude of the unrecorded compensation expense.

### B.     False And Misleading Proxy Statements

243.    Each year during the Class Period, Maxim solicited proxies from it shareholders to vote in favor of its proposal to expand the number of shares available under Maxim's Stock Options Plans. Each of these proxies was (1) sent to its shareholders; (2) filed with the SEC on Schedule 14A; and (3) reviewed, edited and signed by Defendant Gifford.  Also, each of these proxies contained materially false and misleading statements representing that Maxim issued options in accordance with its stock plan, which called for issuance of options at fair market value of Maxim's stock on the date of grant.

244.    As a result of shareholder approval of Maxim's proxies, the number of shares available for issuance (after adjustments for 2:1 stock splits in December 1997 and December 1999) increased as follows:

> 2003: from 95,200,000 to 104,600,000
>
> 2004: from 104,600,000 to 117,600,000
>
> 2005: from 117,600,000 to 128,400,000

245.    In Maxim's proxy statement filed October 7, 2003, Defendant Gifford signed an introductory letter recommending the adoption of Proposal 2, increasing the number of shares available for the 1996 Stock Incentive Plan by 9.4 million.  The proxy statement included a description of the features of the 1996 Plan, stating in part:

> Options. ***The 1996 Plan provides that the purchase price of any incentive stock option shall be at least 100% of the fair market value of the Common Stock at the time the option is granted.*** The 1996 Plan further provides that the purchase price of any non-qualified stock option shall be not less than 85% of fair market value at the time the option is granted unless otherwise determined by the Administrator, provided that the exercise price may be less than 100% of fair market value only if the Administrator determines in writing in good faith that (i) ***such grants are made infrequently***, (ii) ***there is a good business reason for the grant that outweighs the normal presumption of per share exercise price of not less than 100% of the fair market value per share on the date of grant,*** and (iii) the aggregate number of shares subject to such option does not exceed 5% of the total number of shares identified in the 1996 Plan as amended from time to time (currently 104,600,000).

246.    On June 25, 2004, Maxim filed a proxy statement with the SEC which requested that shareholders approve an increase in the size of the option pool equivalent to 4% of outstanding shares.

The Company stated that "Maxim's Option Plan is Managed for the Best Interests of the Shareholders," and added that "All of Maxim's employee options are granted at fair market value." Further, numerous slides accompanied the proxy statement, one of which was entitled "Use of Options Helps Contain Salary Expense."

247.    Maxim's proxy statement filed August 19, 2004, contained a Notice of Special Meeting of Stockholders and requested that shareholders:

> ratify and approve an amendment and restatement of the Company's 1996 Stock Incentive Plan, as amended, to (a) increase the number of shares available for issuance thereunder by 13,000,000 shares from 104,600,000 shares to 117,600,000 shares and (b) *require that all stock options be granted with an exercise price no less than 100% of the fair market value of the Company's Common Stock on the date of grant of the option.*

248.    This proxy statement also contained an introductory letter authored and signed by Defendant Gifford which discussed Maxim's request for additional shares.  The letter stated that "Maxim's Option Plan is Managed for the Best Interests of the Stockholders" in part because "[a]ll of Maxim's options are *granted at fair market value."*

249.    Additionally, Proposal No. 1 explained that the Board amended and restated the 1996 Stock Incentive Plan in July 2004 to, *inter alia,* "require that *all stock options be granted with an exercise price no less than 100% of the fair market value of the Company's Common Stock on the date of grant of the option.*"

250.    The August 19, 2004 proxy statement also included a description of the features of the 1996 Plan, stating in part:

> Options. *The 1996 Plan provides that the purchase price of any incentive stock option shall be at least 100% of the fair market value of the Common Stock at the time the option is granted.* The 1996 Plan further provides that the purchase price of any non-qualified stock option shall be not less than 100% of fair market value at the time the option is granted. The 1996 Plan provides that the aggregate fair market value (determined as of the time the option is granted) of the Common Stock with respect to which incentive stock options may become exercisable for the first time by any individual during any calendar year may not exceed $100,000.

251.    Maxim's proxy statement filed October 7, 2005, contained a Notice of Special Meeting of Stockholders and requested shareholders:

To ratify and approve the amendment and restatement of the Company's 1996 Stock Incentive Plan, as amended (the "1996 Plan"), to (a) increase the number of shares available for issuance thereunder by 10,800,000 shares from 117,600,000 shares to 128,400,000 shares, (b) permit the award of restricted stock units and restricted stock and (c) extend the term of the 1996 Plan through 2015.

252.    This proxy statement also contained an introductory letter authored and signed by Defendant Gifford regarding Maxim's request for additional shares for its option plan.  In urging shareholders to approve the additional shares, the letter similarly stated that Maxim's stock option plan was "managed for the best interests of the stockholders" in part because ***"Maxim's stock options have always been granted with an exercise price equal to the fair market value of Maxim's stock."*** Additionally, Defendant Gifford stated that "Maxim only grants employee stock options under plans that have been approved annually by stockholders."

253.    The October 7, 2005 proxy statement also included a description of the features of the 1996 Plan, stating in part:

Options. ***The 1996 Plan provides that the purchase price of any stock option shall be at least 100% of the fair market value of the Common Stock at the time the option is granted.*** The Administrator may provide for the payment of the purchase price in cash, by delivery of other Common Stock of the Company having a market value equal to the purchase price of such shares, or by any other method, such as delivery of promissory notes to the extent permitted by law, including by delivery of an exercise notice accompanied by a copy of irrevocable instructions to a broker to deliver promptly to the Company sale or loan proceeds to pay the purchase price.

254.    Maxim's proxy statements referenced above were materially false and misleading because:

(a)     Defendants failed to disclose they were regularly and consistently backdating stock options, an act which resulted in those options being granted at prices below the fair market value at the time of the grant in violation of Maxim's stock plans;

(b)     Backdating stock options was a pervasive and regular practice at Maxim, and grants at less than 100% of market value were not "made infrequently;"

(c)     Given that backdating stock options was a pervasive and regular practice at Maxim, there was not a "good business reason" which "outweighed the normal presumption of per

1  share exercise price of not less than 100% of the fair market value per share on the date of grant" for

2  every option granted at less than 100% of market value; and

3          (d)     Defendants failed to disclose to shareholders that they were not properly

4  recording compensation expense to account for the difference between the stock option grant price and

5  the fair market value of the stock options.  Thus, contrary to Company representations in the proxies

6  regarding Maxim's positive financial performance, all Maxim's publicly-filed Class Period statements

7  materially overstated key financial metrics such as EPS and net income.

8  **VI.     ADDITIONAL SCIENTER ALLEGATIONS**

9          **A.     GAAP Violations**

10         255.    As a result of Defendants' conduct detailed above relating to the improper backdating

11  of stock options and failure to recognize proper and sufficient compensation expense for options

12  granted "in-the-money," Maxim's Class Period financial statements violated numerous provisions of

13  GAAP.  Maxim's Restatement admitted the Company's GAAP violations in its financial statements

14  for fiscal years 1997 through 2005 and the first three quarters of 2006.

15         256.    Maxim and the Individual Defendants were responsible for ensuring that Maxim's

16  financial statements throughout the Class Period conformed to GAAP.  As noted by the AICPA and

17  Public Company Accounting Oversight Board ("PCAOB"):

18      [F]inancial statements are management's responsibility. . . . Management is responsible for
        adopting sound accounting policies and for establishing and maintaining internal control that
19      will, among other things, record, process, summarize, and report transactions (as well as events
        and conditions) consistent with management's assertions embodied in the financial statements.
20      The entity's transactions and the related assets, liabilities and equity are within the direct
        knowledge and control of management. . . .  Thus, the fair presentation of financial statements
21      in conformity with generally accepted accounting principles is an implicit and integral part of
22      management's responsibility.

23  Statements on Auditing Standards No. 1, AU § 110.03.

24         257.    Maxim's annual and quarterly financial results for 1997 through 2006 were included in

25  reports filed with the SEC, in other shareholder reports and in press releases. In these reports,

26  Defendants represented that Maxim's financial results were presented in a fair manner and in

27  accordance with GAAP.

28

CONSOLIDATED CLASS ACTION COMPLAINT                                                          -83-
CASE NO. C-08-00832-JW

258.     Defendants' representations were materially false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations.   In fact, as detailed herein and in the Restatement, Maxim's financial results were materially false and misleading and included numerous violations of GAAP and SEC rules.

259.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and standards that define accepted accounting practice at a particular time. SEC Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP.

260.     As set forth in FASB Statement of Financial Accounting Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, ¶42 states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

261.     Under GAAP (APB No. 25, *Accounting for Stock Issued to Employees*), Maxim did not need to record an expense for options granted to employees with an exercise or "strike" price equal to or greater than the current market price ("at-the-money") until June 26, 2005, the first day of Maxim's 2006 fiscal year, when it adopted SFAS 123(R).  The Company was always, however, required to record an expense in its financial statements for any options granted below the current market price ("in-the-money").

262.     Under SFAS 123(R), all options are required to be expensed based on the fair value of the awards, and are recognized as an expense over the grant's vesting period.

263.     Until June 26, 2005, Maxim accounted for stock options using the "intrinsic value" method required by APB 25.  By definition, an option that is "in-the-money" on the measurement date has intrinsic value - the difference between its exercise price and the quoted market price, times the number of optioned shares.  Under APB No. 25, employers were required to determine – and record – the intrinsic value of a stock option as of its "measurement date" (the date on which all required granting actions have been completed) as an expense on their financial statements.  This amount is recorded initially as deferred compensation expense (a component of equity) and then amortized as compensation expense over the option vesting period ("service period").

264.     APB No. 25, ¶10 states in pertinent part:

> Compensation for services that a corporation receives as consideration for stock issued through employee stock option, purchase, and award plans should be measured by the quoted market price of the stock at the measurement date less the amount, if any, that the employee is required to pay.   Thus a corporation recognizes compensation cost for stock issued through compensatory plans unless the employee pays an amount that is at least equal to the quoted market price of the stock at the measurement date.

265.     In order to provide Maxim executives and employees with far more lucrative "in-the-money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without suffering onerous IRS tax consequences for granting such options), Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

266.     As set forth in APB Opinion No. 20, *Accounting Changes* ("APB 20"), GAAP provides that previously issued financial statements, which were misstated as a result of oversight or misuse of existing facts, must be retroactively restated.  Restatement of past financial statements is disfavored because, *inter alia,* it erodes investors' confidence in the financial statements and makes comparisons difficult.   GAAP therefore provides that financial statements can only be restated in limited circumstances.  APB 20, ¶14.

267.     APB 20 defines "errors" as "mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared."   *See* APB Opinion No. 20, ¶¶7-13.   Maxim's Restatement was the result of a "correction of [errors] in previously issued financial statements."

268.   "Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly, to the information" in the financial statements. *See* FASB Statement of Concepts No. 1, ¶7.  For this reason, Maxim's failure to make the required disclosures in its financial statements and in its SEC filings applies to its conference calls, its press releases and its annual reports as well.

269.   By restating, Maxim admitted that (i) its previously reported financial statements were false and misleading; (ii) at the time they were originally issued; (iii) that the errors contained therein were material; and (iv) that there was contemporaneous information available to the Company that demonstrated the falsity of those statements.

270.   Due to these accounting improprieties, Maxim's financial results and statements issued during the Class Period violated GAAP as follows: (i) the principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28); (ii) the principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1); (iii) the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1); (iv) the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1); (v) the principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2); (vi) the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2); (vii) the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of

Concepts No. 2); and (viii) the principle of comparability, that an enterprise's financial information gains greatly in usefulness if it can be compared with similar information about other enterprises and with similar information about the same enterprise for some other period or some other point in time (FASB Statement of Concepts No. 2).

### B. <u>Insider Sales</u>

271.     Defendants Gifford and Jasper were not motivated to disclose the pervasive nature of the backdating scheme because they each reaped substantial proceeds from insider sales during the Class Period.

272.     During the Class Period, Defendant Gifford recognized $23,715,240 in proceeds from the sale of Maxim stock:

| Transaction Date | Form 4 Date | Shares | Share Price | Proceeds |
|---|---|---|---|---|
| 8/15/2005 | 8/16/2005 | 200,000 | $42.63 | $8,526,860 |
| 11/15/2005 | 11/15/2005 | 200,000 | $35.94 | $7,188,000 |
| 2/14/2006 | 2/15/2006 | 3,795 | $40.00 | $151,800 |
| 2/16/2006 | 2/16/2006 | 196,205 | $40.00 | $7,848,200 |
| | | | | **$23,715,240** |

273.     During the Class Period, Defendant Jasper recognized $716,415 in proceeds from the sale of Maxim stock:

| Transaction Date | Form 4 Date | Shares | Share Price | Proceeds |
|---|---|---|---|---|
| 11/10/2003 | 11/10/2003 | 15,000 | $50.76 | **$716,415** |

274.     Defendants Gifford and Jasper received these proceeds while they were in possession of material, non-public information concerning Maxim, namely, that: (1) the Company was not granting all stock options at fair market value; (2) the Company was not properly accounting for stock option grants; and (3) Maxim's operating income, net income and earnings per share were materially inflated.

CONSOLIDATED CLASS ACTION COMPLAINT                                                                   -87-
CASE NO. C-08-00832-JW

## C.   Violation Of SEC Rules

275.   As a result of Defendants' conduct detailed above relating to the improper backdating of stock options and failure to recognize proper and sufficient compensation expense for options granted "in-the-money," Maxim violated numerous SEC Regulation S-K requirements related to financial reporting.  These violations are the result of inaccurate or inadequate disclosures concerning financial and operating performance, management discussion and analysis, executive and employee compensation policies and stock option practices, tax practices and related liabilities.

276.   The violations of Regulation S-K include, but are not limited to, the following:

- Item 201(d): *Securities authorized for issuance under equity compensation plans*;

- Items 301(a) and 301(b):  *Selected financial data*;

- Item 303(a):  *Management's discussion and analysis of financial condition and results of operations; Full fiscal years*;

- Item 303(b):  *Management's discussion and analysis of financial condition and results of operations; Interim periods*;

- Item 307:  *Disclosure controls and procedures*;

- Item 308(a) (*Management's annual report on internal control over financial reporting*;

- Items 402(b), 402(c), 402(d) and 402(e):  *Executive Compensation*; and

- Item 404(a):  *Transactions with related persons*.

277.   For example, Item 402 of Regulation S-K [17 C.F.R. § 229.303] requires an issuer to provide both a Summary Compensation Table and an Option/SAR Grants Table identifying the compensation of the Company's CEO and its next four most highly paid executives.  In the Summary Compensation Table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option grant table, the issuer must identify "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant."  Item 402(c)(2)(iv).

278.     During the Class Period, Defendants failed to disclose that executive officers at Maxim were granted options with exercise prices below the full market value on the grant date.  Maxim made these disclosures, for the first time, in its 2007 Form 10-K (filed September 30, 2008):

> In a few instances, a portion of our annual bonus payments to certain of our executive officers does not currently qualify as deductible under Section 162(m). . . . Our 1996 Stock Incentive Plan has been structured with the intention that stock options and performance shares granted under the plan be qualified as performance-based compensation not subject to Section 162(m), however improperly accounted for stock options and performance shares granted under this plan may not qualify as performance-based compensation.

279.     During the Class Period, Maxim also violated Items 303 and 402 of Regulation S-K related to disclosures regarding stock options and IRC § 162(m) tax compliance.

280.     Under SEC guidelines, Maxim's disclosure violations and its financial statement reporting and disclosure errors from 1997 through the first quarter of 2006, were, and are, material.

### D.    Violation Of The Internal Revenue Code

281.     In addition to Defendants' conduct detailed above relating to the improper backdating of stock options and failure to recognize proper and sufficient compensation expense in Maxim's Class Period financial statements for options granted "in-the-money," Defendants violated various IRS rules and regulations.

282.     Defendants caused Maxim to violate IRS rules and regulations due to its improper tax treatment of "in-the-money" stock options. As a result, the Company underpaid income taxes (by improperly taking tax deductions prohibited by Internal Revenue Code ("IRC") § 162(m), overpaid income taxes (by allowing executives to backdate stock option exercise dates, resulting in lost tax deductions for the Company),  and failed to make adequate deposits to the IRS for its tax withholding obligations.  Maxim has now admitted that it incurred $29.9 million in back taxes, payroll taxes, penalties, interest and withholding tax adjustments for improperly reporting stock-based compensation.

283.     Defendants caused the Company to violate IRC § 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to its five most highly compensated employees to $1 million each unless the pay qualifies as "performance-based." IRC § 162(m) defines stock options as performance-based, ***provided*** they are issued at an exercise price that is no less than

the fair market value of the stock on the date of the grant. Under IRC § 162(m), by definition, "in-the-money" options and base cash salary are ***not*** performance based. Accordingly, tax deductions for salary and gains on stock options by Maxim's five most highly compensated employees are limited to $1 million per person per year.

284.   Defendants caused Maxim to violate IRC § 162(m) by improperly treating options that were ***in*** the money as if they were ***at*** the money for tax purposes. Accordingly, Maxim took tax deductions that were expressly prohibited. In the Restatement, Maxim made the following admission:

> To establish reserves because certain stock options deductions claimed on corporate income tax returns in prior years may be disallowed by Internal Revenue Code ("IRC") Section 162(m), which limits the annual deduction for non-performance-based compensation paid to certain employees to $1 million, we recorded a reserve of $27.8 million as of June 25, 2005

285.   Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Maxim's stock options by improperly accounting for its nonqualified stock options ("NSOs") as incentive stock options ("ISOs").

286.   ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). This allows the recipient to (i) defer payment of income taxes on stock option gains until the stock is sold; and (ii) to pay long term capital gains tax rates (generally, 15%) instead of ordinary income tax rates (generally, 28% or more). Stock options that do not qualify as ISOs are NSOs. NSOs are not entitled to preferential tax treatment. Upon exercise, whether or not the underlying stock is sold, recipients are subject to income tax withholding, FICA taxes and (higher) ordinary income tax rates on the exercise date gain. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

287.   In violation of IRS rules and regulations, Defendants failed to withhold and remit sufficient income tax and FICA deposits upon the exercise of its options by its executives and employees by improperly treating "in-the-money" options as ISOs.

288.   In the Restatement, Maxim disclosed that Defendants not only backdated grant dates – they also backdated *exercise* dates:

> on many occasions, exercise dates for options exercised by grant recipients, including our former CEO, appear to have been incorrectly reported. Generally, in these instances, the price of our common stock was lower on the reported exercise date than on the date the option actually was exercised. ***The reporting of such incorrect exercise dates would have had the effect of reducing the exercising employees' taxable income, resulting in underreported liabilities for withholding taxes and exposing us to withholding tax liabilities plus penalties and interest for failure to pay such withholding taxes.***

289.   This disclosure failed to inform investors that, because *exercise* dates were backdated, in addition to incurring liabilities, penalties and interest for failing to properly withhold employee income taxes, Maxim incurred significant additional income tax liabilities of its own for having failed to take available tax deductions.

290.   Indeed, Defendant Gifford was implicated in this practice.  On December 12, 2006, *The Wall Street Journal* published another article entitled, "How Backdating Helped Executives Cut Their Taxes," which disclosed to the public further information about the backdating practices at Maxim. The article noted that Defendant Gifford exercised options and held shares seven times during 1997-2002 and that ***"[i]n all but one case Mr. Gifford's reported exercise date was the very day the stock reached its lowest closing price of the month.***  After the Sarbanes-Oxley corporate-reform law went in to effect in 2002, drastically reducing the opportunity to backdate by tightening reporting requirements, his fortunate timing vanished."

291.   This practice was described in a January 10, 2007, Fortune Magazine article as "book-cooking:"

> Bizarrely, while this book-cooking appears to be a tax scam . . . . What it reveals most strongly is some executives' utter contempt for their shareholders.
>
>             *      *      *
>
> The really wacky aspect of exercise backdating lies in the realm of taxes. Remember, executives who do this want to minimize their gain on exercise. But for the company that granted the options, that dreaded gain is a good thing because it's a tax deduction.

Thus, when an executive works a scam to reduce his reported gain on exercise, he's also shrinking his own company's tax deduction - causing it to pay more tax.

Note a couple of important points here. First, the shareholders are unambiguously getting shafted. Exercise backdating changes only one thing from their perspective, reducing the tax deduction their company gets. The company needlessly pays more tax, robbing shareholders of wealth, because some top executive got greedy.

*     *     *

Now remember, for every dollar he reduces his gain, he also reduces his company's tax deduction by a dollar . . . . **Who loses?  Just the shareholder.**

Which is why you shouldn't merely shake your head at what looks like another tale of scoundrels trying to cheat the U.S. Treasury. In this case they weren't. **They were stealing only from their own shareholders, and they knew it.**

*See New Backdating Scheme Rips Off Shareholders,* by Geoff Colvin, Fortune senior editor at large.

292.    Maxim's Restatement revealed that as a result of backdated *exercise* dates, it paid $13.9 million in income taxes that it did not owe.  Maxim permanently lost $9.6 million of this due to statutes of limitations and recorded a $4.3 million tax refund receivable for paying taxes that it now hopes to recover.

## VII.    THE TRUTH EMERGES

293.    During the Class Period, Defendants engaged in a scheme to deceive investors which resulted in the price of Maxim's common stock being artificially inflated.  Specifically, Defendants falsely represented that all incentive stock options were granted to employees and the board of directors at fair market value and failed to disclose that Maxim was not recording any compensation expenses after issuing "in-the-money" options.  Defendants' misrepresentations and omissions violated numerous provisions of GAAP, violated the express terms of all the Company's stock option plans, misled investors regarding the reliability of Maxim's internal control systems and caused Maxim's net income, operating income and earnings per share to be materially inflated during the Class Period.

294.    The material false and misleading statements and omissions referred to above caused and maintained artificial inflation in the price of Maxim's common stock throughout the Class Period.

295.    Maxim's share price reacted negatively to the disclosures of the truth regarding Defendants' materially false and misleading statements, as the artificial inflation was removed from the share price.  As a result of their purchases of Maxim's shares during the Class Period, Lead

1  Plaintiffs and the Class suffered economic loss.  These losses were a direct result of the fraudulent

2  scheme to artificially inflate the price of Maxim's common stock.

3  296.   By way of background, on March 18, 2006, *The Wall Street Journal* published a front-

4  page exposé entitled "The Perfect Payday," which detailed the potential backdating of stock option

5  grants at a number of public companies beginning in the mid-1990s.  The article described a pattern

6  whereby option grants at those companies were consistently and fortuitously dated just before a rise in

7  the stock price.  The article concluded that there was effectively a zero probability of the reported

8  grant dates occurring at random.

9  297.   Following the publication of "The Perfect Payday," Merrill Lynch ("Merrill")

10 undertook an analysis of options backdating practices at semiconductor companies (including Maxim)

11 that comprised the Philadelphia Semiconductor Index ("SOX Index").  On May 22, 2006 Merrill

12 published its findings ("Merrill Lynch Report"), which concluded that although excess returns for

13 stock options is unexpected "if the options pricing process isn't being timed," "the stocks comprising

14 the SOX [Index] have consistently generated excess returns during the 20-day period following option

15 grants."  Merrill highlighted Maxim on the front page of the report as a "standout" company whose

16 excess option performance was "at the top" of a list of companies in the SOX Index who were the

17 worst option backdating offenders.  On this news, Maxim stock closed down 4.28% on May 22, 2006,

18 falling $1.41 from $32.97 to $31.56 on volume of 7,664,782, a 30% increase compared to the average

19 volume during the previous 30 days.

20 298.   Other analysts took note.  For example, on May 23, 2006, a Credit Suisse analyst stated

21 that "[g]iven MXIM's aggressive stance on options and options accounting, we expect options to be

22 the most contentious issue of the [upcoming May 24, 2006 analyst] day."

23 299.   In response to the Merrill Lynch Report, Maxim reassured investors that it was – and

24 always had been – in compliance with applicable laws.  Instead, the Company stated in a May 23,

25 2006 press release:

26 The option granting process to the Company's officers consists of a written proposal made by
   the Chief Executive Officer to the Compensation Committee.  Upon the conclusion of
27 discussion and/or adjustment of the proposed amounts, the Compensation Committee approves
   the grants made to officers and the grants are then made by the Company.  The Company's

28

CONSOLIDATED CLASS ACTION COMPLAINT                                                    -93-
CASE NO. C-08-00832-JW

management believes that ***it has complied with all applicable laws*** and its shareholder approved stock option plan in granting options to officers and ***it has not backdated options.***

300.   On June 7, 2006 after the market closed, Maxim announced that it had received notice that the SEC was conducting an inquiry into its stock option backdating.   Stephen Taub of www.cfo.com reported on June 8, 2006, that Maxim "is the latest company to be targeted" by the SEC.   On this news, Maxim stock closed down 1.3% on June 8, 2006, falling $0.64 from $31.31 to $30.67 on volume of 11,189,328, a 60% increase compared to the average volume during the previous 30 days.

301.   Analysts, however, believed the Company's reassurances about backdating.   For example, on June 15, 2006, William Blair & Co. reported that "[o]n the basis of our discussions with management, we believe that Maxim has acted appropriately in granting stock options in accordance with the guidelines specified in its proxy statements, which clearly do not allow for backdating."

302.   On July 3, 2006, Maxim announced that it "received a subpoena from the U.S. Attorney for the Northern District of California asking for documents relating to its stock option grants and practices."   Further, Maxim announced that its Board of Directors had authorized a review of the Company's stock option grant practices, which would be conducted by "a Special Committee of the Board with the assistance of outside independent legal counsel."

303.   After the close of the market on July 5, 2006, analyst Craig A. Ellis ("Ellis") at Citigroup Research cut Maxim from "buy" to "hold," and increased the Company's risk ratings from "High" to "Speculative" based, in part, on "unfavorable options backdating exposure."   Ellis noted that:

> On risk-rating changes, while we increased risk ratings for LLTC and MXIM to High from Medium-risk in our Stock Option Spotlight note dated May 29th, today we increase risk ratings further for these stocks to Speculative from High ***based on their recent announcements of SEC inquiries and subsequently higher risk for potential earnings restatement and/or SEC filings delays.***

304.   Also, for the first time, the market learned that the options backdating at Maxim may be serious enough to require a restatement.   The Citigroup report explained that "[o]ur rating incorporates stock option grant analysis that suggests the company may have engaged in aggressive practices as it

established grant dates and prices for prior historical executive option grants."  Further, Ellis stated, "we believe the company's options grants could cause further pressure to the shares **and potentially result in a financial restatement.**"  On this news, Maxim stock closed down 3.26% on July 6, 2006, falling $1.02 from $31.27 to $30.25 on volume of 8,819,876, a 69% increase compared to the average volume during the previous 30 days.

305.    From the close on July 3, 2006 to the close on July 10, 2006, Maxim's common stock declined 10.0%, falling $3.20 from $32.25 to $29.05.

306.    Then, after the close of trading on September 7, 2006, the Company disclosed for the first time that the ongoing review of its stock-options grants and practices would cause it to be unable to file its Form 10-K for the year ended June 24, 2006, saying:

> Maxim Integrated Products, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the fiscal year ended June 24, 2006 ("Form 10-K") by the prescribed due date of September 7, 2006.  As previously announced, on June 14, 2006 the Company's Board of Directors authorized a review of certain of the Company's past stock option grants and practices, which is being conducted by a Special Committee of the Board with the assistance of outside independent legal counsel. At this time, the Special Committee has not completed its review. ***Until this review is completed, the Company will not be able to file its Form 10-K.*** The Company intends to file the Form 10-K as soon as possible following the completion of the Special Committee's review.

307.    In reaction to this news, Maxim stock closed down 2.19% on September 8, 2006, falling $0.64 from $29.20 to $28.56 on volume of 4,239,686.

308.    Later that month, on September 28, 2006, Maxim announced that on September 25, 2006, it had received a letter from NASDAQ regarding a violation of NASDAQ Marketplace Rule 4310(c)(14).  The letter was issued in accordance with NASDAQ procedures and came "as a result of the delay in the filing of Maxim's Annual Report on Form 10-K for the fiscal year ended June 24, 2006 with the Securities and Exchange Commission (SEC)."  Maxim again reassured investors, stating that it would proactively request a NASDAQ hearing regarding the stock listing.

309.    On December 12, 2006, *The Wall Street Journal* published another article entitled, "How Backdating Helped Executives Cut Their Taxes," which disclosed to the public further information about the backdating practices at Maxim.  The article noted that Defendant Gifford exercised options and held shares seven times during 1997-2002 and that ***"[i]n all but one case Mr.***

***Gifford's reported exercise date was the very day the stock reached its lowest closing price of the month.*** After the Sarbanes-Oxley corporate-reform law went in to effect in 2002, drastically reducing the opportunity to backdate by tightening reporting requirements, his fortunate timing vanished."

310.    Just eight days later, on December 20, 2006, Maxim announced that Defendant Gifford resigned, citing "health reasons."

311.    On January 31, 2007, Maxim announced the findings of the Special Committee formed to investigate backdating of options.  The Special Committee found, *inter alia*, that:

> ***there were deficiencies related to the process for granting stock options to employees and directors during the period under review*** and, specifically, that in certain instances from the beginning of fiscal year 2000 until the end of fiscal year 2006, ***the recorded exercise price of certain stock option grants to employees and directors differed from the fair market value of the underlying shares on the actual measurement date.***

> The Company ***believes that accounting adjustments to previously issued financial statements to reflect stock-based compensation at measurement dates different from the original measurement dates used for certain grants to employees and directors are material*** and expects to restate its financial statements for the fiscal years 2000 through 2005 and the related interim periods through March 25, 2006.

> The Company ***has not yet determined the amount to be restated in any specific period,*** nor has the Company determined the tax consequences that may result from these matters or whether any tax consequences will give rise to additional tax liabilities.  Accordingly, the financial statements, and the related reports of its independent registered accountants, and all earnings press releases and similar communications issued by the Company relating to the periods discussed above (fiscal years 2000 through 2005 and the related interim periods through March 25, 2006) should not be relied upon.

This was the first time that Maxim acknowledged that it backdated options to employees and directors, and that the scheme would cause it to have to restate its financials.   Defendants, however, tempered this information by stating that there had been no evidence of wrongdoing by outside directors, and also that NASDAQ had granted the Company's request for an extension to file its periodic reports and thus Maxim would remain listed.

312.    Also on January 31, 2007, Maxim announced that "in connection with the investigation, former Chief Executive Officer, John F. Gifford, who stepped down for health reasons in December 2006, has retired as a strategic advisor to the Company, and that Carl Jasper, the Company's Chief Financial Officer, has resigned from the Company."

313.   In response to the January 31, 2007 press release, CIBC World Markets noted that "the conclusion of the review removes an overhang" and Wachovia Capital Markets, LLC authored a report stating that the management changes "could prove to be a positive event in the long-term."

314.   On March 9, 2007, Maxim filed a Form 8-K with the SEC disclosing that it had been informed by the NASDAQ Listing and Hearing Review Council that the Council had decided to review the NASDAQ's Listing Qualifications Panel's January 19, 2007 decision, and had also stayed any future action by the Panel to suspend the Company's securities from trading on NASDAQ.  The Listing Council's action was in response to the Company's request for it to review the Panel Decision. Maxim further disclosed that it may submit additional information for the Listing Council's consideration by May 4, 2007.

315.   On April 23, 2007, Bear Stearns issued an analyst report on Maxim, reiterating that "Maxim has until May 4 to provide NASDAQ Listing Council with additional information regarding this restatement," and also explaining that "[w]e believe that the restatement would be material to Maxim's historical results and see risks to Maxim's stock related to the restatement."

316.   Thereafter, Maxim announced on May 10, 2007, that it had received an additional NASDAQ Staff Determination notice indicating that it was not in compliance with requirements for continued listing.  Maxim later disclosed similar letters of failed compliance which were the direct result of its inability to file periodic reports due to the ongoing stock option investigation.  Maxim further announced on July 9, 2007, that it had submitted a request to the NASDAQ Board, requesting that it exercise its discretion to stay any future action to suspend trading of Maxim's common stock on NASDAQ.  Specifically, Maxim requested that the Board grant Maxim additional time to complete and file its past due periodic reports with the SEC and to allow continued listing of its common stock on NASDAQ during this period.

317.   On July 17, 2007, Maxim announced that NASDAQ's Board had granted Maxim's request to stay the decision to suspend the Company's securities from trading, and consequently Maxim's common stock would remain listed on NASDAQ pending further consideration by the NASDAQ Board.

318.    On August 2, 2007, Cowen and Company noted that "the uncertainty associated with the investigation dominated [Maxim's] stock[] performance."  John Lau ("Lau") at Jefferies & Co., Inc. commented on August 3, 2007, that the uncertainty surrounding the status of the listing of Maxim's common stock and the fact that because the Company "is still reviewing its past stock options grant practices, only limited financial data have been provided."  Lau further predicted (incorrectly) that "the audits will be completed in the near future."  That same day, CIBC World Markets noted "[m]anagement indicated that the options review would take longer than originally expected, finishing up in the next 3-6 months instead of at the end of the summer.  We anticipate some investors who were looking for the conclusion of the options investigation as a restructuring catalyst may be disappointed by the delay."

319.    On August 23, 2007 Maxim announced that although the NASDAQ Board had granted the Company until September 25, 2007, to file its past due periodic reports with the SEC (and thus regain compliance with NASDAQ's listing requirements) it would "not be able to file its past due periodic reports with the Commission by September 25, 2007."  The Company downplayed the likelihood of an actual delisting, however, stating:  "Maxim is exploring alternatives that may be available to prevent the suspension from trading of its common stock on Nasdaq on September 27, 2007 as well as the delisting of its common stock from Nasdaq, including seeking relief from Nasdaq's Board of Directors and the Commission."

320.    On August 28, 2007, Banc of America Securities analyst Sumit Dhanda ("Dhanda") downgraded Maxim stock from "Buy" to "Neutral" because uncertainty related to the potential delisting may hurt shares of Maxim in the near term.  Dhanda remarked, "We think the tone of the most recent warning, the delinquency, and the unenviable track record of its auditors in turning around similar restatements in a timely fashion, raises the odds of a delisting."  On this news, Maxim stock closed down 5.56% on August 28, 2007, falling $1.73 from $31.12 to $29.39 on volume of 7,628,064, a 28% increase compared to the average volume during the previous 30 days.

321.    Bloomberg News noted the drop on August 28, 2007, and reported that Maxim's shares "fell the most since Aug. 3, losing . . . 4.6 percent . . . .  the company . . . was cut to 'neutral' from 'buy' by Banc of America Securities on concern Maxim may be delisted from the Nasdaq Stock

Market for failing to file timely financial statements. 'Uncertainty stemming from the potential delisting could serve to pressure the stock in the near term,' wrote analyst Sumit Dhanda."

322. After the close of the market on September 24, 2007, the market learned for the first time that Maxim's delisting was a near certainty, as it would be replaced in the S&P500 after trading ended September 26, 2007. In addition, Maxim was scheduled to be delisted by the NASDAQ on or around that day.

323. On September 25, 2007, Maxim stock closed down 2.65%, falling $0.77 from $28.98 to $28.21 on volume of 18,278,734, a 354% increase compared to the average volume during the previous 30 days.

324. Then, after the close of the market on September 25, 2007, Maxim announced that the SEC had granted another interim stay of the suspension and delisting of the Company's common stock in order to allow the SEC to more fully consider and evaluate the issues involved in the Company's appeal. Analysts noted that "delisting would be incrementally negative for MXIM."

325. The market learned on October 1, 2007, that the SEC denied the Company's appeal to stay the NASDAQ's decision to suspend and delist Maxim's common stock. Earlier in the day, NASDAQ indicated a suspension of trading as of October 2, and the OTC Bulletin Board site indicated it was adding the stock as of October 2. The decision terminated the interim stays of NASDAQ's ruling that had previously been put in place by the SEC and ended all hope that Maxim might remain listed.

326. On October 1, 2007, the market also learned that the stock would be removed from the Nasdaq 100 and the Russell 1000, which resulted in net additional selling pressure of 22-23 million shares. Analysts noted that "[f]rom the close of 9/24 to the close of 10/1 the stock has been down 2.5%. . . . The stock's [Average Daily Volume] has been 30.9M in the past 5 days versus an [Average Daily Volume] of 5M in the 20 days prior to the S&P announcement. On 10/1 alone, 47.7M shares exchanged hands." On this news, Maxim stock closed down 3.71% on October 1, 2007, falling $1.09 from $29.35 to $28.26 on volume of 47,752,371, a 484% increase compared to the average volume during the previous 30 days.

327.   Maxim's stock was suspended from trading on NASDAQ effective as of the opening of business on Tuesday, October 2, 2007, and was subsequently delisted.  Maxim also announced that it expected its restatement to be completed and its past due periodic reports to be filed during the first quarter of calendar year 2008.

328.   Analysts noted that "[s]ince the Sept 24th announcement by S&P to remove the stock from the S&P500 index, close to 155M shares or 48% of float changed hands during market hours."

329.   Maxim and analysts continued to assure the market that its restatement would be shortly forthcoming.   On December 14, 2007, Bear Stearns issued an analyst report entitled "Execution on Track" based on its "one-on-one conference call with [Maxim] CFO Bruce Kiddoo." Bear Stearns stated that "[w]ith regards to the ongoing stock options review and the upcoming financial statement, the company is on the verge of filing the letters to the SEC for review.  We believe that Maxim is on track to file its delinquent financial filings before the end of the March quarter and a stock buyback would be imminent after that."  Likewise, on December 18, 2007, Citigroup issued an analyst report entitled "Now Bullish After 18 Months of Concern; Upgrading to Buy," due in part to the expectation that the restatement would be completed in the first calendar quarter of 2008.  John Lau at Jefferies & Company, Inc. likewise explained on January 2, 2008, that the "impending restatements" were estimated to be complete in March 2008 and "could be major 2008 catalyst."

330.   On January 17, 2008, the Company announced the extensive magnitude of the restatement for the first time: ***in the estimated range of $550 to $650 million.***  The Company also announced that the investigation was more extensive than the market had previously been lead to believe: instead of simply restating fiscal years 2000 through 2005 (and the nine months ending March 25, 2006), Maxim announced that the restatement would now extend back to fiscal 1997.  The Company also announced yet another delay in its completion date of the restatement as it had recently expanded the scope of the analysis "to include a review of stock options granted in years 1995 and 1996, and to conduct further analysis of certain aspects of stock option activity such as employees who either terminated their employ or changed their employment status."  "Based on these new requirements and the overall complexity of the project," the Company estimated that the restatement

would be completed in June 2008, but could not give assurances that it would meet the targeted completion date.

331.    Following this news, Maxim stock closed down 11.98% on January 17, 2008, falling $2.83 from $23.63 to $20.80 on volume of 17,549,962, a 629% increase compared to the average volume during the previous 30 days.

332.    According to Bloomberg, in a report entitled "Maxim Declines Most in Six Years on Restatement Size," Maxim's stock price "fell the most in more than six years in U.S. trading after announcing plans to restate results by as much as $425 million."   It further noted that "[t]he restatement may equal more than a fifth of Maxim's sales in the year ended June 30."   Cowen & Company noted that the January 17 announcement "provided [Maxim's] first official estimate for the magnitude of the restatement," and, commenting on the delay, stated "[w]e are obviously disappointed with this setback. . . .   Not only does it further delay a potential share repurchase program, but it also significantly damages management's credibility with the investment community as it represents the second such push out of its targeted restatement date."   Citigroup issued a January 17, 2008 analyst report entitled "Restatement Target Slips To June from March," and explained that following Maxim's announcement, "[s]hares fell 12% on the day."   Citigroup further explained that, "[a]fter reaching the company we conclude that while the F97-F06 restatements satisfied [Maxim's] auditor's regional office, the national office had a different interpretation which now requires fresh work. . . .   We believe the main challenge from here will be tracking down the F95/96 records, as in F1995 grant authorization for rank and file employees was given solely to [Maxim's] former CEO (but retained by the Board for Exec grants)."

333.    The following day, analysts across the board downgraded Maxim as a result of the January 17 announcement.  Maxim stock closed down 7.07% January 18, 2008, falling $1.47 from $20.80 to $19.33 on volume of 16,387,341, a 473% increase compared to the average volume during the previous 30 days.

334.    By the time the options backdating scandal and its full impact on Maxim's financial statements was completely disclosed to the market, Maxim's share price had plummeted over 41.3%

from its price prior to the issuance of the Merrill Lynch Report on May 22, 2006, to the close of trading on January 18, 2008 (from $32.97 to $19.33).

335. This decline in Maxim's common stock price was foreseeable at the time of Defendants' misrepresentations and omissions. Indeed, despite being aware of the consequences their conduct would have on Maxim's financial statements, Defendants concealed that they were knowingly backdating options, and failing to properly record massive amounts of compensation expenses. Once the whole truth about Defendants' scheme was revealed, a foreseeable drop in the share price occurred.

336. Had Lead Plaintiffs and the Class known the whole truth behind the Company's false and misleading public statements and omissions, they would not have purchased the Company's shares or would have purchased the shares at a lower market price.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

337. At all relevant times, the market for Maxim's publicly traded common stock was an efficient market for the following reasons, among others:

(a) The Company's common stock met the requirements for public listing and was listed and actively traded on the NASDAQ, a highly efficient market until October 1, 2007, when it was delisted and began trading on the pink sheets. The average daily volume of Maxim's common stock during the Class Period was 5,579,389 shares based on information from the Yahoo Finance website. The total number of shares traded during the Class Period was 6,645,051,700 shares. Further, over 85% of the stock was owned by institutional investors;

(b) As a regulated issuer, Maxim made public filings, including its Forms 10-K, Forms 10-Q and related press releases, with the SEC;

(c) Maxim was followed by analysts from major brokerages including Smith Barney Citigroup, Bear Stearns & Co, Inc., Credit Suisse, CIBC World Markets Corp., Wedbush Morgan Securities Inc., William Blair & Company, Deutsche Bank Securities Inc., Kaufman Brothers, Prudential Equity Group, Inc., UBS, SG Cowen Securities Corporation, RBC Capital Markets (US), Fulcrum Global Partners, Pacific Growth Equities, A.G. Edwards & Sons, Inc., Thinkequity Partners,

Wells Fargo Securities LLC, Wachovia Securities, Jefferies & Company, Inc., Cowen and Company, and Canaccord Adams.  The reports of these analysts were redistributed to the brokerages' sales force, their customers, and the public at large;

(d)     Maxim regularly communicated with public investors via established market communication mechanisms, including the Company's website, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Maxim's common stock; and

(f)     Without knowledge of the misrepresented or omitted material facts, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Maxim common stock between the time Defendants made the material misrepresentations and omissions and the time the fraudulent backdating was being disclosed, during which time the price of Maxim common stock was inflated by Defendants' misrepresentations and omissions.

338.    As a result, the market for Maxim's publicly traded common stock promptly digested current information with respect to Maxim from all publicly available sources and reflected such information in the price of the Company's common stock.  Under these circumstances, all purchasers of Maxim's common stock during the Class Period suffered similar injury through their purchase of the stock at artificially inflated prices, and a presumption of reliance applies.

## IX.     <u>NO SAFE HARBOR</u>

339.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made. No statutory safe harbor applies to any Defendants' material false or misleading statement.

340.    Moreover, the statutory safe harbor is inapplicable with respect to the false and misleading statements included in Maxim's financial statements, which purported to be prepared in accordance with GAAP.

341. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Maxim who knew that those statements were false when made.

## X. CLASS ACTION ALLEGATIONS

342. Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired shares of Maxim common stock between April 29, 2003 and January 17, 2008, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

343. Because Maxim had millions of shares of common stock outstanding during the Class Period, and because the Company's common stock was actively traded, members of the Class are so numerous that joinder of all members is impracticable. As of December 29, 2007, Maxim had 320,553,000 shares of common stock outstanding. Disposition of their claims in a class action will provide substantial benefits to the parties and the Courts.

344. Throughout the majority of the Class Period, until October 2, 2007, Maxim's common stock was actively traded on the NASDAQ and then traded over-the-counter on the "Pink Sheets." While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe there are, at a minimum, thousands of members of the Class. Members of the Class may be identified from records maintained by Maxim

1   or its transfer agent and may be notified of the pendency of this action by mail, using the form of

2   notice similar to that customarily used in securities class actions.

3   345.   The names and addresses of the record owners of Maxim common stock purchased

4   during the Class Period are available from Maxim and/or its transfer agent(s). Notice can be provided

5   to persons who purchased or otherwise acquired Maxim common stock by a combination of published

6   notice and first-class mail, using techniques and forms of notice similar to those customarily used in

7   other class actions arising under the federal securities laws.

8   346.   Lead Plaintiffs' claims are typical of the claims of the members of the Class as all

9   members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

10  law that is complained of herein.

11  347.   Lead Plaintiffs will fairly and adequately represent and protect the interests of the

12  members of the Class.  Lead Plaintiffs have retained extremely competent counsel experienced in class

13  and securities litigation and intend to prosecute this action vigorously.  Lead Plaintiffs have no

14  interests antagonistic to, or in conflict with, those of the Class.

15  348.   Common questions of law and fact exist to all members of the Class and predominate

16  over any questions solely affecting individual members of the Class.  Among the questions of law and

17  fact common to the Class are the following:

18      (a)     whether the federal securities laws were violated by Defendants' acts and

19  omissions as alleged herein;

20      (b)     whether Defendants participated in and pursued the common course of conduct

21  and fraudulent scheme complained of herein;

22      (c)     whether Defendants acted with scienter;

23      (d)     whether the price of Maxim common stock was artificially inflated during the

24  Class Period;

25      (e)     whether statements made by Defendants to the investing public during the Class

26  Period misrepresented material facts about the business, financial performance, and management of

27  Maxim; and

28

(f)     to what extent the members of the Class have sustained damages and the proper measure of damages.

349.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, because damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I

**Violations Of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder Against Maxim, Gifford and Jasper**

350.    Lead Plaintiffs repeat and reallege each and every allegation containing above as if fully set forth herein.

351.    The Defendants named in this count include Maxim, Gifford and Jasper.

352.    During the Class Period, Defendants Maxim, Gifford and Jasper carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, as alleged herein; (b) artificially inflate the market price of Maxim's common stock; and (c) cause Lead Plaintiffs and the other Class members to purchase Maxim's common stock at artificially inflated prices.

353.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants Maxim, Gifford and Jasper, individually and jointly, took the actions set forth herein.  Indeed, defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use of means or instrumentalities of interstate commerce; and (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to create and maintain artificially high market prices for Maxim's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Each of the defendants

1  named in this count was a direct, necessary and substantial participant in the common course of

2  conduct alleged herein.

3       354.    In addition to the duties of full disclosure imposed on Defendants Maxim, Gifford and

4  Jasper as a result of their making affirmative statements and reports to the investing public, these

5  defendants had a duty to promptly disseminate truthful information that would be material to investors

6  in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-

7  X (17 C.F.F. § 210.1-01, *et seq.*) and Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC

8  regulations, including accurate and truthful information with respect to the Company's financial

9  condition, earnings and expenses, officer and director compensation, and management integrity so that

10 the market price of the Company's common stock would be based on truthful, complete and accurate

11 information.

12      355.    Defendants Maxim, Gifford and Jasper, directly and indirectly, by the use, means or

13 instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous

14 course of conduct to misrepresent and to not disclose adverse material information about Maxim's

15 financial condition, stock option grants, officer and director compensation and management integrity

16 as detailed herein.

17      356.    Defendants Maxim, Gifford and Jasper employed devices, schemes and artifices to

18 defraud while in possession of material adverse non-public information and engaged in acts, practices

19 and a course of conduct as alleged herein in an effort to deceive and/or mislead concerning Maxim's

20 stock options, officer and director compensation, financial condition and management integrity. Said

21 schemes, devices, acts and artifices included: (a) the making of, or participation in, the making of

22 untrue statements; (b) the omitting of material facts necessary to make the statements made, in light of

23 the circumstances under which they were made, not misleading; and (c) engaging in transactions,

24 practices and a course of conduct which operated as a fraud and deceit upon the purchasers of

25 Maxim's common stock during the Class Period. For example, defendants named in this count: (i)

26 concealed the fact that defendants were allowing insiders to manipulate the Company's stock option

27 plans; (ii) obtained and/or allowed Maxim officers and directors to obtain options using improper

28 exercise prices in violation of its own policies and failed to properly expense compensation derived

1   therefrom; and (iii) allowed themselves and others to retain executive and directorial positions at

2   Maxim as well as the profits, power and prestige which defendants enjoyed as a result of these

3   positions.

4        357.   Maxim's, Gifford's and Jasper's material misrepresentations, omissions and acts in

5   furtherance of the fraud were done knowingly or with deliberate recklessness and for the purpose and

6   effect of misrepresenting Maxim's financial condition, stock option grants, officer and director

7   compensation and management integrity to the investing public and thereby artificially inflating the

8   price of Maxim's common stock.

9        358.   As a result of the above alleged fraudulent scheme and dissemination of the materially

10  false and misleading information regarding Maxim's financial results, officer and director

11  compensation and management integrity, the market price of Maxim's common stock was artificially

12  inflated prior to and during the Class Period.  Ignorant of the fact the market prices of Maxim's

13  publicly traded common stock was artificially inflated and relying, directly or indirectly, on the false

14  and misleading statements made by defendants or upon the integrity of the market in which the

15  common stock traded and/or on the absence of material adverse information, Lead Plaintiffs and the

16  other members of the Class acquired Maxim common stock during the Class Period at artificially high

17  prices and were damaged thereby.

18       359.   By virtue of the foregoing, Defendants Maxim, Gifford and Jasper have violated

19  Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

20       360.   At the time of said misrepresentations and omissions, Lead Plaintiffs and the other

21  members of the Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiffs

22  and the other Class members and the marketplace known of the true financial condition of the

23  Company and its stock option fraud, officer and director compensation and management integrity

24  issues, Lead Plaintiff and the other Class members would not have purchased or otherwise acquired

25  Maxim common stock; or, they would not have purchased or otherwise acquired the common stock at

26  the artificially inflated prices that they paid.

27

28

361.     As a direct and proximate cause of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

**Violations Of Section 20(a) Of The Exchange Act Against Gifford, Jasper and Ruehle**

362.     Lead Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

363.     Defendants Gifford, Jasper and Ruehle acted as controlling persons of Maxim within the meaning of Section 20(a) of the Exchange Act.  By reason of their high-level and/or management positions with the Company, their ownership of Maxim stock, their participation in and/or awareness of the Company's operations and/or intimate knowledge of the fraudulent scheme, the false financial statements and misrepresentations regarding stock options and executive compensation filed with the SEC and disseminated to the investing public and their participation in the fraudulent acts and/or awareness of such acts, the defendants named in this count had the power and authority to control and cause Maxim and its employees to engage in the wrongful conduct complained of herein.  By reason of such conduct, Defendants Gifford, Jasper and Ruehle are liable pursuant to Section 20(a) of the Exchange Act.

364.     By virtue of their high-level and/or management positions with the Company, the defendants named in this count had intimate knowledge of the fraudulent scheme at Maxim, and the resulting false financial statements and misrepresentations regarding stock options and executive compensation.  Maxim's Restatement admits as much, noting that Defendants Gifford, Jasper and Ruehle "had *knowledge of, and participated in, the selection of*" grant dates with the benefit of *"hindsight or prior to completion of the grant-approval process."*  Further, Defendants Gifford and Jasper *"were the employees most involved in the selection of grant dates*."

365.     As set forth above, Defendants Maxim, Gifford and Jasper each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, defendants Gifford, Jasper and Ruehle are liable pursuant to Section 20(a) of the Exchange Act.

366. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Maxim's common stock during the Class Period, upon disclosure of the truth.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a) Determining that this action is a class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs demand a trial by jury.

Dated: November 14, 2008

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP


*/s/ Blair A. Nicholas*
BLAIR A. NICHOLAS

BLAIR A. NICHOLAS
TIMOTHY A. DeLANGE
NIKI L. MENDOZA
MATTHEW P. JUBENVILLE
TAKEO A. KELLAR
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

CHITWOOD HARLEY HARNES LLP
MARTIN D. CHITWOOD
JAMES M. WILSON, JR.
2300 Promenade II
1230 Peachtree Street, N.E.

Atlanta, GA 30309
Tel:   (404) 873-3900
Fax:   (404) 876-4476
               -and-
GREGORY E. KELLER
11 Grace Avenue, Suite 306
Great Neck, NY 11021
Tel:   (516) 773-6090
Fax:   (404) 876-4476

*Attorneys for Lead Plaintiffs the Cobb County
Government Employees' Pension Plan, the DeKalb
County Pension Plan and the Mississippi Public
Employees Retirement System*