1   GREGORY D. HULL (Bar No. 57367)
    *greg.hull@weil.com*
2   WEIL, GOTSHAL & MANGES LLP
    201 Redwood Shores Parkway
3   Redwood Shores, CA 94065
    Tel:    (650) 802-3274
4   Fax:    (650) 802-3100

5   JOHN A. NEUWIRTH (*Pro Hac Vice*)
    *john.neuwirth@weil.com*
6   JOSHUA S. AMSEL (*Pro Hac Vice*)
    *joshua.amsel@weil.com*
7   WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
8   New York, NY 10153
    Tel:    (212) 310-8000
9   Fax:    (212) 310-8007

10  *Attorneys for Defendant Maxim Integrated Products, Inc.*

11

12              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
13                     **SAN JOSE DIVISION**

14  ------------------------------------------------------- x
                                                           :
15  In re MAXIM INTEGRATED PRODUCTS,          :   Case No.  C-08-00832-JW
    INC. SECURITIES LITIGATION                :
16                                            :   **DEFENDANT MAXIM INTEGRATED**
                                              :   **PRODUCTS, INC.'S MEMORANDUM**
17                                            :   **OF POINTS AND AUTHORITIES IN**
                                              :   **OPPOSITION TO MOTION FOR**
18                                            :   **CLASS CERTIFICATION**
                                              :
19                                            :   Date:      May 24, 2010
                                              :   Time:      9:00 a.m.
20                                            :   Judge:     The Honorable James Ware
                                              :              Courtroom 8, Fourth Floor
21                                            :
    ------------------------------------------------------- x
22
                      **REDACTED PUBLIC VERSION**
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 3

ARGUMENT ............................................................................................................................... 9

I.   PLAINTIFFS CANNOT SATISFY FED. R. CIV. P. 23(b)(3) BECAUSE THE
     PROPOSED CLASS IS NOT ENTITLED TO THE "FRAUD ON THE
     MARKET" PRESUMPTION OF RELIANCE ............................................................. 10

     A.   The Stock Price Reaction Following Maxim's January 31, 2007
          Disclosure Rebuts The "Fraud On The Market" Presumption Of
          Reliance ............................................................................................................ 11

     B.   Plaintiffs' Inability To Establish Loss Causation Further Undermines
          The Proposed Class's Reliance On "The Fraud On The Market"
          Presumption ...................................................................................................... 12

          1.   Only One Potential "Corrective" Disclosure Date (January 17,
               2008) Remains In This Case Following The Court's MTD
               Opinion ................................................................................................... 14

          2.   Maxim's January 17, 2008 Disclosure Did Not Reveal
               Anything Materially New Or "Corrective"............................................. 15

               a.   Prior To January 17, 2008, Investors Were Able To
                    Estimate The Restatement's Magnitude And Price It Into
                    Maxim's Stock ............................................................................ 15

               b.   The Market's Indifference To Maxim's September 30,
                    2008 Restatement Confirms That The January 17, 2008
                    Stock Price Decline Was Not Due To Maxim's Disclosure
                    Of The Restatement's Estimated Magnitude ............................... 17

               c.   It Was The Disclosure Of Further Delay On January 17,
                    2008, And Not The Disclosure Of The Restatement's
                    Estimated Magnitude, That Concerned Investors ...................... 18

II.  PLAINTIFFS CANNOT DEMONSTRATE THAT THEIR CLAIMS ARE
     TYPICAL OF THE PROPOSED CLASS ....................................................................... 20

III. IN THE ALTERNATIVE, THE PURPORTED CLASS PERIOD SHOULD
     END ON JANUARY 31, 2007, WHEN MAXIM ADVISED THE MARKET
     NOT TO RELY ON ITS PRIOR FINANCIAL STATEMENTS ................................... 24

CONCLUSION........................................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases** **Page(s)**

3

*In re Am. Int'l Group, Inc. Sec. Litig.,*
    2010 WL 646720 (S.D.N.Y. Feb. 22, 2010)........................................................1, 10, 12, 13

4

*In re Apollo Group, Inc. Sec. Litig.,*
    2008 WL 3072731 (D. Ariz. Aug. 4, 2008)..........................................................15, 16

5

6

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)........................................................................................11

7

*Beach v. Healthways, Inc.,*
    2009 WL 3245393 (M.D. Tenn. Oct. 5, 2009) ..........................................21, 22

8

9

*Beck v. Status Game Corp.,*
    1995 WL 422067 (S.D.N.Y. July 14, 1995) ................................................23

10

*Beledoff v. Netlist, Inc.,*
    2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) .............................................15

11

12

*Brewer v. Salyer,*
    2009 WL 1396148 (E.D. Cal. May 18, 2009) ............................................20

13

*Brown v. Brewer,*
    2009 WL 1574556 (C.D. Cal. May 29, 2009) ...........................................21

14

15

*In re Connetics Corp. Sec. Litig.,*
    257 F.R.D. 572 (N.D. Cal. 2009)..........................................................12, 24

16

*In re Convergent Techs. Sec. Litig.,*
    948 F.2d 507 (9th Cir. 1991) ................................................................11

17

18

*In re Cooper Cos. Inc. Sec. Litig.,*
    254 F.R.D. 628 (C.D. Cal. 2009)........................................................11, 12

19

*In re Daou Sys., Inc.,*
    411 F.3d 1006 (9th Cir. 2005) ..............................................................19

20

21

*Dukes v. Wal-Mart, Inc.,*
    509 F.3d 1168 (9th Cir. 2007) ..............................................................10

22

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005)..............................................................17, 18, 20

23

24

*Ellis v. Costco Wholesale Corp.,*
    240 F.R.D. 627 (N.D. Cal. 2007)........................................................15

25

26

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003)................................................................20

27

28

# TABLE OF AUTHORITIES
### (contd.)

**Cases**          **Page(s)**

*In re Fed. Nat'l Mortg. Ass'n Sec. Litig.*,
  247 F.R.D. 32 (D.D.C. 2008)..................................................................13, 24, 25

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982)..................................................................................9, 10

*Grace v. Perception Tech. Corp.*,
  128 F.R.D. 165 (D. Mass. 1989)...................................................................23

*Hanlon v. Chrystler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .....................................................................10

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ..........................................................10, 20, 21

*Independence Lead Mines, Inc. v. Hecla Mining Co.*,
  2007 WL 2769621 (D. Idaho Sept. 24, 2007)...............................................19

*Jordan v. County of Los Angeles*,
  669 F.2d 1311 (9th Cir.), *vacated and remanded on other grounds*,
  459 U.S. 810 (1982)....................................................................................20

*In re Juniper Networks, Inc. Sec. Litig.*,
  2009 WL 3353321 (N.D. Cal. Oct. 16, 2009) .......................................*passim*

*Keilhotz v. Lennox Hearth Prods., Inc.*,
  2010 WL 668067 (N.D. Cal. Feb. 16, 2010) .................................................21

*In re LDK Solar Sec. Litig.*,
  255 F.R.D. 519 (N.D. Cal. 2009).........................................................*passim*

*In re LTV Sec. Litig.*,
  88 F.R.D. 134 (N.D. Tex. 1980).................................................................25

*Landry v. Price Waterhouse Chartered Accountants*,
  123 F.R.D. 474 (S.D.N.Y. 1989)............................................................21, 23

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).......................................................................20

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001).........................................................24

*Mack Univ. LLC v. Halstead*,
  2007 WL 4458615 (C.D. Cal. Nov. 14, 2007)..............................................19

*Mateo v. V.F. Corp.*,
  2009 WL 3561539 (N.D. Cal. Oct. 27, 2009)...............................................21

## TABLE OF AUTHORITIES
### (contd.)

Cases                                                                                    Page(s)

*In re Maxim Integrated Prods., Inc. Sec. Litig.,*
    639 F. Supp. 2d 1038 (N.D. Cal. 2009) ................................................................. *passim*

*McPhail v. First Command Fin. Planning, Inc.,*
    251 F.R.D. 514 (S.D. Cal. 2008) ...................................12

*In re Merck & Co., Inc. Sec. Litig.,*
    432 F.3d 261 (3d Cir. 2005)...................................16, 17

*In re Nature's Sunshine Prods. Inc. Sec. Litig.,*
    251 F.R.D. 656 (D. Utah 2008) ...................................13

*In re Network Assocs., Inc., Sec. Litig.,*
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ...................................23

*O'Neil v. Appel,*
    165 F.R.D. 479 (W.D. Mich. 1996) ...................................22

*In re Omnicom Group, Inc. Sec. Litig.,*
    541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd,* --- F.3d ---,
    2010 WL 774311 (2d Cir. Mar. 9, 2010) ...................................15

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ...................................10, 11

*Rocco v. Nam Tai Elecs., Inc.,*
    245 F.R.D. 131 (S.D.N.Y. 2007) ...................................23

*Rolex Employees Ret. Trust v. Mentor Graphics Corp.,*
    136 F.R.D. 658 (D. Or. 1991) ...................................24

*Semerenko v. Cendant Corp.,*
    223 F.3d 165 (3d Cir. 2000)...................................24

*Shiring v. Tier Techs., Inc.,*
    244 F.R.D. 307 (E.D. Va. 2007) ...................................22

*Stuart v. Radioshack Corp.,*
    2009 WL 281941 (N.D. Cal. Feb. 5, 2009) ...................................3, 20, 21

*In re Valence Tech. Sec. Litig.,*
    1996 WL 119468 (N.D. Cal. Mar. 14, 1996)...................................23, 24

*In re Wells Fargo Home Mortg. Overtime Pay Litig.,*
    2010 WL 174329 (N.D. Cal. Jan. 13, 2010)...................................10

*In re Worlds of Wonder Sec. Litig.,*
    1992 WL 330411 (N.D. Cal. July 9, 1992)...................................12

# TABLE OF AUTHORITIES
## (contd.)

**Cases**                                                                                               **Page(s)**

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ..........................................................................................15

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005)..........................................................................................12

*Zandman v. Joseph*,
    102 F.R.D. 924 (N.D. Ind. 1984) ..................................................................................23

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

Fed. R. Civ. P. 30 ...........................................................................................................4, 25

**Other Authorities**

Bradford Cornell and James C. Rutten,
    *Collateral Damage and Securities Litigation*,
    2009 UTAH L. REV. 717 (2009) ....................................................................................19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant Maxim Integrated Products, Inc. ("Maxim" or the "Company") respectfully submits this memorandum of points and authorities in opposition to the motion for class certification filed by the Mississippi Public Employees Retirement System ("MissPERS"), the Cobb County Government Employees' Pension Plan ("Cobb County") and the City of Philadelphia Board of Pensions and Retirement ("City of Philadelphia" and, together with MissPERS and Cobb County, "Plaintiffs").

## PRELIMINARY STATEMENT

A class can only be certified if, after a searching inquiry, this Court finds, among other things, that "common" questions of law and fact "predominate" and that the proposed class representatives' claims are "typical" of those held by the other members of the putative class. Neither finding can be made here.

*First*, Plaintiffs cannot establish that they are entitled to a class-wide "fraud on the market" presumption of reliance -- which renders certification "virtually impossible." *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 525 (N.D. Cal. 2009). Because the "fraud on the market" presumption assumes an efficient market, the lack of a price decline upon the disclosure of an alleged fraud "will strongly indicate that there was no price increase on the day the fraud occurred." *In re Am. Int'l Group, Inc. Sec. Litig.*, 2010 WL 646720, at *25 (S.D.N.Y. Feb. 22, 2010). Consequently, the stock price *increase* that followed Maxim's January 31, 2007 disclosure that its historical financial statements "should not be relied upon" (because of its failure properly to record options-related compensation expenses) constitutes "*strong evidence that there was no price change on the date of the misrepresentation, thus rebutting the fraud-on-the-market presumption*" (*id.* (emphasis added)). *See* Point I.A, *infra*.

Plaintiffs' reliance on the "fraud on the market" presumption is further undermined by their inability to establish loss causation, which Plaintiffs themselves have put

squarely at issue on this motion.[1]   Following the Court's decision on Maxim's motion to dismiss,[2] only one alleged "corrective" disclosure -- January 17, 2008 (estimating the amount of Maxim's eventual restatement) -- potentially remains viable.  However, that disclosure did not reveal anything materially new or "corrective" of the alleged fraud because:  (i) investors were able to estimate the amount of Maxim's restatement and price it into the stock *prior to* January 17, 2008; (ii) when Maxim finally completed and filed its restatement in September 2008, *and recorded an earnings charge that dwarfed its estimate*, investors were indifferent; and (iii) the analyst reports immediately following the disclosure reveal that the stock price decline was due to something *other than* the estimate -- namely, further delay in the restatement's completion, or what Plaintiffs' own expert called a mere "*consequence*" of the alleged fraud "*separate . . . from the illegitimate accounting in and of itself*" (emphasis added).[3]   Simply put, because the decline following the January 17, 2008 disclosure was *not* attributable to the alleged fraud, Plaintiffs cannot establish that the alleged misrepresentations and omissions ever inflated Maxim's stock price, which is fatal to their "fraud on the market" theory.  *See* Point I.B, *infra*.

*Second*, discovery has revealed that Plaintiffs traded in Maxim stock exclusively through investment managers who were delegated complete discretion to buy and sell on Plaintiffs' behalf and who, in the exercise of that discretion, communicated regularly with Maxim management.  Plaintiffs will therefore be subject to "unique defenses" -- including that their investment managers relied *not* on the integrity of the market but, rather, on information that they received from management -- that render Plaintiffs atypical of other putative class

---

[1] *See* Expert Report of Gregg A. Jarrell, dated December 11, 2009 ("Jarrell Report"), at ¶ 2(c), 131-97.  In response to the Jarrell Report, Maxim has submitted the Expert Report of Vinita M. Juneja, Ph.D. ("Juneja Report").

[2] *See In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038 (N.D. Cal. 2009) (Ware, J.) (the "MTD Opinion").

[3] Ex. 2 (deposition of G. Jarrell, Feb. 12, 2010 ("Jarrell Dep.")) at 66-67.  Citations to "Ex. __" refer to exhibits attached to the accompanying declaration of John A. Neuwirth, dated March 26, 2010.

members, precluding certification.  As a matter of law, it is irrelevant at this stage whether such defenses ultimately will be successful; "class treatment generally will be denied if a unique defense is *even arguably present*."  *Stuart v. Radioshack Corp.*, 2009 WL 281941, at *7 (N.D. Cal. Feb. 5, 2009) (emphasis added).  *See* Point II, *infra*.

*Third,* at the very least, any certified class in this action should end on January 31, 2007, given that Maxim's January 31, 2007 disclosure precludes reliance after that date.  *See* Point III, *infra*.

### STATEMENT OF FACTS

### A.   Plaintiffs And Their Atypical Program Of Buying Maxim Stock

Plaintiffs are public pension funds that trade securities (on behalf of their respective pensioners) through investment managers who are delegated complete trading discretion, subject only to certain pre-established guidelines.  *See* Ex. 3 (deposition of L. Tingle (MissPERS), Feb. 3, 2010 ("Tingle Dep.")) at 34 (MissPERS' investment managers "have full discretion"); Ex. 4 (deposition of J. Moon (Cobb County), Feb. 2, 2010 ("Moon Dep.")) at 32 (Cobb County does not "tell [its] money managers what to buy or when to buy it or when to sell it"); Ex. 5 (deposition of C. McDonough (City of Philadelphia), Feb. 19, 2010 ("McDonough Dep.")) at 31 (City of Philadelphia's investment managers, "within th[e] [investment] guidelines[,] . . . have full discretion to buy and sell securities").[4]

In the exercise of their discretion, and in order to evaluate both prospective and existing investments, Plaintiffs' investment managers conduct research that includes, among other things, direct, regular communications with company management -- *i.e.*, access that the typical investor does not have. ███████████████████████████████████

---

[4] ████████████████████████████████████████████

████████████████; Ex. 8 (City of Philadelphia/Turner Investment Partners, Inc. ("Turner") Management Agreement, dated January 12, 2007) at PHL00479 and PHL00532; Ex. 9 (deposition of C. McHugh (Turner), Mar. 4, 2010 ("McHugh Dep.") at 68.

1

2

⁵  Maxim was no exception;

3

4

5

6

7

8

; *accord* Ex. 9 (McHugh Dep.) at 80-86 (testifying that Turner's due

9

diligence of Maxim likely would have included discussions with management, especially

10

following (and concerning) the Company's January 31, 2007 disclosure (*see* pp. 6-7, *infra*)).

11

In fact, these investment managers have confirmed that direct communications

12

with management, including at Maxim, help                          for their investments:

13



14

15

16

17

18

19

20

21

22

23

24

25    ⁵ *See also* Ex. 8 at PHL00533 (Turner firm overview) ("Members of Turner's Investment

26  Team conduct more than 500 meetings with company management annually"); Ex. 11 at PHL
    00586 (Turner presentation to the City of Philadelphia) ("[I]t is very important to meet one-on-

27  one with the management teams of the companies that [Turner is] investing in"); Ex. 9 (McHugh
    Dep.) at 50 (testifying that Turner "[g]enerally [meets with] the CFO, CEO or IR person").

28

MAXIM'S MEMORANDUM OF POINTS AND                    4              Case No. C-08-00832-JW
AUTHORITIES IN OPPOSITION TO MOTION
FOR CLASS CERTIFICATION

1

2                                                                                    In

other words, through these communications, Plaintiffs' investment managers are

3

; *see* Ex. 9 (McHugh Dep.) at 62-63 (similar).

4

5          The investment managers' communications with Maxim were not limited solely

to discussions regarding general business issues and financial performance, which, by itself,

6

would render Plaintiffs atypical (and defeat class certification) (*see* pp. 20-23, *infra*), but also

7

extended to the very subject matter of this litigation.  Specifically,

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    6

23

24

25

26

27

28

-- like Turner (on behalf of City of Philadelphia) (*see* Ex. 9 (McHugh Dep.) at 83-85) --

; *accord* Ex. 33 (Turner trading summary for Maxim reflecting, exclusively, purchases post-Jan. 31, 2007); p. 23 n.15, *infra* (identifying substantial post-January 31, 2007 Maxim share purchases by all three Plaintiffs).

### B.    Maxim's January 31, 2007 Disclosure

Soon after becoming aware of potential improprieties with respect to its accounting for stock option grants, Maxim's Board of Directors created a special committee to review matters concerning the Company's stock option grant practices.  On January 31, 2007, Maxim disclosed for the first time the special committee's conclusion that:

> [T]here were deficiencies related to the process for granting stock options to employees and directors and, specifically, that in certain instances from the beginning of fiscal year 2000 until the end of fiscal year 2006, the recorded exercise price of stock option grants to employees and directors differed from the

---

[7] *See* Ex. 31 (Feb. 1, 2007 Form 8-K); *see also* pp. 7-9, *infra*.

fair market value of the underlying shares on the actual measurement date.

Ex. 31 (Feb. 1, 2007 Form 8-K). Maxim further disclosed that it "expect[ed] to restate its financial statements for the fiscal years 2000 through 2005 and the related interim periods through March 25, 2006" to "reflect stock-based compensation at measurement dates different from the original measurement dates used for certain grants," and that "John F. Gifford, who stepped down for health reasons in December 2006, . . . retired as a strategic advisor to the Company, and . . . Carl Jasper . . . resigned from the Company." *Id.*

Notably, Maxim also expressly warned investors on January 31, 2007 that, although "[t]he Company has not yet determined the amount to be restated in any specific period, . . . *the financial statements, and the related reports of its independent registered accountants, and all earnings press releases and similar communications issued by the Company relating to . . . fiscal years 2000 through 2005 and the related interim periods through March 25, 2006 . . . should not be relied upon*." *Id.* (emphasis added).

Thus, by January 31, 2007, the market knew that (i) Maxim had improperly accounted for stock options and (ii) the Company's prior reported financial statements could no longer be relied upon. Yet, the disclosure was followed by just a $0.27 (or less than 1%) decline in Maxim's stock price on January 31, and, on the very next day, February 1, Maxim's stock price *rose* $0.93 (or 3%) over its January 30 (*i.e.*, *pre*-disclosure) closing price. *See* Ex. 34 (Maxim historical opening/closing stock prices).

C.   **Maxim's January 17, 2008 Disclosure**

On January 17, 2008, Maxim made the following disclosure:

On January 31, 2007, Maxim Integrated Products, Inc. announced that it would need to restate certain historical financial statements to record additional stock-based compensation charges and that such financial statements should no longer be relied upon. At this time, Maxim expects to restate its financial statements from Fiscal 1997 through Fiscal 2005 and the related interim periods through March 25, 2006, and to record additional non-cash compensation expense during Fiscal 1997 through Fiscal 2006 in the estimated range of $550 to $650 million on a pre-tax basis and $360 to $425 million on an after-tax basis.

Maxim also announced that its estimated completion date of the restatement will be delayed from the first calendar quarter of 2008. The Company recently determined that the scope of the project must expand to include a review of stock

options granted in years 1995 and 1996, and to conduct further analysis of certain aspects of stock option activity such as employees who either terminated their employ or changed their employment status. Based on these new requirements and the overall complexity of the project, Maxim currently estimates that the restatement will be completed in June 2008, but it cannot give assurances that it will meet this targeted completion date.

The Company remains committed to working diligently with Deloitte & Touche LLP, its independent auditors, and Ernst & Young LLP, its former independent auditors, to complete the restatement and become current with its public filings as soon as possible.

Ex. 35 (Jan. 24, 2008 Form 8-K). Maxim's stock price declined by $2.83 per share (or 11.98%) that day. *See* Ex. 34 (Maxim historical opening/closing stock prices).

Plaintiffs' expert, Dr. Jarrell, opines that this stock price decline "was attributable to the new information in the announcement and admission by Maxim that it would restate or adjust prior years reported earnings by between $550 million and $650 million, review yet an additional two years of stock option grants, and delay the completion of the restatement and filing of current reports with the SEC." Jarrell Report ¶ 178. But a review of the analyst coverage that followed the disclosure confirms that it was just the last item -- *i.e.*, that the restatement would be further delayed -- that disappointed the market and impacted the stock:

- **Bank of America** (*see* Ex. 36 (Jan. 17, 2008 report) at 1) titled its report "Pink-er for Longer: Another Delay in Filings" and stated that "a central tenet of [its] bull case on owning Maxim ha[d] hinged on the filing of financials by the previously announced Mar-08 quarter," but, "[g]iven this further filing delay . . . , we expect the stock to be mired in uncertainty near term."

- **Citigroup** (*see* Ex. 37 (Jan. 17, 2008 report) at 1) titled its report "Restatement Target Slips To June from March" and characterized the stock "now more of a mid-2008 story given restatement timing."

- **Cowen & Company** (*see* Ex. 38 (Jan. 17, 2008 report) at 1) titled its report "Quick Take: Pushes Out Target Restatement Date" and stated that it was "obviously disappointed with this setback" because it "[n]ot only . . . further delay[ed] a potential share repurchase program, but it also significantly damage[d] management's credibility with the investment community as it represent[ed] the second such push out of its targeted restatement date."

- **Deutsche Bank** (*see* Ex. 39 (Jan. 17, 2008 report) at 1) titled its report "Restatement pushed out" and stated that "more patience [wa]s clearly required given this restatement push-out."

- ████████████████████████████████████████████████████

- **Oppenheimer** (*see* Ex. 41 (Jan. 17, 2008 report) at 1) titled its report "Restatement Delay a Blow to Relisting Efforts" and stated that "[t]he delay leaves in place the options overhang, which will continue to weigh on shares until regulatory filings are submitted and the shares relisted."

- **Raymond James** (*see* Ex. 42 (Jan. 17, 2008 report) at 1) stated that it was "putting [its] estimates and Outperform rating on MXIM Under Review pending the restatement of the company's historical financial statements. Maxim has delayed its restatement with an estimated completion date of June 2008. We will reinstate our estimates and rating once the restatement is complete."

- **UBS** (*see* Ex. 43 (Jan. 17, 2008 report) at 1) titled its report "MXIM again delays restatement; Potential catalysts pushed out till June" and stated that such delay was "a clear disappointment given that it is the third time that the company has delayed the restatement." *See also id.* ("We believe that given multiple pushouts, risk to our thesis has increased while the potential rewards have been pushed out till June '08, when relisting and potential re-entry into indices could provide upside."

[8]     In fact, Dr. Jarrell *conceded* that what these analysts "are most uncertain about when they get this announcement is how long is this going to take. . . . Now they have some knowledge on how bad it is going to be, but what they are really freaked out about mostly is the uncertainty about how long it is going to take." Ex. 2 (Jarrell Dep.) at 211.

## ARGUMENT

There is no presumption in favor of class treatment, even though a case may be designated as a class action in the pleadings. Rather, a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been

---

[8] Importantly, January 2008 was not the first time that analysts noted their frustration with the restatement's delay. *See* Ex. 45 (Aug. 2, 2007 Citigroup report) at 1; Ex. 46 (Aug. 3, 2007 William Blair report) at 2; Ex. 47 (Sept. 4, 2007 RBC report) at 4; Ex. 48 (Nov. 2, 2007 Goldman Sachs report) at 1.

satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992) (same).   The Supreme Court has explained that, on a motion for class certification, courts must "probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160.

To this end, "'courts are not only at liberty to but *must* consider evidence which goes to the requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case.'" *In re Juniper Networks, Inc. Sec. Litig.*, 2009 WL 3353321, at *2 (N.D. Cal. Oct. 16, 2009) (Ware, J.) (quoting *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1178 n.2 (9th Cir. 2007)) (emphasis in original); *see also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 2010 WL 174329, at *5 (N.D. Cal. Jan. 13, 2010) ("'Because the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,' 'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case'") (citations omitted).   The movant bears the burden of showing that "the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met." *Dukes*, 509 F.3d at 1176; *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-22 (9th Cir. 1998) (same).

Despite these rigorous requirements, Plaintiffs merely recite in conclusory terms that certification is appropriate here.   As explained below, Plaintiffs have not come close to carrying their heavy burden, and class certification should be denied.

## I.   PLAINTIFFS CANNOT SATISFY FED. R. CIV. P. 23(b)(3) BECAUSE THE PROPOSED CLASS IS NOT ENTITLED TO THE "FRAUD ON THE MARKET" PRESUMPTION OF RELIANCE

Plaintiffs contend that this case "satisfies the requirements of Rule 23(b)(3)," in part, because "common questions of law and fact predominate." Pl. Br. at 14-15.   Specifically, they argue that "[t]here are no significant -- let alone predominant -- individual issues to preclude class certification, *even with respect to issues such as reliance*," given that the proposed class is "entitled to a presumption of reliance in an action alleging 'fraud on the market.'" *Id.* at 17 (emphasis added); *see also Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) ("[I]n a 'fraud

on the market' case, '[a]n investor's reliance on the market . . . is equivalent to reliance upon statements made to the market, or the nondisclosure of material information'") (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512, n.2 (9th Cir. 1991)).

The "fraud on the market" presumption, however, is rebutted -- and, in turn, putative class members are required to establish reliance individually -- upon "any showing that severs the link between the alleged misrepresentation[s] and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988); *Maxim*, 639 F. Supp. 2d at 1049 (same); *see also In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 639 (C.D. Cal. 2009) ("If the defendant can show that this link is severed as to any group of class plaintiffs, it would create in that group the necessity of showing actual reliance, and diminish the predominance of liability-related issues"); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 525 (N.D. Cal 2009) (noting that "[w]ithout the ['fraud on the market'] presumption, class certification would be virtually impossible") (citation omitted).  The "fraud on the market" presumption is particularly inappropriate where, as here, "the misrepresentation in fact did not lead to a distortion of price." *Basic*, 485 U.S. at 248; *see also Juniper*, 2009 WL 3353321, at *7 ("When the applicability of the fraud-on-the-market presumption of reliance is questioned at the class certification phase, a court 'must conduct a rigorous examination into whether plaintiffs are entitled to use [the presumption]'") (citations omitted).

A.    **The Stock Price Reaction Following Maxim's January 31, 2007 Disclosure Rebuts The "Fraud On The Market" Presumption Of Reliance**

"[I]f the market on which [the] stock traded was indeed efficient -- an assumption and requirement of the fraud-on-the-market presumption -- then the absence of a price decline on the day a fraud was disclosed will strongly indicate that there was no price increase on the day the fraud occurred." *In re Am. Int'l Group, Inc. Sec. Litig.*, 2010 WL 646720, at *25 (S.D.N.Y. Feb. 22, 2010).  Accordingly, a showing "that there was *no price decrease* . . . on the date a misrepresentation was disclosed" is "*strong evidence that there was no price change on the date of the misrepresentation, thus rebutting the fraud-on-the-market presumption.*" *Id.* (emphasis

added); *see also McPhail v. First Command Fin. Planning, Inc.*, 251 F.R.D. 514, 516 (S.D. Cal. 2008) ( "fraud on the market" presumption is rebutted "by showing that the misrepresentations did not lead to a distortion of a stock's market price"); *In re Worlds of Wonder Sec. Litig.*, 1992 WL 330411, at *6 (N.D. Cal. July 9, 1992) (same).

As noted above (*see* pp. 6-7, *supra*), on January 31, 2007, Maxim informed the market for the first time that there were deficiencies in its stock option granting practices, that it expected to restate its financial results, that its senior-most officers were leaving the Company, and that its prior financial statements should no longer be relied upon. *See also* Ex. 31 (Feb. 1, 2007 Form 8-K). Despite these disclosures, Maxim's stock price closed at $30.80 that day, down only $0.27 (or less than 1%) from the prior day's closing share price of $31.07. *See* Ex. 34 (Maxim historical opening/closing stock prices). Just 24 hours later, the stock closed at $32.00 -- $0.93 (or 3%) *higher* than the January 30, 2007 (*i.e.*, *pre*-disclosure) closing share price. *See id.*; Jarrell Report ¶ 185; *see also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) ("[F]inancial economists often define the event period as the two-day period consisting of the announcement day and the following day") (citation omitted). This positive, statistically significant price reaction (*see* Ex. 2 (Jarrell Dep.) at 149, 151-52) is "strong evidence that there was no price change on the date of the misrepresentation" and, thus, "severs the link" on which the "fraud on the market" presumption is premised here. *Am. Int'l Group*, 2010 WL 646720, at *25. That is, because the alleged fraud's revelation did not deflate Maxim's stock price, by implication, its perpetration could not have inflated Maxim's stock price. The "fraud on the market presumption," therefore, cannot apply.

### B.   Plaintiffs' Inability To Establish Loss Causation Further Undermines The Proposed Class's Reliance On "The Fraud On The Market" Presumption

Plaintiffs assert in their brief that, at the class certification stage, "there is no requirement to prove loss causation." Pl. Br. at 5 n.4 (citing *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 579 (N.D. Cal. 2009); *LDK*, 255 F.R.D. at 530; and *Cooper*, 254 F.R.D. at 640-41). However, because Plaintiffs have submitted an expert opinion on loss causation (*see* Jarrell

Report ¶¶ 2(c), 131-97), they have put loss causation squarely at issue on this motion.[9]  *See, e.g.*, *LDK*, 255 F.R.D. at 530 (considering loss causation at class certification stage when issue was introduced by plaintiffs, and holding that "[d]efendants' claim that 'plaintiff cannot identify any corrective disclosure' is . . . unsupported by the record"); *Juniper*, 2009 WL 3353321, at *7 (considering loss causation at class certification stage when issue was introduced by plaintiffs, and holding that "Defendants' speculative contention that the drop in Juniper's stock price on May 18 and May 19 may have resulted from other negative press about Juniper . . . is insufficient to rebut the presumption of reliance").[10]

Moreover, in contrast to *Juniper* and *LDK*, the evidence here -- which goes beyond the record available to the Court on Maxim's earlier motion to dismiss -- establishes the absence of a "corrective" disclosure subsequent to January 31, 2007, thereby precluding loss causation and, in turn, a finding of the requisite commonality and predominance under Fed. R. Civ. 23(a)(2) and 23(b)(3).  Specifically, as explained below, because the stock price decline after Maxim's January 17, 2008 disclosure was *not* attributable to the alleged fraud (but, rather, to other confounding, non-fraud-related information), Plaintiffs cannot establish, as they must, that the alleged misrepresentations and omissions ever even inflated Maxim's stock price, thus rebutting the "fraud on the market" presumption.  *See Am. Int'l Group*, 2010 WL 646720, at *25.

---

[9] Notably, Dr. Jarrell concedes in his report (as he did during his deposition) that loss causation is a legal question to be resolved by the "trier of fact."  Jarrell Report ¶ 134 ("I defer to the trier of fact . . . to weigh the economic evidence I present to ultimately determine whether the causal link between the alleged misrepresentations and omissions . . . satisfies the relevant legal requirement for . . . loss causation in this action"); *see also* Ex. 2 (Jarrell Dep.) at 131-42.

[10] Alternatively, the Court can consider the allegedly "corrective" effect of Maxim's post-January 31, 2007 disclosure in the context of determining the end date for the purported class period, which, as indicated at pp. 24-25, *infra*, is also an appropriate analysis at this stage of the litigation.  *See Juniper*, 2009 WL 3353321, at *9; *In re Fed. Nat'l Mortg. Ass'n Sec. Litig.*, 247 F.R.D. 32, 38-41 (D.D.C. 2008); *see also In re Nature's Sunshine Prods. Inc. Sec. Litig.*, 251 F.R.D. 656, 661-67 (D. Utah 2008).  In other words, if there was no "corrective" disclosure after January 31, 2007, there would be no basis to extend the class period beyond that date.

1. **Only One Potential "Corrective" Disclosure Date (January 17, 2008) Remains Following The Court's MTD Opinion**

Although Plaintiffs' expert, Dr. Jarrell, focuses on five disclosure dates in assessing loss causation (*see* Jarrell Report ¶ 2(c)), he admitted during his deposition that he did *not* consider -- much less assess the impact of -- this Court's MTD Opinion in connection with his decision to include those dates. *See* Ex. 2 (Jarrell Dep.) at 42-43, 131-42; *see also id.* at 136 (although he "was aware that there was a decision," he "didn't draw conclusions about [his] work based on this decision" but, rather, "made an independent judgment"). Of course, had he done so, he would have recognized that *only one of his five dates* (namely, January 17, 2008) even potentially remains viable here. *See id.* at 134-35, 139-42 (acknowledging, but disagreeing with, the Court's MTD Opinion).

Specifically, on July 16, 2009, the Court granted Maxim's motion to dismiss, in part, for Plaintiffs' failure to plead loss causation, holding, with respect to Maxim's pre-January 31, 2007 disclosures that:

> While each of these disclosures provides notice that Maxim *may* have illicitly backdated stock options, none of them goes beyond speculation. In *In re Daou Systems*, the Ninth Circuit found that, among other disclosures, an anonymous stock analyst's statement opining that a company was "manufacturing earnings" was sufficient to plead loss causation based on a corrective disclosure. In contrast, the analyst reports identified by Plaintiffs here indicate only a "risk for potential earnings restatement," that Maxim "may have engaged in aggressive practices," and that backdating could be expected to be a "contentious issue" when being rated by other analysts. Such speculative statements are insufficient under Ninth Circuit law.

639 F. Supp. 2d at 1046 (internal citations omitted) (emphasis in original). The Court thus "grant[ed] Maxim's Motion to Dismiss as to Maxim's alleged Pre-January 31, 2007 disclosures." *Id.* at 10. Similarly, with respect to the August 2007 disclosure considered by Dr. Jarrell (and, by implication, the October 2007 disclosure that he considered, which was also directed to Maxim's delisting (*see* Jarrell Report ¶¶ 157-69)), the Court held that:

> [A]lthough it can be inferred from the allegations that Maxim's looming delisting may have been connected to the findings of Maxim's Special Committee disclosed on January 31, 2007, Plaintiffs only allege a causal connection between reports of Maxim's potential delisting and a drop in stock price. The allegations do not provide a plausible connection between the revelation of Maxim's fraud on January 31, 2007, and the eventual price drop eight months later on August 28,

1    2007.

2    639 F. Supp. 2d at 1048.

3              The Court then denied Maxim's motion with respect to the only other alleged

4    "corrective" disclosure (*i.e.*, January 17, 2008), holding that such disclosure "revealed new

5    information regarding the scope and magnitude of Defendants' fraudulent conduct that was not

6    previously disclosed in the January [31], 2007 Announcement." *Id.* at 1049.  But that ruling does

7    not end the inquiry here because at the class certification stage, unlike at the earlier motion to

8    dismiss stage, the Court "should assess all relevant evidence," including Plaintiffs' and Maxim's

9    expert reports and testimony on loss causation, "to determine whether each of the Rule 23

10   requirements have been met," particularly where, as here, Plaintiffs have put loss causation

11   directly at issue.  *Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 635 (N.D. Cal. 2007); *see

12   also LDK*, 255 F.R.D. at 530; *Juniper*, 2009 WL 3353321, at *7.

13         **2.     Maxim's January 17, 2008 Disclosure Did Not Reveal Anything
                    Materially New Or "Corrective"**
14
15              **a.      Prior To January 17, 2008, Investors Were Able To Estimate
                          The Restatement's Magnitude And Price It Into Maxim's
                          Stock**
16

17             A company's disclosure of alleged fraud resulting in a stock price decline

18   "causes" an actionable loss only if the disclosure reveals *new* (and not simply regurgitated)

19   information to the market concerning the alleged fraudulent activity.  *See*, *e.g.*, *In re Apollo

20   Group, Inc. Sec. Litig.*, 2008 WL 3072731, at *2 (D. Ariz. Aug. 4, 2008) ("A disclosure that does

21   not reveal anything new to the market is, by definition, not corrective") (citing *In re Omnicom

22   Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008), *aff'd*, --- F.3d ---, 2010 WL

23   774311 (2d Cir. Mar. 9, 2010)); *Omnicom*, 541 F. Supp. 2d at 551-52 (because a "corrective"

24   disclosure must disclose a fact "new to the market," a "recharacterization of previously disclosed

25   facts cannot qualify as a corrective disclosure").  "When the value of the stock has only declined

26   due to other reasons, the loss cannot be attributed to the misrepresentation." *Beledoff v. Netlist,

27   Inc.*, 2009 WL 1293690, at *12 (C.D. Cal. Apr. 17, 2009) (citing *In re Worlds of Wonder Sec.

28   Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994)).

As confirmed by Plaintiffs' own expert, Dr. Jarrell, investors were able to estimate the amount of Maxim's restatement and price it into the stock *prior to* Maxim's January 17, 2008 disclosure.  *See* Ex. 2 (Jarrell Dep.) at 71-80; *id.* at 79 (agreeing that "you could calculate such a number"); ███████████████████████████████████████████████████████

██████████████████████████████████████████████████; *see also* Ex. 1 (Juneja Report) at ¶¶ 10, 88; *accord In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270-71 (3d Cir. 2005) (holding that an earlier SEC filing noting subsidiary's improper revenue recognition *without disclosing the amount* still enabled the market to calculate the magnitude because "[t]he Journal reporter simply did the math on June 21; *the efficient market hypothesis suggests that the market made these basic calculations months earlier*") (emphasis added); *Apollo*, 2008 WL 3072731, at *2-3 (citing *Merck* with approval; "[t]he situations in which the pertinent facts are obfuscated in such a way, or are of such complexity, as to require someone to connect the dots for a bewildered market represent a very rare type of securities-fraud case, and would not be the rule").[11]

In fact, a number of analysts did precisely that, including:

- **Bear Stearns** (*see* Ex. 51 (Apr. 23, 2007 report) at 4), which noted its "belie[f] that the restatement would be material to Maxim's historical results;"

- **Soleil Securities** (*see* Ex. 52 (June 26, 2007 report) at 1), which concluded that "Maxim will record an extremely large one-time, non-cash charge to earnings," which it believed would "be of zero impact to investors."  *See also id.* at 5 (stating that its estimates "*include the impact of stock-based compensation* -- a non-cash charge -- which reduces EPS (but not cash flow) by roughly $0.30 per share") (emphasis added); *id.* at 7 (noting that potential "large-scale restatement of prior financial reports . . . is *not* a material issue for investors as all financial restatements will be non-cash") (emphasis in original);

---

[11] *See also* Ex. 50 (Gregg A. Jarrell and Gennaro Bernile, "The impact of the options backdating scandal on shareholders" ("Jarrell & Bernile")) at 3 ("[O]ption compensation is a non-cash expense and its value can always be accurately determined, as of the grant disclosure date and thereafter, provided the grants' characteristics are truthfully disclosed.  Thus, on average, correcting historical financial records should have no direct effect, *per se*, on shareholders' wealth"); *id.* at 8 ("[A]t any time after the disclosure of a grant, the economic value of backdated options depends on publicly available information (e.g. exercise price, maturity, vesting, etc.) not affected by the recognition that backdating took place").

- **Cowen & Company** (*see* Ex. 53 (Aug. 2, 2007 report) at 20-21), which concluded that Maxim's "Stock Option Inquiry [was] Already Priced in the Shares" and explained that it did "not foresee a restatement of any magnitude or further disciplinary action that would further concern investors" but, rather, "expect[ed] the outcome to be quickly categorized as a past event and quickly forgotten, allowing the stock to trade on the merits of the company's future potential;" and

- **Lehman Brothers** (*see* Ex. 54 (Nov. 2, 2007 report) at 1), which "estimate[d] proforma gross margin *including stock compensation*." (Emphasis added.)

Consequently, Maxim's supposed "revelation" of the restatement's estimated magnitude on January 17, 2008 did not tell the market anything that had not already been determined independently before then. *See Merck*, 432 F.3d at 271 ("The facts were disclosed . . . and it is simply too much for us to say that every analyst . . . was in the dark").

> **b.** **The Market's Indifference To Maxim's September 30, 2008 Restatement Confirms That The January 17, 2008 Stock Price Decline Was *Not* Due To Maxim's Disclosure Of The Restatement's Estimated Magnitude**

On September 30, 2008, Maxim filed its restatement with the SEC and recorded additional stock-based compensation (for the years 1997 through 2005) of approximately $775 million (*see* Ex. 55 (Sept. 30, 2008 Form 10-K (for the fiscal year ended June 24, 2006)) at i-iv) -- *i.e.*, *$125 million to $225 million more* than the January 17, 2008 "estimate" on a pre-tax basis. Nevertheless, after closing at $17.40 on September 29, 2008, Maxim's stock price closed on September 30 at $18.10 -- an *increase* of $0.70 (or 4%). *See* Ex. 34 (Maxim historical opening and closing stock prices). And, while Maxim's stock price declined the next day by $0.57 (or 3.1%) (*see id.*), the parties' experts agree that such decline was *not* statistically significant. *See* Ex. 2 (Jarrell Dep.) at 214-15; *see also* Ex. 1 (Juneja Report) at ¶¶ 10, 89.

Given the market's indifference to the restatement (and Maxim's recognition of an earnings charge that exceeded its previous estimate by hundreds of millions of dollars), it is simply inescapable that the stock price decline following Maxim's January 17, 2008 disclosure must have been caused by something *other than* the disclosure of the estimate. *See, e.g.*, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005) ("When the purchaser subsequently resells [his] shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations,

new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price"); *see also* Ex. 1 (Juneja Report) at ¶¶ 10, 77-87.[12]  As explained below, that "something else" was Maxim's disclosure, also on January 17, 2008, that the completion of the restatement was being delayed yet again, "from the first calendar quarter of 2008" to "June 2008" (Ex. 35 (Jan. 24, 2008 Form 8-K)) -- which Dr. Jarrell agrees is a mere "*consequence*" of the alleged fraud, "*separate from the illegitimate accounting in and of itself.*"  Ex. 2 (Jarrell Dep.) at 66-67 (emphasis added); *see, e.g.*, *id.* at 206 ("[D]elay itself isn't a causal factor") and 203, 10 (distinguishing between a "direct consequence" and "the fraud itself," *i.e.*, the "improper accounting for . . . stock options expense").

          **c.**      **It Was The Disclosure Of Further Delay On January 17, 2008, And *Not* The Disclosure Of The Restatement's Estimated Magnitude, That Concerned Investors**

As discussed above, all of the analyst coverage that followed Maxim's January 17, 2008 announcement focused principally, if not entirely, on the disclosure of further *delay* in completing the restatement.  *See* pp. 8-9, *supra*; ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  And, while several (but *not* all) of these analysts, in summarizing the announcement, referenced the estimate of the restatement's magnitude that also was disclosed that day, none offered an opinion on those numbers, let alone expressed concern or disappointment with them -- *i.e.*, such that the estimate could be viewed as the catalyst for the subsequent stock price decline.

---

[12] Ironically, although Dr. Jarrell opines in his report that Maxim's disclosure of the restatement's estimated magnitude on January 17, 2008 was "new" information that "surprised" the market and had not previously been priced into the stock (*see, e.g.*, Jarrell Report ¶¶ 173, 187), during his deposition, he attempted to explain away the lack of a stock price impact on September 30, 2008 on the ground that "the market ha[d] already figured it all out" -- including, presumably, the substantially larger earnings charge -- *before* Maxim filed its restatement.  Ex. 2 (Jarrell Dep.) at 216.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   For these reasons, the stock price decline that followed the January 17, 2008 disclosure, at most, can be considered a *collateral* result of the disclosure of a *consequence* of, or something that merely *touched upon*, the alleged fraud -- and *not* the result of anything that *corrected* or *cured* it.[13]  *Cf. Independence Lead Mines, Inc. v. Hecla Mining Co.*, 2007 WL 2769621, at *4 (D. Idaho Sept. 24, 2007) (claims to "secondary" sources of damages, *e.g.*, that "flow as a direct *consequence* of [the defendant's] securities activities," are "*insufficient to satisfy the causal connection requirement of a securities claim*") (citing *Dura*, 544 U.S. 336; *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005)) (emphasis added); *see also* Ex. 1 (Juneja Report) at ¶¶ 18-23, 77-87.  As the Supreme Court explained in *Dura*:

> Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss.  It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation (using language the Ninth Circuit used) "touches upon" a later economic loss.  But, even if that is so, it is insufficient.  To "touch upon" a loss is not to *cause* a loss, and it is the latter that the law requires.

544 U.S. at 343 (internal citations omitted) (emphasis in original); *see also Mack Univ. LLC v. Halstead*, 2007 WL 4458615, at *8 (C.D. Cal. Nov. 14, 2007) (noting that the Supreme Court in *Dura* "rejected the 'touches upon' test for an even higher standard:  *the misrepresentation must actually cause the plaintiff's economic loss*") (emphasis added).

   As a result, "great care must be taken to differentiate between the extent to which a disclosure corrects an original misstatement and thereby removes inflation, *and the collateral damage caused by the disclosure*."  Bradford Cornell and James C. Rutten, "Collateral Damage and Securities Litigation," 2009 UTAH L. REV. 717, 726 (2009) (emphasis added); *see also*, *e.g.*,

---

[13] *See also* Ex. 50 (Jarrell & Bernile) at 2 ("Companies accused of backdating face several potential problems as a *direct* consequence of such allegations.  Conducting internal investigation of past option granting practices and correcting companies' historical financial results and tax returns requires time and resources, which may delay the public release of required financial statements.  This delay could cause firms to run afoul of exchange rules, subjecting them to potential or actual delisting of their stock from the exchange") (emphasis in original); Ex. 2 (Jarrell Dep.) at 65-71 (similar).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) ("[T]o establish loss causation, a plaintiff must [show] . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered") (emphasis added); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 199 (2d Cir. 2003) (loss causation requires a plaintiff to "demonstrate a causal connection between the *content* of the alleged misstatements or omissions and the harm actually suffered") (emphasis added).  Here, for the reasons discussed, collateral damage -- *i.e.*, a "consequence" separate and apart from the "fraud itself" (Ex. 2 (Jarrell Dep.) at 203) -- is all that can be said to have resulted from Maxim's January 17, 2008 disclosure, which, as a matter of law, is insufficient to establish loss causation and, thus, requires the denial of Plaintiffs' motion.

## II.   PLAINTIFFS CANNOT DEMONSTRATE THAT THEIR CLAIMS ARE TYPICAL OF THE PROPOSED CLASS

The typicality requirement of Fed. R. Civ. P. 23(a)(3) "is designed to assure that the named representative's interests are aligned with those of the class." *Jordan v. County of Los Angeles*, 669 F.2d. 1311, 1321 (9th Cir.), *vacated and remanded on other grounds*, 459 U.S. 810 (1982); *see also Stuart v. Radioshack Corp.*, 2009 WL 281941, at *6 (N.D. Cal. Feb. 5, 2009) (similar).  The question, therefore, is "'whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.'"  *Brewer v. Salyer*, 2009 WL 1396148, at *7 (C.D. Cal. May 29, 2009) (citation omitted)).

As explained above (*see* pp. 3-6, *supra*), Plaintiffs' claims -- in light of Plaintiffs' investment managers' repeated, direct communications with Maxim management, among others, including with respect to the central issues in this litigation -- are fundamentally different from those of other members of the proposed class.[14]  As a result, Plaintiffs necessarily will be subject to debilitating and distracting defenses that render them wholly atypical:  "[A] named plaintiff's

---

[14] ███████████████████████████████████████████; Ex. 9 (McHugh Dep.) at 82 (testifying that, upon reviewing Maxim's January 31, 2007 disclosure, Turner "would [have] . . . discuss[ed] it with [the] management team[]").

motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon*, 976 F.2d at 508; *Juniper*, 2009 WL 3353321, at *5 (same); *see also Keilhotz v. Lennox Hearth Prods., Inc.*, 2010 WL 668067, at *5 (N.D. Cal. Feb. 16, 2010) ("Class certification is inappropriate . . . 'where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation'") (citation omitted); *e.g.*, *Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) (holding that proposed representatives were atypical because they "would be required to devote considerable time to rebut the claim that their purchases were based not on the integrity of the market," which "would prejudice absent class members").

Moreover, to defeat class certification, a defendant need *not* establish that such unique defenses will ultimately be successful, given that "'[t]he presence of *even an arguable defense* peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation.'" *Mateo v. V.F. Corp.*, 2009 WL 3561539, at *5 (N.D. Cal. Oct. 27, 2009) (citation omitted) (emphasis added); *see also Stuart*, 2009 WL 281941, at *7 ("'[T]o preclude class certification, the defendant need not establish that the class representative's claim ultimately would be defeated by the unique defense,'" as "'class treatment generally will be denied if a unique defense is even arguably present'") (citation omitted); *Brown v. Brewer*, 2009 WL 1574556, at *2 (C.D. Cal. May 29, 2009) ("Although 'Defendants need not show that these defenses will necessary succeed,'" certification should be denied "if Plaintiff's atypical defenses 'will shape the focus of the litigation in a way that may harm class members and ultimately risk the class' chance of recovery'") (citations omitted).

As the court in *Beach v. Healthways, Inc.*, 2009 WL 3245393 (M.D. Tenn. Oct. 5, 2009), recently explained (in finding that typicality was defeated by an investment manager's direct communications with the defendant-company's management):

> The presumption of reliance may be rebutted if a purchaser of stock relies on non-market information that is not generally available to the public and, therefore, not

available to the unnamed class members.  *Where a plaintiff relies on the fraud-on-the-market presumption to establish typicality, any reliance on non-market information means that the plaintiff cannot be said to have relied on the integrity of the market and, therefore, that plaintiff is atypical of those who have so relied.*

*       *       *

The fact that the Fund relied upon a broker or investment manager, so long as the investment manager relied upon public information, is, without more, insufficient to find the Fund to be atypical.  However, the presence of *even an arguable defense peculiar to the named plaintiff* may destroy the required typicality as well as bring into question the adequacy of the named plaintiff's representation because such a defense can distract the named plaintiff to such an extent that its representation of the interests of the rest of the class will suffer.

*Whether the defense will be successful is of no matter.  If the Lead Plaintiff would be required to devote considerable time to rebut the claim that its purchases were based not on the integrity of the market, but on non-public information that it received, then the situation would prejudice absent class members.*

*Id.* at *3-4 (citations omitted) (emphasis added).  The *Beach* court further held that because "the decision to purchase the Company stock" was made by an investment manager who "had discretionary authority to buy and sell stock" and who "met with officers of the company . . . individually," the proposed class representative (a pension fund) did "not carr[y] its burden of establishing typicality and adequacy" -- despite the fact that "what [the investment manager] knew and did not know [wa]s disputed."  *Id.* at *5, 6.  "Just the fact that the attorneys have already had to spend time, effort and money to examine and question all these matters, which are unique to the Fund, is evidence that the Fund is not typical."  *Id.* at *5.

Indeed, *Beach* follows a long line of cases denying certification, at least in part, on the same basis (*i.e.*, that discussions with company management (and related investigations) subjected a proposed representative to unique defenses that rendered it atypical), including (*e.g.*):

- *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 314 (E.D. Va. 2007) (contact with corporate officers and special meetings at the company rendered the plaintiff atypical, even where factual questions existed as to whether he obtained non-public information:  "*[W]hether these defenses will be successful is of no matter.  The fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members*") (emphasis added);

- *O'Neil v. Appel*, 165 F.R.D. 479, 492-93 (W.D. Mich. 1996) (proposed representative was not typical because he met in private with corporate officers and reviewed corporate documents; it was not necessary, at the class certification stage, to determine conclusively that he relied on non-public information:  "To negate the typicality of a representative's claim, *it is only necessary that the defense be unique, arguable and likely to usurp a significant portion of the litigant's time and energy*") (emphasis added);

- *Beck v. Status Game Corp.*, 1995 WL 422067, *3-4 (S.D.N.Y. July 14, 1995) (proposed representative was not typical because he may have relied on "non-public" information received from an individual defendant (the company's Chairman, President and CEO) in several "face-to-face" meetings and telephone calls; it was not necessary to determine conclusively whether the information received was truly "non-public");

- *Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 169 (D. Mass. 1989) (proposed representatives were not typical because they "were privy to some unique information about [the company] before purchasing their stock:" "It is beyond reality to suggest that any potential shareholder could meet with corporate officers to discuss information that was already available to the public. *Personal contact with corporate officers and special meetings at the company will render a plaintiff atypical to represent the class*") (emphasis added); and

- *Zandman v. Joseph*, 102 F.R.D. 924, 931 (N.D. Ind. 1984) (proposed representative was not typical because he communicated with company officials and attended shareholder meetings and a special meeting for securities analysts, even though the parties disputed whether he had access to non-public information: "For purposes of certification of a class, . . . no final determination on the merits of the issue need be made at this time. *A preliminary finding that a proposed representative is subject to a unique defense is sufficient*") (emphasis added).

*See also cf. In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1029-30 (N.D. Cal. 1999) (acknowledging, in the lead plaintiff context, that, as a result of discussions with company management, applicant "would be encumbered with the unique question whether it acquired its Network shares on better terms than the investing public and not fully in reliance on the market price") (citation omitted).

   For the reasons discussed above, the result here follows *a fortiori*.  In short, "[w]hether the information to which [Plaintiffs] had access w[as] relevant to [their] decision[s] to purchase [Maxim] securities, and whether [they] actually relied on such information in their decision[s] to purchase, are difficult factual questions which cannot be resolved at this stage of the litigation. . . .  *The [mere] fact that [they] will be subject to such defenses renders their claims atypical of other class members.*"  *Landry*, 23 F.R.D. at 476 (emphasis added).[15]

---

[15] Furthermore, the fact that a substantial portion of the Maxim shares that Plaintiffs purchased during the purported class period were purchased *after* the Company's January 31, 2007 disclosure -- specifically, 211,050 shares by MissPERS, 30,300 shares by Cobb County and 106,370 shares by City of Philadelphia (*see* Pl. Exs. B-D) -- only underscores Plaintiffs' atypicality and lack of reliance on the integrity of the market. *See, e.g.*, *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("'[A] person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative'") (citation omitted); *see also In re Valence*

1

2

### III.   IN THE ALTERNATIVE, THE PURPORTED CLASS PERIOD SHOULD END ON JANUARY 31, 2007, WHEN MAXIM ADVISED THE MARKET NOT TO RELY ON ITS PRIOR FINANCIAL STATEMENTS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

Maxim's directive on January 31, 2007 that its prior financial statements "should not be relied upon," at the very least, precludes reliance after (and, thus, requires the class period to end on) that date.[16]   Notwithstanding the Court's prior ruling on this issue in the MTD Opinion (*Maxim*, 639 F. Supp. 2d at 1049), the class certification inquiry is far more "searching" and permits the Court to conclude that once Maxim expressly warned that its prior financial statements were unreliable, investors who thereafter bought Maxim stock did so at their own risk.  Indeed, subsequent to issuing the MTD Opinion, this Court certified a class in *Juniper* that ended on August 10, 2006, when "Juniper admitted that it would have to restate financial results" -- even though it was another *four-plus months* until "Juniper admitted," on December 20, 2006, "that it would incur a $900 million expense as a result of correcting the improper accounting of its option grants."  2009 WL 3353321, at *1, 9 (citations omitted).  As the Court instructed in *Juniper*: "In determining the duration of a securities fraud class based on a fraud-on-the-market theory, the Court must determine whether 'a curative disclosure had been made so as to render it unreasonable for an investor, or the market, to continue to be mislead [sic] by the defendants'

17

18

19

*Tech. Sec. Litig.*, 1996 WL 119468, at *5 (N.D. Cal. Mar. 14, 1996) (similar); *Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (similar); *but see Connetics*, 257 F.R.D. at 577.

20

21

22

23

24

25

26

27

[16] *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 439-40 (S.D.N.Y. 2001) ("*Cassandra herself could not have warned [plaintiffs] more directly and ominously that Livent's prior statements about the company's financial health could no longer be reasonably relied upon*") (emphasis added); *see also Semerenko v. Cendant Corp.*, 223 F.3d 165, 181 (3d Cir. 2000) ("The complaint states that Cendant disclosed on April 15, 1998 that it had uncovered accounting irregularities, and that it warned investors *not to rely on its prior financial statements* and auditor's reports when making an investment decision. . . .  *Thus, neither the market nor the Class members could have reasonably relied upon Cendant's prior financial statements or its audit reports after April 15, 1998*") (emphasis added); *Fed. Nat'l Mortg.*, 247 F.R.D. at 39-40 (holding that Fannie Mae's December 2004 announcement that its financial statements should not be relied upon pending restatement "severed the link between the alleged misrepresentations and the stock price" and later investors therefore could not "claim a reasonable reliance on Fannie Mae's financial statements").

28

alleged misrepresentations.'"  2009 WL 3353321, at *9 (quoting *Fed. Nat'l Mortg.*, 247 F.R.D. at 38).  "*Where companies disclose accounting irregularities,*" as Maxim did here on January 31, 2007, "*courts generally find it unreasonable as a matter of law for investors to rely afterward on the company's prior financial statements*."  *Id.* (citations omitted) (emphasis added).

In support of this holding in *Juniper*, the Court relied, in part, upon:

- *Fed. Nat'l Mortg.*, 247 F.R.D. at 39, which ended the class period on the day that the company informed the market that its financial statements should not be relied upon pending its forthcoming restatement; and

- *In re LTV Sec. Litig.*, 88 F.R.D. 134, 147-48 (N.D. Tex. 1980), which ended the class period on the day that the company requested the suspension of trading in its stock and reported that adjustments to its historical financial statements would have a "materially adverse impact" on its results, even though the restatement's size was not then known.

All of these cases (including *Juniper*) support ending the class period here -- only assuming, *arguendo*, that a class is certified at all -- on January 31, 2007.  *See*, *e.g.*, *LTV*, 88 F.R.D. at 148 ("The post-announcement purchasers are confronted with factual defenses unique to them" and "would be hard put to travel upon a fraud on the market theory" because they "present the court with individualized assessments different from those who purchased before").  Indeed, even Plaintiffs' Fed. R. Civ. P. 30(b)(6) designees testified that after January 31, 2007, investors could *not* "rely upon the financial statements to be truthful."  Ex. 4 (Moon Dep.) at 46; *id.* at 103 (agreeing that Maxim's January 31, 2007 disclosure was "a fair warning" to "beware prior to purchasing securities" and stating that an investor needed to "look at something beyond the financial statements and not rely solely upon them"); *see also* Ex. 3 (Tingle Dep.) at 64 (agreeing that it would not "have been appropriate for [MissPERS's] investment advisors to have relied on Maxim's financial statements after January 31, 2007").

## **CONCLUSION**

For the foregoing reasons, class certification should be denied.

1

2
Dated: March 26, 2010                    Respectfully submitted,

3
                                         WEIL, GOTSHAL & MANGES LLP

4

5                                              */s/ John A. Neuwirth*
                                         GREGORY D. HULL
6                                        *greg.hull@weil.com*
                                         201 Redwood Shores Parkway
7                                        Redwood Shores, CA 94065
                                         Tel:    (650) 802-3274
8                                        Fax:    (650) 802-3100

                                                 -and-
9

10                                       JOHN A. NEUWIRTH (*Pro Hac Vice*)
                                         *john.neuwirth@weil.com*
11                                       JOSHUA S. AMSEL (*Pro Hac Vice*)
                                         *joshua.amsel@weil.com*
12                                       767 Fifth Avenue
                                         New York, NY 10153
13                                       Tel:    (212) 310-8000
                                         Fax:    (212) 310-8007

14                                       *Attorneys for Defendant Maxim Integrated*
                                         *Products, Inc.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28