# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| |
|---|
| In re MAXIM INTEGRATED PRODUCTS, INC. SECURITIES LITIGATION |

CASE NO. C-08-00832-JW

**EXPERT REPORT OF VINITA M. JUNEJA, PH.D.**

**MARCH 26, 2010**

# TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

I.    Introduction ................................................................................................1
      A.  Instruction and Scope of Report .........................................................1
      B.  Qualifications .....................................................................................1
      C.  Remuneration .....................................................................................2
      D.  Materials Considered .........................................................................2

II.   Summary of Opinion ...................................................................................2

III.  Case Background .........................................................................................5
      A.  The Company .....................................................................................5
      B.  Litigation and Regulatory Actions Involving Maxim .........................5

IV.   Loss Causation May Not Be Established By Losses Resulting From Ancillary
      Effects of Maxim's Accounting for In-The-Money Option Grants ...................7

V.    Professor Jarrell Fails to Prove Loss Causation From The Alleged Disclosures in
      His Report ..................................................................................................9
      A.  The Merrill Lynch Backdating Report on May 22, 2006 .................10
      B.  The September 8, 2006 Announcement of a Delay in Maxim's Filing of SEC
          Form 10-K ........................................................................................15
      C.  The January 31, 2007 Announcement of Option Grant Deficiencies and the Need
          to Restate Prior Year Financial Results, and Maxim's Instruction Not to Rely on
          Its Prior Financial Statements ...........................................................17
      D.  The August 28, 2007 Downgrade by Banc of America Securities ....18
      E.  Maxim's October 1, 2007 De-listing and Removal from Indices......21
      F.  The January 17, 2008 Announcement of a Restatement Estimate, the Expanded
          Scope of the Restatement Process and Further Delay of the Restatement's
          Completion........................................................................................26

VI.   Miscellaneous ...........................................................................................30

## List of Exhibits to the Report

Exhibit 1.        Curriculum Vitae

Exhibit 2.        Materials Considered

## List of Appendices and Related Exhibits

Appendix A-1.            Analyst EPS Estimates Prior to and Following May 22, 2006

Appendix A-2.            Analyst EPS Estimates Prior to and Following October 1, 2007

Appendix A-3.            Analyst EPS Estimates Prior to and Following January 17, 2008


Appendix B.            Event Study Methodology and Multiple Comparisons

        Exhibit 1-A.   Market Model of Professor Jarrell

        Exhibit 1-B.   Market Model of Professor Jarrell Estimated over Alternative Period

        Exhibit 1-C.   Summary of Market-Adjusted Price Reactions


Appendix C.            Analyst Ratings and Price Targets around January 17, 2008

# I.   INTRODUCTION

## A.  Instruction and Scope of Report

1.      I have been retained by counsel for Maxim Integrated Products, Inc. ("Maxim" or the "Company") in the matter of *In re Maxim Integrated Products, Inc. Securities Litigation* to review the Expert Report of Professor Gregg A. Jarrell ("the Jarrell Report"),[1] submitted by plaintiffs in support of their motion for class certification, and in particular to focus on the Jarrell Report's analysis of loss causation.

## B.  Qualifications

2.      I am a Senior Vice President in the Global Securities and Finance Practice of NERA Economic Consulting ("NERA").  I am on the Board of Directors of NERA and I was the Global Chair of the Securities and Finance Practice at NERA from 2006 through 2009.  NERA was established in 1961 and now employs approximately 550 people in over 20 offices worldwide.  The Securities and Finance Practice dates from the early 1970s and employs a research staff of about 150 professionals with economics, finance, accounting and mathematics degrees.  The practice's clients include major securities exchanges, risk managers, principals requiring valuation services and plaintiffs and defendants in litigation and arbitration.

3.      I have a B.A. in economics from the University of Western Ontario and an M.A. and a Ph.D. in economics from Harvard University.  I have taught courses in economics and business regulation, and currently serve as an independent arbitrator for the Financial Industry Regulatory Authority (FINRA).  My publications include chapters in books on the topics of damages in securities litigation and arbitration and event studies.  I have authored papers on the extent and nature of shareholder claims.  I have testified at trials and at depositions and have submitted affidavits as an expert in United States federal and state courts, in Canadian court and in arbitrations, including international arbitrations in the United Kingdom.  My testimony, affidavits and depositions have covered numerous economic, financial and statistical issues arising in many securities, financial economics and valuation-related lawsuits, including many shareholder class and derivative actions.  I have worked on many hundreds of matters involving securities fraud class

---

[1] Expert Report of Gregg A. Jarrell, *In re Maxim Integrated Products, Inc. Securities Litigation,* filed December 11, 2009.

actions over the past twenty years.  Subjects covered in these testimonies, affidavits and depositions have included the efficiency of markets, materiality of news to reasonable investors, the impact of news on company share prices, loss causation, the proper calculation of damages per share, the proper calculation of the number of damaged shares, and other issues related to shareholder litigations and derivative actions.  I have spoken frequently on the topics of event studies, issues involving materiality and causation, and on the proper calculation of damages in shareholder class action litigation and derivative litigation to audiences including risk managers, executives from publicly traded corporations, insurance industry participants and lawyers.

4.      My curriculum vitae listing publications from the past ten years and testifying experience from the past four years is attached as *Exhibit 1*.  In preparing this report, I have been assisted by others at NERA, who have worked under my supervision and review.

*Exhibit 1.       Curriculum Vitae*

## C. Remuneration

5.      NERA is being compensated for its time and out-of-pocket expenses at standard billing rates.  My current hourly rate is $645.  The hourly billing rates charged for other NERA professionals who worked on this matter range from $185 to $655 per hour.  Payments to NERA are not contingent in any way on the opinions expressed in this report, or on the outcome of this matter.

## D. Materials Considered

6.      The materials considered in forming my opinions expressed in this report are listed in *Exhibit 2*.

*Exhibit 2.       Materials Considered*

## II.   SUMMARY OF OPINION

7.      Professor Jarrell claims that there are five corrective disclosure dates on which the alleged fraud was revealed and for which he finds loss causation.  Professor Jarrell's five dates are May 22, 2006; September 8, 2006; August 28, 2007; October 1, 2007; and January 17, 2008.

8.      However, following the Court's decision on Maxim's motion to dismiss (the impact of which, as Professor Jarrell conceded at his deposition, he did not consider in rendering his

report), only one of these dates remains in the case, January 17, 2008.  This report, nevertheless, examines all five dates in order to respond to Professor Jarrell.

9.     A proper analysis of loss causation on the five dates selected by Professor Jarrell would consider the total mix of information that was publicly available before and after each date, as well as a full and complete statistical analysis of whether the stock price reactions to the news on these dates indicates that the news was likely material.  Professor Jarrell, however, ignores (1) ancillary or collateral effects of the alleged fraud for which Maxim may not be liable; (2) the analyst commentary before and after each of the alleged disclosure dates; (3) confounding news released on each date, as well as contemporaneous concerns expressed by analysts; and (4) the stock price reactions following these alleged disclosures, subsequent stock price recoveries, and appropriate and properly performed tests for statistical significance of the news revealed on these dates.

10.     I specifically find that:

   o   For each of the five dates selected by Professor Jarrell, the negative stock price reaction either cannot be distinguished from the random day-to-day movements in the stock price or is a result of collateral effects of the alleged fraud, rather than curative disclosures of the alleged fraud itself. To the extent that the finder of fact concludes that Maxim is not liable for such collateral effects, they do not indicate loss causation.

   o   Professor Jarrell purports to test whether the Maxim stock price reactions to the news on these five dates are statistically significantly different from what would be expected in the absence of the news. His analysis which finds statistical significance on each of his five dates indicates that the news was likely material to investors.  However, his statistical significance tests for May 22, 2006 and September 8, 2006 are extremely sensitive to his choice of time period over which to estimate his model of how Maxim's stock price is expected to change in light of market and industry movements ("market model").  Slightly different (and more appropriate) estimation time periods result in statistical *insignificance* of the stock price reactions on those dates, which invalidates Professor Jarrell's conclusion that the news allegedly triggering those reactions was material.

3

o   Separate from the issue of market model time period selection, appropriate statistical corrections to Professor Jarrell's analysis also support the statistical *insignificance* of the stock price movements on those two dates.

o   Again, even using Professor Jarrell's own market model, Maxim's stock price recovered within two days after the negative stock price reaction on September 8, 2006 and the *recovery* (i.e., increase) was statistically significant on each of these two days.  In other words, by the time the market fully assimilated the information revealed on September 8, there was no indication that the news was material.  In addition, on October 1, 2007, the stock price recovered from the initial price drop two days later.  These results show that there was no loss caused by the September 8, 2006 alleged disclosure and that the conclusion that a loss was caused by the October 1, 2007 disclosure is suspect.

o   Moreover, as for August 28, 2007, when news of Maxim's "potential delisting" was disclosed to the market, the lack of statistically significant price reactions upon Maxim's earlier announcements of receipt of NASDAQ letters regarding potential de-listing strongly suggests that the August 28, 2007 disclosure was not material and also was not new information.

o   In fact, Professor Jarrell's tests of statistical significance assume that the only potentially material news revealed on those five dates was released in an untimely fashion (i.e., that it should have been disclosed earlier) and related directly to the allegedly misstated or withheld information. Yet, to the extent that there is either confounding news, which is unrelated to the allegedly misstated or withheld information, or to the extent that there is news which is revealed in a timely fashion, a correct analysis of statistical significance would first remove the impact of the confounding and/or timely news. Professor Jarrell has not done so, and consequently his tests of statistical significance are thus invalid for those dates for this reason as well.

o   Finally, the stock price decline on January 17, 2008, which Professor Jarrell principally links to Maxim's disclosure of an estimate of the impending

4

restatement's magnitude, was likely instead due to Maxim's disclosure of further delay of the restatement's completion.  A review of the analyst coverage on that day readily bears this out.  Indeed, analysts hardly addressed the estimate of the restatement amount, other than in passing and without any follow up analysis of its implications or consequences.  This is not surprising given that analysts would have formed their own opinions about the expected magnitude of any potential restatement by Maxim before January 17, 2008. And when Maxim completed and filed the restatement on September 30, 2008, the market did not have a statistically significant negative reaction even though the restatement amount turned out to be larger than the January estimate.  This underscores the fact that the market may either have had a reasonable expectation of Maxim's restatement amount in both January and September or did not consider the amount of importance to its expectation of future cash flows for the company, in either case, rendering the size of the restatement not material.

## III.   CASE BACKGROUND

### A. The Company

11.      Maxim, originally incorporated in California in 1983, designs, develops, manufactures and markets an array of linear and mixed-signal integrated circuits, or analog circuits, for many geographically diverse customers. The Company also provides a range of high-frequency process technologies and capabilities that can be used in custom designs.[2]

### B. Litigation and Regulatory Actions Involving Maxim

12.      On May 22, 2006, Merrill Lynch published a report titled "Options Pricing – Hindsight is 20/20."  In this report, Merrill Lynch concluded that a review of stock price patterns surrounding option grants indicated that investors at certain companies, including Maxim, "need to be aware of the possibility of [either pending or impending] regulatory activity."  On June 7, 2006,

---

[2] Maxim *SEC Form 10-K* filed September 30, 2008 for the period ended June 24, 2006.

Maxim announced that it was being investigated by the SEC regarding its stock options practices.[3] On July 3, 2006, the Company announced that it had received a subpoena from the U.S. Department of Justice relating to the same matter, and also announced that its Board of Directors had authorized a review of the Company's option practices by a Special Committee of the Board.[4]

13.    On January 31, 2007, Maxim announced the Special Committee's conclusion that there were deficiencies in Maxim's option granting practices and that, as a result, the Company would need to restate its historical financial results.  Maxim also advised investors not to rely on previous financial statements, and announced the retirement of two of its executives, John F. Gifford, formerly the Company's CEO, and the resignation of Carl Jasper, the Company's CFO.[5]

14.    More specifically, the announcement revealed that for options granted from the beginning of fiscal year 2000 through the end of fiscal year 2006, "the recorded exercise price of stock option grants to employees and directors differed from the fair market value of the underlying shares on the actual measurement date."[6]  The press release also noted that financial results for years before 2000 might need to be restated, along with those from 2000-2006.  However, the Special Committee found no evidence that management or any member of the Board engaged in backdating for personal enrichment. On February 1, 2007, Maxim's stock price closed at $1.20 more than its closing price on the prior day, or an increase of $1.03 on a market-adjusted basis (see ¶ 51 below).

15.    On January 17, 2008, Maxim announced that due to an expansion of the options review back to 1995, its restatement would be delayed from the first calendar quarter of 2008 to June 2008, but that the Company could not guarantee that the restatement would even be completed by then.  Maxim also estimated that the amount of the restatement would be between $550 million and $650 million on a before-tax basis and between $360 million and $425 million on an after-tax basis.[7]

---

[3] "Maxim Receives Informal SEC Inquiry on Options," *Maxim Press Release*, June 7, 2006, 10:25 PM.

[4] "Maxim Asked for Records Relating to Stock Options and Practices," *Maxim Press Release*, July 3, 2006, 1:18 PM.

[5] "Maxim Announces Results of Special Committee Review of Option Grants," *Maxim Press Release*, January 31, 2007, 5:58 PM.

[6] "Maxim Announces Results of Special Committee Review of Option Grants," *Maxim Press Release*, January 31, 2007, 5:58 PM.

[7] "Maxim Provides Update on Its Restatement," *Maxim Press Release*, January 17, 2008, 9:00 AM.

16.     Less than a month after this announcement, on February 6, 2008, the first class action complaint was filed in this matter.[8]  On May 15, 2008, all cases that had been filed were consolidated, and a Consolidated Class Action Complaint ("the Complaint") was filed on November 14, 2008,[9] a little more than a month after the Company ultimately restated its financial results on September 30, 2008 (and recorded additional stock-based compensation of $775 million).[10]

17.     On July 16, 2009, the Court partially granted and partially denied Maxim's motion to dismiss.[11]  As noted above, the Court's decision left only the January 17, 2008 alleged "corrective" disclosure in the case.  Nevertheless, in order to fully respond to Professor Jarrell's report, I have examined all five alleged "corrective" disclosure dates selected by Professor Jarrell.


## IV.     LOSS CAUSATION MAY NOT BE ESTABLISHED BY LOSSES RESULTING FROM ANCILLARY EFFECTS OF MAXIM'S ACCOUNTING FOR IN-THE-MONEY OPTION GRANTS

18.     An important distinction not made in the Jarrell Report is the one between the ancillary effects of Maxim's alleged fraud and revelations of the alleged fraud itself.  Indeed, none of Professor Jarrell's alleged disclosure dates are corrective of the alleged fraud, and the disclosures on those dates did not directly reveal that a prior representation by Maxim was false or omitted material information.  In fact, Maxim's only corrective statement was its announcement on January 31, 2007 that there were deficiencies in its option granting practices, that it would need to restate its historical financial results, and that its prior financial statements should not be relied upon. Yet, Maxim's stock price increased on that news.

19.     The consequences of the alleged fraud are referred to as ancillary, consequential or collateral losses in the legal and economic academic literature.  Consequential losses or collateral losses refer to those losses suffered by investors as a result of the disclosure or effects of new

---

[8] *Allan Query v. Maxim Integrated Products, Inc., John F. Gifford and Carl W. Jaspar*, USDC, Northern District of California, San Jose Division, filed February 6, 2008.

[9] Consolidated Class Action Complaint, *In re Maxim Integrated Products, Inc. Securities Litigation,* filed November 14, 2008.

[10] "Maxim Completes Restatement of Financial Statements," *Maxim Press Release*, September 30, 2008, 5:35 PM.

[11] Order Granting In Part And Denying In Part Defendant Maxim's Motion To Dismiss With Leave To Amend; Denying Defendant Timothy Ruehle's Motion To Dismiss, *In re Maxim Integrated Products, Inc. Securities Litigation*, July 16, 2009.

information that defendants were never required or able to disclose. The literature on collateral loss examines what happens when an event contains disclosures for which defendants may be liable (resulting in allowable damages) and for which they are not liable as a matter of law (collateral loss caused).[12]  For example, much is made by Professor Jarrell of Maxim's de-listing from NASDAQ, but by itself, the de-listing does not constitute an alleged fraud or the revelation of the same.  A company that is not accused of any wrongdoing could be de-listed from NASDAQ, and, similarly, a company accused of fraud may never be de-listed from its exchange.  Indeed, even Professor Jarrell agreed in his deposition that delayed filing, de-listing, and bad management are not fraud but, at most, consequences of the alleged fraud.[13]

20.     The literature states that when such an event occurs, recovery should be limited to the price decline associated with the portion of the disclosure attendant to the correction of the alleged fraud itself, for which defendants can be found liable under the applicable law.  Courts have agreed that defendants are not liable for collateral damages.[14]

21.     This distinction is a major theme of "The impact of the options backdating scandal on shareholders," a paper Professor Jarrell co-authored with Gennaro Bernile, which was published in the *Journal of Accounting and Economics* in November 2008.  In the paper, the authors conclude:

> Unlike other types of fraud, revelations of stock option backdating have a relatively small effect on cash flows. Absent unconditional out-of-pocket costs and tax adjustments, one could argue the backdating scandal should not affect shareholders (*Direct Cost Hypothesis*). Alternatively, investors' reaction to backdating news may reflect an increase in perceived agency costs and information risk, if the accusations impair the reputation and credibility of targeted companies (*Agency Hypothesis*).[15]

---

[12] See, for example, the following articles:

Allen Ferrell and Atanu Saha. "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo, Inc.," Vol. 63 *The Business Lawyer* (November 2007), pp. 163-186.

Bradford Cornell and James C. Rutten. "Collateral Damage and Securities Litigation," 2009 *Utah Law Review* 717 (2009).

Frederick C. Dunbar and Arun Sen. "Counterfactual Keys to Causation and Damages in Shareholder Class-Action Lawsuits," Vol. 2009 *Wisconsin Law Review* 199 (2009), pp. 199-242.

[13] Jarrell Deposition Transcript, pp. 61:18 – 63:7.

[14] See, for example, *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477 (1977), *In re Craftmatic Securities Litigation*, 890 F.2d 628, 640 (1990) and *Galati v. Commerce Bancorp*, 2005 U.S. Dist. LEXIS 26851, 9 (2005).

[15] Gennaro Bernile and Gregg Jarrell. "The impact of the options backdating scandal on shareholders," *Journal of Accounting and Economics* 47 (2009) 2-26.

The paper clearly distinguishes between direct effects of backdating and consequential effects; the Jarrell Report does not.

22.    In addition, in reference to a paper by David Tabak and Frederick Dunbar,[16] Professor Jarrell's report states:

> Event studies are most useful in determining the effects of new information on security prices when: (i) there is a well-defined public disclosure or announcement; (ii) the time that the news item reaches the market is known; (iii) there is no reason to believe that the market anticipated the news item; and (iv) it is possible to isolate the effect of the news item from market, industry, and other issuer-specific factors simultaneously affecting the issuer's security price.[17]

In his report here, however, Professor Jarrell does not attempt to isolate the direct effects of the alleged fraud from confounding and consequential news items.

23.    Below, I discuss each of Professor Jarrell's alleged "corrective" disclosure dates in the context of contemporaneous analyst commentary, as well as proper statistical analysis, and break down the alleged disclosures into their components to allow the finder of fact to distinguish between what losses, if any, resulted directly from the accounting for in-the-money stock options, and what losses, if any, were caused by ancillary disclosures.

## V.    PROFESSOR JARRELL FAILS TO PROVE LOSS CAUSATION FROM THE ALLEGED DISCLOSURES IN HIS REPORT

24.    Professor Jarrell identifies five dates as "corrective" disclosures.  They are: May 22, 2006, the date a Merrill Lynch report indicated Maxim may have been involved in options backdating; September 8, 2006, the date Maxim announced it would be delinquent in filing periodic financial reports with the SEC as a result of its ongoing internal options backdating investigation; August 28, 2007, when Banc of America downgraded Maxim and warned of its potential de-listing from NASDAQ; October 1, 2007, the date Maxim was de-listed from NASDAQ and removed from major indices; and January 17, 2008, when Maxim announced a further delay in the completion of its restatement and preliminary estimates of the restatement's magnitude.

---

[16] Dr. David Tabak is a NERA Senior Vice President and Dr. Fred Dunbar is a former NERA Senior Vice President and currently an Economic Fellow at the Securities and Exchange Commission.

[17] Jarrell Report Par. 72. The Tabak and Dunbar paper referenced is "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition, ed. by Roman L. Weil, Michael J. Wagner and Peter B. Frank, Wiley, 2001.

25.     The Jarrell Report fails to address some or all of the following where applicable: (1) collateral effects of the alleged fraud; (2) confounding factors; (3) certain analyst commentary; (4) appropriate econometric principles and statistical sensitivity tests; and (5) the fact that certain of Maxim's announcements did not reveal any new information.  Ultimately, Professor Jarrell's report fails to prove that there was loss caused by a corrective disclosure on any of the above dates.

## A. The Merrill Lynch Backdating Report on May 22, 2006

26.     On May 22, 2006, Merrill Lynch published a report titled "Options Pricing – Hindsight is 20/20."  Merrill Lynch concluded that, based on publicly available information on stock price patterns surrounding management grants, investors at certain companies, including Maxim, "need to be aware of the possibility of [pending or impending] regulatory activity."[18]  However, Merrill Lynch warned that the records it had access to were not sufficient to confirm whether the companies actually backdated or not.

27.     Other analysts were not concerned by the Merrill Lynch report with regard to Maxim around the time of its publication.  On May 25, 2006, a Credit Suisse analyst stressed his optimism about Maxim's business model and the Company's long-term ability to outgrow the market.[19]  On the same day, a C. E. Unterberg, Towbin analyst reiterated his "BUY" rating on the stock and advised investors to be aggressive buyers.[20]  Neither equity analyst report even mentioned backdating or the Merrill Lynch report.  Furthermore, none of the more than a dozen analyst reports issued over the period from May 22 to May 25, 2006 mentioned the Merrill Lynch report, and only one mentioned Maxim's May 23, 2006 announcement of a recent shareholder derivative lawsuit in connection with the Company's stock option grants.[21]

28.     Moreover, although certain analysts had opinions about Maxim's use of options, the concern was not due to backdating.  For example, Credit Suisse commented on options expensing, given the move to a GAAP-based valuation model for semiconductors.  In addition, Citigroup, in an analyst report also published on May 22, 2006, stated that investors may react to technology companies that have or continue to use options because they were under increasing scrutiny and

---

[18] "Options Pricing – Hindsight is 20/20," *Merrill Lynch*, May 22, 2006.

[19] "Integration Jubilation," *Credit Suisse*, May 25, 2006.

[20] "Is it time to buy yet, and other notes from Maxim's analyst Meeting," *C. E. Unterberg, Towbin*, May 25, 2006.

[21] "Valuation looks attractive given gross margin decline fears," *UBS Investment Research*, May 25, 2006.

possibly due for a revision in accounting treatment.[22]  Even with these concerns about options expensing, analysts did not reduce their earnings estimates for Maxim.[23]

29.     In consideration of the foregoing, the decline in Maxim's stock price associated with Merrill Lynch's May 22, 2006 report likely was not a result of the market's appreciation of the alleged fraud, but, if anything, was the market's reaction to speculation by a single analyst and the uncertainty surrounding the new accounting treatment of stock options.

30.     The speculative nature of the Merrill Lynch report is further evidenced by the fact that several companies identified in the report ultimately were not determined to have backdated: Teradyne, Intel, Applied Materials, Advanced Micro Devices, National Semiconductors, Texas Instruments and Micron.[24]  Inclusion in Merrill Lynch's report, therefore, did not mean a company actually backdated options or had issues related to accounting for in-the-money stock option grants.

31.     In response to this possibility of speculation, Professor Jarrell, in his deposition, claimed that the implication by Merrill Lynch that Maxim backdated options was not speculative because "the odds, if you look at the Merrill Lynch report and you look at the work that people were doing and backdating and the statistical work that was done [and] the statistical work that we did [in] Bernile and Jarrell, when you look at…that type of statistical analysis…the notion that it is speculative seems inconsistent with the statistical odds that the grant dates were picked randomly for these types of companies."[25]  However, the Merrill Lynch report did not calculate the odds of the option grant dates of Maxim being arrived at by chance, as previous studies had done for other companies.  Without any statement quantifying the probability that Maxim's grant dates were chosen by chance, the Merrill Lynch report is speculative. The Court agreed with this assessment in granting, in part, Maxim's motion to dismiss.[26]

---

[22] "MXIM: Can Analyst Day Give Shares A Boost?" *Citigroup Global Markets Investment Research*, May 22, 2006.

[23] See Appendix A-1.

[24] According to Bloomberg Finance L.P.'s "Executive Stock Options Backdating Tracker", which was used by Professor Jarrell in his selection of peers for his market model (See Jarrell Report Par. 78), and according to "Options Backdating Lawsuits: Settlements, Dismissals, Denials," *The D&O Diary*, last updated March 17, 2009.

[25] Jarrell Deposition Transcript, pp. 130:21 – 131:19.

[26] In its ruling on the Motion to Dismiss, the Court wrote, "[w]hile each of these [pre-January 31, 2007] disclosures provides notice that Maxim *may* have illicitly backdated stock options, none of them goes beyond speculation." Order Granting in Part and Denying in Part Defendant Maxim's Motion to Dismiss with Leave to Amend; Denying Defendant Timothy Ruehle's Motion to Dismiss, *In re Maxim Integrated Products, Inc. Securities Litigation*, filed July 16, 2009, p. 9.

32.     Further, and independent of the speculative nature of the Merrill Lynch report, there are several bases for calling into doubt Professor Jarrell's statistical significance tests of the Maxim stock price reaction on May 22, 2006.  A test for statistical significance examines whether the stock price reaction is statistically significantly different from the stock price reaction that one would expect in the absence of any news.  A statistically significant stock price reaction indicates that the news is likely material.  But a properly done test for significance would control for, among other things, any contemporaneous market and industry news or contemporaneous unrelated company-specific news.  In controlling for market or industry news, one needs to construct a market model which in turn estimates the impact of market and industry news on the company's stock so that the market and industry news impact can be removed from the stock price reaction, leaving only the impact of company-specific news.  One can then test the company-specific news for statistical significance.

33.     I conclude that Professor Jarrell's results are highly sensitive to his choice of market model.  A slightly different and more appropriate model finds that there is no statistically significant Maxim stock price response to the May 22, 2006 news.  What is more, Professor Jarrell is simultaneously testing the statistical significance of several dates with respect to the same allegedly undisclosed information; this is known as a situation of "multiple comparisons."  The threshold levels for statistical significance are different, and higher, in this situation than in one where only one date is being examined.  When one corrects for this factor, and thus uses a higher threshold for statistical significance, there is also no statistically significant Maxim stock price reaction to the May 22, 2006 news.  I elaborate on these findings below, but a more detailed and technical explanation of these findings is given in Appendix B to this report.

34.     Professor Jarrell tests for the statistical significance of the Maxim stock price reaction to the Merrill Lynch report by estimating the historical relationship between the day-to-day movements of the Maxim stock price in the absence of the alleged fraud and the day-to-day movements in a market and an industry index.  This relationship is used to predict the impact of market- and industry-related factors on Maxim's stock price.  By removing this predicted market and industry impact, one controls for such expected price movement and enables an examination of the stock price impact due to company-specific news.  Professor Jarrell constructs his model by looking at the relationship between the daily returns to Maxim stock and the daily returns to a market and an industry index in the year prior to a seminal academic options backdating study in

May 2005.[27] As a sensitivity test of his findings, I estimate the same relationship, using the same indices, but estimate the market model during an equally, if not more, appropriate time period – the year prior to March 18, 2006, when the *Wall Street Journal* published an article that brought the options backdating controversy into the mainstream.[28]

35.     This alternative estimation period market model indicates that the Maxim stock price reaction to the May 22, 2006 Merrill Lynch report is statistically *insignificant,* which in turn indicates that the May 22 Merrill Lynch report was not material news to investors.[29]  This can be seen in the table below.  The daily t-statistic column illustrates the degree to which the observed market-adjusted Maxim stock price reaction on May 22, 2006 is significantly different from what would have been expected.  One would expect that in the absence of new material information, the observed market-adjusted stock price reaction on any day would be zero.  A t-statistic with an absolute value greater than 1.96 indicates a stock price reaction which I would expect to see less than five percent of the time in the absence of material news.  With the alternative estimation period of March 18, 2005 to March 17, 2006 for the market model, the stock price reaction on May 22, 2006 is a decline of 73 cents.  The t-statistic is 1.62, a number lower in magnitude than the cutoff of 1.96, which indicates that the stock price impact is not statistically significant and that the news on that day was likely not material.

| Estimation Period (1) | Market-Adjusted Price Reaction on 5/22/2006 (2) | t-Stat for Reaction (3) | | Critical Value for Significance at 5% Level (4) | Statistically Significant? (5) |
|---|---|---|---|---|---|
| April 30, 2004 - April 29, 2005 | -$0.78 | -2.27 | < | -1.96 | Yes |
| March 18, 2005 - March 17, 2006 | -$0.73 | -1.62 | > | -1.96 | No |

36.     This shows that Professor Jarrell's finding of statistical significance on May 22, 2006 is tenuous, and may change with slight (but appropriate) changes to the market model.

---

[27] Erik Lie. "On the Timing of CEO Stock Option Awards," *Management Science* Vol. 51, (May 2005), pp. 802–812.

[28] "The Perfect Payday—Some CEOs reap millions by landing stock options when they are most valuable; Luck—or something else?" *The Wall Street Journal*, March 18, 2006.  Professor Jarrell's analysis assumes that the May 2005 academic publication is relevant because it could have informed the market about the prevalence of options backdating.  Yet, his analysis also assumes that the market was not informed about the potential for options backdating at Maxim until twelve months later.

[29] Statistical significance at the five percent level requires a t-statistic greater than or equal to 1.96 in absolute value.  Exhibit 1-C to Appendix B shows the market-adjusted price reactions using each of these estimation periods on all of the days I tested.

37.     As described above, there is a threshold value of the t-statistic which indicates statistical significance. In this context, both Professor Jarrell and I agree that the appropriate level of significance is five percent – i.e., that we deem a stock price reaction to be statistically significant when it would be expected to occur less than five percent of the time in the absence of any material news. And 1.96 is the t-statistic which corresponds to this level of significance, when testing one particular date alone. However, when one tests multiple dates as potential disclosures of the same allegedly undisclosed information, this same criterion applied to each day individually will prove to be too lax.[30]

38.     We know Professor Jarrell tests at least the five dates he selects for statistical significance with respect to the revelation of the alleged fraud, and indeed in his report he actually alludes to testing about 20 different dates.[31] By testing multiple days, each with a threshold of statistical significance at the five percent level, the probability of falsely finding materiality grows. To correct for testing at least five dates, a more appropriate threshold t-statistic is 2.58. As one can see in the table above, the t-statistic for the May 22, 2006 reaction under our replication of Professor Jarrell's own model is 2.27 in absolute value.[32]  Therefore, after adjusting for the fact that multiple days were tested, Professor Jarrell's own event study shows that the stock price reaction on May 22, 2006 is statistically *insignificant*, which in turn implies that the Maxim-related news on that day was not considered material by investors.

39.     Professor Jarrell's analysis has not proven loss causation based on the Maxim stock price movements following the May 22, 2006 Merrill Lynch report.

---

[30] According to the *Reference Manual on Scientific Evidence* published by the Federal Judicial Center, multiple comparisons is defined as "[m]aking several statistical tests on the same data set."  The *Manual* further cautions that "[m]ultiple comparisons complicate the interpretation of a *p*-value. For example, if 20 divisions of a company are examined, and one division is found to have a disparity 'significant' at the 0.05 level, the result is not surprising; indeed, it should be expected under the null hypothesis." (Fed. Jud. Ctr. ed., 2d ed. 2000, pp. 166, available at the following URL: http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

[31] There are about 20 days mentioned in the "Truth Emerges" section of the Complaint which are implied potential "corrective" disclosures.  Professor Jarrell states in his report that he "deliberately restricted [his] financial-economic analysis of materiality and loss causation to the dates specifically named in the Complaint" (Jarrell Report Par. 4).  This implies that Professor Jarrell tested at least the 20 implied potential "corrective" disclosures, and may have tested more.  Testing any more than five dates would require an even higher threshold t-statistic for statistical significance than the one used here for five dates.

[32] Professor Jarrell's actual model gives 2.21.  See Appendix A to Jarrell Report, pp. 434 of 712.

### B.  The September 8, 2006 Announcement of a Delay in Maxim's Filing of SEC Form 10-K

40.    On September 8, 2006, Maxim announced that it would be unable to file its annual report on SEC Form 10-K for the fiscal year ended June 24, 2006 because the Special Committee of the Board, which was authorized to review certain stock option grants and practices, had not yet completed its review.[33]  Furthermore, the Company announced that it would be unable to file its annual report until the Special Committee review was complete.

41.    On the same day, Deutsche Bank published an analyst report saying it continued to believe in Maxim's fundamentals and maintaining its "Buy" rating.[34]

42.    William Blair & Company had a similar view.[35]  Namely, the analyst stated that the delay itself was not a red flag, given that such delays had become more commonplace in option backdating investigations.  Furthermore, the analyst stated that any findings would not affect the Company's growth strategy or its operating margin.

43.    In addition to the lack of analyst concern regarding the filing delay, the test performed by Professor Jarrell for statistical significance of the market-adjusted price reaction on September 8, 2006 suffers from deficiencies similar to those of his test of the stock price reaction on May 22, 2006.

44.    As with the May 22, 2006 stock price reaction, changing the time period over which the market model is estimated results in the September 8, 2006 stock price reaction being statistically insignificant at the five percent level.  That is, the stock price reaction to this allegedly material news is not different from what one would expect in the absence of the news.

45.    Additionally, using either Professor Jarrell's estimation period or the alternative I proffer, if one corrects for the fact that Professor Jarrell is examining multiple dates for statistical significance, the stock price reaction, again, is statistically *insignificant*.  That is, it is not different from what one would expect in the absence of any news.  Both effects can be seen in the table below.

---

[33] "Maxim Integrated Files To Delay *10-K*," *Dow Jones Corporate Filings Alert*, September 8, 2006, 6:13 AM.

[34] "Industry Alert: Stock option woes continue," *Deutsche Bank Global Markets Research*, September 8, 2006.

[35] "Maxim Integrated Products, Inc. Delays 10-K Filing," *William Blair & Company*, September 8, 2006.

| | Estimation Period: April 30, 2004 - April 29, 2005 | | Estimation Period: March 18, 2005 - March 17, 2006 | |
| Date | Market-Adjusted Daily Price Reaction | t-Stat for Daily Price Reaction | Market-Adjusted Daily Price Reaction | t-Stat for Daily Price Reaction |
| (1) | (2) | (3) | (4) | (5) |
| 9/8/2006 | -$0.74 | *-2.45* ** | -$0.76 | *-1.91* * |
| 9/11/2006 | $0.92 | *3.11* ** | $0.93 | *2.39* ** |
| 9/12/2006 | $0.85 | *2.76* ** | $0.80 | *1.98* ** |

*Note: Two stars indicates statistical significance at the 5% level, as the t-stat is greater than 1.96 in absolute value.*

46.     The first row of the table indicates the stock price reaction following the September 8, 2006 announcement, accounting for any expected price change as a result of market and industry movements on the same day.  Columns (2) and (4) show the stock price reaction using the two alternative market model estimation periods.  Columns (3) and (5) indicate the statistical significance where, again, a t-statistic greater than an absolute value of 1.96 indicates that the stock price reaction is statistically significantly different from what one would expect less than five percent of the time in the absence of any news.  As one switches from the estimation period used in Professor Jarrell's report to the year prior to the March 18, 2006 *Wall Street Journal* article on backdating, the September 8, 2006 market-adjusted price reaction in the first row changes from statistically significant to statistically *insignificant.*

47.     However, whether one uses the same or a different estimation period for the market model as Professor Jarrell, if one corrects for "multiple comparisons" (as discussed above), one needs to change the threshold for statistical significance depending on the number of dates being examined.  If it is five or more potential disclosures (and Professor Jarrell alludes to examining about 20 dates, but settles on five dates), then the threshold t-statistic for statistical significance is an absolute value of 2.58.[36]  The t-statistic of 2.45 is less than the 2.58 threshold, and therefore, the stock price reaction on September 8, 2006 is statistically *insignificant*, even using Professor Jarrell's market model estimation period.

---

[36] The value of the Bonferroni t-statistic is a function of the number of tests that are performed and equals the inverse standard normal distribution function applied to the following quantity: one half of the desired overall error rate divided by the number of tests performed.

16

48.     Even disregarding the correction for reviewing multiple dates and disregarding the estimation period of the market model, Professor Jarrell's test of statistical significance on September 8, 2006 is both incomplete and incorrect.  With no further news released on September 11 and September 12, the two trading days immediately after September 8, 2006, Maxim's stock price recovered and traded above September 7 levels for more than a week.  The second and third rows of the table above show, on both September 11 and 12, Maxim's market-adjusted stock price return was positive and statistically significant at the five percent level using Professor Jarrell's own market model.   In this instance, the proper way to examine the impact of the news released on September 8 would be to examine the cumulative stock price reaction from September 8 to 12, which is positive, whether one uses Professor Jarrell's market model estimation period or the alternative model.  The price reaction is $0.84 using Professor Jarrell's model and $0.79 if using the alternative market model.

49.     Professor Jarrell's analysis has not proven loss causation based on the Maxim stock price movements following the September 8, 2006 news.

## C.  The January 31, 2007 Announcement of Option Grant Deficiencies and the Need to Restate Prior Year Financial Results, and Maxim's Instruction Not to Rely on Its Prior Financial Statements

50.     The disclosure date of January 31, 2007, while not mentioned in Professor Jarrell's report, is important to consider, as Maxim announced on that date that the Special Committee's review found that there were deficiencies in Maxim's option granting practices and that the Company would need to restate its historical financial results.  Maxim also advised investors not to rely on previous financial statements, and disclosed the retirement of former CEO John F. Gifford, and the resignation of Carl Jasper, Maxim's CFO.[37]  The announcement put investors and the market squarely and expressly on notice as to the risks inherent in relying on Maxim's prior financial statements and related disclosures.

51.     In response to this news, Maxim's stock price increased by $1.03, or 3.34 percent, on February 1, 2007, on a market-adjusted basis, which was statistically significant at the five percent

---

[37] "Maxim Announces Results of Special Committee Review of Option Grants," *Maxim Press Release*, January 31, 2007, 5:58 PM.

level.[38]  It is clear from the stock price reaction that there is no loss causation based on the news revealed on this date.

52.      During his deposition, Professor Jarrell testified with regard to Maxim's analyst coverage following the January 31, 2007 announcement as follows: "They obviously were aware of the do not rely [instruction] and then they did what they did."[39]  Thus, Professor Jarrell concedes that analysts were aware of the Company's instruction.  In other words, the market was aware of the increased risk of purchasing Maxim's common stock: the informed decision by investors to purchase Maxim stock after January 31, 2007, and any alleged losses subsequently incurred as a result, cannot be blamed on Maxim.

### D.  The August 28, 2007 Downgrade by Banc of America Securities

53.      The next alleged corrective disclosure considered by Professor Jarrell was on August 28, 2007, when Banc of America Securities published an analyst report about Maxim titled "Downgrading to Neutral on Delisting Risk, Execution Concerns."  In its first paragraph, Banc of America stated its belief that "uncertainty stemming from the potential delisting could serve to pressure the stock in the near term,"[40] and hypothesized that Maxim would be unable to file with the SEC in time to prevent a de-listing.

54.      By Professor Jarrell's own admission during his deposition, potential and actual de-listing are not revelation of fraud but are instead outcomes that in this case are alleged to be *consequences* of the alleged fraud, separate from the allegedly improper accounting (and the alleged misrepresentations and omissions concerning the same).  For example, when asked "[w]hat about delisting and whether disclosures going to potential or actual delisting, is that something that you viewed to be consequence [of the alleged fraud]?", Professor Jarrell responded "Yes."[41]  Thus, the August 28, 2007 disclosure regarding the possibility of a de-listing is not a revelation of the alleged fraud, and the August 28, 2007 Banc of America report must be examined in that context.

---

[38] According to Professor Jarrell's market model.  See page 553 of 712 of Appendix A to the Jarrell Report.

[39] Jarrell Deposition Transcript, pp. 158: 13 – 14.

[40] "Downgrading to Neutral on Delisting Risk, Execution Concerns," *Banc of America Equity Research*, August 28, 2007, pp. 1.

[41] Jarrell Deposition Transcript, pp. 97: 21 – 25.

55.     Putting aside that de-listing risk was a consequence of the alleged fraud and not a revelation of the alleged fraud itself, Maxim had been receiving notices from NASDAQ regarding its delinquent status since the Company announced on September 8, 2006 that it was unable to file its Form 10-K with the SEC.  In fact, Maxim received NASDAQ letters regarding potential de-listing on the following four dates: September 25, 2006;[42] November 7, 2006;[43] February 7, 2007;[44] and July 3, 2007,[45] and the receipt of each letter was disclosed publicly.  The risk of Maxim's de-listing, therefore, was not something new to the market on August 28, 2007, and it is likely that, if considered material, this risk had already been priced into Maxim's shares before that date.  Indeed, Professor Jarrell's analysis wholly ignores these other dates on which announcements were made concerning the likelihood of a de-listing, none of which were followed by statistically significant stock price reactions.

56.     Specifically, on each of the four dates prior to August 28, 2007,  and also on September 6, 2007,[46] when Maxim announced it had received a NASDAQ determination letter (i.e., dates with news that would seem to point to a potential de-listing), there was no resulting statistically significant stock price reaction, even using Professor Jarrell's own market model.  See the table below.[47]

| News Date (1) | News (2) | Statistically Significant Price Reaction? (3) |
|---|---|---|
| 9/28/2006 | Maxim announced receipt of NASDAQ letter on 9/25/2006 | No |
| 11/13/2006 | Maxim announced receipt of NASDAQ letter on 11/7/2006 | No |
| 2/13/2007 | Maxim announced receipt of NASDAQ letter on 2/7/2007 | No |
| 7/9/2007 | Maxim announced receipt of NASDAQ letter on 7/3/2007 | No |
| 8/28/2007 | Bank of America published report about de-listing | Yes |
| 9/6/2007 | Maxim announced receipt of NASDAQ letter on 8/31/2007 | No |

---

[42] "Maxim to Request NASDAQ Hearing Regarding Stock Listing," *Maxim Press Release*, September 28, 2006, 8:30 PM.

[43] "Maxim Announces Receipt of Additional Notice From NASDAQ Regarding Stock Listing," *Maxim Press Release*, November 13, 2006, 2:40 PM.

[44] "Maxim Announces Receipt of Additional Notice From Nasdaq", *Maxim Press Release*, February 13, 2007, 4:00 PM.

[45] "Maxim Provides Update on NASDAQ Listing Matters," *Maxim Press Release*, July 9, 2007, 6:40 PM.

[46] "Maxim Announces Receipt of Additional Notice from NASDAQ Regarding Stock Listing," *Maxim Press Release*, September 6, 2007, 4:00 PM.

[47] For more detail on the price reactions and their statistical significance, see Exhibit 1-C to Appendix B.

Again, discussion of these dates, on which there were timely disclosures by Maxim of news relevant to a potential de-listing, was omitted from Professor Jarrell's report.  Indeed, as discussed above, his report fails to note that on other dates the revelation of de-listing-related information similar to that revealed on August 28, 2007 never resulted in a statistically significant negative stock price reaction, indicating that the market did not find such news to be material.

57.     In short, Professor Jarrell mentions the *only* potential de-listing announcement that (arguably) was helpful to his (and Plaintiffs') position (and disregards similar prior announcements with no statistically significant negative stock price impact), but ignores that de-listing risk was merely a consequence, not the revelation, of the alleged fraud.

58.     Professor Jarrell's report also fails to mention Banc of America's unease regarding management and execution, which is potentially confounding information that should have been taken into account.  The report's title even mentions "Execution Concerns."  On page 3, the report states, "delisting risks, as well as a seeming lack of management focus, keep us from adopting a positive stance on the stock," and on the same page, the company's "inability to deliver on past delinquent filings…, while simultaneously targeting an acquisition that we don't view to be particularly compelling, leaves us less confident in the execution prowess and focus of the relatively new management."  Thus, de-listing risk (itself not a revelation of the alleged fraud) was not the only concern identified by Banc of America.  Concern regarding management focus and execution was an additional, potentially confounding (but, again, not alleged fraud revealing) factor.  The existence of this additional, potentially confounding news weakens Professor Jarrell's assertion that the risk of de-listing alone wholly caused Maxim's stock price decline on August 28, 2007.  Even putting aside whether Professor Jarrell's significance tests were done correctly, if one is testing the statistical significance of a piece of news, but there is other news released at the same time which may be material, then one cannot state that the first piece of news is what caused the stock price reaction. The significance may hinge upon the confounding or "contaminating" piece of news.  Because Professor Jarrell does not adjust his tests for possibly confounding news, his findings cannot be relied upon.

59.     In sum, the Jarrell Report's inconsistent approach suggests that Professor Jarrell has not fully considered the question of the potential de-listing's materiality to investors.  Given that the other de-listing announcements were not met with statistically significant stock price reactions, the

Jarrell Report's conclusion that the August 28, 2007 announcement and stock price reaction proves loss causation rests on a shaky foundation and, in fact, is inconsistent with Professor Jarrell's claim that Maxim traded in an efficient market, given that the information on which the Banc of America equity analyst report was based was already public.

### E.  Maxim's October 1, 2007 De-listing and Removal from Indices

60.     Professor Jarrell's next alleged disclosure date is October 1, 2007, when Maxim's stock was actually de-listed by NASDAQ and removed from major stock indices.[48]

61.     As noted above, when talking about potential and actual de-listing, Professor Jarrell stated during his deposition that he was addressing consequences of the alleged fraud, not corrections of the alleged fraud itself.[49]

62.     In any event, contrary to Professor Jarrell's claim that the stock price reaction associated with the de-listing represented a decline in the fundamental value of Maxim, as described below, many analysts cited the de-listing and index removal as a buying opportunity due to pressure put on the stock by forced selling as a result of index funds and certain institutional investors being prohibited from holding de-listed stocks.

63.     As the following quotations demonstrate, most analysts did not opine that Maxim's value as a company had declined on October 1, 2007 but, rather, advised investors to add to their Maxim holdings because of the opportunity created by the October 1, 2007 price drop.

64.     For example, Deutsche Bank stated, "We continue to believe the fundamentals at MXIM remain strong and the valuation is compelling.  We do not expect the delisting to impact MXIM results significantly and therefore leave estimates and P/T unchanged."[50]

65.     UBS attributed the price drop to technical selling: "We believe MXIM's fundamentals remain strong and after a period of technical selling, the stock should trade according

---

[48] "Henry Schein, Inc. to Join the NASDAQ-100 Index Beginning October 2, 2007," *Prime Newswire*, October 1, 2007, 10:37 AM; "NYSE Arca Tech 100 Index Announces Change to Index Components," *NYSE Company Release*, October 1, 2007, 2:48 PM; "Maxim Integrated Products, Inc. Announces Suspension of Trading," *Market Wire*, 5:57 PM.

[49] Jarrell Deposition Transcript, pp. 97: 8 – 25.

[50] "Maxim delisted from NASDAQ," *Deutsche Bank Global Markets Research*, October 1, 2007.

to its fundamentals."[51]   Similarly, Banc of America stated that "[t]he large amount of stock that needs to be potentially sold by index funds to reflect the reconfiguration of the Russell 1000 (~9m shares or ~1.5x daily trading volume), coupled with the inability of some mutual fund owners to hold a delisted stock, could continue to put pressure on the stock."[52]

66.     RBC Capital Markets expressed similar thoughts: "As the delist event had been widely anticipated we do not expect the stock to suffer much on the news. We continue to view the current turbulence as excellent buying opportunity for value investors prepared to hold the stock through completion of earnings restatement."[53]

67.     And Cowen & Company agreed: "We believe there will be a strong appetite for these shares and expect investors to buy on any weakness as underlying fundamentals remain quite strong."[54]

68.     On October 4, 2007, Goldman Sachs upgraded Maxim to "Buy" and added it to its "Conviction Buy List," citing a buying opportunity as a result of the de-listing, further suggesting that the price drop associated with the de-listing did not represent a drop in the Company's fundamental value.[55]

69.     The Citigroup and Banc of America reports[56] issued on October 1, 2007 are relatively more negative than, and contrast with, the tone of the five other reports issued by Goldman Sachs, Deutsche Bank, UBS, RBC and Cowen & Company between October 1 and October 4, 2007. However, the general consensus of the analyst community was, nevertheless, that Maxim's underlying value was unchanged as a result of the de-listing, and recommended buying the Company's stock.

---

[51] "MXIM delisted as SEC turns down appeal," *UBS Investment Research*, October 1, 2007.

[52] "(Not) Pretty in Pink; Filing Delinquencies Comes Home To Roost," *Banc of America Equity Research*, October 1, 2007.

[53] "Delisted!" *RBC Capital Markets Equity Research*, October 2, 2007.

[54] "Announces Suspension of Trading and Delisting from Nasdaq," *Cowen and Company*, October 2, 2007.

[55] "Upgrading MXIM, downgrading MPWR, removing NSM from CL," *Goldman Sachs Global Investment Research*, October 4, 2007.

[56] "Now De-Listed; To Trade On The Pink-Sheets," *Citigroup Global Markets Investment Research*, October 1, 2007; "(Not) Pretty in Pink; Filing Delinquencies Comes Home to Roost," *Banc of America Equity Research*, October 1, 2007.

70.     Furthermore, a review of institutional holdings data indicates that the October 1, 2007 price decline was the result of liquidity problems resulting from the de-listing (and consequent forced selling) and not the revelation of alleged fraud.  Professor Jarrell conceded in his deposition that a temporary price decline resulting from liquidity problems (i.e., forced selling by institutional investors) is *not* enough for loss causation, stating that, "pure liquidity effects do not constitute loss causation."[57]  Professor Jarrell then testified that he does not agree that "forced institutional selling in and of itself has caused any stock price impacts on Maxim"[58]  because "it is the delisting itself that causes the stock price effects."   According to data from FactSet Research Systems, Inc., however, from September 30, 2007 to December 31, 2007, institutional ownership in Maxim declined from about 282.2 million shares to 132.9 million shares.  From September 30, 2008 to December 31, 2008, during which period Maxim was re-listed, institutional ownership increased from 38.3 million shares to 271.6 million shares.  These data suggest that a substantial number of Maxim shareholders were forced to sell as a result of the de-listing, and were largely unable to take positions in Maxim while its stock traded over-the-counter. Thus, investors did not sell Maxim or refuse to purchase the stock because of changes in the Company's fundamental value.

71.     The table below illustrates this point.  One can see that institutional holdings as a percentage of shares outstanding drastically declined during the quarter of the de-listing, and rebounded almost completely after Maxim's re-listing in the fourth calendar quarter of 2008 (i.e., following Maxim's September 2008 restatement after which it again was current with the SEC).

---

[57] Jarrell Deposition Transcript, pp. 112:21 – 22.

[58] Jarrell Deposition Transcript, pp. 114:15 – 19.



72.    Moreover, the continued decline of institutional holdings as a percentage of shares outstanding in the first calendar quarter of 2008 was also likely at least partially the result of timely news about a decline in Maxim's business outlook.  On January 31, 2008, Maxim published an earnings release in which it reduced revenue estimates because "[d]uring Q2 Maxim's net realizable bookings were down 9% sequentially primarily due to seasonality and customer concerns about the economic environment."[59]  The release was met with disappointment by the market, as "[a]t least four brokerages downgraded [Maxim] a day after the analog chipmaker projected third-quarter revenue well below Wall Street view."[60]  This news was unrelated to the alleged fraud.

73.    In addition, Professor Jarrell's report fails to account for the swift price recovery in Maxim's stock after October 1, 2007, which is consistent with the notion that the price reaction was purely a result of forced selling.  On October 3, 2007, according to our replication of Professor Jarrell's market model, Maxim's market-adjusted stock price return was 2.79 percent, which was

---

[59] "Maxim Reports Record Quarterly Revenue; Announces Restructuring of FAB and R&D Operations," *Maxim Press Release*, January 31, 2008, 4:16 PM.

[60] "Brokerages cut Maxim Integrated on weak third qtr revenue view," *Reuters*, February 1, 2008, 2:01 PM.

statistically significant at the five percent level.  This reaction resulted in the three-day stock price reaction from October 1 to October 3, 2007 of only -$0.28 based on our replication of Professor Jarrell's model.  Furthermore, by October 5, 2007, Maxim's stock had rebounded to close at $29.45, ten cents higher than its closing price on September 28, 2007, the trading day prior to the news of the NASDAQ de-listing and index removals.

74.    In light of this stock recovery, it is difficult to argue that the October 1, 2007 price decline reflected a fundamental loss in value for Maxim shareholders, as opposed to temporary liquidity effects.[61]  A Bear Stearns analyst report stated that its "analysis of other technology stocks that were previously delisted under similar circumstances shows that while the average firm lost 10% of its market value in the week leading up to the delisting, most of the firms regained their market value within a week after trading on the Pink Sheets."[62]  The chart below illustrates this effect for Maxim.



---

[61] These temporary liquidity effects, as well as the less efficient (if not inefficient) nature of trading on the Pink Sheet market, can explain the unusual pattern of a significant price decline one day followed by a significant increase two days later.

[62] "The Other Shoe Drops; Any Weakness Is an Opportunity to Accumulate," *Bear Stearns*, October 1, 2007.

75.     In sum, demand for liquidity (again, due to forced selling by institutional and other investors) seems to be responsible for Maxim's price decline on October 1, 2007, instead of a loss caused by any revelation of the alleged fraud.  Furthermore, the de-listing was a consequential effect of the alleged fraud, as Professor Jarrell admitted during his deposition.

### F.  The January 17, 2008 Announcement of a Restatement Estimate, the Expanded Scope of the Restatement Process and Further Delay of the Restatement's Completion

76.     The final alleged corrective disclosure considered by Professor Jarrell is January 17, 2008, when Maxim released an estimate of the restatement's magnitude of between $550 million and $650 million before-tax ($360-$425 million after-tax), and announced that the scope of the options review had expanded and would not be completed until June 2008, instead of in the first quarter of 2008, as previously projected.[63]  That day, Maxim's stock price declined by more than ten percent on a market-adjusted basis, according to Professor Jarrell's market model.

77.     According to the analysts, the cause of the price drop was not Maxim's estimate of the restatement, as Professor Jarrell suggests.  Analysts were not troubled by the restatement amount and did not reflect in any of their reports a negative surprise about the estimate.  Rather, a reading of the analyst reports published on or shortly after January 17, 2008 indicates that the market's primary concern was the further delay of the restatement's completion, which would cause delays in possible catalysts to the stock, such as re-listing on NASDAQ, inclusion again in major indices, and a share repurchase program.  This is apparent just from reading the titles of the analyst reports on January 17, 2008: "Restatement Target Slips To June from March," Citigroup; "Restatement pushed out," Deutsche Bank; "Quick Take: Pushes Out Target Restatement Date," Cowen & Company; "MXIM again delays restatement; Potential catalysts pushed out till June," UBS; "Pink-er for Longer: Another Delay in Filings," Banc of America; "Downgrading to Neutral; restatement push-out raises risk profile," Goldman Sachs; and "Restatement Delay a Blow to Relisting Efforts," Oppenheimer.  Not one title referenced (much less expressed concern with) Maxim's estimate of the restatement's magnitude.

78.     In addition, within the text of these reports, the estimated size of the restatement was hardly addressed by analysts, and, in fact, the Banc of America and Oppenheimer reports did not

---

[63] "Maxim Provides Update on Its Restatement," *Maxim Press Release*, January 17, 2008, 9:00 AM.

even mention it.  And even in reports that did mention the restatement estimate, it was in passing
and without a follow up analysis of its implications or consequences.  Instead, the delay of the
restatement, management reliability, and even Maxim's business prospects were analysts' primary
concerns.

79.     For example, Cowen & Company was disappointed by the delay to catalysts for the
stock and expressed concern about management:

> We are obviously disappointed with this setback. Not only does it further delay a potential
> share repurchase program, but it also significantly damages management's credibility with
> the investment community as it represents the second such push out of its targeted
> restatement date.  We would expect the investment community to receive the revised target
> date with a healthy degree of skepticism and deservedly so.[64]

80.     Goldman Sachs worried that the extended delay in the restatement enhanced the risk
inherent in its estimates.  The investment bank also touched upon the Pink Sheets listing and
Maxim's declining fundamentals:

> We no longer expect Maxim to outperform for three reasons. First, the push-out in the
> restatement completion increases the uncertainty in our EPS estimates and thus merits a
> deeper discount; Jun-08 will be the seventh consecutive quarter without reported financials,
> increasing the likelihood that our estimates will have meaningfully diverged from the
> company's actual result.  Second, the longer Maxim remains listed on the Pink Sheets rather
> than on a major exchange, the more damaging that is likely to be to employee morale and
> customer relationships.  Third, we continue to expect that Maxim's FY3Q (Mar) outlook
> will be slightly below the Street on weakening analog fundamentals.[65]

Despite the negatives in the Goldman Sachs report, which, at most, merely concerned consequences
of the allegedly inappropriate accounting for in-the-money stock option grants, Goldman Sachs
maintained that it was not moving Maxim to a Sell rating because it "remain[ed] relatively
attractively valued given its above-average growth."[66]

81.     UBS echoed the concerns of Cowen & Company and Goldman Sachs:

> We see no near term catalysts for the stock given the weaker seasonality and current macro-
> environment. We believe that given multiple pushouts, risk to our thesis has increased while

---

[64] "Quick Take: Pushes Out Target Restatement Date," *Cowen & Company*, January 17, 2008.

[65] "Downgrading to Neutral; restatement push-out raises risk profile," *Goldman Sachs Global Investment Research*,
January 17, 2008.

[66] *Ibid.*

the potential rewards have been pushed out till June '08, when relisting and potential re-entry into indices could provide upside.[67]

The UBS analyst also stated that the restatement push-out was a clear disappointment, given that it was the third time that the Company had delayed the restatement, which touches upon management's reliability, something consequential to the alleged fraud.

82.   Deutsche Bank, in noting the setback caused by the delay, maintained a positive stance on Maxim:

> While this push-out removes a primary near-term catalyst from our positive thesis, we are retaining our Buy rating for three reasons.
>
> 1. The restatement and re-listing will occur, just later than anticipated.
>
> 2. We continue to expect MXIM to outgrow its peer group...
>
> 3. Valuation remains attractive on a relative and absolute basis.  Similar to other semi companies, when MXIM reports on Jan 31 we expect in-line Dec. qtr results and an incrementally more cautious C1Q guidance.  Even including this more cautious outlook, we believe MXIM's valuation discount of ~20-30% on fwd P/E and EBITDA multiples to be excessive.[68]

83.   Banc of America also lamented the removal of catalysts for the stock and cited management concerns.  It said, "a central tenet of the bull case on owning Maxim hinged on the filing of financials by the previously announced Mar-08 quarter. The filing would in theory result in share price appreciation as a headwind is removed from the stock (a greater percentage of institutional investors would choose to/be required to own the stock, especially if reinstated to the major indices)," and "[r]ecall the current review process has been underway since Jan-07; hence our lack of confidence with respect to management's ability to complete the expanded review in a timely manner (by the Jun-08 quarter)."[69]

84.   Citigroup likewise pointed out the delay and not the estimate, as well as Maxim's auditor's role in causing the push out:

---

[67] "MXIM again delays restatement; Potential catalysts pushed out till June," *UBS Investment Research*, January 17, 2008.

[68] "Restatement pushed out," *Deutsche Bank Global Markets Research*, January 17, 2008.

[69] "Pink-er for Longer: Another Delay in Filings," *Banc of America Equity Research*, January 17, 2008.

After reaching the company we conclude that while the F97-F06 restatements satisfied MXIM.PK's auditor's regional office, the national office had a different interpretation which now requires fresh work.[70]

85.     Raymond James put its estimates and rating under review pending the restatement of the Company's historical financial statements, but was the only analyst to do so.[71]

86.     Other than Goldman Sachs, which did not tell investors to sell Maxim (and decreased its price target from $29 to $27 – still more than a $3 premium on Maxim's stock price at the time), not one of the analysts changed its ratings or price target following the January 17, 2008 announcement.  In addition, we find no evidence of changes to earnings estimates.[72]  That is, none of the analysts changed their financial projections based on the January 17, 2008 announcement.  These facts are illustrated by Appendix C in the case of ratings and price targets, and Appendix A in the case of earnings estimates.

87.     The analysts' indifference towards the January 17, 2008 announcement of the restatement estimate as it related to Maxim's fundamental value suggests that the size of the estimate was not material to the market.  Analysts' repeated discussion of delays to stock price catalysts like re-listing, reincorporation into indices, and management's credibility strongly imply that these were the causes for Maxim's stock price drop.

88.     Second, analysts would have formed their own opinions about the expected magnitude of any potential restatement by Maxim while making recommendations to their clients.  They could have used information about option grants, historical Maxim stock prices, options backdating related restatements made by comparable companies, and other publicly available information to arrive at a reasonable estimate even before January 17, 2008.  In fact, as Professor Jarrell stated in his deposition, "[i]t is reasonable for them [analysts] to try to make a judgment as to how bad it could be, they look at other companies, they make a judgment how bad it could be," in reference to the restatement.[73]

---

[70] "Restatement Target Slips To June from March," *Citigroup Global Markets Investment Research*, January 17, 2008.

[71] "MXIM: Putting Estimates and Rating Under Review," *Raymond James Equity Research*, January 17, 2008.

[72] The reports published by Cowen & Company and Banc of America on January 17, 2008 do not contain earnings per share estimates.  In addition, Raymond James placed its estimates "Under Review," pending Maxim's restatement.

[73] Jarrell Deposition Transcript, pp. 155:6 – 9.

89.     Indeed, this conclusion (i.e. that the January 17, 2008 stock price decline was due to something *other than* the disclosure of Maxim's restatement estimate) is bolstered by the absence of a statistically significant stock price impact on September 30, 2008, when Maxim completed and filed, after hours, the restatement and recorded additional stock-based compensation of $775 million—a significantly higher number than the January 17, 2008 estimate.  On the following day, October 1, 2008, the stock price fell by 32.5 cents, after adjusting for market- and industry-specific effects, and that price decline was statistically insignificantly different from what one would have expected less than five percent of the time in the absence of any news.  This underscores the fact that the market may either have had a reasonable expectation of Maxim's restatement amount in both January and September or did not consider the amount to be of importance to its expectation of future cash flows for the company, in either case, rendering the size of the restatement not material.

## VI.   MISCELLANEOUS

90.     My opinions are subject to revision based on new information (including new reports or testimony by Plaintiffs' experts), which subsequently may be provided to or obtained by me.  I confirm these opinions represent my true and complete professional opinion.  This report is signed by me on March 26, 2010, in New York, USA.

Vinita M. Juneja, Ph. D.

30

**NERA**
Economic Consulting

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 3148
vinita.juneja@nera.com
www.nera.com

# Vinita M. Juneja
## Senior Vice President

## Education

**Harvard University**
Ph.D., Economics, 1988
Social Sciences and Humanities Research Council of Canada
Doctoral Fellow, 1982-1985
A.M., Economics, 1983

**University of Western Ontario**
B.A., Honors, Economics, 1980
U.W.O. Continuing Scholar, 1976-1980
Dean's Honors List, 1976-1979

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| 2006 - | Board of Directors |
| 2006 - 2009 | Chair, Global Securities & Finance Practice |
| 2000- | Senior Vice President |
| | Directs projects in the areas of securities economics, finance, and valuation. |
| 1995-2000 | Vice President |
| 1988-1995 | Senior Consultant |
| 1988 | Senior Economic Analyst |
| 1985-1987 | Economic Analyst |

**Harvard University**

1983-1985    Assistant Head Tutor, Department of Economics
Helped to coordinate and administer the undergraduate program in economics at Harvard College; advised undergraduates on their course of study.

1982-1985    Teaching Fellow, Department of Economics
                    Taught microeconomics, economics of business regulation, and economics of bureaucracy.

1982-1985    Resident Tutor, Cabot House, Harvard College
                    Served as economics tutor and academic advisor.

**Shell Canada**
1981-1982    Economic Consultant, Strategic Planning Department
                    Responsible for a study of multinationals and foreign investment with focus on the oil and natural gas sectors.

Summer 1981 Junior Economist, Strategic Planning Department
                    Responsible for economic forecasting of the world oil market, policy analysis, and macroeconomic research.

**University of Western Ontario**
1979-1980    Teaching Assistant, Department of Economics
                    Taught microeconomics and labor economics.

**Toronto Investment Management**
Summer 1979 Economic Consultant
                    Conducted research for various projects, including reports on forecasting and the size of the market sector in Canada.

**University of Toronto**
Summer 1979 Teaching Assistant, Department of Economics
                    Taught introductory economics.


## Honors and Professional Activities

Member, FINRA Board of Arbitrators, 2007 - Present

Member, NASD Board of Arbitrators, 1990 - 2007

Member, American Economic Association

Member, American Finance Association

American Bar Association, Industrial Organization Economist Associate; member of Business Law and Litigation Sections

## Testimony (Last Four Years)

Testimony at the International Dispute Resolution Centre in London in the matter of an arbitration between *Oracle Corporation and Lawrence J. Ellison, Claimants, and Corporate Officers & Directors Assurance, Ltd., Respondent*, 2009.

Deposition before the United States District Court District of Eastern Pennsylvania, *In Re: Comcast Corporation ERISA Litigation*, 2009.

Deposition before the United States District Court District of Colorado in the matter between *Amy J. Straily et al. v. UBS Financial Services, Inc.*, 2009.

Deposition before the United States District Court Southern District of New York in the matter of: *Kingsway Financial Services, Inc., et al. v. PricewaterhouseCoopers, LLP., John A. Dore, et al.*, 2009.

Cross examination before the Court of Queen's Bench of Alberta, in the matter between *William B. Wheeler v. 1000128 Alberta LTD., CNPC International (Canada) Ltd., China National Oil & Gas Exploration & Development Corp., CNPC International Ltd. and China National Petroleum Corporation*, 2009.

Cross examination before the Superior Court of Ontario, in the matter between *Paul Lawrence et al. and Atlas Cold Storage Holdings Inc. et al.*, 2007.

Deposition before the United States District Court Southern District of New York, in the matter of: *In Re Veeco Instruments Inc., et al. Securities Litigation*, 2007.

Deposition before the United States District Court for the Eastern District of Texas, Texarkana Division, in the matter of: *In Re Fleming Companies Securities Litigation*, 2007.

Testimony in an arbitration on expected future D&O liability claims against a pharmaceutical company and on costs of product recall, 2006.

## Publications (Last Ten Years)

with John H. Johnson, "The Use of Event Studies in Intellectual Property Litigation," in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh (New York: National Economic Research Associates, 2005).

with David Tabak and Denise Martin, "Are Investors Signaling You About Your Y2K Risk?" *Y2K Marketwatch*, December 1999.

with Todd S. Foster, Denise N. Martin, Frederick C. Dunbar, and Lucy P. Allen, "Securities Litigation Reform: Problems and Progress," *Viewpoint,* Issue No. 2, November 1999.

with Denise Martin and David Tabak, "What Does the Market Think About Your Y2K Exposure?" *Viewpoint*, Issue No. 2, November 1999.

with Todd S. Foster, Denise N. Martin, Frederick C. Dunbar, and Lucy P. Allen, "Trends in Securities Litigation and the Impact of the PSLRA," *Class Actions & Derivative Suits*, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999.

with Denise N. Martin, Todd S. Foster, and Frederick C. Dunbar, "Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions, "*Stanford Journal of Law, Business & Finance,* Spring 1999.

with Todd S. Foster, Denise N. Martin, and Frederick C. Dunbar, "Securities Litigation Trends," *Management Liability Review,* 1999.

3/25/10

**Exhibit 2**
**Materials Considered**

| Number | Document |
|---|---|
| (1) | (2) |

**Legal Documents** *In re Maxim Integrated Products, Inc. Securities Litigation*

1     Civil Docket for Case #: 5:08-cv-00832-JW

2     *Allan Query v. Maxim Integrated Products, Inc., John F. Gifford and Carl W. Jaspar,* filed February 6, 2008.

3     Certifications of Named Plaintiffs Cobb County Government Employees' Pension Plan, Dekalb County Pension Fund, and Public Employees' Retirement System of Mississippi, filed April 7, 2008.

4     Consolidated Class Action Complaint, filed November 14, 2008.

5     Defendant Maxim Integrated Products, Inc.'s Notice of Motion and Motion to Dismiss the Consolidated Class Action Complaint and Memorandum of Points and Authorities in Support, filed January 30, 2009.

6     Defendant Timothy Ruehle's Notice of Motion and Motion to Dismiss the Consolidated Class Action Complaint Pursuant to Fed. R. Civ. P. 12(b)(6); Memorandum of Points and Authorities in Support, filed January 30, 2009.

7     Lead Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss Consolidated Class Action Complaint, filed March 16, 2009.

8     Defendant Maxim Integrated Products, Inc.'s Reply Memorandum of Points and Authorities in Further Support of its Motion to Dismiss the Consolidated Class Action Complaint, filed April 15, 2009.

9     Defendant Timothy Ruehle's Reply in Support of Motion to Dismiss the Consolidated Class Action Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), filed April 15, 2009.

10     Order Granting In Part And Denying In Part Defendant Maxim's Motion To Dismiss With Leave To Amend; Denying Defendant Timothy Ruehle's Motion To Dismiss, July 16, 2009.

11     Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities in Support Thereof, filed December 11, 2009.

12     Declaration of Timothy A. DeLange in Support of Motion for Class Certification, filed December 11, 2009.

13     Expert Report of Gregg A. Jarrell, filed December 11, 2009.

14     Jarrell Deposition Transcript, February 12, 2010.

**SEC Filings**

15     Forms 10-K, 10-K/A, N/T 10-K, 10-Q, 10-Q/A, N/T 10-Q, 8-K, and DEF 14A and related forms filed by Maxim Integrated Products, Inc. from January 2002 through December 2008.

**News, Financial Data, and Miscellaneous**

16     Daily stock price and trading volume data for Maxim Integrated Products, Inc. and competitors from FactSet Research Systems, Inc.

17     Daily price data for various market indices from FactSet Research Systems, Inc.

18     Earnings estimates from FactSet Research System's I/B/E/S Database.

19     News Stories from Factiva and Bloomberg News from January 2002 through December 2009.

20     Various data from Bloomberg Finance, L.P.

21     Maxim press releases obtained from Maxim's corporate website and Bloomberg News.

22     Institutional holdings data from FactSet Research Systems, Inc.

23     Document production by Professor Jarrell.

**Analyst Reports**

24     Equity analyst reports issued regarding Maxim from April 2005 through October 2008, obtained from Thomson Reuters, Counsel, and the document production by Professor Jarrell.

**Academic Literature**

25     Allen Ferrell and Atanu Saha. "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo, Inc.," Vol. 63 *The Business Lawyer* (November 2007), pp. 163-186.

**Exhibit 2**
**Materials Considered**

| Number | Document |
|---|---|
| **(1)** | **(2)** |
| 26 | Bradford Cornell and James C. Rutten. "Collateral Damage and Securities Litigation," 2009 *Utah Law Review* 717 (2009). |
| 27 | Frederick C. Dunbar and Arun Sen. "Counterfactual Keys to Causation and Damages in Shareholder Class-Action Lawsuits," Vol. 2009 *Wisconsin Law Review* 199 (2009), pp. 199-242. |
| 28 | Gennaro Bernile and Gregg Jarrell. "The impact of the options backdating scandal on shareholders," *Journal of Accounting and Economics* 47 (2009) 2-26. |
| 29 | David Tabak and Frederick C. Dunbar. "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 in Litigation Services Handbook: The Role of the Financial Expert, Third Edition, ed. by Roman L. Weil, Michael J. Wagner and Peter B. Frank, Wiley, 2001. |
| 30 | Erik Lie. "On the Timing of CEO Stock Option Awards," *Management Science* Vol. 51, (May 2005), pp. 802–812. |
| 31 | *Reference Manual on Scientific Evidence*, Second Edition: Federal Judicial Center, 2000. |
| 32 | Janet Cooper Alexander, "The Value of Bad News," 41 *UCLA L. Rev.* 1421 (1994), pp. 1421-69. |
| 33 | Bradford Cornell and R. Gregory Morgan. "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.* (1990), pp. 883-84. |
| 34 | Alan J. Cox and Jonathan Portes. "Mergers in Regulated Industries: The Uses and Abuses of Event Studies," 14 *Journal of Regulatory Economics*, Kluwer Academic Publishers (1998), pp. 281-304. |
| 35 | Daniel R. Fischel. "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *Bus. Law.* 1 (1982). |
| 36 | Jared T. Finkelstein, Note, "Rule 10b-5 Damage Computation: Application of Financial Theory to Determine Net Economic Loss," 51 *Fordham L. Rev.* 838 (1983). |
| 37 | Jon Koslow, Note, "Estimating Aggregate Damages in Class Action Litigation Under Rule 10b-5 for Purposes of Settlement," 59 *Fordham L. Rev.* 811 (1991), pp. 826-42. |
| 38 | Philip J. Leas, Note, "The Measure of Damages in Rule 10b-5 Cases Involving Actively Traded Securities," 26 *Stan. L. Rev.* 371 (1974), pp. 385-96. |
| 39 | Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter. "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," 77 *Va. L. Rev.* 1017 (1991), pp. 1021-28. |
| 40 | A. Craig MacKinlay. "Event Studies in Economics and Finance," 35 *Journal of Economic Literature*, March 1997, pp. 13-39. |
| 41 | Mark L. Mitchell and Jeffry M. Netter. "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," 49 *Bus. Law.* (1994), pp. 545-90. |
| | **Legislation and Court Decisions** |
| 42 | *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477 (1977). |
| 43 | *In re Craftmatic Securities Litigation*, 890 F.2d 628, 640 (1990). |
| 44 | *Galati v. Commerce Bancorp*, 2005 U.S. Dist. LEXIS 26851, 9 (2005). |
| 45 | *In re Executive Telecard*, 979 F. Supp 1021 (SDNY 1997) at 1027. |

# Appendix A-1
## Analyst EPS Estimates Prior to and Following May 22, 2006 [1]

| Analyst | Current Fiscal Year (6/2006) Earnings Per Share Estimates | | Next Fiscal Year (6/2007) Earnings Per Share Estimates | |
| --- | --- | --- | --- | --- |
| | Estimate as of 5/26/2006 [2] | Estimate as of 5/19/2006 [3] | Estimate as of 5/26/2006 [2] | Estimate as of 5/19/2006 [3] |
| (1) | (2) | (3) | (4) | (5) |
| SANFORD C. BERNSTEIN & CO., LLC | $1.74 | $1.74 | $2.16 | $2.16 |
| KINTISHEFF RESEARCH | 1.74 | 1.74 | n/a | n/a |
| GC RESEARCH LTD. | 1.74 | 1.74 | 2.30 | 2.30 |
| JMP SECURITIES | 1.39 | 1.39 | 1.72 | 1.72 |
| UBS (US) | 1.37 | 1.37 | 1.66 | 1.66 |
| JEFFERIES & CO. | 1.73 | 1.73 | 1.99 | 1.99 |
| WILLIAM BLAIR & COMPANY, L.L.C. | 1.74 | 1.74 | 2.10 | 2.10 |
| RAYMOND JAMES | 1.74 | 1.74 | 2.09 | 2.09 |
| WELLS FARGO SECURITIES, LLC | 1.74 | 1.74 | 2.03 | 2.03 |
| THINKEQUITY LLC | 1.74 | 1.74 | 2.07 | 2.07 |
| FBR CAPITAL MARKETS & CO. | 1.73 | 1.73 | 2.05 | 2.05 |
| CARIS & COMPANY | 1.39 | 1.39 | 1.77 | 1.77 |
| CITI | 1.74 | 1.74 | 2.15 | 2.15 |
| PACIFIC CREST SECURITIES | 1.40 | 1.40 | 1.83 | 1.83 |
| FTN EQUITY CAPITAL MARKETS | 1.77 | 1.77 | 2.19 | 2.19 |
| BOFA MERRILL LYNCH | 1.38 | 1.38 | 1.68 | 1.68 |
| THOMAS WEISEL PARTNERS | 1.73 | 1.73 | 2.12 | 2.12 |
| LEHMAN BROTHERS | 1.74 | 1.74 | 2.10 | 2.10 |
| CIBC WORLD MARKETS CORP. | 1.74 | 1.74 | 2.06 | 2.06 |
| JPMORGAN | 1.39 | 1.39 | 1.67 | 1.67 |
| DEUTSCHE BANK NORTH AMERICA | 1.74 | 1.74 | 2.10 | 2.10 |
| PRUDENTIAL EQUITY GROUP, LLC | 1.47 | 1.47 | 1.38 | 1.38 |
| BROADPOINT AMTECH | 1.73 | 1.73 | 2.13 | 2.13 |
| COLLINS STEWART LLC | 1.75 | 1.75 | 2.25 | 2.25 |
| RBC CAPITAL MARKETS | 1.74 | 1.74 | 2.06 | 2.06 |
| PIPER JAFFRAY | 1.74 | 1.74 | 2.17 | 2.17 |
| COWEN AND COMPANY | 1.71 | 1.71 | n/a | n/a |
| GOLDMAN SACHS & CO. | 1.38 | 1.38 | 1.63 | 1.63 |
| BANC OF AMERICA SECURITIES LLC. | 1.40 | 1.40 | 1.71 | 1.71 |
| MORGAN STANLEY | 1.73 | 1.73 | 2.06 | 2.06 |

**Notes and Sources:**

[1] Data are from FactSet Research Systems' I/B/E/S Database.  Data are presented from most recent estimate date prior to and as of May 26, 2006.
   Credit Suisse North America has been excluded because the pre-5/22/2006 estimate used the FAS123 accounting standard and the post-5/22/2006 estimate did not.

[2] May 26, 2006 is the first date after May 22, 2006 for which the I/B/E/S data show a consensus estimate.

[3] May 19, 2006 is the date closest to and before May 22, 2006 for which the I/B/E/S data show a consensus estimate.

# Appendix A-2
## Analyst EPS Estimates Prior to and Following October 1, 2007 [1]

| | Current Fiscal Year (6/2008) Earnings Per Share Estimates | | Next Fiscal Year (6/2009) Earnings Per Share Estimates | |
| | Estimate as of 10/5/2007 [2] | Estimate as of 9/28/2007 [3] | Estimate as of 10/5/2007 [2] | Estimate as of 9/28/2007 [3] |
| Analyst | | | | |
| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| RBC CAPITAL MARKETS | $1.34 | $1.34 | n/a | n/a |
| KINTISHEFF RESEARCH | 1.58 | 1.58 | n/a | n/a |
| GOLDMAN SACHS & CO. | 1.47 | 1.47 | $1.64 | $1.64 |
| GARP RESEARCH & SECURITIES | 1.40 | 1.40 | 1.70 | 1.70 |
| JEFFERIES & CO. | 1.40 | 1.40 | n/a | n/a |
| RAYMOND JAMES | 1.50 | 1.50 | 1.79 | 1.79 |
| BROADPOINT AMTECH | 1.55 | 1.55 | 2.00 | 2.00 |
| THINKEQUITY LLC | 1.43 | 1.43 | n/a | n/a |
| CITI | 1.30 | 1.30 | 1.54 | 1.54 |
| JMP SECURITIES | 1.30 | 1.30 | 1.60 | 1.60 |
| PACIFIC CREST SECURITIES | 1.44 | 1.44 | n/a | n/a |
| CREDIT SUISSE - NORTH AMERICA | 1.32 | 1.32 | n/a | n/a |
| CIBC WORLD MARKETS CORP. | 1.31 | 1.31 | n/a | n/a |
| JPMORGAN | 1.33 | 1.33 | 1.49 | 1.49 |
| DEUTSCHE BANK NORTH AMERICA | 1.42 | 1.42 | 1.74 | 1.74 |
| BANC OF AMERICA SECURITIES LLC. | 1.46 | 1.46 | 1.68 | 1.68 |
| COWEN AND COMPANY | 1.39 | 1.39 | n/a | n/a |
| LEHMAN BROTHERS | 1.42 | 1.42 | 1.79 | 1.79 |
| BEAR, STEARNS & CO. [4] | 1.45 | 1.45 | 1.68 | 1.68 |
| SOLEIL - PRINCETON TECH | 1.41 | 1.41 | 1.68 | 1.68 |
| GC RESEARCH LTD. | 1.33 | 1.33 | n/a | n/a |
| MORGAN STANLEY | 1.86 | 1.86 | n/a | n/a |
| THOMAS WEISEL PARTNERS | 1.35 | 1.35 | 1.80 | 1.80 |
| UBS (US) | 1.44 | 1.44 | 1.79 | 1.79 |
| WILLIAM BLAIR & COMPANY, L.L.C. | 1.45 | 1.45 | n/a | n/a |

**Notes and Sources:**

[1] Data are from FactSet Research Systems' I/B/E/S Database.  Data are presented from most recent estimate date prior to and as of October 5, 2007

[2] October 5, 2007 is the first date after October 1, 2007 for which the I/B/E/S data show a consensus estimate.

[3] September 28, 2007 is the date closest to and before October 1, 2007 for which the I/B/E/S data show a consensus estimate.

[4] Analyst reports published by Bear Stearns on 10/1/2007 and 9/25/2007 show a FY 2008 estimate of $1.42, not $1.45 as reported by I/B/E/S.

**Appendix A-3**

**Analyst EPS Estimates Prior to and Following January 17, 2008** [1]

| | Current Fiscal Year (6/2008) Earnings Per Share Estimates | | Next Fiscal Year (6/2009) Earnings Per Share Estimates | |
| | Estimate as of 1/18/2008 [2] | Estimate as of 1/11/2008 [3] | Estimate as of 1/18/2008 [2] | Estimate as of 1/11/2008 [3] |
| Analyst | | | | |
| (1) | (2) | (3) | (4) | (5) |
| CANACCORD ADAMS | $1.23 | n/a | n/a | n/a |
| OPPENHEIMER & CO. | 1.29 | n/a | $1.49 | n/a |
| PACIFIC CREST SECURITIES | 1.30 | $1.31 | n/a | n/a |
| BROADPOINT AMTECH | 1.28 | 1.28 | 1.71 | $1.71 |
| BANC OF AMERICA SECURITIES LLC. | 1.37 | 1.37 | 1.53 | 1.53 |
| THOMAS WEISEL PARTNERS | 1.36 | 1.36 | 1.79 | 1.79 |
| GOLDMAN SACHS & CO. | 1.29 | 1.29 | 1.45 | 1.45 |
| KINTISHEFF RESEARCH | 1.56 | 1.56 | n/a | n/a |
| UBS (US) | 1.30 | 1.30 | 1.60 | 1.60 |
| DEUTSCHE BANK NORTH AMERICA | 1.38 | 1.38 | 1.73 | 1.73 |
| COWEN AND COMPANY | 1.31 | 1.31 | n/a | n/a |
| JPMORGAN | 1.27 | 1.27 | 1.42 | 1.42 |
| LEHMAN BROTHERS | 1.30 | 1.30 | 1.62 | 1.62 |
| GARP RESEARCH & SECURITIES | 1.37 | 1.37 | 1.65 | 1.65 |
| JEFFERIES & CO. | 1.33 | 1.33 | n/a | n/a |
| THINKEQUITY LLC | 1.23 | 1.23 | n/a | n/a |
| RBC CAPITAL MARKETS | 1.08 | 1.08 | n/a | n/a |
| CITI | 1.19 | 1.19 | 1.37 | 1.37 |
| CREDIT SUISSE - NORTH AMERICA | 1.27 | 1.27 | n/a | n/a |
| WILLIAM BLAIR & COMPANY, L.L.C. | 1.41 | 1.41 | n/a | n/a |
| BEAR, STEARNS & CO. | 1.34 | 1.34 | 1.64 | 1.64 |
| RAYMOND JAMES | 1.50 | 1.50 | 1.79 | 1.79 |
| JMP SECURITIES | 1.30 | 1.30 | 1.60 | 1.60 |
| GC RESEARCH LTD. | 1.33 | 1.33 | n/a | n/a |

**Notes and Sources3/25/2010**

[1] Data are from FactSet Research Systems' I/B/E/S Database.  Data are presented from most recent estimate date prior to and as of January 18, 2008.

[2] January 18, 2008 is the first date after January 17, 2008 for which the I/B/E/S data show a consensus estimate.

[3] January 11, 2008 is the date closest to and before January 17, 2008 for which the I/B/E/S data show a consensus estimate.

**APPENDIX B**

**EVENT STUDY METHODOLOGY AND MULTIPLE COMPARISONS**

**THE EVENT STUDY METHODOLOGY, PROFESSOR JARRELL'S MARKET MODEL CONSTRUCTION, AND FAILURE TO ACCOUNT FOR MULTIPLE DAYS TESTED**

## A. The Event Study Methodology and Testing for Materiality of News

Financial economics is a body of theory and empirical research based on the scientific method.  There are objective statistical tests that are used in financial economics to determine whether or not a piece of information is, in fact, material.  If information is material, it would be expected to have a statistically significant impact on the price of the stock at the time that the information is disclosed.  A statistically significant movement in a stock price (at the five percent level) is one that you would observe by chance less than five percent of the time in the absence of material information.  However, if a statistically significant price reaction can be associated with a particular announcement, that association is not sufficient to establish that the whole price reaction was due to any specific part of the announced information.  To establish a connection between any specific part of the announced information and the price reaction, one would need to examine what part of the announced information was new and to what extent that information altered the total mix of information available.

A great deal of research in financial economics has focused on "event studies" as a scientifically rigorous way of separating a given stock price return into an idiosyncratic component and a component that can be explained using new information common to the whole industry and/or market.  Courts have also stated that "failure to conduct a thorough 'event study' would be reason enough to exclude" an expert witness's report.[1]  An event study allows us to examine the impact of allegedly corrective disclosures cited by Plaintiffs' expert on Maxim's common stock price.  If the disclosure of the prior allegedly misrepresented or omitted information had a statistically significant impact on the stock price, then the information revealed on that day may be considered material.  If,

---

[1] *In re Executive Telecard*, 979 F. Supp 1021 (SDNY 1997) at 1027.

on the other hand, a statistically significant stock price movement does not accompany the disclosure, then the allegedly withheld information could not have been material.[2]

The event study technique is appropriate for testing the materiality of an alleged omission or misrepresentation, that is, whether the information would have been important to a reasonable investor and therefore would have affected the market price by a statistically significant amount if it were revealed. A number of academic papers have concluded that these techniques are appropriate for such questions.[3]

In performing an event study, one first needs to predict stock price movements for the company in the absence of company-specific news as a result of market or industry movements. Therefore, one identifies one or more indices that can proxy for market and industry effects that

---

[2] Statistical significance is measured relative to the typical volatility in Maxim's stock price. If we observe a daily stock price return that is outside the range we expect to observe 95 percent of the time given Maxim's daily stock price volatility, that price movement is deemed statistically significant. The 95 percent level of confidence, also referred to as the 0.05 significance level, has been described in the *Reference Guide on Statistics*, p. 124, as follows: "In practice, statistical analysts often use certain preset significance levels – typically .05 or .01. The .05 level is most common in social science, and an analyst who speaks of 'significant' results without specifying the threshold probably is using this figure. An unexplained reference to 'highly significant' results probably means that *p* is less than .01." (Internal footnotes omitted, including citations to two Supreme Court opinions: *Castaneda v. Partida* and *Hazelwood School District v. United States*), (Fed. Jud. Ctr. ed., 2d ed. 2000 available at the following URL: http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

[3] See, for example, the following papers:

  a. Janet Cooper Alexander, "The Value of Bad News," 41 *UCLA L. Rev*. 1421 (1994), pp. 1421-69.

  b. Bradford Cornell and R. Gregory Morgan. "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.* (1990), pp. 883-84.

  c. Alan J. Cox and Jonathan Portes. "Mergers in Regulated Industries: The Uses and Abuses of Event Studies," 14 *Journal of Regulatory Economics*, Kluwer Academic Publishers (1998), pp. 281-304.

  d. Daniel R. Fischel. "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *Bus. Law.* 1 (1982).

  e. Jared T. Finkelstein, "Rule 10b-5 Damage Computation: Application of Financial Theory to Determine Net Economic Loss," Note, 51 *Fordham L. Rev*. 838 (1983).

  f. Jon Koslow, "Estimating Aggregate Damages in Class Action Litigation Under Rule 10b-5 for Purposes of Settlement," Note, 59 *Fordham L. Rev.* 811 (1991), pp. 826-42.

  g. Philip J. Leas, Note, "The Measure of Damages in Rule 10b-5 Cases Involving Actively Traded Securities," 26 *Stan. L. Rev*. 371 (1974), pp. 385-96.

  h. Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter. "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," 77 *Va. L. Rev*. 1017 (1991), pp. 1021-28.

  i. A. Craig MacKinlay. "Event Studies in Economics and Finance," 35 *Journal of Economic Literature*, March 1997, pp. 13-39.

  j. Mark L. Mitchell and Jeffry M. Netter. "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," 49 *Bus. Law*. (1994), pp. 545-90.

may cause the price to move.  In identifying an industry or peer index, the researcher is concerned with identifying companies where the stock price movements of these companies capture industry effects that also influenced Maxim's own stock price.  In identifying a market index, the researcher is concerned with defining a "market" which is affected by the same forces that would affect Maxim's stock price.

The researcher then estimates the relationship between the day-to-day changes in the Maxim stock price and the industry/peer and market indices.  Typically this estimation uses a procedure, known as ordinary least squares regression, and is called a "market model."  This procedure estimates the parameters of the underlying statistical relationship between the movements of the stock price and the movement of the peer and market indices.  This statistical market model allows one to calculate, on any given day, the amount by which Maxim's stock price would be expected to change, in the absence of company-specific news, given the change in the value of the industry and market indices on that day.  For any particular day, one can use the model to estimate the market-adjusted price reaction of Maxim's common stock, which is also the proportion of the stock price movement on that day that was specific to Maxim, as opposed to driven by factors impacting the whole industry or the market in general.

Since one can use the market model to determine which part of the stock price movement is due to market forces and which part is left unexplained by the model, one can then test whether the unexplained movement on a given day is statistically significant, for example, whether statistically there is a high enough probability that the aberrant movement is caused by something other than chance.  In concurrence with scientific studies, courts have commonly relied on a 95 percent probability to determine whether the movement is statistically significant.

## B.  Deficiencies in Professor Jarrell's Market Model Construction

The market model in the Jarrell Report predicts Maxim's daily returns using the daily returns of a market index and an industry index.  For the market index, the Jarrell Report used the NASDAQ 100, and for the industry index he computed an equal-weighted index of the returns of a subset of the competitors listed by Maxim on page 8 of its SEC Form 10-K filed September 8, 2005.

This subset of nine companies results from removing those of Maxim's peers that are primarily traded on foreign exchanges, and by removing companies whose returns were not correlated with those of Maxim by at least 60 percent from April 30, 2004 to April 29, 2005.  This

second step is inappropriate for several reasons, as it leads to false inference, causing the model to find statistical significance at a much higher error rate for any date tested.

First, selecting only companies whose daily price fluctuations correlate well with Maxim, results in an index with an inappropriately high correlation to Maxim.  Because the daily fluctuations contain both an industry and a company-specific component, the high correlation between Maxim and some of Professor Jarrell's peers may be due, in part, to the company-specific movements in these peers having a randomly high positive correlation with the company-specific price movements of Maxim during the estimation period.  Selecting peers in this fashion may result in a spurious selection process of companies that may or may not actually operate in the same industry space, and whose daily returns may or may not actually contain information relevant to explaining Maxim's daily returns.[4]

Second, ultimately the market model using this index is used to estimate the day-to-day volatility of Maxim's stock price controlling for market and industry movements. The volatility is based on what is known as the standard error of the regression.  The higher the volatility, the higher the bar which is set for a day's stock price movement to be statistically significant; the lower the volatility (which results from a lower standard error), the lower the threshold that a price movement needs to exceed in order to be statistically significant.  But once such a spurious selection of companies has occurred for the peer index, it ensures that the regression's measured standard errors will be smaller and thus any price reaction's statistical significance would appear to be larger than it actually is, possibly supporting a conclusion that a reaction is significant when in fact it is not.  This implies that all the confidence levels of the statistically significant dates tested by Professor Jarrell are falsely inflated and some price reactions that show as significant may not be.

Third, by using the above process to select "peers," Professor Jarrell is in effect excluding other possibly relevant companies from his industry index.  To the extent that the prices of these other companies are true peers of Maxim and their prices contain industry information that is not contained in the price movement of the nine companies that Professor Jarrell did select, his market model suffers from the econometric problem of omitted variables, which results in an

---

[4] For example, suppose that two peer companies should each normally have a 59 percent correlation with Maxim, but due to chance, one has a 54 percent correlation and one has 64 percent correlation during the estimation period. Professor Jarrell would include only the peer company with the higher correlation and would therefore find an index member that "explained" 64 percent of the movements in Maxim's stock price, rather than the 59 percent that one would expect to find in a random period, such as the period of the alleged disclosures.

undeterminable bias to the model's coefficients and standard errors.  This introduces a bias to the estimated size of his market adjusted returns, possibly, again, causing Professor Jarrell to find significance on some alleged disclosure dates when the price reaction on these days is not significant. [5]

## C.  Failure to Account for Multiple Days Tested

One of the questions before the finder of fact in these class certification proceedings is the question of loss causation.  There are two ways in which the present report can assist the finder of fact in this regard.  One is to perform a qualitative review of each alleged disclosure for purposes of determining whether Maxim's alleged backdating and allegedly improper accounting therefor proximately caused the stock price movements on the alleged disclosure dates.  This has been done in the main sections of my report.  The second is to examine the statistical analysis of the price movement on the alleged corrective disclosure dates and assist the finder of fact in interpreting these results.  While I perform this analysis in my report, I elaborate further on the criteria used to interpret the results.

In determining whether there was a statistically significant stock price reaction upon disclosures of defendant's improper accounting for in-the-money stock option grants on the alleged disclosure dates, a *single* significant stock price reaction will suffice for the Plaintiffs to argue that they have satisfied their burden of showing loss causation with respect to these price movements.  However, if Plaintiffs examine multiple days, they increase the likelihood that a significant price movement will be found on at least one of the days examined.  Typically, a statistical significance threshold of five percent is used so that the probability that a significant reaction will be found even though the news on that day was not material is less than five percent.  However, when multiple days are tested, this same criterion applied to each day individually will prove to be too lax.  By testing multiple days, each with a threshold of statistical significance at the five percent level, the probability that a date will be found to be statistically significant and indicate that news on that date

---

[5] In addition, according to a Microsoft Excel file obtained in discovery, Professor Jarrell did not adjust the prices of the components of his peer index for stock splits.  We have corrected for this error in our replication of Professor Jarrell's analysis.

is material grows and increases the likelihood of a false inference.  This concept is known as "multiple comparisons."[6]

Professor Jarrell's report examined all the disclosure dates alleged in the Complaint. Namely, he states that "every date that is in the complaint, then you take the date that is in the complaint and go over and look at the stock return, if it is statistically significant and negative, then it is discussed."[7]  The Complaint alleged about 20 potential disclosure days; we do know that Professor Jarrell examined market-adjusted returns for at least five days.  The probability that a false inference would be made by the Court were it to allow Plaintiffs to successfully plead loss causation if any one of 20 dates examined turns out to be statistically significant at the five percent level, is 64.2 percent.[8]  In other words, assuming none of the days contained a material announcement that caused the price to decline in a statistically significant way, and Plaintiffs tested each of the days with a five percent threshold of statistical significance, they would be able to state in front of the Court 64.2 percent of the time that at least one of the examined dates showed a statistically significant movement (even though there was no material news on that day).

Similarly, the probability that a false inference will be made by the Court were it to allow Plaintiffs to successfully plead loss causation if any one of five dates examined turns out to be statistically significant at the five percent level, is 22.6 percent.[9]  In other words, assuming none of the days contained a material announcement that caused the price to decline in a statistically significant way, and Plaintiffs tested each of the days with a five percent threshold of statistical significance, they would be able to state in front of the Court 22.6 percent of the time that at least one of the examined dates showed a statistically significant movement (even though there was no material news on that day).

---

[6] According to the *Reference Manual on Scientific Evidence* published by the Federal Judicial Center, multiple comparisons is defined as "[m]aking several statistical tests on the same data set."  (Fed. Jud. Ctr. ed., 2d ed. 2000, p. 166, available at the following URL: http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

[7] Jarrell Deposition Transcript, pp. 119:5 – 8.

[8] This is calculated as one minus the following quantity raised to the power of twenty: one minus five percent.  The *Reference Manual on Scientific Evidence* specifically cautions that "[m]ultiple comparisons complicate the interpretation of a p-value. For example, if 20 divisions of a company are examined, and one division is found to have a disparity 'significant' at the 0.05 level, the result is not surprising; indeed, it should be expected under the null hypothesis [that none of the divisions has a disparity]."

[9] This is calculated as one minus the following quantity raised to the power of  five: one minus five percent.

As a further illustration, suppose Plaintiffs had examined 1,000 days during the alleged class period and identified 200 days with news about Maxim and options backdating, ordered these days according to their daily return in excess of the market and then tested the largest five negative days. The procedure would, with an extremely high degree of likelihood, result in finding that at least one of these days was statistically significant.  Indeed, even if the news connecting Maxim to backdating did not have a systematic negative effect on the Company's stock returns, on average, a statistician would expect to find that the five days with largest negative returns in excess of market are statistically significant and would label each of these days as a day when the price reacted materially to news about the options backdating.

When we examine the approximately 1,200 days in the alleged class period, there are 191 trading days corresponding to news mentioning backdating or de-listing and Maxim.[10]  Once we order these days according to Professor Jarrell's report, we notice that all his days are among the top 13 days, or bottom 7 percent, of market-adjusted returns.  The fact that all these returns also test as statistically significant is not surprising given Professor Jarrell's procedure, when examining Maxim's market efficiency, to identify the ten largest returns and then examine all of them.[11] Indeed, Professor Jarrell himself refers to these days by their rank among all the others, for example, referring to January 17, 2008 as the date that "has the next largest return with a negative excess return of 10.34%"[12] and clearly he paid attention to especially large negative price reactions. This may have caused him to forego a day with relevant news that was not significant in favor of one with possibly less relevant news that was accompanied by a downward price movement.

When a statistician performs multiple tests, or looks at the data in order to decide which tests to perform, the probability of finding one or more statistically significant result where none exist increases.  As discussed above, the probability that a false inference will be made by the Court were it to allow Plaintiffs to successfully plead loss causation if any one of 20 dates examined turns out to be statistically significant at the five percent level, is 64.2 percent. The 64.2 percent is the measure of this *potential rate of error*.

---

[10] Based on a Factiva search of  ("maxim integrated or MXIM" and backdate* or de-list* or delist*).  When the news article did not have a time stamp, it was assumed that the news was released during trading hours.

[11] Jarrell Report, Par. 103.

[12] Jarrell Report, Par. 105.

Statisticians have developed procedures to counter this excessive error rate.  The Bonferroni procedure uses a formula to calculate the appropriate t-statistic, or threshold of statistical significance, that needs to be applied to each test individually so that when taken together, the probability of finding at least one of the tests to produce a statistically significant result is five percent.[13]

When asked about "the concept of multiple comparisons," Professor Jarrell initially said, "You would have to define that for me."[14]  Professor Jarrell then testified that multiple comparison adjustments would apply "if I ask the question what are the odds that one of the five days is negative, okay, well, I have a much higher chance of 5 percent of being wrong because I have multiple experiments, I have many shots at answering that question and the more days you have— and that requires a Bonferroni correction."[15]  While Professor Jarrell said the correction does not apply to his loss causation analysis, he later testified that he did exactly what was in his example in which a correction was "require[d],"[16] thus making the multiple comparisons correction necessary in interpreting his results.

As described in my report, correcting the threshold criterion for statistical significance for the five days that Professor Jarrell tested shows that the price reactions following the May 22, 2006 and September 8, 2006 news are not statistically significant.

## PROFESSOR JARRELL'S SELECTION OF HIS MARKET MODEL ESTIMATION PERIOD AFFECTS THE SIGNIFICANCE OF HIS RESULTS

Professor Jarrell estimated his regression over the period April 30, 2004 to April 29, 2005 – the year prior to a study by Erik Lie[17] which ushered in an academic focus on in-the-money option grants.  Professor Jarrell's choice of period was based on the fact that the period was "untainted by

---

[13] In general, the value of the Bonferroni t-statistic is a function of the number of tests that are performed and equals the inverse standard normal distribution function applied to the following quantity: one half of the desired overall error rate divided by the number of tests performed.

[14] Jarrell Deposition Transcript, pp. 120:2-4.

[15] Jarrell Deposition Transcript, pp. 121:18-24.

[16] See Jarrell Deposition Transcript, 146:23 – 147:3  ("Because [for] loss causation really all you would need, I think, is one clear example of statistically significant losses on a date that in your opinion was clearly a corrective disclosure.  You don't need more than one.")

[17] Erik Lie, "On the timing of CEO stock option awards," *Management Science* 51, May 2005, pp. 802–812.

the alleged misdeeds."[18]   However, there is no indication that Maxim's investors were aware of Professor Lie's article or considered it telling about Maxim's option granting practices.  So, an equally, if not more, appropriate regression period is March 18, 2005 through March 17, 2006, or the year before the *Wall Street Journal* published an article titled "The Perfect Payday --- Some CEOs reap millions by landing stock options when they are most valuable; Luck -- or something else?", which introduced the backdating issue to the investing public.

If one estimates a market model using Professor Jarrell's indices over this second period, the results of statistical significance tests change substantially.[19]   In particular, the price reactions on two of Professor Jarrell's alleged corrective disclosures in 2006 become statistically insignificant, which shows that the statistical significance of these dates is not robust with regard to the market model estimation period.  The effect of the change in regression period on the market model and the statistical significance of Professor Jarrell's five alleged corrective disclosure dates can be seen in Exhibit 1-C to this Appendix.

---

[18] Jarrell Report, Par. 79.

[19] See Exhibit 1-A and Exhibit 1-B to this Appendix for our replication of Professor Jarrell's market model and of his market model estimated over the one-year period prior to the *Wall Street Journal* article.

**Appendix B: Exhibit 1-A**
**Relationship Between Maxim Integrated Products, Inc.'s Stock Price Returns**
**and the Returns of the NASDAQ 100 and the Competitor Index**
**Estimation Period: April 30, 2004 - April 29, 2005**

[1] Percent Return of Maxim Integrated = -0.0006 + 0.9371 * Percent Returns of + 0.5567 * Percent Returns of
Products, Inc.'s Stock Price     *-0.86*       *13.96*   NASDAQ 100          *10.24*   Competitor
                                                                                                Index Minus Percent
                                                                                                Returns of
Number of Observations    =    252                                                              NASDAQ 100
Adjusted R$^2$            =    0.6850
Standard Error            =    0.0104

**Notes and Sources:**

t-statistics are shown in italics.

[1] See Appendix A to the Expert Report of Gregg A. Jarrell.  Returns are predicted using daily returns as a function of returns of the Nasdaq 100 and returns of a competitor index described in footnote 81 on page 38 of Professor Jarrell's report. The estimation period is from April 30, 2004 to April 29, 2005.

Data obtained from FactSet Research Systems, Inc.

**Appendix B: Exhibit 1-B**
**Relationship Between Maxim Integrated Products, Inc.'s Stock Price Returns**
**and the Returns of the NASDAQ 100 and the Competitor Index**
**Estimation Period: March 18, 2005 - March 17, 2006**

| [1] Percent Return of Maxim Integrated | = | -0.0012 | + | 1.1020 | * | Percent Returns of | + | 0.5127 | * | Percent Returns of |
|---|---|---|---|---|---|---|---|---|---|---|
| Products, Inc.'s Stock Price | | *-1.39* | | *11.00* | | NASDAQ 100 | | *5.30* | | Competitor |
| | | | | | | | | | | Index Minus Percent |
| Number of Observations | = | 252 | | | | | | | | Returns of |
| Adjusted $R^2$ | = | 0.4097 | | | | | | | | NASDAQ 100 |
| Standard Error | = | 0.0136 | | | | | | | | |

**Notes and Sources:**

t-statistics are shown in italics.

[1] See Appendix A to the Expert Report of Gregg A. Jarrell.  Returns are predicted using daily returns as a function of returns of the Nasdaq 100 and returns of a competitor index described in footnote 81 on page 38 of Professor Jarrell's report. The estimation period is from March 18, 2005 to March 17, 2006.

Data obtained from FactSet Research Systems, Inc.

**Appendix B: Exhibit 1-C**

**Maxim Integrated Products, Inc.**

**Summary of Market-Adjusted Price Reactions[1]**

| Date | Estimation Period: April 30, 2004 - April 29, 2005 | | | | Estimation Period: March 18, 2005 - March 17, 2006 | | | |
|---|---|---|---|---|---|---|---|---|
| | Daily Market-Adjusted Reaction | Daily t-Stat | Cumulative Market-Adjusted Reaction | Cumulative t-Stat | Daily Market-Adjusted Reaction | Daily t-Stat | Cumulative Market-Adjusted Reaction | Cumulative t-Stat |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | *Merrill Lynch report suggests backdating may have occurred at Maxim and other companies. -Dow Jones Newswires, 5/22/2006, 11:31 AM.* | | | | | | | |
| 5/19/2006 | | | | | | | | |
| **5/22/2006** | $ (0.78) | *-2.27* ** | $ (0.78) | *-2.27* ** | $ (0.73) | *-1.62* | $ (0.73) | *-1.62* |
| 5/23/2006 | $ 0.33 | *1.00* | $ (0.44) | *-0.91* | $ 0.40 | *0.94* | $ (0.32) | *-0.50* |
| 5/24/2006 | $ (0.02) | *-0.06* | $ (0.46) | *-0.78* | $ (0.04) | *-0.09* | $ (0.35) | *-0.46* |
| 5/25/2006 | $ (0.99) | *-3.00* ** | $ (1.47) | *-2.15* ** | $ (1.03) | *-2.40* ** | $ (1.42) | *-1.58* |
| 5/26/2006 | $ (0.26) | *-0.81* | $ (1.74) | *-2.27* ** | $ (0.26) | *-0.63* | $ (1.68) | *-1.68* * |
| | *"Maxim Integrated Products Inc. (MXIM) said Friday it couldn't file its annual report within the deadline on Thursday, citing an ongoing review of its stock-options grants and practices." -Dow Jones Corporate Filings Alert, 9/8/2006, 6:13 AM.* | | | | | | | |
| 9/7/2006 | | | | | | | | |
| **9/8/2006** | $ (0.74) | *-2.45* ** | $ (0.74) | *-2.45* ** | $ (0.76) | *-1.91* * | $ (0.76) | *-1.91* * |
| 9/11/2006 | $ 0.92 | *3.11* ** | $ 0.18 | *0.42* | $ 0.93 | *2.39* ** | $ 0.17 | *0.29* |
| 9/12/2006 | $ 0.85 | *2.76* ** | $ 1.02 | *1.94* * | $ 0.80 | *1.98* ** | $ 0.95 | *1.39* |
| 9/13/2006 | $ (0.08) | *-0.26* | $ 0.94 | *1.55* | $ (0.11) | *-0.25* | $ 0.85 | *1.08* |
| 9/14/2006 | $ 0.08 | *0.25* | $ 1.02 | *1.50* | $ 0.11 | *0.25* | $ 0.96 | *1.08* |
| | *"Maxim to Request NASDAQ Hearing Regarding Stock Listing." -Maxim Press Release, September 28, 2006, 8:30 PM.* | | | | | | | |
| **9/28/2006** | | | | | | | | |
| 9/29/2006 | $ (0.44) | *-1.48* | $ (0.44) | *-1.48* | $ (0.41) | *-1.05* | $ (0.41) | *-1.05* |
| 10/2/2006 | $ 0.08 | *0.26* | $ (0.36) | *-0.86* | $ 0.15 | *0.40* | $ (0.26) | *-0.46* |
| 10/3/2006 | $ (0.37) | *-1.28* | $ (0.74) | *-1.44* | $ (0.33) | *-0.88* | $ (0.60) | *-0.88* |
| 10/4/2006 | $ 0.24 | *0.81* | $ (0.51) | *-0.85* | $ 0.13 | *0.35* | $ (0.46) | *-0.59* |
| 10/5/2006 | $ (0.54) | *-1.82* * | $ (1.04) | *-1.56* | $ (0.55) | *-1.41* | $ (1.00) | *-1.15* |
| | *"Maxim Announces Receipt of Additional Notice From NASDAQ Regarding Stock Listing." -Maxim Press Release, November 13, 2006, 2:40 PM.* | | | | | | | |
| 11/10/2006 | | | | | | | | |
| **11/13/2006** | $ 0.20 | *0.61* | $ 0.20 | *0.61* | $ 0.17 | *0.41* | $ 0.17 | *0.41* |
| 11/14/2006 | $ 0.31 | *0.94* | $ 0.50 | *1.10* | $ 0.30 | *0.70* | $ 0.47 | *0.79* |
| 11/15/2006 | $ (0.12) | *-0.34* | $ 0.39 | *0.70* | $ (0.11) | *-0.25* | $ 0.36 | *0.50* |
| 11/16/2006 | $ 0.48 | *1.44* | $ 0.85 | *1.33* | $ 0.48 | *1.08* | $ 0.82 | *0.98* |
| 11/17/2006 | $ 0.05 | *0.15* | $ 0.90 | *1.26* | $ 0.07 | *0.15* | $ 0.88 | *0.94* |

**Appendix B: Exhibit 1-C**

**Maxim Integrated Products, Inc.**

**Summary of Market-Adjusted Price Reactions[1]**

| Date | Estimation Period: April 30, 2004 - April 29, 2005 | | | | Estimation Period: March 18, 2005 - March 17, 2006 | | | |
|---|---|---|---|---|---|---|---|---|
| | Daily Market-Adjusted Reaction | Daily t-Stat | Cumulative Market-Adjusted Reaction | Cumulative t-Stat | Daily Market-Adjusted Reaction | Daily t-Stat | Cumulative Market-Adjusted Reaction | Cumulative t-Stat |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| | "Maxim Announces Results of Special Committee Review of Option Grants." -Maxim Press Release, January 31, 2007, 5:58 PM. | | | | | | | |
| **1/31/2007** | | | | | | | | |
| 2/1/2007 | $ 1.03 | 3.22 ** | $ 1.03 | 3.22 ** | $ 1.07 | 2.55 ** | $ 1.07 | 2.55 ** |
| 2/2/2007 | $ 0.34 | 1.02 | $ 1.37 | 3.02 ** | $ 0.34 | 0.78 | $ 1.40 | 2.37 ** |
| 2/5/2007 | $ 0.07 | 0.20 | $ 1.43 | 2.59 ** | $ 0.10 | 0.22 | $ 1.50 | 2.07 ** |
| 2/6/2007 | $ (0.56) | -1.67 * | $ 0.87 | 1.37 | $ (0.54) | -1.24 | $ 0.96 | 1.14 |
| 2/7/2007 | $ (0.35) | -1.06 | $ 0.53 | 0.74 | $ (0.35) | -0.82 | $ 0.60 | 0.64 |
| | "Maxim Announces Receipt of Additional Notice From Nasdaq". -Maxim Press Release, February 13, 2007, 4:00 PM. | | | | | | | |
| **2/13/2007** | | | | | | | | |
| 2/14/2007 | $ 0.23 | 0.73 | $ 0.23 | 0.73 | $ 0.16 | 0.40 | $ 0.16 | 0.40 |
| 2/15/2007 | $ (0.10) | -0.32 | $ 0.13 | 0.29 | $ (0.11) | -0.27 | $ 0.05 | 0.09 |
| 2/16/2007 | $ (0.15) | -0.47 | $ (0.02) | -0.04 | $ (0.12) | -0.29 | $ (0.07) | -0.09 |
| 2/20/2007 | $ 0.02 | 0.06 | $ (0.00) | 0.00 | $ (0.00) | 0.00 | $ (0.07) | -0.08 |
| 2/21/2007 | $ 0.22 | 0.68 | $ 0.21 | 0.30 | $ 0.21 | 0.50 | $ 0.14 | 0.15 |
| | "Maxim Provides Update on NASDAQ Listing Matters." -Maxim Press Release, July 9, 2007, 6:40 PM. | | | | | | | |
| **7/9/2007** | | | | | | | | |
| 7/10/2007 | $ (0.11) | -0.32 | $ (0.11) | -0.32 | $ (0.04) | -0.08 | $ (0.04) | -0.08 |
| 7/11/2007 | $ (0.31) | -0.89 | $ (0.43) | -0.85 | $ (0.33) | -0.71 | $ (0.37) | -0.56 |
| 7/12/2007 | $ 0.19 | 0.55 | $ (0.24) | -0.38 | $ 0.13 | 0.29 | $ (0.24) | -0.30 |
| 7/13/2007 | $ 0.26 | 0.71 | $ 0.01 | 0.02 | $ 0.23 | 0.50 | $ (0.01) | -0.01 |
| 7/16/2007 | $ (0.05) | -0.14 | $ (0.04) | -0.05 | $ (0.01) | -0.03 | $ (0.02) | -0.02 |
| | "Banc of America cuts Maxim." -Reuters 8/28/2007, 7:17 AM. | | | | | | | |
| 8/27/2007 | | | | | | | | |
| **8/28/2007** | $ (1.05) | -3.24 ** | $ (1.05) | -3.24 ** | $ (0.90) | -2.13 ** | $ (0.90) | -2.13 ** |
| 8/29/2007 | $ (0.16) | -0.52 | $ (1.21) | -2.65 ** | $ (0.27) | -0.69 | $ (1.18) | -1.98 ** |
| 8/30/2007 | $ (0.31) | -0.99 | $ (1.52) | -2.71 ** | $ (0.31) | -0.77 | $ (1.49) | -2.04 ** |
| 8/31/2007 | $ (0.30) | -0.97 | $ (1.81) | -2.81 ** | $ (0.33) | -0.82 | $ (1.82) | -2.16 ** |
| 9/4/2007 | $ 0.24 | 0.78 | $ (1.58) | -2.18 ** | $ 0.18 | 0.45 | $ (1.64) | -1.74 * |

**Appendix B: Exhibit 1-C**

**Maxim Integrated Products, Inc.**

**Summary of Market-Adjusted Price Reactions[1]**

| | Estimation Period:<br>April 30, 2004 - April 29, 2005 | | | | Estimation Period:<br>March 18, 2005 - March 17, 2006 | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Daily Market-Adjusted Reaction | Daily t-Stat | Cumulative Market-Adjusted Reaction | Cumulative t-Stat | Daily Market-Adjusted Reaction | Daily t-Stat | Cumulative Market-Adjusted Reaction | Cumulative t-Stat |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |

*"Maxim Announces Receipt of Additional Notice from NASDAQ Regarding Stock Listing." -Maxim Press Release, September 6, 2007, 4:00 PM.*

| Date | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|
| **9/6/2007** | | | | | | | | |
| 9/7/2007 | $ (0.15) | -0.45 | $ (0.15) | -0.45 | $ (0.02) | -0.05 | $ (0.02) | -0.05 |
| 9/10/2007 | $ (0.06) | -0.18 | $ (0.20) | -0.45 | $ (0.05) | -0.11 | $ (0.07) | -0.12 |
| 9/11/2007 | $ (0.37) | -1.19 | $ (0.58) | -1.05 | $ (0.43) | -1.05 | $ (0.51) | -0.70 |
| 9/12/2007 | $ (0.47) | -1.52 | $ (1.06) | -1.65 * | $ (0.47) | -1.15 | $ (0.98) | -1.17 |
| 9/13/2007 | $ 0.02 | 0.08 | $ (1.03) | -1.44 | $ 0.01 | 0.02 | $ (0.97) | -1.04 |

*Maxim out of NASDAQ 100 Index, replaced by Henry Schein, Inc. -Prime Newswire, 10/1/2007, 10:37 AM;*
*Maxim out of NYSA Arca Tech 100 Index. -NYSE Company Release, 10/1/2007, 2:48 PM;*
*"Maxim Integrated Products Inc. (MXIM) said the Securities and Exchange Commission denied the company's appeal to stay the Nasdaq Stock Market's decision to suspend and delist its common stock." Dow Jones News Service, 10/1/2007, 6:01 PM.*

| Date | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|
| 9/28/2007 | | | | | | | | |
| **10/1/2007** | $ (1.36) | -4.48 ** | $ (1.36) | -4.48 ** | $ (1.41) | -3.53 ** | $ (1.41) | -3.53 ** |
| 10/2/2007 | $ 0.30 | 1.03 | $ (1.07) | -2.47 ** | $ 0.32 | 0.84 | $ (1.09) | -1.93 * |
| 10/3/2007 | $ 0.79 | 2.69 ** | $ (0.28) | -0.53 | $ 0.83 | 2.14 ** | $ (0.27) | -0.39 |
| 10/4/2007 | $ 0.45 | 1.51 | $ 0.18 | 0.29 | $ 0.45 | 1.15 | $ 0.19 | 0.24 |
| 10/5/2007 | $ (0.18) | -0.59 | $ (0.00) | 0.00 | $ (0.27) | -0.69 | $ (0.09) | -0.10 |

*Maxim delays restatement until June 2008 from the first quarter of 2008, and gives a preliminary estimate of the restatement amount. -Dow Jones News Service, 1/17/2008, 9:08 AM.*

| Date | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|
| 1/16/2008 | | | | | | | | |
| **1/17/2008** | $ (2.48) | -10.13 ** | $ (2.48) | -10.13 ** | $ (2.41) | -7.52 ** | $ (2.41) | -7.52 ** |
| 1/18/2008 | $ (1.81) | -8.39 ** | $ (4.32) | -12.47 ** | $ (1.78) | -6.29 ** | $ (4.23) | -9.31 ** |
| 1/22/2008 | $ (0.88) | -4.39 ** | $ (5.20) | -12.25 ** | $ (0.78) | -2.97 ** | $ (5.01) | -9.01 ** |
| 1/23/2008 | $ 0.94 | 5.02 ** | $ (4.24) | -8.65 ** | $ 0.98 | 3.98 ** | $ (4.00) | -6.23 ** |
| 1/24/2008 | $ (0.39) | -1.96 ** | $ (4.64) | -8.46 ** | $ (0.44) | -1.68 * | $ (4.45) | -6.20 ** |
| 1/25/2008 | $ 0.59 | 2.96 ** | $ (4.05) | -6.75 ** | $ 0.66 | 2.56 ** | $ (3.78) | -4.81 ** |
| 1/28/2008 | $ (0.85) | -4.27 ** | $ (4.92) | -7.59 ** | $ (0.87) | -3.31 ** | $ (4.67) | -5.50 ** |
| 1/29/2008 | $ (0.32) | -1.64 | $ (5.24) | -7.55 ** | $ (0.31) | -1.21 | $ (4.99) | -5.49 ** |

**Appendix B: Exhibit 1-C**
**Maxim Integrated Products, Inc.**
**Summary of Market-Adjusted Price Reactions[1]**

| | Estimation Period: April 30, 2004 - April 29, 2005 | | | | Estimation Period: March 18, 2005 - March 17, 2006 | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Daily Market-Adjusted Reaction | Daily t-Stat | Cumulative Market-Adjusted Reaction | Cumulative t-Stat | Daily Market-Adjusted Reaction | Daily t-Stat | Cumulative Market-Adjusted Reaction | Cumulative t-Stat |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| 9/30/2008 | *Maxim announced the completion of its restatement. - Market Wire, 9/30/2008, 5:35 PM.* | | | | | | | |
| 10/1/2008 | $ 0.67 | *-1.73* * | $ (0.33) | *-1.73* * | $ (0.25) | *-1.01* | $ (0.25) | *-1.01* |
| 10/2/2008 | $ 0.37 | *3.25* ** | $ 0.27 | *1.03* | $ 0.74 | *3.11* ** | $ 0.51 | *1.45* |
| 10/3/2008 | $ (0.30) | *-2.08* ** | $ (0.12) | *-0.37* | $ (0.32) | *-1.37* | $ 0.16 | *0.37* |
| 10/6/2008 | $ (0.27) | *-2.10* ** | $ (0.51) | *-1.36* | $ (0.23) | *-1.01* | $ (0.09) | *-0.19* |
| 10/7/2008 | $ (0.00) | *-4.16* ** | $ (1.27) | *-3.03* ** | $ (0.52) | *-2.42* ** | $ (0.68) | *-1.24* |

**Notes and Sources:**

Data were obtained from FactSet Research Systems, Inc.

[1] Returns are predicted using daily returns as a function of the NASDAQ 100 and the Competitor Index.

See Appendix B: Exhibits 1-A and 1-B.

We have not corrected Professor Jarrell's model for his exclusion of competitors whose returns are not correlated with Maxim's at a 60% level during the regression period, or for his lack of an adjustment for multiple comparisons.

[2] Significance is based on the excess return's t-statistic, calculated as the daily excess return divided by the standard error of the regression over the sample period. Two stars indicate significance at the 5% level, and one star indicates significance at the 10% level.

[3] Cumulative excess return t-statistics are calculated as the cumulative excess return divided by the standard error of the regression over the sample period times the square root of the number of days cumulated. Two stars indicate significance at the 5% level, and one star indicates significance at the 10% level.

# Appendix C
## Analyst Ratings and Price Targets Around January 17, 2008[1]

| Report Date (1) | Report Title (2) | Rating (3) | Price Target (4) |
|---|---|---|---|
| **Citigroup** | | | |
| 12/18/2007 | Now Bullish After 18 Months of Concern; Upgrading to Buy | Buy | $ 35.00 |
| 1/17/2008 | Restatement Target Slips To June from March | Buy | $ 35.00 |
| **Deutsche Bank** | | | |
| 1/7/2008 | Positive catalysts aligning for 2008 | Buy | $ 38.00 |
| 1/17/2008 | Restatement pushed out | Buy | $ 38.00 |
| **Cowen and Company** | | | |
| 12/6/2007 | Seeing the Light at the End of the Tunnel | Outperform | N/A |
| 1/17/2008 | Quick Take: Pushes Out Target Restatement Date | Outperform | N/A |
| **UBS** | | | |
| 12/5/2007 | Another step toward re-listing. Buy | Buy | $ 36.00 |
| 1/17/2008 | MXIM again delays restatement; Potential catalysts pushed out till June | Buy | $ 36.00 |
| **Bank of America** | | | |
| 1/2/2008 | Lowering Estimates; Maintain Neutral | Neutral | $ 29.00 |
| 1/17/2008 | Pink-er for Longer: Another Delay in Filings | Neutral | $ 29.00 |
| **Goldman Sachs** | | | |
| 1/13/2008 | Semi & SPE quarterly preview: Expect cuts to Street estimates | Buy | $ 29.00 |
| 1/17/2008 | Downgrading to Neutral; restatement push-out raises risk profile | Neutral | $ 27.00 |

**Notes and Sources:**

[1] Analyst reports obtained from Counsel and Thomson Reuters.

On 1/17/2008, Maxim announced that its restatement would be delayed from the first quarter of 2008 until June 2008, and provided an estimated range for the magnitude of the restatement. See "Maxim Provides Update on Restatement," *Maxim Press Release*, January 17, 2008, 9:00 AM.