# EXHIBIT 2

Page 1

1           UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2              SAN JOSE DIVISION

3   - - - - - - - - - - - - - - - - - - - - -

    In Re:      MAXIM INTEGRATED
4               PRODUCTS, INC.,
            SECURITIES LITIGATION
5

6                     Case No. C-08-00832-JW

7   - - - - - - - - - - - - - - - - - - - - -

8   Videotaped Deposition Upon Oral Examination Of:

9             Gregg A. Jarrell, Ph.D.

10

11  Location:    Alliance Court Reporting, Inc.
                183 East Main Street, Suite 1500
                Rochester, New York 14604
12

13

14  Date:        February 12, 2010
15

16

17  Time:        9:15 a.m.

18

19

20  Reported By:    Joanne N. Pero
21                  Alliance Court Reporting, Inc.
22                  183 Main Street East, Suite 1500
23                  Rochester, New York 14604
24

25  TSG Job No. 28306

## Page 2

```
 1              A P P E A R A N C E S
 2   Appearing on Behalf of Plaintiffs:
 3   Benjamin Galdston, Esq.
       Bernstein Litowitz Berger & Grossmann LLP
 4     12481 High Bluff Drive
       Suite 300
 5     San Diego, California 92130
       beng@blbglaw.com
 6
     James M. Wilson, Jr., Esq.
 7     Chitwood Harley Harnes LLP
       2300 Promenade II
 8     1230 Peachtree Street
       Atlanta, Georgia  30309
 9     jwilson@chitwoodlaw.com
10
     Appearing on Behalf of Maxim Integrated Products:
11
     Joshua S. Amsel, Esq.
12   Robert V. Spake, Jr.
       Weil, Gotshal & Manges LLP
13     767 Fifth Avenue
       New York, New York  10153
14     joshua.amsel@weil.com
15   Also Present:  Patrick Conroy, Ph.D.,
                    NERA Economic Consulting
16
17
     Appearing on Behalf of Estate of Gifford:
18
     Jerome M. Selvers, Esq.
19     Law Office Sonnenblick Parker & Selvers, P.C.
       Freehold Executive Center
20     4400 Route 9 South
       Freehold, New Jersey 07728
21     jselvers@spspc.com
22
23          (Appearances continuing on next page)
24
25
```

TSG Reporting - Worldwide    877-702-9580

## Page 3

```
 1          A P P E A R A N C E S (cont'g.)
 2   Appearing on Behalf of Carl Jasper:
 3   Margaret A. Tough, Esq.
       Latham & Watkins LLP
 4     505 Montgomery Street
       Suite 1900
 5     San Francisco, California 94111
       margaret.tough@lw.com
 6
 7   Appearing Telephonically on Behalf of
     Timothy Ruehle:
 8
     Peter T. Snow, Esq.
 9     O'Melveny & Myers, LLP
       2765 Sand Hill Road
10     Menlo Park, California 94025
       psnow@omm.com
11
12   Appearing as Videographer:
13   Peter Colucci
14                    *    *    *
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

## Page 4

```
 1        IT IS HEREBY TIPULATED by and between the
 2   attorneys for the respective parties that this
 3   deposition may be taken by the Plaintiff at this time
 4   pursuant to notice;
 5        IT IS FURTHER STIPULATED, that all
 6   objections except as to the form of the questions and
 7   responsiveness of the answers, be reserved until the
 8   time of the trial;
 9        IT IS FURTHER STIPULATED, that the witness
10   may read and sign the deposition and make any
11   corrections to same before any Notary Public;
12        IT IS FURTHER STIPULATED, that if the
13   original deposition has not been duly signed by the
14   witness and returned to the attorney taking the
15   deposition by the time of trial or any hearing in this
16   cause, a certified transcript of the deposition may be
17   used as though it were the original;
18        IT IS FURTHER STIPULATED, that the
19   attorneys for the parties are individually responsible
20   for their certified transcript charge, including any
21   expedite or other related production charges in
22   accordance with Rochester Rules.
23        AND IT IS FURTHER STIPULATED, that the
24   Notary Public, JOANNE N. PERO, may administer the oath
25   to the witness.
```

TSG Reporting - Worldwide    877-702-9580

## Page 5

```
 1                    *    *    *
 2        (Appearances were placed on the videotaped
 3        record.)
 4   GREGG A. JARRELL, Ph.D.,
 5        called herein as a witness, first being sworn,
 6        testified as follows:
 7        EXAMINATION BY MR. AMSEL:
 8        Q.  Good morning, Professor Jarrell.
 9        A.  Good morning.
10        Q.  We have met before but for the sake of
11   formalities on the record, Josh Amsel from Weil,
12   Gotshal & Manges, on behalf of Defendant Maxim
13   Integrated Products, Inc.
14        And before we get into the deposition, I
15   notice you are joined by a colleague from Forensic
16   Economics; Ms. Li, I believe was the name.
17        A.  Yes.
18        Q.  And we have no objection to Ms. Li sitting
19   in on the deposition, but I just want to confirm that
20   she is here as a spectator and not to confer with you
21   regarding substantive testimony during breaks or
22   whenever we are off the record.
23        A.  Exactly.
24        MR. GALDSTON:  Josh, can we have a
25   representation as to who Mr. Conroy is affiliated with
```

TSG Reporting - Worldwide    877-702-9580

## Page 6

1  as well?

2      MR. AMSEL: Mr. Conroy, Patrick Conroy,

3  C-O-N-R-O-Y, and he is with NERA Economic Consulting.

4      Q. Okay. Professor, you have obviously been

5  deposed numerous times, so I am not going to belabor

6  the ground rules. But suffice it to say if I ask a

7  question and you don't hear it, please say so and I

8  will be happy to repeat or have the court reporter

9  repeat it. If you don't understand a question I ask,

10 which is likely to happen once or twice, I am happy to

11 rephrase it.

12     A. Okay.

13     Q. I would ask just for the sake of the

14 transcript and so we have a clear transcript that you

15 wait until I am finished asking a question, just as I

16 will wait until you are finished answering a question

17 before I ask my next one, so we don't talk over each

18 other.

19     And lastly, to the extent you would like a

20 break at any point, feel free to tell me. I will take

21 breaks periodically anyway so everyone can stretch

22 their legs, but I am happy to take a break at a time

23 that is convenient if you think if you need one.

24     Can you tell me briefly what you did to

25 prepare for today's deposition?

TSG Reporting - Worldwide   877-702-9580

## Page 7

1      A. Reread the report and exhibits and

2  reviewed some analyst reports, news stories, and

3  yesterday met for about 45 minutes or so with these

4  two lawyers here (indicating).

5      Q. Mr. Galdston and Mr. Wilson?

6      A. Yes.

7      Q. Was that the only meeting you had with

8  counsel in preparation for today's deposition?

9      A. Yes.

10     Q. You said you reviewed your report, and by

11 that you are referring to the report that was

12 submitted in support of Plaintiffs' Motion for Class

13 Certification back in December; is that correct?

14     A. Yes.

15     Q. Was that the first time you had reviewed

16 your report since its submission in December?

17     A. I think that is right. I don't think I

18 have looked at it since I have signed it, until

19 preparing from this deposition.

20     Q. In the course of reviewing it again in

21 preparation for your deposition, did you identify

22 anything in the report that you believed needed to be

23 changed or you had come to a different conclusion with

24 respect to anything in there?

25     A. Nothing substantive, but I noticed on the

TSG Reporting - Worldwide   877-702-9580

## Page 8

1  cover page the Court affiliation, the Court itself,

2  like what district we are, was wrong, which was

3  surprising.

4      Q. I hadn't noticed that.

5      A. Apparently no one noticed that, which is

6  not good.

7      Q. We are just bogged down in the details.

8      A. I know.

9      The other thing I noticed was the

10 footnotes. Towards the end of the document, the

11 footnotes were mismumbered. It sort of started again

12 at a lower number. So I don't know if you picked up

13 on that, but I noticed that.

14     Other than that, I don't remember anything

15 that I would want to, you know, change.

16     Q. So these are all what I will characterize

17 as typographical-type errors?

18     A. Yes.

19     Q. And were there any substantive errors or

20 substantive things that you wanted to change in the

21 report?

22     A. I don't think so.

23     Q. You also said that you reviewed some

24 analyst reports and news articles. Do you recall

25 which analyst reports and which news articles?

TSG Reporting - Worldwide   877-702-9580

## Page 9

1      A. The ones -- not off the top of my head,

2  but the ones that were mostly in connection with the

3  corrective disclosures that were talked about towards

4  the latter part of the paper, latter part of the

5  report. I just remember -- I have a practice of

6  reviewing the news stories and the analyst reports for

7  those particular days and the days surrounding it, so

8  that is what I did.

9      Q. So for the dates that are identified in

10 your report that you talk about in the context of loss

11 causation; is that correct?

12     A. Yes.

13     Q. For those dates, you went back and looked

14 at analyst reports around those dates and news

15 articles around those dates, correct?

16     A. That's right.

17     Q. You used the term in your answer a minute

18 ago, and I think it is a term that is going to come up

19 a handful of times today, and that is "corrective

20 disclosure."

21     A. Yes.

22     Q. So we are speaking the same language, can

23 you explain what you mean by "corrective disclosure"?

24     A. It is a disclosure that corrects the

25 alleged fraud where the market learns, at least

TSG Reporting - Worldwide   877-702-9580

3 (Pages 6 to 9)

Page 10

1  partly, some information that causes it to reverse the
2  economic effects of the alleged fraud to eliminate,
3  quote/unquote, "artificial inflation."
4      Q. In the context of this case -- which I
5  assume you are familiar with the context of this case?
6      A. Yes.
7      Q. -- you would agree, wouldn't you, that the
8  alleged fraud is the improper accounting for stock
9  options backdating and stock options expense as a
10  result?
11      A. Yes.
12      Q. Let me show you, because we are obviously
13  going to refer to it a bunch of times, your report,
14  which we are going to mark as Exhibit 22. And that is
15  not because there is another 21 before this, but
16  because we are using a sequential numbering system.
17      (The following exhibit was marked for
18      identification: Number 22.)
19      Q. Professor, I ask you to take a quick look
20  at that document or take as long as you need if you
21  need longer. Tell me whether you recognize that
22  document.
23      A. Yes, this is a copy of my expert report in
24  this case.
25      Q. And I will represent, if you haven't

TSG Reporting - Worldwide   877-702-9580

Page 11

1  noticed already, that we have not included the
2  appendices to the report, given the volume, in an
3  effort to save some trees. We have some copies here
4  to the extent that we need to refer to them.
5      But for the appendices, does this appear
6  to be a complete copy of your report, Exhibit 22?
7      A. Yes, it would appear to be.
8      Q. Okay. And you can just leave that in
9  front of you. I am sure we will come back to it.
10      I am not going to belabor your background.
11  You have a CV attached to your report which sets it
12  out in some detail.
13      Let me just ask you, what is your current
14  occupation?
15      A. I'm a Professor of Economics and finance
16  at the Simon Business School at the University of
17  Rochester.
18      Q. And in addition to your work as a
19  Professor at the University of Rochester, you also
20  perform work as an expert; correct?
21      A. Yes.
22      Q. How about -- about how much of your time
23  is devoted to work as an expert?
24      A. It depends on the time of year, you know,
25  from teaching. It is less time than when I am not

TSG Reporting - Worldwide   877-702-9580

Page 12

1  teaching. But probably at least half of my time is
2  spent as an expert or, you know, consulting or
3  activities in connection with that.
4      Q. And if you could estimate, how many times
5  have you served as an expert in litigation?
6      A. Hundreds.
7      Q. And over how many years would that be?
8      A. 25 years, at least.
9      Q. And just so I have an order of magnitude,
10  when you say "hundreds," are we talking about 500
11  times or less than that?
12      A. It might be more than that. 25 years.
13  Well, probably less than 250, but I don't know.
14      Q. And for that 250, whatever the number is,
15  are those all matters in which you submitted a report
16  or testified?
17      A. Not necessarily. The overwhelming
18  majority would be assignments where I at least put in
19  a report, got deposed probably, that sort of thing.
20      Sometimes I am involved in things where
21  there is no report; it is state court or something
22  like that. But most of the time it is the type of
23  assignment that would result in a report and at least
24  a deposition.
25      Q. For the cases that resulted in a report

TSG Reporting - Worldwide   877-702-9580

Page 13

1  and potentially some testimony with a deposition or
2  trial, what types of cases would those fall into, if
3  you can categorize them?
4      A. Well, they always involve some type of
5  financial economic work, some type of financial
6  economic questions that come up, because that is, you
7  know, broadly defined, my area, and so that is what
8  people would want me to -- you know, that is why they
9  would want me to be involved.
10      So inside trading, valuation, securities
11  class action litigation, contract litigation of all
12  kinds. Questions about mergers and acquisitions and
13  the litigation surrounding mergers and acquisitions.
14  Bankruptcy litigation revolving around bankruptcy.
15      That is just off the top of my head.
16      Q. One of the categories you identified was
17  securities class action litigation, and for those
18  types of cases are we talking about 10b-5-type cases
19  like the one we are dealing with here?
20      A. Yes.
21      Q. And can you recall how many matters -- how
22  many securities class action litigations have you
23  served as an expert?
24      A. I have never counted it, but it is
25  certainly dozens and dozens. Dozens and dozens of

TSG Reporting - Worldwide   877-702-9580

Page 14

1  cases.
2      Q. And as a general proposition, have more of
3  those matters been with plaintiffs or with defendants?
4      A. With securities class action litigation,
5  it is probably more with plaintiffs than defendants.
6  You know, again, I haven't actually sat down and done
7  the counting, but that is probably true if I were to
8  sit down and do the counting.
9      Q. And have they been — of those reports —
10 and again, I am just focusing on securities class
11 action litigation — have the reports that you have
12 put in, have they been in connection with damages or
13 have they also been in connection with class
14 certification?
15     A. Both, both.
16     Q. Do you recall how many reports you have
17 done in connection with class certification in the
18 securities class action litigation context?
19     A. Off the top of my head, I can't. But
20 several.
21     Q. Would it be 20?
22     A. It might be 20. I don't know. That
23 sounds a little high. I am just thinking as you ask
24 this question, I am just thinking that it seems to me
25 that this — you know, that this putting in a report

TSG Reporting - Worldwide   877-702-9580

Page 15

1  for class certification is something that I think is
2  fairly — that wasn't always the way it was done, so
3  that is what I am sort of mulling over in my brain, is
4  how long have people been putting in reports
5  separately for class certification. And I think it is
6  only the last — again, I just — I am trying to
7  remember — in the last few years. But I have done
8  several of those reports in the last few years. I
9  don't know if it would — it is not 20; that sounds
10 like too many. I don't think it is — I don't think
11 there is that many reports just for class
12 certification.
13     Q. If it's not 20, you think it is less. And
14 again, you don't have to pinpoint it exactly, but
15 where would you put the number?
16     A. Again, completely a shot in the dark
17 without counting them, I would say it is under 20
18 reports for class certification. And if I went back
19 and counted them over the years, I don't think it
20 would be 12.
21     Q. Do you recall any specifically offhand?
22     A. Yes, I think — just — I think
23 Countrywide recently, but that is the only one that
24 pops into my brain. I believe that I testified in the
25 Countrywide case. I think that that was a report for

TSG Reporting - Worldwide   877-702-9580

Page 16

1  class certification, but I wouldn't want to, you
2  know — I wouldn't want to necessarily rely on that,
3  because I don't draw a big distinction in my own mind.
4      So again, without sitting down and
5  studying it and looking at it, I don't know if I could
6  give you an accurate answer. But I just — I just
7  recall that this — you know, this trend of doing a
8  report for class certification is fairly recent. And
9  I have done several of them, but that is the best I
10 can do.
11     Q. And in your view, what explains that
12 trend, whereby you have in recent years put in class
13 certification reports?
14     A. Court decisions. Court decisions, what
15 the courts require. I don't know.
16     Q. Have all those reports been in support of
17 class certification?
18     A. No, I don't think so.
19     Q. What percentage, if you had to put a
20 percentage on it, have been in support of class
21 certification as opposed to against class
22 certification?
23     A. Again, now I am trying to remember the
24 proportion of reports that I don't remember, so this
25 is even less reliable than the first number.

TSG Reporting - Worldwide   877-702-9580

Page 17

1      But I can remember — I think that it
2  would be, you know, if I have put in ten such reports,
3  I would say probably two or three have been against
4  class certification and the rest have been for.
5  Again, I just don't know.
6      Q. Besides Countrywide, you don't recall any
7  others specifically?
8      A. Not just sitting here, no.
9      Q. And Countrywide, was that a report that
10 you put in on behalf of plaintiffs or defendant?
11     A. Plaintiff.
12     Q. Do you recall what your opinions were in
13 that report?
14     A. Well, I recall that there was — I think
15 the issue there was the same sorts of things. Mainly
16 it was efficiency of the market, and in that
17 particular case there are a lot of securities, a lot
18 of bonds. So I just remember the — you know,
19 efficiency of the market being the big deal.
20     Q. Were there also opinions on loss
21 causation, that you recall?
22     A. Yes, I think there were. Materiality,
23 loss causation. Normally that is what one talks about
24 in those types of reports.
25     Q. Just to get a little broader and go back

TSG Reporting - Worldwide   877-702-9580

Page 18

1   to just the larger spectrum of securities class action
2   litigation reports and 10b case reports, do you recall
3   how many, or at least, you know, roughly what
4   percentage contained opinions related to market
5   efficiency?
6       A. I think again, just giving you the best --
7   the best answer based on my recollection, however poor
8   it might be, I think that all securities class action
9   reports that I have done, my guess would be all of
10  them have some discussion of market efficiency, some
11  opinion related to market efficiency.
12      You know, just because that is a
13  fundamental question and people that would hire me to
14  use me as an expert witness would ask me to talk about
15  that before I talked about anything else. So I think
16  there would be a section on market efficiency in
17  virtually every report I have turned in regarding --
18  you know, related to class action cases.
19      Q. And what about loss causation; would you
20  say the same thing?
21      A. Maybe there are some reports that just
22  focus on market efficiency, I don't -- that is
23  possible. But I can't remember any. Normally this
24  recent practice of having a report before you do
25  damages, normally that is market efficiency, loss

TSG Reporting - Worldwide    877-702-9580

Page 19

1   causation and materiality.
2       Q. Have you ever been retained before by the
3   proposed class representatives in this case? And I
4   can identify them if you don't recall.
5       A. Proposed class representatives?
6       Q. That is Miss. PERS, Cobb County, City of
7   Philadelphia.
8       A. I do not know. Not that I know of, but I
9   just don't know.
10      Q. Have you ever been retained before this
11  case by Bernstein Litowitz?
12      A. Yes.
13      Q. About how many times?
14      A. I don't know. I would say at least --
15  again, this is a shot in the dark -- three or four
16  times, but don't hold me to that. I would say at
17  least three times, but it might be -- I might be way
18  off.
19      Q. Do you recall any of the specific matters?
20      A. Not sitting here, no.
21      IRF. A case called IRF. It just popped
22  into my head.
23      Q. What type of case was IRF?
24      A. That's what I get for saying that. It
25  was -- I think it was a similar type of case. I think

TSG Reporting - Worldwide    877-702-9580

Page 20

1   it was materiality, efficiency of the market, loss
2   causation. I think that was a similar type of
3   assignment.
4       Q. Do you recall any others with Bernstein
5   Litowitz?
6       A. No.
7       Q. I knew you were going to say that.
8       What about retentions by the other law
9   firm for plaintiffs here, Chitwood Harley Harnes?
10      A. Not that I can recall, no. I could be
11  wrong, but I don't recall any other times that I have
12  worked with them.
13      Q. Again, looking at your full slate of 10b
14  cases that you have worked in or securities class
15  action litigations that you have worked in, have any
16  other than this case concerned the alleged stock
17  option backdating?
18      A. Yes.
19      Q. About how many?
20      A. I don't know and I can't remember any
21  specifics, but I just -- I am confident that the
22  answer is yes.
23      Q. And those are backdating cases, and again,
24  just to be clear, in the securities class action
25  context?

TSG Reporting - Worldwide    877-702-9580

Page 21

1       A. Yes.
2       Q. And those are cases that you submitted
3   reports?
4       A. I think so. Maybe they are cases -- you
5   know, I am involved in a case where I am scheduled to
6   testify, but I don't think -- I don't think I put in a
7   report for that case because I think that is state
8   court, and maybe that is that I am thinking of when
9   you mentioned option backdating. So I don't know if I
10  have written another report regarding option
11  backdating, but I think I have. I don't think this is
12  the first one.
13      Q. And the case you are scheduled to testify,
14  what case is that?
15      A. KB Home. I don't think that's a big
16  secret. I hope it's not.
17      Q. And KB Home, I think you said you did not
18  submit a report but you're planning to testify?
19      A. Yeah, I don't think I submitted a report
20  in that case. That I think is accurate.
21      Q. Do you recall what the claims are -- is
22  that a 10b case? You said it was in state court,
23  so...
24      A. It is in state court, so I don't know. I
25  don't know what it is. It is serious.

TSG Reporting - Worldwide    877-702-9580

**Page 22**

1    Q. Can you remember any other backdating
2  cases in which you have worked as an expert?
3    A. No, but I think there are others.  I just
4  can't remember as I sit here what they are.
5    Q. One more question about KB Home.  In KB
6  Home, what are the nature of the opinions you are
7  giving in KB Home?
8    A. Materiality is what I think the focus is.
9    Q. And when I talk about backdating cases,
10  let's get even more broad, because you talked about
11  the state court case, KB Home, in the non-10b context.
12  So any cases whatsoever in the stock options
13  backdating cases, stock options backdating, you have
14  worked in that context?
15    A. Other than legal issues -- legal
16  matters or --
17    Q. No, legal matters, but just not -- I don't
18  want to limit it just to securities class actions.
19    A. No, I am not limiting it in my mind.  I am
20  having a hard enough time remembering the subject
21  matters.  So I am not parsing it up that finely in my
22  mind; I just happen to remember that KB Home is state
23  court, because recently I was talking about it and it
24  dawned on me that I haven't put in a report.  You
25  know, because I asked to review my report and there

TSG Reporting - Worldwide   877-702-9580

**Page 23**

1  was none.  So that is how I remember that.
2    MR. AMSEL:  Ben, I know we have requested
3  these before, but I will request again the production
4  of all reports and testimony, specifically in the
5  backdating context, but even more broadly in the loss
6  causation, materiality and market efficiency contexts,
7  because those are issues that are directly relevant to
8  the report that Professor Jarrell is giving in this
9  case.  I will make that request again.
10    MR. GALDSTON:  I will consider the request
11  and respond accordingly.
12    Q. Now, Exhibit 1 to your report -- and you
13  can flip through it if you like, but I am not going to
14  go in depth -- that is your CV.
15    A. Yes.
16    Q. And included in there is the list of other
17  testimonial engagements, your testimony engagements
18  for the prior four years; is that correct?
19    A. Yes.
20    Q. Are there any engagements, whether the
21  submission of a report or testimony, that are not
22  included on your CV?  I am talking about new, since
23  you put in your report.  Sorry, I should have been
24  clear.
25    A. I don't think so.  I looked at that with

TSG Reporting - Worldwide   877-702-9580

**Page 24**

1  that same question in mind the other day and I
2  couldn't remember any, so I think not.
3    Q. Okay.  Are you being paid for your
4  services?
5    A. Yes.
6    Q. And how are you being paid?
7    A. With U.S. dollars.
8    Q. Are you being paid on an hourly fee basis?
9    A. Yes.  Sorry.
10    Q. Is any portion of your compensation in
11  this matter contingent upon the outcome of the
12  litigation?
13    A. No.
14    Q. Who is paying your fees?
15    A. I believe the law firm is paying it.  One
16  or the other law firms is paying.
17    Q. Do you know if that is Bernstein Litowitz
18  or Chitwood Harley Harnes?
19    A. No, I don't know which one.  It might be
20  both.  I don't know which one.
21    Q. And do you know whether you have been paid
22  for any of your services in this matter?
23    A. Yes, I have.  I am completely up-to-date.
24    Q. And do you know how much those fees have
25  been that you have been paid?

TSG Reporting - Worldwide   877-702-9580

**Page 25**

1    A. I do not.  I do not know.  I am happy to
2  try to guesstimate for you, but I didn't sit down and
3  look at the documents and get the number for you.
4    Q. Do you have a ballpark?
5    A. For me, I think it is -- I would say it is
6  under $100,000 for sure.  Maybe considerably less than
7  that.  I will just stick with it is under $100,000 for
8  mine and Forensic Economics bills separately, and I
9  don't know what their number is.
10    Q. And by -- you are referring -- just to
11  look at the language in the report, in paragraph 9 you
12  talk about your compensation, and included in there
13  you have a sentence that says to assist you in the
14  assignment, you have worked with Forensic Economics.
15    A. Correct.
16    Q. And we have talked a little bit about
17  Forensic Economics already.
18    Can you just explain what is Forensic
19  Economics and what did they do to assist you in this
20  report?
21    A. They are a litigation support firm here in
22  Rochester founded by an ex-student of mine, Frank
23  Torchio; been around since -- probably 20 years, and I
24  work with them in this type of work.
25    So they did all the backup work, they did

TSG Reporting - Worldwide   877-702-9580

Page 26

1   all the empirical work, the statistical work, made the
2   exhibits. Howard Mulcahey was the person at Forensic
3   Economics who was in charge of the case, so he did
4   virtually all of the discussions with attorneys and
5   things like that, so... and he was assisted by a
6   couple of people, including Jiyuan Li and probably
7   some other, Ken Kotz. But principally, it was Howard
8   Mulcahey who was in charge of the case, and they are
9   the ones that do all of the real work.
10      Q. Do you know how much Forensic Economics —
11  Forensic Economics is also being paid on an hourly fee
12  basis; is that correct?
13      A. Exactly right.
14      Q. Is there any portion of the compensation
15  for Forensic Economics that is contingent on the
16  outcome or the litigation?
17      A. Oh, no, no.
18      Q. Do you know how much Forensic Economics
19  has billed to date in this matter?
20      A. I do not.
21      Q. Do you have any idea whether Forensic
22  Economics has been paid by plaintiffs or their
23  counsel?
24      A. I don't know for sure, but I am very
25  confident that they are up-to-date as well.

TSG Reporting - Worldwide    877-702-9580

Page 27

1      MR. AMSEL: Let me show you a document
2   which we will mark as Exhibit 23, and this is a
3   document that plaintiffs' counsel produced just the
4   other day. It does not have the Bates number on it
5   because we had some technical difficulties with the
6   attachment, but I will represent it is the identical
7   document that was produced the other day.
8      So let the court reporter mark that and
9   then we'll talk about that.
10      (The following exhibit was marked for
11  identification: Number 23.)
12      Q. Professor, I will let you look at this
13  document for a minute, but it appears to be an
14  invoicing statement from Forensic Economics to
15  plaintiffs' counsel, specifically Tim DeLange of
16  Bernstein Litowitz, dated January 12, 2010, and then
17  there is some backup behind it.
18      A. Yes.
19
20
21      **REDACTED**
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 28

1      Q. And you are not listed on here, so I am
2   assuming that you invoice your time separately from
3   Forensic?
4      A. Correct.
5      Q. Does this refresh your recollection as
6   to — actually, I might not have asked this, so let me
7   ask the question for the first time.
8      Was it Bernstein Litowitz who retained you
9   in the matter?
10      A. I don't know. I think so. That would
11  be — I don't know for sure, but I think the answer is
12  yes.
13      Q. Do you recall when you would have been
14  engaged?
15      A. I do not know. Sometime in 2009, I would
16  assume.
17      (Ms. Tough entered the deposition room.)
18      Q. The cover sheet of Exhibit 23 appears to
19  be a running total of time of invoicing, whether it is
20  outstanding or not. It appears to all be outstanding
21  except for the retention fee?
22      A. Right.
23      Q. But it dates back to September.
24      Do you have any reason to believe that
25  work was done on behalf of plaintiffs prior to

TSG Reporting - Worldwide    877-702-9580

Page 29

1   September of 2009?
2      A. The way this is set up, I think that is
3   probably a safe assumption that September '09 was the
4   first month it was billed on this particular case, and
5   the 10,000 looks like some type of retention fee, as
6   it says.
7      MR. GALDSTON: Can you get the appearance
8   noted?
9      MS. TOUGH: Margaret Tough with Latham &
10  Watkins, for Carl Jasper.
11      Q. Particularly given the discrepancy in
12  numbers that there was only 5800 in September and then
13  we got up to 37,000 in October, seems to make sense
14  that the work probably started in September.
15      A. I agree.
16      Q. Going back to the retention for a second,
17  do you know whether or not there is an engagement
18  letter for your retention in this matter?
19      A. I do not.
20      Q. You don't recall signing one?
21      A. I don't recall signing one, but that is
22  not probative.
23      Q. Is it your typical practice to sign an
24  engagement letter?
25      A. It is more often than not, but it is —

TSG Reporting - Worldwide    877-702-9580

Page 30

1   you know, there are lots of times that I don't have an
2   engagement letter, I don't bother. But recently in
3   the last few years I think it has become more often
4   than not. It's good practice.
5        MR. AMSEL: And we -- Ben, I don't know;
6   it's possible that engagement letter is in the
7   voluminous production that you have made on behalf of
8   Professor Jarrell. But to the extent it is not, we
9   would request the production of the engagement letter,
10  to the extent one exists?
11       MR. GALDSTON: I am fairly confident it
12  has been produced, but I will double-check.
13       MR. AMSEL: It very well might be.
14       Q. Professor, this time goes through December
15  of 2009. Do you have any idea how much has been
16  incurred as far as fees both on behalf of yourself and
17  Forensia since December of 2009?
18       A. I do not know on behalf of Forensia, but
19  for myself it would only be work that I have done in
20  preparation for the deposition, I believe.
21       Q. And we had talked about this a minute ago,
22  but looks like of the 179,000, that 169,000 is still
23  outstanding, at least as of January 12, 2010, a couple
24  of weeks ago or a few weeks ago.
25       A. Yes.

TSG Reporting - Worldwide   877-702-9580

Page 31

1        Q. Your understanding is that your fees in
2   this matter have been paid already?
3        A. Oh, yes.
4        Q. Now, if you go -- I wanted to ask you a
5   couple other questions. If you go to the third page
6   of Exhibit 23.
7        A. Sure.
8        Q. This is a time breakdown for the
9   individuals on the matter. And just out of curiosity,
10  if you look down at December 16th -- the third page
11  when you get into the breakdown of the time.

REDACTED

TSG Reporting - Worldwide   877-702-9580

Page 32

REDACTED

11       Q. And do you know whether or not those
12  backup materials have been produced in the litigation?
13       A. I don't know. I haven't been --
14  participated in that in any detail, but I would assume
15  so. That would be common practice. Anything I have
16  seen or, you know, in preparation for -- in building
17  this report, presumably has been turned over to you.
18       MR. AMSEL: Not to keep this list growing
19  too exponentially, but to the extent, Ben, that there
20  are documents included in this backup that were
21  reviewed by Professor Jarrell but not produced to us,
22  we would request production of those documents.
23       MR. GALDSTON: I represent based on my
24  personal knowledge, because of my participation in the
25  production, that all of the materials that were

TSG Reporting - Worldwide   877-702-9580

Page 33

1   identified as materials reviewed have been produced,
2   but I will make an effort to confirm that.
3        MR. AMSEL: Again, to the extent that
4   anything that Professor Jarrell looked at that went
5   above and beyond what is in the materials reviewed
6   category, using that as a classification, we would ask
7   they be produced, if they went to his preparation for
8   his opinion, for giving his opinions or testifying
9   about his opinions.
10       MR. GALDSTON: Sure. I don't know that
11  there has been any record there are such materials,
12  but if there are, we will produce them.
13       MR. AMSEL: The Professor just testified
14  he had this binder with backup materials, and I am
15  saying to the extent there is a discrepancy to what
16  those backup materials are and what we have received
17  today, we would like a production to make up that
18  discrepancy.
19       MR. GALDSTON: I agree I will produce
20  anything, but I don't agree there is any discrepancy.
21       MR. AMSEL: I am not saying that. I am
22  saying if there is, so we are clear.
23       Q. One other thing. If you look at
24  December 22nd on that same page, under Howard Mulcahey
25  still.

TSG Reporting - Worldwide   877-702-9580

9 (Pages 30 to 33)

Page 34

1    A. Yes.

2    Q. December 22nd is after the submission of

3 the report on December 11th, and Howard's entry on

4 that day is "revised report."

5        Do you have any idea how the report was

6 revised on December 22?

7    A. No.

8    Q. Was the report revised at your direction?

9    A. No, not that I can recall, no.

10    Q. You can put that aside.

11        Professor, did you write your report?

12    A. Yes. With some help from Howard, but yes.

13    Q. So is it fair to say that Howard and

14 others at Forensic took the labor in putting it

15 together, and you reviewed, commented and revised,

16 that sort of thing?

17    A. Well, it depends on the section that you

18 are talking about. He was in charge of putting

19 together all of the materials, and for certain

20 sections he would take a shot at, you know, either

21 writing or outlining a draft, but depends on the

22 section. The background section, I would rely more on

23 him, and then the sections where you have to draw

24 conclusions and express what your opinions are, then

25 that would be my hand.

TSG Reporting - Worldwide   877-702-9580

Page 35

1    Q. If you turn to — and just to backtrack a

2 little in your report — paragraph 1 sets out your

3 assignment in this matter —

4    A. Yes.

5    Q. — is that correct?

6        What it says is that "You have been

7 retained by plaintiffs' counsel" — and I am

8 paraphrasing slightly — "you have been retained by

9 plaintiffs' counsel to opine on issues relating to

10 market efficiency and loss causation for certain

11 investors as set out in plaintiffs' request for class

12 certification, who purchased common stock of Maxim's

13 Integrated Products, Inc., between April 29, 2003 and

14 January 27, 2008, inclusive."

15        And you see that language?

16    A. Yes.

17    Q. Is that an accurate description of your

18 assignment?

19    A. Yes. I would throw in materiality.

20    Q. With your addition of materiality, is it

21 fair to say you did nothing in this matter beyond what

22 that assignment is, again including your opinions

23 relating to materiality?

24    A. Correct.

25    Q. And when you say "plaintiffs' counsel,"

TSG Reporting - Worldwide   877-702-9580

Page 36

1 "you have been retained by plaintiffs' counsel," you

2 are referring to Bernstein Litowitz and Chitwood

3 Harley Harnes, or one or the other?

4    A. Yes, one or the other. Yes. Probably

5 Bernstein Litowitz, you know, you know that I see the bill

6 from Forensic Economics. But I can't be sure.

7    Q. You are saying the invoice identifies Tim

8 DeLange from Bernstein Litowitz?

9    A. Exactly.

10    Q. Had you had worked with Mr. DeLange

11 before?

12    A. I do not know.

13    Q. Nothing that you can recall?

14    A. I mean, it rings a bell, but I don't know.

15 I can't picture him and I don't know.

16    Q. Have you been asked by plaintiffs' counsel

17 to do anything in this matter beyond submitting a

18 report?

19    A. No. Appear today. Other than that, no.

20    Q. Do you anticipate being asked to submit

21 any additional reports in the future in this case?

22    A. I don't know. I mean, the usual sequence

23 is at some point a damage report would have to be —

24 you know, assuming the legal side goes a particular

25 direction, then there presumably could come a time

TSG Reporting - Worldwide   877-702-9580

Page 37

1 they would ask for a damage report, but I haven't

2 talked to them about that and I don't know for sure.

3 But just from experience.

4    Q. So you haven't begun working on a damages

5 report or anything of that sort?

6    A. No.

7    Q. Have you been asked at any point to

8 prepare any revisions to your report?

9    A. No.

10    Q. During the course of your preparation of

11 your report, did you ever reach a conclusion with

12 respect to any of the opinions that are in the report

13 that is different from the opinions or conclusions

14 reflected in the report as submitted in December of

15 2009?

16    A. Not that I can recall.

17    Q. And I think I asked this before, but just

18 because we are on the subject again, since you

19 submitted the report, have your opinions or

20 conclusions changed at all, again, as compared to what

21 is reflected in the report that was filed?

22    A. No.

23    Q. Turning to paragraph 10 of your report —

24 and I apologize, but we are going to flipflop a little

25 bit.

TSG Reporting - Worldwide   877-702-9580

Page 38

1    Paragraph 10 identifies the materials that
2  you reviewed in the course of your assignment, and
3  that includes — and I am just, you know, taking the
4  language from paragraph 10 — the Complaint, the
5  defendants' various Motions to Dismiss, the Court's
6  decision on the Motions to Dismiss, and the
7  defendants' Answers to the Complaint.
8         It says you also reviewed traded prices
9  and volume of Maxim's common stock and options and
10  various news reports, press releases, analyst reports
11  and SEC filings.
12         Is that an accurate description of the
13  materials you reviewed in preparation of your report?
14    A. Yes. I don't think it is exhaustive
15  because, just as I read it, then I also reviewed
16  traded prices and volume for companies other than
17  Maxim, for example. You know, peer companies,
18  indexes. But I just noticed that as I was reading it.
19  But, you know, Exhibit 2 is supposed to give a more
20  comprehensive list, but that is the basic idea. That
21  is a good summary of it.
22    Q. And you just mentioned Exhibit 2, and the
23  language in paragraph 10 says Exhibit 2 is a
24  comprehensive list of materials that you considered in
25  connection with this report.

TSG Reporting - Worldwide   877-702-9580

Page 39

1    A. That's the idea.
2    Q. Okay. And are you aware as we sit here —
3  and feel free to flip to it — are you aware whether
4  anything has been left out of Exhibit 2, anything that
5  was reviewed in the course of preparing the report?
6    A. I didn't notice any in my preparation.
7  You know, it does happen sometimes, though, that
8  during a deposition it will become — it will come to
9  light that there are materials that are in Exhibit 2
10  that I did consider. I didn't see any of those
11  instances in this case, but it is not unprecedented.
12    Q. What was the criteria for the inclusion of
13  materials on Exhibit 2?
14    A. Well, the Exhibit 2, the criteria is
15  pretty exhaustive. You know, anything that was sent
16  to us, anything that we looked at, anything that I
17  looked at or that Forensic Economics looked at.
18         So Exhibit 2 is supposed to be sort of an
19  exhaustive universal universe of things. And then
20  things that I really relied on or focused on or, you
21  know, that in particular I would want to review before
22  my deposition or that — you know, that would back up
23  a statement that I make in the report, would
24  presumably be cited in a footnote, ideally.
25    Q. So it is supposed to — just so I am

TSG Reporting - Worldwide   877-702-9580

Page 40

1  clear, it is supposed to encapsulate everything that
2  was reviewed as opposed to just materials that were
3  relied upon.
4    A. Exactly.
5    Q. And everything that is listed on
6  Exhibit 2, were those materials that you personally
7  reviewed?
8    A. Not necessarily. Not necessarily. I am
9  happy to try to do better than that, but I — it is
10  not meant to be necessarily something that I
11  personally review. It is supposed to be more
12  exhaustive than that.
13    Q. But everything that is on there was, in
14  fact, reviewed by somebody?
15    A. Yes.
16    Q. And if it wasn't reviewed by you, it was
17  reviewed by somebody in the team at Forensic
18  Economics; is that correct?
19    A. Presumably. With a very loose definition
20  of the word "review," yes.
21    Q. What do you mean by "review" when you say
22  a "loose definition of review"?
23    A. Sometimes the lawyers may send you a legal
24  document that, you know, you read two pages and you
25  go, "oh yai yai" and you put it aside. And I looked

TSG Reporting - Worldwide   877-702-9580

Page 41

1  over that document (indicating). Anything that was
2  economic or that — you know, presumably the "review"
3  is a real use of the word "review," but it is supposed
4  to be exhaustive and comprehensive so that we, you
5  know, bent over backwards to sort of give you the
6  benefit of, "Look, this is all of the stuff that we
7  have, that was sent to us or that we, you know, dug up
8  or made use of in some way, shape or form in preparing
9  the report," you know, "Here, all this," so that is
10  the idea.
11    Q. And did you personally choose materials
12  that you personally reviewed?
13    A. No, no. I mean, people know, you know,
14  the types of materials that you need; they know to get
15  the news stories, they know to get all the analyst
16  reports, so... you know, I didn't have to, you know,
17  verbalize it.
18    Q. And so did someone — did someone collect
19  the materials that you reviewed and send those to you,
20  or was it more of a back-and-forth where someone sent
21  something to you and you asked for something, work
22  like that?
23    A. I don't really remember the process, but,
24  you know, sometimes it can be both of those or either
25  of those, depending upon the issue and depending upon

TSG Reporting - Worldwide   877-702-9580

Page 42

1    the document. Sometimes I am looking at something and
2    I say, "Gee," you know, "are there any analyst reports
3    from this person that come earlier or later or" -- so
4    it depends.
5         Q.  One of the items you identified
6    specifically in paragraph 10 of the report, which we
7    talked about a minute ago, is the Court's order
8    regarding defendant's Motions to Dismiss.  Did you
9    review that decision personally?
10        A.  At some point briefly, yes.  I didn't
11   focus on it.
12        Q.  Do you have an understanding of what Judge
13   Ware held in that decision, particularly as it
14   pertains to the opinions you are giving in this
15   report?
16        A.  I don't want to hold myself out as someone
17   who could accurately spit back what the judge's
18   opinion was.  I reviewed it at some point.  I don't
19   know how I would do on a quiz.
20        Q.  Let me ask you a more specific question.
21        A.  Sure.
22        Q.  Maybe it will help the discussion.
23        Do you have an understanding as to what
24   dates are still in the case after Judge Ware's
25   decision on the Motions to Dismiss?

TSG Reporting - Worldwide    877-702-9580

Page 43

1         MR. GALDSTON:  Object to the form of the
2    question.
3         A.  I don't think I could go through it date
4    by date and say "This is in, this is out."
5         Q.  And we are going to get into this in,
6    obviously, some detail, but in giving your opinion on
7    loss causation and you key in on certain dates, did
8    you evaluate whether those dates were still in the
9    case as a result of Judge Ware's Motion to Dismiss
10   decision?
11        A.  No.
12        Q.  Do you have an understanding that that
13   decision narrowed the issues in this case?
14        MR. GALDSTON:  Object to the form of the
15   question.
16        A.  I don't know.  It is a judge's opinion, so
17   to the extent there is a dispute over this or that,
18   then he answers the question and settles the dispute.
19   But then there is the appeals process, and I don't
20   think that is -- I don't think that it has run its
21   course, but we just got the opinion, so I don't know.
22        Q.  For purposes of giving your opinions here,
23   you did not evaluate the impact of that decision on
24   these opinions?
25        A.  Correct.

TSG Reporting - Worldwide    877-702-9580

Page 44

1         Q.  To talk about your opinions, if we go to
2    paragraph 2, which is up front in your report.  And
3    this is really just the summary.  We will get into
4    some more detail.
5         But in summary form, you give three
6    opinions in this report, correct?
7         A.  Correct.
8         Q.  The first one, which is in paragraph 2A of
9    the report, is that "During the class period from
10   April 29, 2003 through January 17, 2008, Maxim common
11   stock traded in what economists refer to as an
12   efficient market with regard to publicly-disclosed
13   information."
14        Does that accurately reflect your
15   conclusion with respect to market efficiency?
16        A.  Yes.
17        Q.  In paragraph 2B, you conclude that "The
18   alleged false statements and omissions during the
19   class period arising from the backdating of and
20   improper accounting for executive and employee stock
21   options at Maxim were material to investors."
22        Does that accurately reflect your
23   conclusion with respect to materiality?
24        A.  Yes.
25        Q.  Can you just tell me briefly how you

TSG Reporting - Worldwide    877-702-9580

Page 45

1    reached that conclusion with respect to materiality?
2         A.  Well, little 1, 2 and 3 there can kind of
3    give you the summary of what is behind that opinion,
4    in my view:  Stock price movements on dates when
5    corrective disclosures were made public, the sheer
6    size of the restatement, the reaction by analysts and
7    other market participants, and news stories and
8    analyst reports.  That is not exhaustive, but that is
9    probably the gist of what is revealed later in the
10   report as the basis for that opinion.
11        Q.  Is it fair to say your opinion with
12   respect to materiality is principally a quantitative
13   evaluation as opposed to a qualitative evaluation?
14        A.  Yes, I think that -- I think that the
15   first -- the first order of evidence in my mind is the
16   stock price response and the statistical significance
17   of the stock price response.  I think that is the most
18   important thing in my mind.  But on dates that I
19   deemed to be, you know, relevant fraud-related events,
20   so that would be the first order.
21        But it is -- the other stuff matters.  You
22   know, the reaction from the analyst matters, and sort
23   of the economic -- you know, my economic understanding
24   of the nature of the alleged fraud.
25        But I think that -- I wouldn't say

TSG Reporting - Worldwide    877-702-9580

Page 46

1  exclusively, but I would say principally it is based
2  on the quantitative evidence. I think that's right.
3      Q. Is it fair to say that but for the
4  statistical significance of stock price movements on
5  the dates that you evaluate, you would not have
6  reached a conclusion of materiality here, the
7  conclusion that you do reach with respect to
8  materiality?
9      A. Not a conclusion that I would, you know,
10  testify to in court, no; not without that kind of
11  evidence.
12      Q. Paragraph 2C of the report is your third
13  opinion, and that is that "The correction of the
14  alleged misrepresentations and omissions on May 22,
15  2006, September 8, 2006, August 28, 2007, October 1,
16  2007, and January 17, 2008 caused losses for
17  shareholders who purchased shares during the class
18  period and held those shares to at least one of the
19  partial corrective disclosures discussed in this
20  report."
21      And then you go on to say, "Shareholder
22  loses based on the excess stock price declines
23  following these disclosures net of market and industry
24  effects and after accounting for any potential
25  confounding information."

TSG Reporting - Worldwide    877-702-9580

Page 47

1      Does that accurately reflect your
2  conclusion with respect to loss causation?
3      A. Yes.
4      Q. Just explain to me at the very end of that
5  paragraph 2C, it says, "after accounting for potential
6  confounding information," just explain what you mean
7  by that?
8      A. Well, confounding information refers to
9  information that might have been revealed during the
10  same day or during the same time period as information
11  that I deemed to be corrective disclosures.
12      So when you investigate the stock price
13  returns on the same day as the information was
14  released that corrects the alleged fraud, if there
15  is -- if there is other important material information
16  that is disclosed to the market at the same time, that
17  we refer to as confounding information.
18      So normally you want to -- in doing this
19  type of analysis, you have to be on your guard for
20  confounding information and try to -- if there is
21  confounding information, you need to try to decide
22  whether or not the stock price return is in response
23  to the information related to the alleged fraud or
24  whether it is in relation to the confounding
25  information or to both.

TSG Reporting - Worldwide    877-702-9580

Page 48

1      Q. So when you say you accounted for any
2  potential confounding information, is that -- was that
3  a qualitative or a quantitative assessment?
4      A. Well, it can be both because -- I don't
5  specifically recall here, but it can be both:
6  Qualitative in the sense that you are reading a
7  document and you are reading news stories and analyst
8  reports, and then quantitative because you might see a
9  news story that potentially is confounding, but then
10  you might look for other days to see whether it was
11  disclosed earlier or whether the disclosure was later.
12  And when you do that, you would be interested in the
13  stock return on those other days, and that would be
14  the quantitative part. So both.
15      Q. And isn't it true that you could also, in
16  fact, parse stock price declines on a given day based
17  on the news that is out there, attributed to the
18  different pieces of news on that given day?
19      A. Sometimes you can and sometimes you can't.
20      Q. Did you do a quantitative analysis with
21  respect to the effects of confounding information
22  here, or just qualitative?
23      A. No. I think what I just answered a moment
24  ago, that is generally how I investigate confounding
25  information, and I think that is accurate for what I

TSG Reporting - Worldwide    877-702-9580

Page 49

1  did in this case.
2      Q. And did you find that there was any
3  confounding information on the dates that you opine on
4  in the report?
5      A. No, I didn't find any material information
6  that would upset the conclusion that I reached about
7  corrective disclosures.
8      Q. We'll come back to that.
9      A. Sure.
10      Q. To close the loop on the opinions, the
11  three that we have gone through in paragraphs 2A, B
12  and C of the report, those are the entirety of the
13  opinions that you have given in this matter; correct?
14      A. Yes.
15      Q. So you are not opining on other elements
16  of, say, section 10b, such as reliance?
17      A. Well, not legally. However, there is a
18  section in the report that addresses the issue -- one
19  of the issues in the case regarding the defense's
20  position that -- I don't know how to say it, but I
21  suppose that the class periods should end on an
22  earlier date when the company said "do not rely."
23      So there is a whole section on that. And
24  although that is a legal issue, I do offer some -- as
25  an economist, some viewpoints and some opinions

TSG Reporting - Worldwide    877-702-9580

Page 50

1  relevant to that. So to the extent that that is in
2  the general area of reliance, I think that is relevant
3  to your question.
4      Q.  But you are not opining on the legal
5  question of reliance?
6      A.  No.  I am giving information and opinions
7  that might be relevant to a fact-finder who is going
8  to -- who is going to consider that question of
9  reliance, but the fact-finder -- I am not giving legal
10  advice, and the fact-finder, of course, is the legal
11  expert that is responsible for coming up with the
12  ultimate decision.
13      Q.  We are obviously going to spend some time
14  on the disclosure you are talking about, which is
15  January 31, 2007, but let me ask you just about that,
16  because you referenced it already.
17      The company on that day told the market
18  not to rely on its financials; is that correct?
19      MR. GALDSTON:  Object to the form of the
20  question.
21      A.  Yes, certain financial statements.
22      Q.  Is it your -- would you agree that it
23  would have been unreasonable for investors to rely on
24  those financials after the company said, "Do not rely
25  on our financials"?
            TSG Reporting - Worldwide   877-702-9580

Page 51

1      MR. GALDSTON:  Object to the form of the
2  question.  Which financials?
3      MR. AMSEL:  The financials that are
4  identified in that report, in that disclosure.
5      A.  Do I think it would be unreasonable for
6  them to rely on them?  It depends on what one meant by
7  "rely."
8      Q.  What are the different things you can mean
9  by "rely"?
10      A.  Well, it depends on what you mean by rely
11  on them.
12      Do I think it is reasonable that
13  shareholders would trade in the stock after that date.
14  I mean, you know, do you have to rely on the financial
15  documents in order to trade on the stock?
16      If I trade on the stock, would you
17  consider that I had relied on the financial documents.
18      Or by rely on the financial documents, do
19  you mean take the financial documents and go to a --
20  say a bank or something and try to use them in some
21  legal way.  I don't --
22      Q.  We'll come back to that some more, I am
23  sure.
24      A.  Sure.
25      Q.  You are also offering no opinion on
            TSG Reporting - Worldwide   877-702-9580

Page 52

1  scienter, the legal requirements of scienter?
2      A.  That is correct.
3      Q.  Wouldn't you agree that even with respect
4  to the opinions that you are giving -- let's just
5  focus on materiality and loss causation -- that at the
6  end of the day, both materiality and loss causation
7  are legal questions for the trier of facts?
8      A.  Yes.
9      Q.  And you are not opining on that legal
10  question?
11      A.  Well, I am not drawing a legal conclusion.
12  Again, I am drawing economic conclusions that I
13  believe that the trier of fact has to consider in
14  order to reach the legal conclusion.  These are very
15  economic-oriented types of questions, and typically
16  the fact-finder relies heavily on expert testimony
17  from both sides in coming to the conclusions on those
18  types of questions.
19      Q.  If you turn to paragraph 11 of your
20  report, it talks about your assumptions.  And the
21  first sentence of paragraph 11 says, "Generally my
22  opinions are based on the assumption that plaintiffs
23  will prevail at trial on the allegations of wrongdoing
24  contained in the Complaint or revealed during
25  discovery, and the class and class period proposed by
            TSG Reporting - Worldwide   877-702-9580

Page 53

1  plaintiffs will be certified by the Court."
2      Do you see that language?
3      A.  Yes.
4      Q.  Is that an accurate description of your
5  assumptions, for purposes of your report?
6      A.  Yes.  It is a very general statement and,
7  I mean, I think it is accurate.  But as you read it
8  back to me, in my mind, that has more relevance, I
9  think, for a damage opinion.
10      What I am thinking when I write that
11  sentence is that generally these cases are broken up
12  into two parts:  liability and damages, in my mind,
13  and I don't have any -- I don't make -- I am not
14  rendering opinions about liability.  As you mentioned
15  a moment ago, I don't have anything to say about
16  scienter.
17      And those -- but -- and unless the
18  Court -- unless the Court rules in favor of the
19  plaintiffs on liability, then by definition there are
20  no damages.  So that is the point of that sentence, is
21  to say that I am obviously, as both sides of the
22  table's economists presumably are, assuming that there
23  will be liability in the case.  Otherwise, what's the
24  point of doing this work on damages?
25      This isn't a damage report, so I guess I
            TSG Reporting - Worldwide   877-702-9580

Page 54

1  don't know if that statement is all that relevant. I
2  mean, I think the second statement is a little more on
3  point for this particular report; the second sentence.
4      Q. So, just so I am clear, are you or are you
5  not assuming liability in giving the opinions in this
6  report?
7      A. Yes. I mean, I think I am -- I'm assuming
8  the second statement, that the company had a duty to
9  issue this and that plaintiffs -- I am assuming that
10  plaintiffs are correct that they violated that duty.
11     Q. And in violating that duty, are you
12  assuming that plaintiffs have satisfied or have proved
13  their claim under section 10b?
14     A. Yes. I think that is right.
15     Q. And embedded in that, if plaintiffs have
16  proven their claim under section 10b, you would agree
17  that you're assuming that they have satisfied the
18  elements of section 10b, which would include scienter,
19  reliance, loss causation, materiality, and so on?
20     A. Well, yeah, see, that -- we are in an area
21  here that is a little uncomfortable for me because it
22  is very legal. And I can only testify about -- you
23  know, intelligently about things that are areas of my
24  expertise, and legal questions like this are not.
25     So, you know, as soon as you say that, it

TSG Reporting - Worldwide   877-702-9580

Page 55

1  doesn't make sense to me because we are arguing about
2  loss causation and we are arguing about materiality,
3  so obviously I am not assuming -- I'm not making
4  assumptions about those things; those things are the
5  basis -- those things are the actual opinions that I
6  render in this case in this report. So those aren't
7  assumptions; those are conclusions. So I don't know
8  where that leaves us.
9      Q. So you are actually not assuming
10  plaintiffs have proven their case?
11     A. I am assuming the second sentence, that
12  defendants had a duty to issue accurate financial
13  statements, and that -- and that I agree -- I am
14  assuming the plaintiffs are correct in their
15  allegations that the company violated that duty.
16     Q. Okay.
17     A. I think that is where I am, you know, at
18  this point for this particular report.
19     Q. And I apologize if I am a little dense,
20  but you are not assuming -- just tell me if I have
21  this correct: You are not assuming that plaintiffs
22  have established their claim under section 10b, or are
23  you?
24     MR. GALDSTON: Asked and answered.
25     A. I am not assuming that plaintiffs have

TSG Reporting - Worldwide   877-702-9580

Page 56

1  proven loss causation, and I am not assuming
2  plaintiffs have proven market efficiency, and I am not
3  assuming plaintiffs have proven materiality. And
4  those issues are up for grabs, they are on the table,
5  and that is what I am opining about. Beyond that, I
6  don't know.
7      Q. And those issues, you are not assuming
8  they have proven those for purposes of establishing
9  liability in this case?
10     A. I think that is right. So I guess we are
11  down to scienter.
12     Q. You are assuming scienter?
13     A. Yes.
14     Q. And in fact, you are -- you don't have a
15  formal opinion in here on reliance, so I assume that
16  you are assuming reliance as well?
17     A. Well, you know, you are not allowed to
18  have reliance without market efficiency. So I am
19  opining about market efficiency, so I guess I am not
20  assuming reliance.
21     Q. You say -- is that because market
22  efficiency is a supporting factor or a pivotal factor
23  in using or relying on the fraud on the market theory
24  of reliance?
25     A. Yes.

TSG Reporting - Worldwide   877-702-9580

Page 57

1      Q. Going back to the three opinions that we
2  talked about: Market efficiency, materiality, loss
3  causation, did plaintiff ask you to give any other
4  opinions in this case?
5      A. Those are the areas that I was asked to
6  consider; none other.
7      Q. I would like to dig in a little bit on
8  loss causation and materiality. And before we get to
9  specifically the language of your report and the
10  analyses in your report, I would like to spend a few
11  minutes on the article that you recently did on stock
12  options backdating.
13     A. Okay.
14     Q. I think you refer to it in your report as
15  your most recent study, and that is the article "The
16  Impact of the Options Backdating Scandal on
17  Shareholders," and we'll mark this as Exhibit 24.
18     (The following exhibit was marked for
19  identification: Number 24.)
20     Q. I know that the article is available in
21  various forms. I think this might have been a form
22  that was produced to us, but I will let you look at it
23  and just confirm that this is the article that you
24  submitted within -- with a gentleman by the name of
25  Gennaro Bernile, titled "The Impact of the Options

TSG Reporting - Worldwide   877-702-9580

Page 58

1    Backdating Scandal on shareholders."
2         A. Yes, I agree with you it is in various
3    forms but this -- I guess, is this a copy of the
4    published version? I mean, I wouldn't -- I think that
5    is right, but I wouldn't know -- I don't know just
6    from looking at it.
7         Q. I will say that I believe it is. I think
8    this is the form that it was produced to us in, and I
9    am assuming we were given only the published version
10   as opposed to, you know, an earlier iteration.
11        A. Okay.
12        Q. And you, in fact, co-authored this
13   article --
14        A. Yes.
15        Q. -- with -- and it's a gentleman by the
16   name of Gennaro Bernile?
17        A. Yes.
18        Q. Who is Mr. Bernile?
19        A. Gennaro is a Ph.D. from the University of
20   Rochester Simon Business School, who is now a
21   Professor at the University of Miami; has also worked
22   at the SEC. A good friend of mine, and he was -- he
23   worked under me as a Ph.D. student; I was his
24   supervisor, Ph.D. thesis supervisor and, you know, so
25   I know him very well. Ph.D. students spend a lot of

TSG Reporting - Worldwide   877-702-9580

Page 59

1    time in the program, and I worked with him a great
2    deal and got to be good friends with him.
3         Q. And the article that we are looking at,
4    Exhibit 24, this is, in fact, the article that is
5    referred to throughout your expert report in this
6    case?
7         A. Yes.
8         Q. And does it accurately reflect your views,
9    and presumably those of your co-author, on -- to use
10   the title, "The Impact of the Options Backdating
11   Scandal on Shareholders"?
12        A. Mostly the views of my co-author.
13        No, it accurately reviews my views. I
14   don't know that I would, you know, agree with each and
15   every sentence or I don't know if I would say things
16   exactly the way he says them, but, you know, he did
17   most of the writing in the article, and actually he
18   did most everything for the article.
19        But yeah, it accurately reflects in a
20   general way my views, and I certainly support, you
21   know, all of the empirical work that is done, and so
22   forth, so I think yes.
23        Q. And I assume that, you know, you reviewed
24   and commented on drafts, to the extent that Mr.
25   Bernile was putting pen to paper?

TSG Reporting - Worldwide   877-702-9580

Page 60

1         A. Well, yes, and I did do -- I did do a lot
2    of writing. I am exaggerating. But I did do a lot of
3    the writing as well in certain sections, but he did
4    most of the work, as well he should.
5         Q. Is this the only article you have ever
6    authored on stock options backdating?
7         A. I mean, there is previous versions of this
8    article. But other than that, you know, other than
9    acknowledging that there are previous versions, yes.
10        Q. Yes, it is the only one?
11        A. Yes.
12        Q. But with its prior versions?
13        A. Including its -- you know, its
14   predecessors in the long stream of this process
15   usually involves draft after draft and goes to people
16   presenting it at conferences and then they put it in
17   to the journal, and the journal asks for revisions.
18   So by the time it gets published, there are probably
19   several predecessors lying around.
20        Q. What was the impetus for writing this
21   article, if you can recall?
22        A. Fame. A pathetic search for relevance and
23   meaning in life. I don't know.
24        Gennaro needed to get tenure; you have to
25   have published articles to get tenure. That is why he

TSG Reporting - Worldwide   877-702-9580

Page 61

1    did all of the -- most of the work is, of course, is
2    because I have tenure and he needs tenure.
3         It was an interesting -- I found it
4    interesting at the time that it was -- that it was
5    occurring. You know, I teach MBA students, and almost
6    all of my students are -- you know, view themselves as
7    going to go into the world of financial economics.
8    And, you know, I try to teach them something about
9    ethics.
10        Finance students tend to be ethically
11   challenged by nature. You know, these are MBA
12   students; they come to the program and their sole
13   objective -- unlike people that go to graduate school
14   for music or history or medicine, their sole objective
15   is to get rich. And I found this whole area, this
16   whole thing fascinating for, you know, the nature of
17   the conduct and the pervasiveness of the conduct and
18   the fact it was the academics who found -- you know,
19   who figured out what was going on.
20        So it was just a fascinating area to me,
21   and I was interested in how the stock market was
22   reacting to the disclosures by all of the companies as
23   they -- you know, as they got into trouble and as they
24   reacted to the trouble, I was interested in the stock
25   price responses to that.

TSG Reporting - Worldwide   877-702-9580

Page 62

1    So I talked to Gennaro about it and he
2  started looking at the data and he started getting
3  some interesting findings, and then it led to a paper.
4    Q. I should have asked you this before, but
5  of the articles, the published articles that are
6  listed in your CV, did any relate to loss causation or
7  materiality? And you can feel free to look back at
8  it.
9    A. I mean, not -- there is no article -- you
10  know, that studies materiality in a, you know,
11  securities class action context and, boom, there is an
12  article about it, no. Or loss causation, no.
13    Q. Okay. We had talked about this at the
14  very beginning, and I think that we were on the same
15  page, that the alleged fraud in a securities class
16  action on options backdating like this one is the
17  improper -- the alleged improper accounting for
18  options-related compensation expense as a result of
19  the issuance of backdated options.
20    A. That is the -- that is the central -- you
21  know, that is sort of the immediate bad act, you know,
22  the immediate mistake. But I think an equally
23  important part of that is the false disclosures that
24  go along with that.
25    So it's -- you know, maybe that is

TSG Reporting - Worldwide   877-702-9580

Page 63

1  subsumed in your assumption, but in my mind it is
2  improper accounting, and then it is that -- you know,
3  it is the hoodwinking the investing public through the
4  dissemination of documents, you know, that are SEC
5  filings and so forth.
6    So I view it as like -- as two things:
7  You know, not doing the accounting properly and
8  misstating -- hiding that -- hiding that, the fact
9  that you didn't do the accounting properly and that
10  you backdated options requires you to hide that and
11  to, you know, do other kinds of things like falsify
12  documents and stuff like that. So it is -- that is
13  the behavior that I am talking about.
14    Q. Okay, and I think that is fair. And what
15  you are including in that universe of falsified
16  documents, let's say allegedly falsified documents,
17  because obviously nothing is proven here --
18    A. Yes.
19    Q. -- would be financial statements that are
20  filed in periodic reports with the SEC that, you know,
21  for example, understate compensation expense.
22    A. Yes.
23    Q. That is the type of things that you are
24  referring to?
25    A. That's right.

TSG Reporting - Worldwide   877-702-9580

Page 64

1    Q. And a corrective disclosure --
2    A. I just want to say, you threw in there
3  nothing is proven here. I mean, the company itself
4  has made restatements. So when you say nothing is
5  proven, I mean, I am aware, obviously, of all -- you
6  know, the company has come clean and filed
7  restatements and admitted, you know, not having
8  internal controls and, you know, has basically
9  admitted to backdating all of these things.
10    So I think what you are saying is, is that
11  the 10b-5 case hasn't been ruled on yet, so that is
12  fair.
13    Q. That is exactly what I was talking about.
14    A. I'm sorry.
15    Q. I mean, the public statements say what
16  they say and are what they are.
17    A. Right, yes.
18    Q. So going back to what we have now, I
19  think, agreed on what is the, quote/unquote, "fraud"
20  in these types of cases, would you also agree that a
21  corrective disclosure of that fraud is a disclosure
22  that reveals the fact that there was such improper
23  accounting that compensation expense was understated,
24  those types of disclosures?
25    A. Yes. Well, that is the first order, but

TSG Reporting - Worldwide   877-702-9580

Page 65

1  when you -- obviously in this type of exercise and
2  this type of -- if you commit those sins, then you are
3  going to have, quite necessarily, a whole host of
4  problems that follow, like, you know, immediately
5  follow.
6    You are going to have to restate.
7    You are going to have to spend a ton of
8  money.
9    You are going to have to stop filing --
10  you know, you are going to have to stop filing until
11  you clean everything up; it is going to take a long
12  time to clean it up.
13    So you run into -- as all these companies
14  do, most of them do -- you run into things that flow
15  from that, such as delisting.
16    You get in trouble with the Exchange.
17    You -- when you don't have financial
18  documents that -- as a public company, that you are
19  filing on time with the SEC, there is a whole lot of
20  things that naturally flow from that, so I am
21  including that as well.
22    Q. And the types of things you have just
23  talked about in that last answer, that is what you
24  would refer to -- and I think this is the language of
25  your article and Mr. Bernile's article -- that is what

TSG Reporting - Worldwide   877-702-9580

17 (Pages 62 to 65)

Page 66

1 you would refer to as consequences of the backdating.
2     A. Yes.
3     Q. Is that fair to say?
4     A. Yes.
5     Q. So when you speak of consequences, and
6 then, for example, if you look at page 2 of your
7 article, and you are talking -- in the first paragraph
8 on page 2 at the very end you talk about direct
9 consequences of the involvement in backdating.
10     A. Yes.
11     Q. And so when you talk of direct
12 consequences, you know, of a company's involvement in
13 stock options backdating, you are not referring to the
14 backdating itself or the accounting for that
15 backdating; what you are really referring to are
16 essentially the collateral effects of that backdating
17 that flow from it?
18     A. I wouldn't use the word "collateral"
19 because that is sort of becoming a bit of a term of
20 art, you know, that some lawyers and economists are
21 using the term "collateral" to mean, you know, not
22 relevant for a corrective disclosure.
23     So I wouldn't use the word "collateral."
24 But, you know, as I say here, it is a direct
25 consequence. I agree with you that it is a
        TSG Reporting - Worldwide   877-702-9580

Page 67

1 consequence. You know, it is useful to separate that
2 from the -- from the illegitimate accounting in and of
3 itself.
4     Q. So just to look at some more of the
5 language -- and again I am still focusing on this
6 first paragraph on page 2 -- the article states here,
7 "Although backdating involves reporting the fictitious
8 granting, the actual strike prices and all other
9 relevant grant characteristics are truthfully
10 disclosed in the historical company's filings."
11     A. Yes.
12     Q. "Hence, investors have sufficient
13 information to calculate accurately the economic value
14 of backdated options absent tax consequences; yet,
15 companies accused of backdating face several potential
16 problems as a direct consequence of their
17 involvement."
18     And that is the language that we have now
19 been talking about for a minute or two.
20     A. Right.
21     Q. I would like to focus first on the
22 sentence that starts "Hence..."
23     And again, you say there, "investors have
24 sufficient information to calculate the economic value
25 of backdated options."
        TSG Reporting - Worldwide   877-702-9580

Page 68

1     A. Can you point me to exactly where you are?
2     Q. It's the middle sentence in the first
3 paragraph on page 2 that starts "Hence..." The
4 conclusion to the first sentence about the fact that
5 the actual information with respect to the grants --
6 maybe I am looking at a different version. It is the
7 paragraph that starts "Although..."
8     A. I don't have such a paragraph.
9     MR. GALDSTON: Yes, I don't either.
10     THE WITNESS: Is this a good time for a
11 break?
12     MR. AMSEL: Why don't we take five minutes
13 and get our copies in order.
14     (The proceeding recessed at 10:34 a.m.)
15     (The proceeding reconvened at 10:58 a.m.;
16     appearances as before noted.)
17 GREGG A. JARRELL, PH.D., resumes;
18     EXAMINATION BY MR. AMSEL CONTINUING:
19     Q. Professor, before we took the break, we
20 were talking about your article on options backdating
21 and we had a little bit of a snafu in the copied
22 version, so I am going to talk about it, but a little
23 more conceptually than, you know, the language.
24     A. Okay.
25     Q. And, you know, we might come back to it
        TSG Reporting - Worldwide   877-702-9580

Page 69

1 after lunch or --
2     A. Okay.
3     Q. -- something like that.
4     You agree that as far as backdating is
5 concerned, that other than what you might consider a
6 fictitious or a false grant date, that all other
7 characteristics, all other information with respect to
8 the grant is disclosed by the company?
9     A. I think that is right. And I don't know
10 about all other, but the things I have in mind is what
11 you read before the break about the exercise price.
12     I mean, I think people -- early on in
13 the -- when this was first becoming a subject of
14 discussion among people, there was -- some people
15 thought that -- in at least one or two early academic
16 articles that I read, they made the mistake of
17 thinking that there was something about the exercise
18 price itself that had been misdisclosed, and that --
19 so I think that is what we were emphasizing, was that
20 the exercise price -- it's not the exercise price
21 itself that is wrong; that is the correct -- that is
22 the exercise price. Presumably that has been
23 disclosed accurately. And if that has been disclosed
24 accurately, then everything else that the stockholders
25 need to value the options, you know, presumably are
        TSG Reporting - Worldwide   877-702-9580

## Page 70

1  the same as they would be without backdating.
2      So there is nothing about backdating that
3  changes the mix of information that shareholders would
4  need in order to value the options themselves.
5      Q. And so presumably once the shareholders
6  had a reason to do it, and whether it is because
7  suspicions were in the market of backdating or the
8  company came out and said, "We backdated options,"
9  presumably once a shareholder went to go do the
10 analysis, they could then go calculate the economic
11 value of those allegedly backdated options, presumably
12 by looking back at, say, a quarterly low or looking at
13 some benchmark as far as a grant date.
14     A. I had you until the last phrase.
15     Q. Okay, well, then let me take off the last
16 phrase.
17     A. I thought what you were asking was that if
18 you take two firms, one has backdated options and one
19 has not backdated options, and they are otherwise
20 identical, there is nothing about the fact that this
21 company has backdated options that would interfere
22 with the ability of shareholders to value the options,
23 at least as well as they could value it over here in
24 this hypothetical where there was no backdating.
25     You don't need -- the grant date is not --

TSG Reporting - Worldwide    877-702-9580

## Page 71

1  is not an input to the Black-Scholes option pricing
2  model; the exercise price is. So if you have -- if
3  you have an accurate disclosure of the exercise price
4  in both instances, then there should be no difference
5  in the ability of shareholders to value the options
6  themselves.
7      Q. Okay. So if we go one step further, and
8  to go to the last clause that I had added to that,
9  isn't it fair to say that -- that shareholders or
10 public investors could actually go a step further and
11 calculate the magnitude of the backdating issue by
12 taking that public information that is out there and
13 comparing it to, say, a quarterly low or another
14 measurement date; that you can essentially calculate
15 it as compared to a worst-case scenario?
16     A. Yes, I don't know -- I don't know about
17 that. I mean, I think that what the analysts did and
18 what the academics did was they took the actual
19 exercise price itself, which presumably had been
20 disclosed accurately, and then they simply compared
21 that exercise price historically to the stock prices
22 of the company, and from that -- and then -- and then
23 simply computed, you know, using statistical analysis,
24 determined whether or not there -- that this exercise
25 price was chosen, quote/unquote, "randomly."

TSG Reporting - Worldwide    877-702-9580

## Page 72

1      The presumption was that if there is no
2  backdating in large samples, then the random theory
3  would be supported by the statistical data, and then
4  the academics found that the random theory was
5  rejected by the statistical data.
6      So if that is what you are talking about,
7  then I don't know that shareholders themselves did
8  that. I mean, it is a pretty sophisticated analysis
9  by academics, and some of the analysts were able to do
10 that as well.
11     They did it a little bit differently than
12 the academics. They would compute the rate of return
13 that you would have earned had you bought stock at
14 that exercise price and found that that rate of return
15 was very, very positive relative to what the rate of
16 return would be if you had had exercise prices chosen
17 randomly.
18     So I don't know if that helps.
19     Q. In the analysis that these academics did,
20 and analysts, including, for example, Merrill-Lynch,
21 which put out a report on options backdating in
22 May 2006, those analyses were all based on
23 publicly-available information; is that correct?
24     A. Yes.
25     Q. And just to go back to really the more

TSG Reporting - Worldwide    877-702-9580

## Page 73

1  specific question that I had asked: Based on that
2  publicly-available information, isn't it possible
3  for -- and I am not saying mom-and-pop individual
4  shareholder who is not going to have the
5  sophistication to do this analysis, but --
6      A. Or you. Or you.
7      Q. Or me, absolutely. I should have used
8  myself for the example.
9      But academics or sophisticated entities in
10 the marketplace that are doing these analyses, it
11 would have been possible to use that
12 publicly-available information to calculate
13 theoretically the magnitude of the backdating
14 exposure?
15     A. No. I don't -- if I understand your
16 question correctly, you can, as people did, use
17 publicly-available information to call into question
18 the randomness of the grant dates. But I don't -- I
19 don't think that -- without knowing the true grant --
20 I mean, I don't think -- you don't know the actual
21 grant date; you know the purported grant date. So
22 without knowing the actual grant date, I don't know if
23 you could take the step that you are suggesting.
24     Q. Well, what if you put in a proxy for that
25 grant date of, say, like I said earlier, a quarterly

TSG Reporting - Worldwide    877-702-9580

Page 74

1 low, which you know, right? You could — you could
2 track the stock price —
3    A. But that is the purported grant date. The
4 company — the company — with backdating, the company
5 peeks back, finds the quarterly low price, and then
6 asserts falsely that that is the grant date, when in
7 fact the grant date is some other date that is unknown
8 to us until and unless they tell us what really was
9 the grant date, through investigation and that sort of
10 thing.
11    Q. Right. And you were correct; I am using
12 the wrong term. What I should be asking is going back
13 and looking at a quarterly high, okay.
14    So what I really want to find out is could
15 you — and again, this would be a worst-case scenario,
16 and obviously companies do investigations to find out
17 the appropriate measurement dates.
18    But could someone sophisticated in the
19 market, based on publicly-available information, take
20 all of the information that is out there and use as a
21 proxy the quarterly high to determine a worst-case
22 scenario exposure for backdating magnitude?
23    A. I don't know of anyone that has done that,
24 and I don't know if you could do that. I don't see
25 any obstacle, obvious obstacle to it, because it

TSG Reporting - Worldwide   877-702-9580

Page 75

1 sounds to me like you are doing exactly the same thing
2 except you're saying, well, let's assume that this
3 exercise price — this grant date is false, and let's
4 assume further that the actual grant date was on the
5 date — again, I still don't know the real grant date,
6 but let's assume that the real grant date was the date
7 on which the high stock price occurred.
8    You know, that would be — but, you know,
9 the problem with that would be a worst-case scenario,
10 that it would be as equally unlikely as the — as the
11 first thing, where, you know, how could you possibly
12 pick the lows as reliably as you do if you didn't use
13 hindsight.
14    Well, if you go through and you look at
15 the actual grant dates, the real grant dates, and look
16 at the exercise prices, that is not going to go
17 hand-in-glove with the highs. It is going to be
18 random.
19    Q. I agree with you at that, but I just want
20 to confirm that you could, or someone could — and
21 then I know you said you don't know if anyone did —
22 but someone could go out and figure out this
23 worst-case scenario by using quarterly highs; you
24 could come up with a number.
25    MR. GALDSTON: Objection; asked and

TSG Reporting - Worldwide   877-702-9580

Page 76

1 answered.
2    A. I don't know. I don't know.
3    Q. I mean, is there — what is not available
4 publicly that would prevent you from doing that
5 analysis at any given moment?
6    A. Well, I suppose you are saying let's go
7 back and let's say that the highest stock price in
8 this relevant period of time is the actual grant date,
9 and the highest price should be the exercise price.
10    If that were the — and then assume that
11 that is — that that is the proper grant date and that
12 is the proper exercise price.
13    Wouldn't — I am really having trouble
14 with it. Wouldn't that imply — I don't think that
15 works. I mean, doesn't that imply that your options
16 are under water when you grant them? I don't think
17 you can get — I don't think that gives you a
18 worst-case scenario, now that I think about it.
19    I don't — I am stuck — once you — you
20 know, you can do what you said; you can go back and
21 go, okay, let's assume they are not telling the truth
22 with regard to the grant date.
23    Well, what is the true grant date. Well,
24 unless they tell me, I don't know.
25    Well, let's make an assumption that it is

TSG Reporting - Worldwide   877-702-9580

Page 77

1 the date on which the stock price is the highest. And
2 that doesn't mimic — that doesn't mimic the
3 consequences of the fraud because if you went down
4 that road, you would have this very high exercise
5 price, much higher than — so then you — let's
6 value the — I don't — I get stuck. I don't know. I
7 really don't know. I don't think so.
8    Q. I am trying to think if we are getting
9 bogged down in the quarterly high versus quarterly
10 low. Let me just clear it up.
11    A. Go ahead.
12    Q. What I am trying to figure out is what
13 information is not publicly available that would
14 prevent someone sophisticated in the market from
15 calculating the magnitude of a potential earnings
16 charge relating to stock options backdating.
17    A. The true grant date.
18    Q. I agree with you, and that is why
19 companies do investigations and come up with new
20 measurement dates and that sort of thing.
21    But as far as figuring out what order of
22 magnitude is possible to, say, for example, viewing
23 the company's predicament and trying to determine what
24 type of situation it could conceivably, worst-case, be
25 in, what is out there to prevent a market maker or

TSG Reporting - Worldwide   877-702-9580