Page 78

1 someone sophisticated in the market from doing an
2 analysis that calculates a worst-case scenario?
3    A. I think you need to know -- you need to
4 know the grant date in order to do -- in order to
5 compute the consequence of the -- the accounting
6 consequences of backdating. You need to know the true
7 grant date. And I don't think that you can, using
8 publicly-available information, get any kind of
9 reliable estimate of that.
10    Q. But why couldn't you use -- why couldn't
11 you -- I think we are not getting directly at what I
12 am trying to ask you.
13        I am trying to understand why someone who
14 is doing this analysis could not use the worst-case
15 date for purposes of that analysis, and putting aside
16 the fact that number may ultimately turn out to be
17 high. Why couldn't the analysis be done?
18    A. Because that won't tell you the degree to
19 which the option was actually in the money on the true
20 grant date, and it wouldn't even be an estimate of
21 that.
22        So unless and until you can figure out a
23 way to estimate the degree to which it is in the
24 money -- I mean, the whole accounting problem is that
25 in reality when an option is granted, on the true
        TSG Reporting - Worldwide    877-702-9580

Page 79

1 grant date it is in the money. Given that exercise
2 price that was falsely picked, it is in the money.
3        By your method of getting the worst
4 potential thing that can happen, you are assuming that
5 the exercise price is different, so -- let me just --
6 let me catch up with you.
7        So you are saying let's assume that the
8 true grant date is the date on which the stock price
9 was at its high. Then using the disclosed exercise
10 price, which is low, compute the absolute worst-case
11 estimate of the degree to which the options were
12 really in the money. That is what you are asking.
13    Q. Correct.
14    A. I don't know what value it would be, but
15 as -- now that I understand your question, I think
16 that you could calculate such a number. I don't know
17 of anyone who has and I don't know of what value it
18 would be relative to, you know, getting a reasonable
19 estimate of the problem, but now I understand what you
20 are saying, I think -- I think that you could do that.
21    Q. And do you have any reason to believe that
22 analysts -- and obviously there were numerous analysts
23 that were following Maxim throughout this period -- do
24 you have any reason to believe that those analysts did
25 not perform that type of an analysis?
        TSG Reporting - Worldwide    877-702-9580

Page 80

1    A. I have not seen it.
2    Q. But it is possible that they did those
3 types of analyses and it is embedded in their
4 recommendations with respect to Maxim, isn't it?
5    A. I haven't seen that. I haven't seen that.
6 I mean, anything is possible, but unless I saw it, I
7 don't know what value it would be.
8    Q. But you agree that it could be done?
9    A. If I am understanding the calculation that
10 you have in mind, yes. I mean, you -- as I explained
11 it a moment ago, yes.
12    Q. Now, am I correct that your conclusion in
13 this article with respect to options backdating is
14 that the backdating itself and its accounting is of no
15 economic relevance?
16        MR. GALDSTON: Object to the form of the
17 question.
18    A. Yes, I don't know that I -- I don't know I
19 said it quite that way.
20    Q. Do you agree with that statement?
21    A. No. Relevance to what?
22    Q. Well, you agree that compensation expense
23 for stock options is a non-cash expense; correct?
24    A. No. I don't agree with that.
25    Q. It is not a non-cash expense?
        TSG Reporting - Worldwide    877-702-9580

Page 81

1    A. Well, when you give an option to an
2 employee and then they go out and exercise that option
3 five years later, you have -- that is a cash expense.
4 That is dollars. That's U.S. dollars.
5        I don't understand the question.
6    Q. I am talking about the compensation
7 expense that a company records on its financial
8 statements for, say, in-the-money stock options. That
9 expense is a non-cash expense, isn't it?
10    A. It is -- it is --
11    Q. I'm sorry, I think you got cut off.
12        MR. AMSEL: Would you read back that last
13 question and answer?
14        (The reporter read the requested material.)
15    A. Well, I was going to say that under
16 current rules -- and I am no expert in accounting
17 rules, but it is my impression that under current
18 rules that I have to compute, using an option pricing
19 model of some sort, the economic present value of the
20 option at the time that you grant it. And that
21 particular number is then treated as the compensation
22 expense in that particular period in which you granted
23 it.
24        So in that sense -- if that is the
25 question, then at that particular time when the
        TSG Reporting - Worldwide    877-702-9580

21 (Pages 78 to 81)

Page 82

1  accountant puts down on the paper the compensation
2  expense, what it is is an estimate of the eventual
3  cost to the shareholders of this option that is
4  granted today when it is, in fact, exercised in the
5  future. So it is a present-value expectation of the
6  cash costs of that compensation down the road.
7      So it is -- in the first instance it is
8  not a cash cost, but on the -- but what it is in
9  economic reality is a present value of an expected
10 actual cash cost.
11     Q. But the compensation expense, option
12 compensation expense when it is recorded is not a cash
13 expense; is that a correct statement?
14     A. No. I just -- I will give you the answer
15 that I gave you: It is the present value, using an
16 option pricing model, of the expected cash expense.
17 So, you know, do you call that a cash expense or not?
18 I don't know. I call it a cash expense, but I am not
19 an accountant; I am an economist.
20     Q. I'm sorry. Why don't we look at page 13
21 of your article.
22     A. Okay.
23     Q. And it is the last paragraph on the bottom
24 of the page, page 13. I think we are on the same page
25 as far as versions, and it is the paragraph that

TSG Reporting - Worldwide    877-702-9580

Page 83

1  starts, "Backdating related..."
2      A. Yes.
3      Q. And the sentence reads, "Backdating
4  related restatements should have no effect on firm's
5  cash flows because option compensation is not a cash
6  expense."
7      A. Correct.
8      Q. So do you agree with that statement?
9      A. Well, yes and no. I think this
10 statement -- this sentence is accurate because what it
11 is saying is that when you -- as we discussed a moment
12 ago, the economic value of the options that you grant
13 to the employee is what it is, and it is not affected
14 by whether, in fact, you backdated something or not.
15 And so the fact that you backdate it doesn't affect
16 that number.
17     Q. Now you have lost me. Are you saying that
18 this isn't completely accurate, this statement? Are
19 you saying that it is accurate?
20     A. First off, I am telling you neither one of
21 us are accountants, so you shouldn't be using this as
22 some kind of -- you know, authoritative guide as to --
23 as to what is or is not a cash expense in some
24 accounting term.
25     What he is trying to say here and what I

TSG Reporting - Worldwide    877-702-9580

Page 84

1  understand from the sentence is that you are not --
2  when you go back and fix backdating, you are not
3  actually in the first instance changing how much money
4  you pay the employees.
5      Now, whether you call that money cash or
6  whether you call it non-cash is -- is -- I don't know
7  what accountants would call it, but you are not
8  changing it. So there are no cash consequences; there
9  is no cash consequences of backdating from that point
10 of view.
11     Q. So there is no impact or effect on the
12 company's cash flows?
13     A. No, I wouldn't go that far, because
14 obviously you -- now you screwed up the -- you know,
15 the tax calculations and it is much more complicated
16 than we are making it out to be.
17     But my answer was -- explained the extent
18 to which -- you know, what I am saying is that the
19 value -- you are not changing how much you pay
20 employees when you fix a backdating problem. You are
21 changing your reported earnings, you are changing a
22 lot of other things. But one thing you are not
23 changing is how much you actually are paying the
24 employees. You know -- you know, that -- everybody
25 knew what the options were worth at the time, and that

TSG Reporting - Worldwide    877-702-9580

Page 85

1  hasn't changed.
2      Q. So would you agree or disagree that
3  backdating and restatements for compensation expense
4  relating to backdating have no effect on a firm's cash
5  flows?
6      A. No.
7      Q. You would say they do have an effect on a
8  firm's cash flows?
9      A. Of course.
10     Q. So you disagree with what is written in
11 the article?
12     A. No. I think if you read this in context,
13 what we are saying here is that if you look at -- in
14 the first order -- the first order, the first order of
15 analysis here, without considering taxes, without
16 considering accounting expenses, without considering
17 lawsuits, without considering all of the other things
18 that are cash outlays, that if you just look at,
19 "Well, let's fix this option backdating problem," does
20 that affect the cash flow in the sense that it changes
21 the compensation that you are paying employees? No.
22 No, it does not. That is the first step in the
23 analysis.
24     Obviously there are a lot of cash flow
25 consequences, and as a practical matter -- in this

TSG Reporting - Worldwide    877-702-9580

Page 86

1  case as well as a lot of the others -- you actually do
2  have to write checks to employees as a result of
3  compensation, to make up for the fact that you did the
4  backdating. You have to write checks for millions of
5  dollars to reimburse for the tax consequences; you
6  have to write checks for millions of dollars because
7  they can't exercise options they were supposed to be
8  able to exercise because you don't have securities.
9  So it is very complicated.
10         And all I am saying is, and what we're
11  trying to say here as we walk through the analysis,
12  that when you first consider the first-order effects
13  of going back and fixing a backdating problem, it
14  doesn't change the compensation. The cash flow of the
15  company just on that consideration is unaffected by
16  fixing the backdating; the cash flows of the company.
17  The earnings are dramatically affected, but that is
18  different. The cash flows of the company are, for
19  that reason and that -- because of the backdating per
20  se are unaffected. That I agree with, and that is
21  what I am trying to say here, I think.
22     Q. So the impacts on cash flows that you just
23  talked about -- and I think this is your word -- were
24  all consequences of the backdating?
25     A. Largely, that is right. I mean, that is a
Page 87

1  little bit of an exaggeration, but yes, that is
2  correct. Because when you go back and fix the
3  accounting for backdating, you are doing an awful lot
4  of accounting work, but you're not -- you know, until
5  you start -- until you start bringing in the direct
6  consequences, you are not affecting cash flow as much.
7     Q. So the backdating itself and the
8  accounting for backdating and the compensation charge
9  that you will record in a restatement for backdating,
10  those in and of themselves, putting aside the
11  consequences, have no impact on a firm's cash flows;
12  is that correct?
13     A. I don't know if I would say it that way.
14  I would say it the way I said it. If you are
15  confident that that is the same thing -- I am not
16  confident that that is an accurate summary of what I
17  just said.
18     Q. I just want to understand what you said.
19     A. Yes.
20     Q. Is what you are saying that the effect on
21  cash flows are because of the consequences of
22  backdating, and you are not separating those two. I
23  mean, is that fair?
24     A. The effect on cash flows is
25  predominantly -- you know, predominantly a result of

Page 88

1  the direct consequences of the backdating, as opposed
2  to fixing the accounting itself for the backdating.
3         If you could go in and magically fix the
4  accounting for the backdating and that was it and that
5  was all, you would have minimal cash flow effects.
6     Q. Would you have any?
7     A. Well, you know, we are ignoring taxes,
8  too, which, you know, I don't know why we would call
9  that a direct consequence. But, you know, I just
10  don't want to say you wouldn't have any, because that
11  is probably wrong.
12     Q. But you find -- and then we can look for
13  the language -- but you find in this article that the
14  tax implications are relatively negligible --
15     A. Yes.
16     Q. -- as far -- from an economic perspective?
17     A. Overall, for any given company, they could
18  be -- they could be -- they could be big.
19     Q. So putting aside tax consequences --
20  again, I just really want to make sure we are getting
21  at this right.
22     A. I think we are. I think we are agreeing.
23  I mean, I am agreeing with you that -- as we say in
24  the article, that it is one of the paradoxes. You
25  know, why are the stock price effects so big relative

Page 89

1  to the cash flow consequences of fixing backdating?
2  And that is the fundamental paradox that is addressed
3  in the paper.
4     Q. So there is no cash flow effect for just
5  the backdating. I understand your view with respect
6  to consequences, and we are going to get to that.
7  There is no cash flow effect; the impact on the
8  company's cash flow is in the economic value, the
9  economic effect of backdating. It is simply a result
10  of out-of-pocket costs and the consequences that you
11  have run through; is that fair?
12         MR. GALDSTON: Object to the form of the
13  question.
14     A. Well, it is from all of the other
15  problems, other than what we have just discussed, that
16  didn't affect -- I mean, if it doesn't affect the cash
17  flows per se at that moment, that doesn't mean it
18  doesn't affect future cash flows. So we didn't talk
19  about that and -- so I don't know the point. I have
20  lost the point.
21     Q. How does it affect future tax flows?
22  Putting aside the consequences, I still want to just
23  view this narrowly with respect to the fix of the
24  accounting for the options.
25     A. Well, for example, now suppose you can't

TSG Reporting - Worldwide   877-702-9580

### Page 90

1  use options anymore; suppose you decide the firm says
2  well, we can't use options anymore, so now we have to
3  pay higher cash expenses. I don't know what you mean,
4  it doesn't affect cash flows. I explained what I
5  meant when I said that fixing the backdating does
6  not -- if you go back and fix the backdating that
7  occurred two years ago, you don't -- you probably have
8  minimal changes in the company's cash flow statements
9  from that same period of time. That is what I am
10 trying to say. You are going to have all kinds of
11 changes to every other accounting document that you
12 have: The income statement, the balance sheet. It is
13 an accounting nightmare. But the cash flow statement
14 sources and uses in the cash flow of the company, that
15 statement itself will have minimal changes compared to
16 all that other stuff.
17     Q. So there is no real impact, is there, on a
18 firm's value because of the impact on cash flow; would
19 you agree with that?
20     A. Of course I wouldn't agree with that.
21     Q. Don't you agree that cash flows are often
22 a proxy for value?
23     A. Well, it goes further than that. In
24 economics, the present value of a company depends
25 exclusively on its future projected cash flows and its
     TSG Reporting - Worldwide    877-702-9580

### Page 91

1  discount rate; that is true. I mean, I am
2  exaggerating to make a point, but yes, cash is king in
3  financial economics.
4        MR. AMSEL: With that, why don't we go off
5  the record. I think he needs to change the tape.
6        (The proceeding recessed at 11:28 a.m.)
7        (The proceeding reconvened at 11:38 a.m.;
8        appearances as before noted.)
9  GREGG A. JARRELL, Ph.D., resumes;
10       EXAMINATION BY MR. AMSEL CONTINUING:
11     Q. Professor, before we broke to change the
12 tapes, we were talking a little bit about what I was
13 referring to as the economic relevance of backdating
14 and it's allegedly improper accounting.
15       Is it fair to say that that economic
16 relevance, viewing just the accounting issues that are
17 corrected in a restatement and putting aside the
18 consequences that you have talked about, that that
19 economic relevance is virtually nil as far as
20 shareholders are concerned?
21       MR. GALDSTON: Object to the form of the
22 question.
23     A. I don't know how to -- at that level of
24 analysis, the problem is that the company misstates
25 the grant date, so, you know, I suppose you could
     TSG Reporting - Worldwide    877-702-9580

### Page 92

1  think about correcting the backdating would be simply
2  telling people the correct grant date. And you could
3  define backdating, you know, correcting backdating,
4  then you could define it as changing the grant date.
5  And, you know, that is something that you can do with
6  a pen or a typewriter, is, you know, put out a
7  disclosure and tell shareholders, "Here are the actual
8  grant dates for the options."
9        And if you define correcting backdating as
10 that act, then, well, obviously that has no effect on
11 anything other than information about the grant date.
12     Q. Well, I am actually being a little bit
13 broader and referring not just to the correction of a
14 grant date --
15     A. Okay.
16     Q. -- or the change of a grant date.
17     A. You could refer to everything else as a
18 consequence. Everything.
19     Q. Including the recording of additional
20 compensation expense?
21     A. Everything. Everything else other than --
22 because the problem is -- the problem is you have told
23 shareholders, whether you meant to or not, the wrong
24 grant date. Imagine there is just one option and
25 there's one option issuance. "We told you the grant
     TSG Reporting - Worldwide    877-702-9580

### Page 93

1  date was this date; our bad. The new grant date, the
2  real grant date is this date."
3        Why not just define correcting backdating
4  as that simple act? It is a matter of semantics. If
5  that is correcting backdating, then that has no effect
6  on anything other than people's understanding of the
7  grant date.
8     Q. So your opinion is that when you move
9  beyond that, you are actually recording additional
10 compensation expense at the impact on shareholders as
11 a consequence of the backdating?
12    A. Yes. I would refer to everything else as
13 a direct consequence, personally. That is to keep
14 things straight in my mind. I would refer to
15 everything else as a direct consequence; that the
16 alleged fraud is the lie about the grant date, period.
17 That is the fraud. You lied about the grant date and
18 that is the fraud.
19       And if you just could go in magically and
20 then correct that, take away the lie and tell people
21 the real grant date, the true grant date, then that
22 would correct the backdating. And that has no
23 economic effect on anything per se; it is a date.
24       So to me, everything else -- the
25 accounting, the investigations, the lawsuits, the
     TSG Reporting - Worldwide    877-702-9580

Page 94

1   lawyers, the accountants -- everything else is a
2   direct consequence. Some more direct than others,
3   arguably, but they're all consequences of that one
4   act.
5          The fraudulent act is, people don't do
6   backdating because they want to fraudulently fix the
7   accounting. I don't know -- you know, I don't know
8   what their motive is. But the thing they did wrong
9   was lie about the grant date; that is the thing you
10  did wrong.
11         So in that -- so why not say that if you
12  just simply corrected the grant date, that is a
13  correction of the fraud, and everything else is a
14  consequence. That is how I think about it.
15     Q. But you could backdate legally if you
16  record the appropriate compensation expenses.
17     A. No, you can't. Backdating is by
18  definition illegal. Backdating is by definition
19  picking a date and lying about it. That is how I am
20  defining it. What does the word "backdating" mean if
21  it doesn't mean that you are cheating?
22     Q. You are putting -- I recognize this is a
23  little bit of connotation in the word, but you are
24  putting some additional color on it. If we look at it
25  in more vanilla terms --

TSG Reporting - Worldwide   877-702-9580

Page 95

1      A. No.
2      Q. -- a backdated option is essentially an
3   in-the-money option.
4      A. As soon as you say "backdating," you've
5   got two dates in mind. You can't use the
6   word "backdating" without having two dates in mind,
7   correct? Backdating. You've got to have two dates in
8   mind; you've got to have a real date and a back date,
9   a date that you backed it up to. So by definition,
10  that is -- the backdating of the document itself, that
11  is the fraud, alleged fraud. That is it. Everything
12  else is a consequence.
13     Q. Let's step back from the terminology of
14  backdating, and let's just -- just to set the stage a
15  little bit.
16         A company can issue in-the-money stock
17  options, correct?
18     A. Correct.
19     Q. And you can do that, assuming that you
20  recognize an appropriate compensation expense and you
21  disclose, and so on and so forth?
22     A. Correct.
23     Q. So in this case, the alleged -- is it your
24  view that the alleged fraud is the alleged backdating,
25  or is the fraud the allegedly improper accounting for

TSG Reporting - Worldwide   877-702-9580

Page 96

1   the grant of in-the-money stock options?
2      A. Well, look, I call it all fraud-related
3   because, you know, when you are trying to figure out
4   the economic consequences of that thing, that fraud,
5   the backdating, that single isolated act of
6   backdating, you have to consider all of the
7   consequences of that in order to figure out the
8   damages, losses, materiality; in my judgment,
9   obviously.
10         But if you are asking the question, well,
11  suppose that -- you know, how could you correct a
12  backdating problem? Well, I suppose that you could
13  correct the date, tell people the correct date, okay?
14         And then once you tell people the correct
15  date, invariably now the option that was granted was
16  in the money and then from that flow this whole, you
17  know, ugly sequence of direct consequences.
18         Alternatively, you could -- you could have
19  given the true grant date and made it in the money.
20  That was something that you could imagine going back
21  and say, well, suppose we had given the true grant
22  date and it was in the money.
23         Or you could give the true grant date and
24  have a different exercise price, make it at the money
25  on the true grant date.

TSG Reporting - Worldwide   877-702-9580

Page 97

1          So those are all possible ways of
2   imagining how history could have been different.
3      Q. So based on your characterization of what
4   the fraud is, or the alleged fraud --
5      A. Right.
6      Q. -- is it correct to say no damages flow
7   from the fraud itself but, rather, flow from the
8   consequences of the fraud?
9          MR. GALDSTON: Object to the form of the
10  question.
11     A. As -- well, we are using this word "fraud"
12  here, you know, in the sense in which it has been used
13  in the report and the sense which it has been used in
14  litigation, you know, it encompasses everything. It
15  encompasses this bad act, which is backdating, and all
16  of the consequences that flow from it. So that is the
17  fraud, okay.
18         But for purposes of your questions, you
19  wanted to sort of break it up into little pieces and
20  you wanted to define what is the real fraud itself and
21  what are the direct consequences of the fraud.
22         Well, for that discussion, the direct
23  consequences of the fraud you could consider
24  everything a direct consequence of the fraud. Part of
25  the fraud, yes, but a direct consequence of the key

TSG Reporting - Worldwide   877-702-9580

Page 98

1 fraud, the central fraud, which is the bad act of
2 backdating. That is the start of the problem.
3     Q. So your view, and for purposes of how you
4 use the terminology in the report, is that the alleged
5 fraud is not only the backdating, but is also all of
6 the consequences of the backdating; that is all
7 included, encapsulated in what the alleged fraud is?
8     A. To use the terms in the way that people
9 are using it in the actual litigation and in the
10 courtroom, I think that I would say that what people
11 are referring to as fraud versus direct consequences
12 would be the fraud is the backdating and then all of
13 the accounting problems that come with the backdating,
14 okay.
15     So when you go in and you tell the public,
16 "Oops, we backdated and we are going to have a
17 restatement," the restatement is considered part of
18 the fraud.
19     And then the fact that you have to hire
20 investigators, that you have to hire accountants, that
21 you have to, you know, fire employees or let them go,
22 those are typically referred to as the consequences of
23 the fraud.
24     So that is kind -- that is how people are
25 talking about it, and I don't have any problem with

Page 99

1 that.
2     Q. So those things that you just
3 characterized as consequences, those are not the
4 alleged fraud? I am just trying to understand --
5     A. It depends on how -- I was reacting to
6 your question to me about what do I consider a fraud
7 and what do I personally consider a consequence.
8     Personally what I consider to be the fraud
9 is that bad act of cheating on the grant date. Once
10 you do that, that is the fraud.
11     Now, as a practical matter, you know, I
12 would say that the executives probably were then
13 knowingly misstating the financial records. Well,
14 that is a fraud, too; you are not allowed to misstate
15 your financial records in a material way.
16     So, yes, I think it makes sense to talk
17 about that as being part of the fraud, because you did
18 obviously misstate your financial records. But for
19 purposes of you asking me what do I consider a
20 consequence, my point to you was I don't know what
21 those words mean; I don't know where you draw the line
22 between a consequence and the fraud itself, you know?
23     And to make that point, I was saying why
24 not call the accounting improprieties a consequence;
25 why not call that a consequence? That is as much of a

Page 100

1 consequence as anything else, in my view. The thing
2 you did wrong was backdated. If you hadn't backdated,
3 well, then those accounting statements wouldn't be
4 wrong. So one flows from the other.
5     So the question about what is a
6 consequence and what is the fraud itself to me is open
7 to interpretation.
8     Q. Are you familiar with the Supreme Court's
9 decision in Dura Pharmaceuticals?
10     A. Yes.
11     Q. And you are aware in that decision that
12 the Supreme Court differentiated between disclosures
13 that go to the fraud and disclosures that,
14 quote/unquote, "touch upon" the fraud?
15     A. Right.
16     Q. And you are aware that the Supreme Court
17 said that disclosures that touch upon the fraud are
18 not corrective disclosures for loss causation
19 purposes; is that correct?
20     A. Yes.
21     Q. Isn't it fair to say that the consequences
22 that you are talking about, and especially as they
23 become more and more indirect or less direct, are
24 consequences or things or events that touch upon the
25 fraud as opposed to go to the fraud itself?

Page 101

1     A. No. Not things that I have considered as
2 fraud-related events. When I define something in the
3 report and conclude that it is a fraud-related event,
4 I am not saying that touches upon the fraud; I am
5 saying that is enough of a direct consequence of this
6 bad act of backdating that it should be considered
7 part of the fraud. It is such an obvious and direct
8 consequence that you are going to screw up all of your
9 accounting records that are issued with the SEC under
10 penalties of fraud, that it doesn't make sense to not
11 call the accounting improprieties part of the fraud.
12 You have to call that part of the fraud for purposes
13 of Dura, and I think even defense lawyers recognize
14 that. And then they argue about, okay, well, what
15 about the fact that you had to do an investigation?
16 What about those cash costs? Is that a direct
17 consequence?
18     Here is an example of something that
19 touches upon the fraud, but is a consequence of the
20 fraud: Mr. Gifford's health problems. I am sure if
21 you went to him back when he was alive and talked to
22 his doctor and talked to his friends and stuff, they
23 would say that his health problems were maybe not
24 directly caused by the fraud, but they were
25 exacerbated by the fraud and by the consequences of

Page 102

1  the fraud.
2      Well, is that part of the damages under
3  Dura, no. That is a consequence of the fraud, but it
4  is not something that is directly foreseeable. It is
5  not something that is such a direct natural
6  consequence that you should consider it as a part of
7  the fraud for purposes of Dura.
8      Q. So your definition or what you would
9  include in the fraud as opposed to the Supreme Court
10 language of "touch upon" is any consequence that is
11 foreseeable and caused by the fraud would not be
12 something that just touches upon, but which would be
13 actually part of the fraud? Is that your view?
14     A. Well, it is not in contradiction of the
15 Supreme Court. I think that is exactly what they
16 meant.
17     Q. What do you base that on, just your
18 interpretation of the decision?
19     A. Yes. My reading of it and using my common
20 sense.
21     Q. What about delisting and whether --
22 disclosures going to potential or actual delisting?
23 Is that something that you viewed to be a consequence
24 as well?
25     A. Yes.
   TSG Reporting - Worldwide    877-702-9580

Page 103

1      Q. Of the alleged fraud?
2      A. Oh, yes.
3      Q. But not something that merely touches
4  upon?
5      A. No, no. It is as direct a consequence as
6  the fact that you screwed up all of your accounting
7  records.
8      Q. And you would also include as a
9  consequence perceptions about disclosure quality,
10 management competence, integrity, those sorts of
11 things that are called into question theoretically by
12 disclosures of an alleged fraud? Do you call that a
13 consequence?
14     A. Not necessarily, no. Depends on the
15 circumstances. That is very fact-specific. But no,
16 not necessarily.
17        For example, you call into question the
18 competence of particular managers, but then the firm
19 lets them go; they are out of the game. You know,
20 they are a casualty of the fraud. But, you know, does
21 the firm continue to suffer problems from its
22 reputation when the managers, the people that did the
23 fraud, are let go and the, quote/unquote, "good guys"
24 are now running the company? It depends on the facts
25 and circumstances.
   TSG Reporting - Worldwide    877-702-9580

Page 104

1      Q. But if you found that perceptions in
2  management integrity, disclosure quality, those sorts
3  of things were impacted by disclosures or caused by
4  what you would characterize as the fraud, you would
5  find that those lead to recoverable damages?
6      A. I just said it depends on the facts and
7  circumstances. Not necessarily.
8      Q. What about in this case?
9      A. I don't see that in this case. I don't
10 see any role for what I have included as a direct
11 consequence, managerial integrity.
12     Q. Because you would agree that perceptions
13 in management integrity and disclosure quality, those
14 aren't -- to the extent that shareholders have
15 negative views of those things is not fraudulent in
16 and of itself?
17     A. It can be, sure. I would think in a lot
18 of backdating cases, yes, it can be. If you are
19 backdating options and knowingly falsifying financial
20 records year after year after year, then -- and given
21 the importance of managerial integrity and credibility
22 to the valuation of a publicly-traded company, then
23 that can easily be a direct consequence.
24        I am just saying in this particular case,
25 I am not aware of any of my disclosure dates relying
   TSG Reporting - Worldwide    877-702-9580

Page 105

1  upon reputation or managerial integrity as being a
2  direct consequence for purposes of loss causation or
3  materiality.
4      Q. And I am trying to parse out views and
5  perceptions about management integrity and disclosure
6  quality and to find out if those perceptions that
7  would lead to a stock price decline are in and of
8  themselves fraudulent or evidence of loss causation,
9  separating it from -- you are bringing in all of the
10 facts of an underlying fraud and I am trying to
11 separate in and of itself.
12     A. I am saying in this particular case I
13 don't think that is an issue, at least with respect to
14 my report. I don't include as part of loss causation
15 or materiality effects -- the managerial reputational
16 effects, or the negative effects on managerial
17 reputation, I am not relying on that, using that,
18 including that, so I don't have to make a judgment
19 about whether it is a real direct consequence in this
20 case or whether it touches upon it.
21        I do note that the company early on let go
22 the three high-ranking officials -- the three
23 highest-ranking officials of the firm that were
24 presumably the ones that did the backdating. Okay.
25 And the stock price of the company went up on that day
   TSG Reporting - Worldwide    877-702-9580

Page 106

1   when they let them go. So, you know, that to me takes
2   care of the managerial reputation issues in this case.
3       Q. You do find in this case that disclosures
4   with respect to delisting, whether potential or
5   actual, help establish or underline your conclusions
6   with respect to loss causation; is that correct?
7       A. Yes. In this case, delisting is a direct
8   consequence of the fraud and the -- and one or two of
9   the corrective disclosures zero in on the fact that
10  the company is likely to be delisted as disclosures
11  about the delisting that I do use as indications of
12  loss causation, correct.
13      Q. But disclosures with respect to actual
14  potential delisting in and of themselves are not
15  disclosures of fraud, are they?
16      A. I don't know what that means. "In and of
17  themselves"?
18      Q. Let me give you a hypothetical.
19      A. Yes.
20      Q. And my guess is it is one you may have
21  heard before.
22          Say you have two companies: Company A and
23  Company B. Both are held 85 percent by institutional
24  shareholders. Company A's institutional -- if at any
25  point you lose me, I can clarify.

TSG Reporting - Worldwide    877-702-9580

Page 107

1   Company A's institution shareholders have
2   a restriction against holding delisted stock; Company
3   B's shareholders have no such restriction.
4           Say that both companies are delinquent in
5   their SEC filing for the exact same reason and are
6   delisted on the exact same day. Company A's
7   shareholders, who can't hold the stock through a
8   delisting, sell and the stock price goes down
9   significantly. Company B's shareholders can hold and
10  the stock price stays the same.
11          Should Company A be liable for that
12  decline?
13      A. Well, I don't know.
14      Q. What would you need to know?
15      A. I don't know. I don't know. It is a
16  legal question.
17      Q. And you are not opining on any legal
18  questions?
19      A. No.
20      Q. You also talk in the article about
21  institutional trading more generally, and I know we
22  just talked about --
23      A. In the article --
24      Q. In the Bernile article.
25      A. Yes.

TSG Reporting - Worldwide    877-702-9580

Page 108

1       Q. Did you do any articles on institutional
2   trading in Maxim common stock here?
3       A. Yes.
4       Q. And what did you find in that analysis?
5       A. Throughout the class period, institutions
6   had a very large fraction of the stock of Maxim.
7       Q. Do you have a view as to whether any of
8   the stock drops that you discuss in your report were
9   the result of sell-offs by institutional traders?
10      A. I don't know how to make sense of that
11  statement. That is -- stock drops due to sell-offs by
12  institutional shareholders, in and of itself a bunch
13  of institutional shareholders selling the company
14  doesn't create a stock drop, because there are other
15  people on the other side buying the company. So I
16  don't get that.
17      Q. Say Maxim finally comes out and says it is
18  delisted or the news hits the market it has been
19  delisted.
20      A. Right.
21      Q. At that point you potentially have forced
22  selling by institutions.
23      A. Let's assume that -- let's assume that
24  there is some institutions that absolutely have to get
25  rid of it?

TSG Reporting - Worldwide    877-702-9580

Page 109

1       Q. Yes.
2       A. Yes. But that doesn't cause the stock
3   price to fall, not perceptibly. Why would that cause
4   the stock price to fall? Suppose the thing that
5   caused them to have to get rid of it was associated
6   with a positive event for the value of the company?
7       Q. For example?
8       A. Suppose that -- well, suppose they had to
9   get rid of it because they are not allowed to own
10  companies that are involved in a particular foreign
11  land. I'm just making stuff up; it is hypothetical.
12          Okay, you are not allowed to hold it
13  because the holding -- because the holding -- they
14  have assets in a country that the United States has
15  just decided to sanction, and you are not allowed to
16  hold those. But the assets in those countries that
17  you are entering are very profitable.
18          So, you know, it is the information that
19  causes the stock price to go up or down; it is not
20  whether or not some institutions have to get out of
21  the stock or don't have to get out of the stock.
22      Q. Your example is potentially a one-off-type
23  situation, right? It is not going to be common to all
24  institutional holders, they can't hold when you invest
25  in a foreign country.

TSG Reporting - Worldwide    877-702-9580

## Page 110

1  A. I don't know. I mean, I could come up
2  with other hypotheticals. I am just challenging your
3  notion that telling -- telling an economist that there
4  is a restriction -- that a company bumps into a
5  restriction and now institutional shareholders can't
6  hold the stock, okay, that is not enough to say
7  therefore the stock price would decline. That is not
8  enough.
9      The value of the company is the value of
10 the company is the value of the company, regardless of
11 who owns it. And the fact that the ownership changes
12 hands doesn't change the value of the company. The
13 value of the company changes simultaneously with
14 people changing hands, but that is because of the
15 information.
16     Q. Is it your view that for a company like
17 Maxim that is 80-plus percent held by institutions --
18 and you understand that is, in fact, the case?
19     A. Let me just check.
20     Q. Okay.
21     A. Yes, it is like 90 percent throughout most
22 of the class period, until you get to the end of '07
23 calendar year, 12/31/07, and then it drops to -- on
24 this document; I am looking at Exhibit 5 -- and then
25 it drops to 42 percent. So that is what you are

TSG Reporting - Worldwide   877-702-9580

## Page 111

1  talking about.
2      Q. Yes.
3      A. Will a decline in the institutional
4  holdings from 90 percent to 42 percent in and of
5  itself, no other information about the company, cause
6  its value to change.
7      If they had to all rush to the door at the
8  same time, all get rid of the stock at the same time,
9  I would predict a temporary decline in the value of
10 the stock, okay, because of the liquidity problem.
11 All the shareholders are going to the market at the
12 same time, trying to dump shares in a particular
13 security. Given the value of the company, that will
14 cause the stock price of the company to decrease by a
15 certain amount, but it will be temporary because by
16 definition, the value of the company hasn't been
17 changed, so that is a liquidity issue.
18     So, yes, I think that is reasonable to say
19 that if overnight a company that has 90 percent
20 institutional ownership has to go from 90 percent to
21 40 percent, yes, that will cause a stock price
22 decline, but it will be temporary by definition
23 because it is liquidity.
24     Q. And is that decline sufficient to show
25 loss causation?

TSG Reporting - Worldwide   877-702-9580

## Page 112

1      MR. GALDSTON: Object to the form of the
2  question.
3      A. By definition, I am -- by definition, the
4  way I am talking about the problem, no, because the
5  value of the company has not fundamentally been
6  changed. Just because the shareholders have to get
7  out, that doesn't change the value of the company.
8      So, no, that wouldn't be loss causation;
9  that would be a temporary decline on the company as
10 they all race to the door, "temporary" meaning a day,
11 so I would expect the stock price to go down
12 4 percent, next day up 4 percent.
13     Q. If you lost, say -- based on just those
14 numbers -- 50 percent of your institutional holders?
15     A. Yes. Down 4 percent -- I am making up --
16 I mean, 4 percent, 3 percent, 5 percent, I don't know,
17 but down enough so you notice it, because by
18 definition we have a huge number of shareholders
19 heading for the door on the same day.
20     So it has to give, because of liquidity
21 problems. In a very efficient market the size of this
22 company, it doesn't have to give that much. It
23 doesn't have to give that much, and whatever it gives,
24 it is not going to give it for that long.
25     So my estimation as an economist sitting

TSG Reporting - Worldwide   877-702-9580

## Page 113

1  here would be the stock price would decline somewhere
2  between 3 and 5 percent on the day they had to get
3  out, and then it would quickly recover. Because by
4  definition, the value of the company is still the
5  same.
6      Q. Did you do any analysis on the recovery in
7  the stock in the relatively near future after these
8  announcements where -- which might have caused forced
9  selling by the institutional shareholders?
10     MR. GALDSTON: Object to the form of the
11 question; vague as to which announcements.
12     A. I looked at stock price returns on the
13 days around the days of the corrective disclosures, if
14 that is your question, yes.
15     Q. And did you -- did your measure the
16 recovery in the stock price? For how long a period
17 did you measure the recovery in the stock price after
18 the date --
19     A. I was just looking at the next day.
20     Q. So to the extent that you lost
21 50 percent -- and I am just using these numbers;
22 obviously we can get the real numbers.
23     If you lost 50 percent of your
24 institutional holders in one day, wouldn't it be
25 appropriate to not only look at the next day, but to

TSG Reporting - Worldwide   877-702-9580

Page 114

1  look at the day after that and the day after that?
2      A. No. No. There is no -- the liquidity
3  problem is going to be temporary. A day is plenty.
4      Q. Okay. Well, what about the fact here --
5      A. We are talking about a hypothetical here.
6  We are talking about a hypothetical where a company
7  loses half of its institutional investors all at the
8  same time suddenly, in one day, and by definition the
9  value of the company is unchanged. That is the
10 hypothetical.
11     Q. But here we are also talking about a
12 delisting, right?
13     A. I don't know what we are talking about
14 here. I don't have any idea what you are talking
15 about here. I mean, I have a feeling I know what you
16 are talking about here, because we have an analyst
17 talking about institutions having to leave and we have
18 institutions leaving.
19     But I have -- so far, nothing I have said
20 has -- I am not talking about Maxim. So far
21 everything I have said has to do with hypotheticals.
22     If you want to ask me a specific question
23 about Maxim on this issue, I am happy to answer it.
24 But so far we don't have a day, we don't have a
25 disclosure, we don't have anything specific with

TSG Reporting - Worldwide    877-702-9580

Page 115

1  regard to Maxim; we are just talking in the abstract
2  and you are asking me questions as an economist, and I
3  am answering them in the context of this hypothetical.
4      Q. And I appreciate that. And we are talking
5  a little bit in the abstract, and we will get into the
6  specific dates. But I just want to confirm, if you
7  lose the bulk of your institutional holders in a
8  single day as a result of delisting, do you agree that
9  that would cause the stock price decline on that day?
10     A. Yes. I don't care why they headed for the
11 door. If half of your shareholders -- for all
12 practical purposes, all of the shareholders are
13 institutions, let's assume, and if half of your
14 shareholders have to go sell the stock in one day,
15 okay, typically, for a typical firm, that is a very
16 large fraction of the flow to turn over in one day.
17     By definition, then, I would expect as an
18 economist in an efficient market, the stock price
19 would have to decline by an amount that you would
20 notice, a perceptible amount, to handle the liquidity
21 problem. But that by definition, because the value of
22 the company is unchanged, whatever it was that caused
23 the institutions to head to the door doesn't change
24 the value of the company; that that decline in stock
25 price would be very temporary, so it would spring back

TSG Reporting - Worldwide    877-702-9580

Page 116

1  again literally the next day by that same amount.
2      Q. What about if the next day, the stock is
3  no longer listed on an exchange?
4      A. Well, then it can't bounce back.
5      Q. So here -- and again we are still talking
6  hypothetically -- if you had forced selling because of
7  a delisting by institutional holders, you agree that
8  that could cause a stock price decline?
9      A. Temporarily due to liquidity, yes. Again,
10 in a real case, the delisting could reduce the value
11 of the company in and of its own right. What you want
12 me to focus on here, and what I am focusing on, is the
13 pure liquidity aspects of all of the institutions
14 selling for legal reasons, not because the value of
15 the company has changed.
16     So under that setting -- as I have said
17 now eight times -- the stock price will decline on the
18 day which they have to sell, but then very shortly
19 thereafter, within hours or at most another day, the
20 stock will come back, as other investors who are not
21 so constrained will want to pick up that cheap -- that
22 easy 4 percent return that they are looking at for
23 buying the stock. Because it went down 4 percent,
24 let's say, because everybody headed for the door, but
25 then all of the other investors in the world who are

TSG Reporting - Worldwide    877-702-9580

Page 117

1  not so constrained because the value of the company is
2  unchanged, it is a bargain. So I can pick up an
3  additional 4 percent just by going in and buying that
4  stock.
5      If the value of the company has been
6  fundamentally changed, then I would expect it to go
7  down and stay down.
8      Q. And really -- and I apologize if I am
9  asking this a few times, but really what I am looking
10 for -- and I understand your opinion as to what would
11 happen subsequently, but all I want now is a yes or
12 no -- if institutional traders, institutional holders
13 are forced out of the stock by a delisting, will the
14 stock go down that day?
15     MR. GALDSTON: Objection; the question has
16 been asked now and answered eight times.
17     MR. AMSEL: I still haven't gotten a yes
18 or a no.
19     MR. GALDSTON: It doesn't mean it hasn't
20 been answered. It has been asked and answered.
21     A. It would both go down and back up again.
22     Q. And that decline, I think you have already
23 testified, if it was due to the forced selling by the
24 delisting, would not show loss causation?
25     MR. GALDSTON: Object to the form of the

TSG Reporting - Worldwide    877-702-9580

Page 118

1  question.
2  A. No.
3  Q. Is that correct?
4  A. No, no. Pure liquidity effects do not --
5  do not constitute loss causation, okay? So if I
6  measure a pure liquidity effect, I am not going to use
7  that as part of loss causation. Loss causation has to
8  cause losses to investors due to some fundamental
9  change in the value of the company.
10  Q. If you were to find here that any of the
11  decline in Maxim stock price was due to institutional
12  holders selling because they cannot hold delisted
13  stock, then you would agree that that decline would
14  not show a change in the company's underlying
15  valuation; it would not show loss causation?
16  A. No, I don't agree. I don't agree. I
17  don't know that it is due to liquidity. If the
18  company is being delisted and that is why the
19  institutions are heading for the doors, because of the
20  delisting, then you can't assume that the value of the
21  company has been unaffected.
22  Q. Why not?
23  A. Because it is being delisted.
24  Q. Explain to me how the delisting affects
25  the company's value, underlying value.

TSG Reporting - Worldwide    877-702-9580

Page 119

1  A. It increases your cost of capital. The
2  reason why people pay money to list on a good exchange
3  is because the other exchange they would be on results
4  in a higher cost of capital. The company is not as
5  liquid, not as valuable to investors as you would be
6  if you were traded on a more active exchange.
7  Q. Did you do any analysis to determine
8  whether any of the stock declines that you measure --
9  in this case speaking specifically of Maxim -- were
10  caused at least in part by forced selling by
11  institutional holders?
12  A. I don't think that that is responsible for
13  the declines in Maxim that are associated with the
14  delisting, no.
15  Q. But if you were to find that they were --
16  again, I am just trying to understand. If Maxim's
17  institutional holders had to leave the stock because
18  the company was delisted, based on what you know about
19  this case, would that forced selling show loss
20  causation?
21  A. No. First off, I am saying that I do not
22  agree that forced institutional selling in and of
23  itself has caused any stock price impacts on Maxim. I
24  am saying it is the delisting itself that causes the
25  stock price effects.

TSG Reporting - Worldwide    877-702-9580

Page 120

1  If I had convinced myself that there were
2  no valuation consequences of delisting or anything
3  else and that the stock price effects that I am
4  measuring are temporary liquidity effects, I would not
5  use that as loss causation, whether it is delisting or
6  anything. It's just -- okay?
7  So those are the two answers that I am
8  trying to -- that I am trying to give you. So in this
9  case with respect to Maxim, the stock price declined
10  because of the delisting, and that decreases the value
11  of the company to investors, period.
12  Also, as a result of the delisting, that
13  creates problems and some institutions can no longer
14  hold the stock. That did not create a perceptible --
15  that is not incorporated in my opinion of loss
16  causation; that's not what I am relying on, that's not
17  what I am using. And I am using the fact that the
18  company lost its value.
19  Q. But you also find -- and tell me if I am
20  wrong -- you conclude in the report that Maxim still
21  traded in an efficient market even after its
22  delisting, correct?
23  A. Yes.
24  Q. So what was the effect on shareholder
25  value, on company value, as a result of the delisting?

TSG Reporting - Worldwide    877-702-9580

Page 121

1  I think you explained already that the delisting
2  changed, you know, liquidity and had other impacts on
3  the company value.
4  A. It is a pretty well-known academic finding
5  that when you get delisted, that your stock price is
6  going to decline, because your stock is not as
7  valuable to investors. It gives you a higher cost of
8  capital.
9  So it's an efficient market, but it is not
10  as desirable, it is not as good for your employees, it
11  is not as good for your company. And notice what
12  Maxim did: As soon as they could, they listed back on
13  NASDAQ.
14  Q. Just to close the loop, to go back to
15  where we started with that discussion, which is
16  somewhat a little bit more in the conceptual, I
17  believe you said -- and I just want to confirm -- that
18  to the extent the company was no longer listed after a
19  delisting, that you wouldn't have the bounceback that
20  you expect there to be based on effects on liquidity
21  by forced selling?
22  MR. GALDSTON: Object to the form of the
23  question; it misstates the prior testimony.
24  A. I think the economic -- the liquidity
25  effects are by definition temporary effects. So if

TSG Reporting - Worldwide    877-702-9580

## Page 122

something goes down because of liquidity, then you do expect a bounceback, an equal -- an equal and immediate bounceback. So that is how liquidity shows itself in the data; down and then back up. Maybe within the day, maybe over two days, but down and then back up.

Q. But if that changes the delisting, where the stock is no longer listed, no longer traded -- but if that drop -- let me strike that and I'll rephrase.

To the extent that that decline and the liquidity issues that result in a stock drop is the result of a delisting, after which the stock is no longer traded, you wouldn't have that bounceback effect the next day or whenever it would be?

MR. GALDSTON: Object to the form of the question.

A. If I understand the question, by definition you can't measure the bounceback if it is not traded. You said the next day it is not traded?

Q. Correct.

A. I can't measure a bounceback if it is not traded.

MR. AMSEL: This is probably a convenient time to break for lunch.

(The proceeding recessed at 12:13 p.m.)

TSG Reporting - Worldwide 877-702-9580

## Page 123

(The proceeding reconvened at 12:19 p.m.; appearances as before noted.)

GREGG A. JARRELL, PH.D., resumes;

EXAMINATION BY MR. AMSEL CONTINUING:

Q. Now I would like to dig in a little more specifically on Maxim and get away from the more conceptual discussion, okay?

A. Okay.

Q. Specifically, your opinion on loss causation and materiality, which is essentially embedded in the same conclusion.

And in that analysis -- and if you look, you know, in paragraph 2C, but then it's -- it obviously only goes in much more detail in the back -- focuses on five disclosure dates. Those are May 22, 2006, September 8, 2006, August 28, 2007, October 1, 2007, and January 17, 2008; is that correct?

A. Correct.

Q. How did you pick those dates?

A. Well, these dates are from the Complaint, so it is dates that are from the Complaint that have a negative statistically-significant stock price impact upon their disclosure.

Q. So just so I understand how you --

A. That I considered to be fraud-related. So

TSG Reporting - Worldwide 877-702-9580

## Page 124

fraud-related from the Complaint, statistically-significant negative stock price reaction. I think that would be the way to define where the dates came from.

Q. And for purposes of arriving at those five days, did you start with the quantitative or did you start with the qualitative?

A. No, I --

Q. And by that, just so I am clear, did you evaluate the news and then test the statistical significance or did you test the significance first?

A. Well, you test the statistical significance on each and every day, whether there is news or not. That is just a statistical run that gives you the T statistics each and every day.

The dates themselves literally come from the Complaint. So every date that is in the Complaint, then you take the date that is in the Complaint and go over and look at the news -- or look at the stock return.

If it is statistically significant and negative, then it is discussed. If it is in the Complaint but it is not statistically significant, or it is positive, then it is not discussed; it is not eligible for my discussion of loss causation.

TSG Reporting - Worldwide 877-702-9580

## Page 125

So it is not -- it is not every story that I would use for damage calculation. I haven't decided whether to use these stories for damage calculations; I haven't decided whether to use other days. I mean, so it is only for loss causation. And so for that purpose, I just used the dates from the Complaint; I just started with those and then looked at the stock returns, examined the news stories and convinced myself that, okay, these are fraud-related and they are negative and statistically significant, and therefore they caused losses to investors.

And at this stage of the work in the case, you know, that was my -- that was my objective, was to reach a conclusion on whether or not there were losses; not on accurately measuring all of the losses.

Q. Are you familiar with the concept of multiple comparisons?

A. You would have to define that for me.

Q. Using an analysis that heightens your -- heightens your criteria for statistical significance based on the fact that you are testing multiple dates.

A. Are you talking about the Bonferroni effect? Yes, I do know all about that.

Q. And just so I am clear we are talking about the same thing, can you describe the Bonferroni

TSG Reporting - Worldwide 877-702-9580

Page 126

1  effect?
2      A. Sure. Let's say that I -- let's say that
3  I prespecify five disclosure dates, okay? And I ask
4  the question -- and I compute a T statistic for each
5  of those five, and I learn from my T statistic for
6  each of the five that each one of the five days has a
7  statistically-significant loss at the 95 percent
8  confidence level.
9      Now, if I ask the question ahead of
10 time -- if I look at one of the dates and I ask the
11 question what are the odds, what are the odds that one
12 of these dates has a negative
13 statistically-significant stock price decline, the
14 odds that one of them has a negative
15 statistically-significant stock price decline is not
16 accurately given to me by that T statistic because I
17 have multiple shots at finding a negative
18 statistically-significant effect.
19     Okay, so put differently, the odds of a
20 type 1 error are not 5 percent, the odds of a type 1
21 error are much higher than the odds of 5 percent -- or
22 type 2 error -- or type 1 error are much higher than
23 the odds -- type 1 error are much higher than the odds
24 of 5 percent. The odds of a type 1 error are much
25 higher than 5 percent.

TSG Reporting - Worldwide   877-702-9580

Page 127

1      95 percent means that, okay, I have a
2  95 percent chance that I am right, but there is a
3  5 percent chance that due to randomness, I have come
4  to the wrong conclusion when I conclude that that is
5  negative and significant, and that is wrong; it is
6  really zero.
7      That holds for any one of these days. Any
8  one of these days that T statistic tells me accurately
9  that on that particular day for that particular
10 disclosure, it is significant at the 95 percent level.
11 So I have less than a 5 percent chance of being wrong
12 when I ask the question with respect to any given day.
13     But if I ask the question what are the
14 odds that one of the five days is negative, okay,
15 well, I have a much higher chance of 5 percent of
16 being wrong because I have multiple experiments; I
17 have many shots at answering that question.
18     And the more days you have -- and that
19 requires a Bonferroni correction. Bonferroni is the
20 guy who wrote the article that says, okay, how could
21 you adjust your T statistic for that one disclosure to
22 accurately reflect the answer to the question what are
23 the odds that any one of the days is statistically
24 negative or significant.
25     So the point about multiple comparisons is

TSG Reporting - Worldwide   877-702-9580

Page 128

1  there's a fundamental difference -- of multiple
2  comparisons, to use your phrase, is there is a
3  difference between asking a question of statistical
4  significance with respect to one day each and every
5  given day versus asking a question of statistical
6  significance in the form of one of many days; what are
7  the odds that one of 10, 1 of 6, one of 20. And the
8  more days -- in that second form of question, the more
9  days that you have in mind, the greater is the
10 importance of the Bonferroni correction.
11     Now, none of this has anything to do with
12 securities fraud. That is -- because in securities
13 fraud, all you are ever asking is what are the odds on
14 this day that this disclosure is negatively
15 statistically significant, and there is no Bonferroni
16 correction required, of course, for that question.
17     So this whole thing about Bonferroni and
18 securities fraud is based on a misconception about
19 what the question is. Nobody in securities fraud is
20 asking the question what are the odds that one day of
21 these 20 preselected days is negatively significant.
22 No one is asking that question.
23     You are asking the question for each and
24 every artificial disclosure day, each and every one of
25 them. And for that question, which is what we all do,

TSG Reporting - Worldwide   877-702-9580

Page 129

1  there is no Bonferroni correction required.
2      Q. Is it fair to say that you did not make a
3  Bonferroni correction --
4      A. Exactly.
5      Q. -- here?
6      A. Exactly. Nor is it -- nor would it be
7  correct to do so. Because I didn't ask -- if I asked
8  the question what are the odds that any one of those
9  five days is statistically significant and negative,
10 okay, then that is a different question and I would
11 have to introduce Bonferroni to answer that question.
12     But if I say what are the odds that
13 May 22, 2006 is negatively significant, I am good; no
14 Bonferroni, I used the T statistic, I am fine. And
15 that is the question you are always asking in
16 securities fraud; no one is ever asking the other
17 question. It is a red herring.
18     Q. So for the five days you picked as your
19 measurement dates, are those corrective disclosure
20 dates?
21     A. Yes, in my judgment they are.
22     Q. And what did they correct?
23     A. They corrected the fraud or the direct
24 consequences of the fraud. They put -- they built
25 into the market price the fraud and/or the direct

TSG Reporting - Worldwide   877-702-9580

Page 130

1  consequences of the fraud, depending upon how you want
2  to define the fraud, versus the consequences of the
3  fraud.
4     Q. Isn't it true that they didn't correct the
5  consequences; they disclosed or announced the
6  consequences?
7     MR. GALDSTON: Object to the form of the
8  question.
9     A. Oh, okay.
10    Q. Wouldn't you agree that there is a
11 difference between a company stating that it has been
12 delisted versus a company coming out and saying, "We
13 backdated stock options, we have to restate our
14 financial statements, don't rely on them"? There is a
15 difference in those types of disclosures?
16    A. The words are different.
17    Q. But as far as whether they correct --
18 quote/unquote, "correct" the fraud, there is a
19 difference. The one about delisting doesn't correct
20 the fraud; it just discloses that the company has been
21 delisted.
22    MR. GALDSTON: Object to the form of the
23 question.
24    Q. Is that correct?
25    A. It is semantics. It is semantics. It is

TSG Reporting - Worldwide   877-702-9580

Page 131

1  what it is. The market is learning that you are not
2  going -- you are not going to get all these accounting
3  things done in time. Why? Because you backdated
4  stock options and you did it for so many options in so
5  many years that you are not going to be able to fix
6  it. There is absolutely no other reason this company
7  got delisted. There is not another competing reason
8  this company got delisted.
9     So when the company gets delisted and that
10 causes a decrease in the value of the company, then I
11 call that a correction of the fraud. If you want to
12 call that evidence of the losses caused by the fraud,
13 that is fine, too. We call them corrective
14 disclosures simply because the economic impact of the
15 loss is to make the stock price more accurate in light
16 of the fact that there is the fraud.
17    Q. But ultimately whether or not something is
18 a corrective disclosure, that is ultimately a legal
19 question?
20    A. Yes, I think obviously the finder of fact
21 is going to be the one that ultimately decides whether
22 it is -- whether this one is or that one is, whether
23 any of them are or whether all of them are. That is
24 going to be the judge or the jury or whatever.
25    Q. I asked you this earlier, but I want to

TSG Reporting - Worldwide   877-702-9580

Page 132

1  spend a few more minutes on it, whether you assessed
2  the appropriateness of using those dates in light of
3  the decision on the Defendants' Motions to Dismiss in
4  this case. And I believe you testified that you did
5  not evaluate that decision in picking your dates and
6  coming to your opinions?
7     A. Correct.
8     MR. AMSEL: I would like to mark that
9  decision as Exhibit 25, I believe we are up to.
10    (The following exhibit was marked for
11    identification: Number 25.)
12    Q. Professor, I believe you said you reviewed
13 this to some degree in the past, but I will represent
14 to you that this is Judge Ware's decision issued on
15 July 16, 2009 on the defendants' various Motions to
16 Dismiss. And I would be more than happy to give you a
17 couple minutes to scan it over if you feel the need,
18 but I am going to direct you specifically to some
19 language in it.
20    A. You can direct.
21    Q. If you turn to page 8.
22    A. Okay.
23    Q. Really 8 into 9.
24    A. Okay.
25    Q. Starting on the bottom of 8, there is the

TSG Reporting - Worldwide   877-702-9580

Page 133

1  start of a recitation of various disclosures which the
2  judge characterizes as pre-January 31, 2007 corrective
3  disclosures.
4     A. Yes.
5     Q. There is some bullet points at the bottom
6  of the page that start with May 22, 2006, and that is
7  one of the dates that you use in your report; correct?
8     A. Correct.
9     Q. If you turn to the next page, there is a
10 series of additional bullet points, one September 7,
11 2006, the second-to-last one. And I believe that is
12 another one of the dates that you use in your report?
13    A. Yes.
14    Q. And after the bullet points are over,
15 there is some text, and Judge Ware wrote, "While each
16 of these disclosures provides notice that Maxim may
17 have elicited backdated stock options, none of them
18 goes beyond speculation."
19    And at the end of that paragraph, before
20 the turnover to page 10, he says, "Such speculative
21 statements are insufficient under Ninth Circuit law."
22    A. Right.
23    MR. GALDSTON: Objection. You may have
24 misspoken. It is "illicitly backdated stock options."
25    MR. AMSEL: I apologize if I did. Let me

TSG Reporting - Worldwide   877-702-9580

## Page 134

1 go back and just redo the language.
2    Q. The first sentence which I had referred
3 to, which is after the bullet points, states that
4 "While each of these disclosures provides notice that
5 Maxim may have illicitly backdated stock options, none
6 of them goes beyond speculation."
7    And he says at the end of that paragraph,
8 "Such speculative statements are insufficient under
9 Ninth Circuit law."
10    And if you flip over onto page 10, before
11 he gets to subpart B, Judge Ware writes, "Accordingly,
12 the Court grants Defendant Maxim's Motion to Dismiss
13 as to Maxim's alleged pre-January 31, 2007
14 disclosures."
15    Isn't it fair to say that two of the dates
16 you use, the May 2006 and September 2007 dates -- 2006
17 date, excuse me -- were both dismissed by Judge Ware?
18    MR. GALDSTON: Object to the form of the
19 question.
20    I also want to make sure you have had
21 enough time to review the document to put the context
22 to your satisfaction.
23    A. I think I can answer the question by just
24 looking at page 10, line 11 and 12.
25    Q. Okay.

TSG Reporting - Worldwide   877-702-9580

## Page 135

1    A. You are just telling me that sentence.
2 "The Court grants Defendant Maxim's Motion to Dismiss"
3 these disclosures, including all of those bullet
4 pointed disclosures.
5    Q. Correct.
6    A. So the answer is yes.
7    Q. So is it fair to say that your discussion
8 of those dates in this report, that those issues have
9 already been resolved by the Court?
10    MR. GALDSTON: Object to the form of the
11 question; calls for a legal conclusion.
12    A. I don't know. I mean, it is up to the
13 lawyers. But it seems to me that there is an appeals
14 process, and that other fact-finders might disagree
15 and reverse this. I don't think this is over.
16    Q. Based on this decision here, you
17 understand this decision as saying those two dates are
18 now out of this case?
19    MR. GALDSTON: Same objection; asked and
20 answered three times.
21    A. It says what it says. He is saying that
22 they are out, and if he has the final word, then they
23 are out. If some other court is going to reconsider
24 this, then we don't know; I don't know. And so that
25 is really all.

TSG Reporting - Worldwide   877-702-9580

## Page 136

1    Q. But you did not assess the appropriateness
2 of using those two dates in light of this decision; is
3 that fair?
4    A. I was aware that there was a decision. I
5 was aware -- at one point I read the decision, but I
6 didn't -- I didn't draw conclusions about my work
7 based on this decision, okay. So I made an
8 independent judgment -- there were a lot of dates he
9 listed that I don't use, so obviously I am making an
10 independent judgment, independent from the one that
11 the judge made, and I came to a different conclusion.
12 I mean, for -- he says that May 22nd is speculative --
13 excuse me -- May 22nd is speculative and -- I mean,
14 the odds, if you look at this -- the Merrill Lynch
15 report and you look at the work that people were doing
16 on backdating and the statistical work that was done
17 and the statistical work that we did in Bernile and
18 Jarrell, when you look at the --
19    MR. SELVERS: Is there a question pending?
20 Objection.
21    MR. GALDSTON: Excuse me, Professor.
22 Please proceed, respond and finish your answer.
23    A. When you look at that type of statistical
24 analysis --
25    MR. GALDSTON: Allow the witness to finish

TSG Reporting - Worldwide   877-702-9580

## Page 137

1 his answer.
2    MR. SELVERS: I just want to know what the
3 question was.
4    MR. GALDSTON: Wait until he has finished
5 his answer and you can ask for the question to be read
6 back.
7    A. I don't understand how the judge -- and I
8 would be happy to talk to the judge -- but the notion
9 that it is speculative seems inconsistent with the
10 statistical odds that the grant dates were picked
11 randomly for these types of companies.
12    I mean, the odds that are -- that these
13 grant dates are picked randomly, given the exercise
14 prices that were announced in relation to the actual
15 stock price patterns, those odds are of the same --
16 are even larger odds than people have in these
17 forensic cases involving DNA. DNA is considered to
18 be -- DNA is considered to be proof positive in a
19 court of law, but it is not positive; there is some
20 chance that that is somebody else's DNA. It is one in
21 100 million, are the numbers that are thrown around;
22 one in 200 million.
23    The odds that these grant dates are picked
24 randomly are odds that are much larger than that, so
25 how a judge could consider DNA evidence -- maybe he

TSG Reporting - Worldwide   877-702-9580

**Page 138**

1  considers that speculative -- but how a judge could
2  consider DNA evidence to not be speculative and yet
3  consider a statistical analysis where the odds that
4  there is not something fishy going on is one in
5  billions as speculative struck me -- I didn't
6  understand that. I am not saying that the judge can't
7  explain it. I am saying when I read this, I didn't
8  understand that. That doesn't seem speculative to me.
9       MR. SELVERS: What was the question?
10      (The reporter read the requested material.)
11      Q. Can I get a "yes" or "no" to that
12  question?
13      MR. GALDSTON: Objection; asked and
14  answered.
15      MR. SELVERS: With all due respect, there
16  was no answer to that question.
17      MR. GALDSTON: It has been asked. It was
18  asked at the outset of the deposition and Professor
19  Jarrell answered. It was asked again and Professor
20  Jarrell supplemented that answer, and now we are
21  asking it yet a third time.
22      Q. And I would like the answer.
23      A. The first time that you asked the
24  question, I said I did not factor into my work the
25  work that the Court did. By the fourth time you asked

TSG Reporting - Worldwide    877-702-9580

**Page 139**

1  the question, now you are challenging me and you're
2  saying, "Well, you should have," I mean in sum and
3  substance. Like, "How could you not consider what the
4  judge said in doing your work," okay?
5       Q. I don't know if that is exactly what --
6       A. Well, come on. When you ask the question
7  four or five times, what am I supposed to infer from
8  that?
9       Q. Let me ask it this way: I think suffice
10  it to say that based on the long answer you just gave,
11  that you potentially disagree with what Judge Ware
12  did; is that fair?
13      A. Well, no, that's not even fair either,
14  because the judge is making a legal judgment and the
15  judge has got other -- other things that he is
16  factoring in, that he has to factor in, that are
17  completely outside of my frame of reference. You
18  know, he has other -- he has precedents, okay? I
19  don't know what the precedents are. He has -- he has
20  appeals courts to worry about. He has to try to
21  put the law -- he is doing a legal analysis and I am
22  not, okay?
23      So that is why I say yes to your question
24  when you say, "Did you factor this in," well, yes and
25  no. I mean, I am aware of it, and when I read his, I

TSG Reporting - Worldwide    877-702-9580

**Page 140**

1  am interested in knowing what he thinks, because I am
2  doing an economic analysis and there is a chance that
3  what the judge says would inform that economic
4  analysis.
5       But the reason that he threw -- so then I
6  am answering more specifically your question, "Well,
7  then how come he threw them out and you didn't?" That
8  is what I read your question to be. "How do you get
9  off not throwing them out, Professor Jarrell, when the
10  judge threw them out?"
11      And that is why I gave you the long
12  answer; I am trying to explain there is a difference
13  between the analysis the judge does and the analysis I
14  do. I am not disrespecting the judge, I am not
15  arguing with the judge; I am just saying that as an
16  economist, I see it differently. Speculative to me
17  doesn't make sense. And if it does, then why isn't
18  DNA evidence speculative? That was my answer.
19      And so I didn't go, "Oh, the judge said it
20  is out; therefore economically, as an economist, I
21  have to conclude it is not a corrective disclosure."
22  I came to a different decision.
23      Q. You would agree -- and you have testified
24  to this already -- that the determination of whether
25  or not these dates or any dates in the case are

TSG Reporting - Worldwide    877-702-9580

**Page 141**

1  corrective disclosures is at the end of the day a
2  legal question for the trier of fact, correct?
3       A. Correct.
4       Q. If you turn to the bottom of 11, there is
5  a subsequent discussion, and this is specifically with
6  respect to August 28, 2007, and that is another date
7  you use in your report?
8       A. Yes.
9       Q. And what Judge Ware writes at the end of
10  that paragraph or at the end of the second-to-last
11  line of page 11 is, "Although it can be inferred from
12  the allegations that Maxim's looming delisting may
13  have been connected to the findings of Maxim's Special
14  Committee disclosed on January 31, 2007, Plaintiffs
15  only allege a causal connection between reports of
16  Maxim's potential delisting and a drop in stock price.
17  The allegations do not provide a plausible connection
18  between the revelation of Maxim's fraud on January 31,
19  2007 and the eventual price drop eight months later on
20  August 28, 2007."
21      Do you see that language?
22      A. Yes.
23      Q. To short-circuit so we don't get into
24  another long debate, would this fall into the same
25  camp; that you would disagree with the judge's

TSG Reporting - Worldwide    877-702-9580